UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                      :

In re                                   :           Chapter 11
                                        :

CORPORATE RESOURCE SERVICES, Inc., *et al*.,      :           Case No. 15-12329 (MG)
                                        :

                     Debtors.           :
                                        :

----------------------------------------------------------------------X

**DECLARATION OF SUSAN A. ARBEIT IN SUPPORT OF UNITED
STATES TRUSTEE'S MOTION FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

       I am a Trial Attorney for movant, William K. Harrington, as United States Trustee for

Region 2 ("United States Trustee"). Within this Office, I am responsible for monitoring the

Chapter 11 case of Corporate Resource Services, Inc. ("CRS"), and its affiliated entities

("Debtors") captions above. I make this declaration based on personal knowledge, information

and belief formed from records of the Office of the United States Trustee, kept in the ordinary

course of its business and my personal review of the dockets of these cases on the PACER

information system. If called, I would testify to the following:

**A.       General Background**

       1.       On February 2, 2015, TS Employment, Inc. ("TSE") commenced a voluntary case

under Chapter 11 of the Bankruptcy Code. Case No. 15-10243, ECF Doc. No. 1.

       2.       On February 12, 2015, the United States Trustee filed a Motion for the Entry of

An Order Directing the Appointment of a Chapter 11 Trustee. Id. at ECF Doc. No. 21.

       3.       On February 20, 2015, this Court entered an Order Directing the Appointment of

a Chapter 11 Trustee. Id. at ECF Doc. No. 31.

       4.       On February 27, 2015, after consultation with the parties in interest, the United

States Trustee filed a Notice of the Appointment of James S. Feltman as Chapter 11 Trustee ("Feltman or TSE's Trustee"). Id. at ECF Doc. No. 33.

5.      On July 23, 2015, the Debtors hired J. Scott Victor ("Victor") as their chief restructuring officer. ECF Doc No. 1.

6.      On that same day, the Debtors commenced voluntary cases (the "Petitions") in Delaware under Chapter 11 of the Bankruptcy Code. Id.

7.      On July 27, 2015, TSE's Trustee filed an Application to Transfer Venue of the Debtors' Cases to the Southern District. Case No. 15-10243, ECF Doc. No. 127.

8.      On August 10, 2015, the United States Trustee for Region 3 held an organizational meeting to form an official committee of unsecured creditors in the Debtors' cases. No committee was appointed.

9.      On August 18, 2015, this Court issued a Memorandum Opinion and Order granting TSE's Trustee's Application to Transfer Venue of the Debtors' Cases. Id. at ECF Doc. No. 146.

10.      On August 20, 2015, the Debtors' Board of Directors approved the United States Trustee's request to consent to the appointment of a Chapter 11 trustee.

**B.      The Debtors' Business Operations**

11.      The Debtors' were a diversified technology staffing, recruiting, and consulting firm that provided employment and human resource solutions for corporations. CRS's Annual Report under Section 13 or 15(d) of the Securities Exchange Act of 1934, at 1 (dated Jul. 1, 2014) (the "SEC Annual Report). A true and correct copy of the SEC Annual Report is attached hereto as Exhibit 1.

12.      TSE was a professional employer organization that provided pay-roll services to

1

CRS. Case No. 15-10243, ECF Doc. No. 2 at ¶ 4.

       13.      CRS, one of the Debtors, was a publicly-traded company on the NASDAQ stock exchange. Id.

       14.      Beginning in February 2015, the Debtors engaged in a wind down of operations. ECF Doc. No. 9 at ¶ 7. The Debtors have reduced their staff significantly and currently have approximately five full-time employees, a reduction from approximately 30,000 employees. Id.; Case No. 15-10243, Transcript of Aug. 18, 2015 Hearing ("Transcript") at 31, lines 23-24. A true and correct copy of the Transcript is attached hereto as Exhibit 2.

       15.      On March 20, 2015, CRS was delisted from the NASDAQ stock exchange.

**C.**      **Resignation of CRS' Audit Committee**

       16.      On February 5, 2015, CRS filed a Form 8-K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 ("8K"). A true and correct copy of the 8K is attached hereto as Exhibit 3.

       17.      In the 8K, CRS disclosed that Thomas Clarke, Sylvan Holzer, and Larry Melby, the members of its Audit Committee (the "Audit Committee"), who were also members of the Board of Directors, submitted their resignation as members of the Board of Directors and Audit Committee effective February 5, 2015. Exhibit 3 at 2.

       18.      In each of Audit Committee's resignation letters, it was indicated that the Audit Committee had learned of TSE's unpaid federal payroll tax liability on January 29, 2015 and immediately notified management that it had engaged independent counsel to commence an independent investigation. Exhibit 3 at 4.

       19.      This investigation, however, never took place. In the Audit Committee's resignation letters, it was explained:

… we were advised by Wells Fargo, which has sole control of [CRS]'s financing, that it expressly and unequivocally refuses to provide any funding for the Audit Committee's investigation or to allow any [CRS] funds at all to be used for an investigation. Further, management has advised the Audit Committee that there is no other funding whatsoever available for such investigation. This leaves the Audit Committee paralyzed from taking action, in direct contravention of the well establish [*sic*] legal and policy imperatives applicable to it, including under The Dodd Frank Act, its fiduciary duties to stockholder, and other standards that demand audit committees be assured access to proper advisors and financing to execute their responsibilities.

The foregoing concerns are exacerbated not only by the apparent malfeasance that requires immediate remediation for the benefit of our stockholders, but also by the obvious related party transactions between TSE and [CRS]. We believe the circumstances clearly call for complete independence in immediate investigations. We are additionally concerned that [CRS]'s inexplicable delay in issuing and enforcing a document hold may jeopardize any investigation and invoke the possibility of criminal liability if relevant documents are destroyed.

Nonetheless, all the members of the Audit Committee have been effectively obstructed by the positions of [CRS] and Wells Fargo.

Id. at 4.

## D.    Cassera's Ownership Interests in the Debtors, TSE, and the Tri-State Entities

20.     Robert Cassera ("Cassera") owns 89.7% of the outstanding common stock of

CRS. Exhibit 1 at 7.

21.     CRS owns 100% of each of the remaining Debtors. Id.

22.     Upon information and belief, TSE is wholly-owned by Cassera.

23.     Cassera also has an interest in and/or controls a group of affiliated entities of the

Debtors called the Tri-State entities. Exhibit 1 at 7.

24.     The entities include Tri-State Employment Service Inc.; Carusso Staffing Corp.;

Tri-State Entertainment Production PEO, Inc.; TSE-PEO, Inc.; Justin & Brooks, Inc.; Tri-State

CRM, Inc.; Tri-State Staffing, Inc.; Tri-State Solutions, Inc.; Todays PEO Inc.; TSEFL, Inc.; Tri-

Overload Staffing Inc.; D & D Staffing of New York, Corp.; Tri-Odyssey PEO Inc.; Solutions

H2 Corp.; Tri-State Employment Services Inc.;TS Staffing Corp.; Tri-State Personet Corp.; Tri-

3

Diamond Staffing Inc.; A Temporary Staffing Inc.; STS Group, Inc. True and correct copies of

the most recent annual reports (the "Tri-State Filings) for these entities filed with the Florida

Department of State are attached hereto as Exhibit 4.

25.    According to documents filed by CRS with the SEC, CRS acknowledges that it

has a conflict of interest with Cassera and his Tri-State entities:

> [B]ecause Mr. Cassera and his affiliated companies have the ability to exercise
> significant control over our financing decisions, there can be no assurance that we would
> enforce any rights and claims that we have or may have against these parties relating to
> the transactions.
>
> . . .
>
> The interests of Mr. Cassera and Tri-State could conflict with out interests and the
> interests of our other shareholders.
> . . .
>
> As a result of such ownership, Mr. Cassera has the ability to cause the election of all of
> the members of the Board, appoint new management and approve actions requiring the
> approval of our shareholders, including amending our certificate of incorporation and
> merging us with or into another entity or selling all or substantially all of our assets.
>
> Exhibit 1 at 7.

26.    Due to its status as a "controlled company," CRS was not required to comply with

NASDAQ corporate governance standards:

> Tri-State and its affiliated persons control a majority of our common stock.  As a result,
> we are a "controlled company" within the meaning of the NASDAQ corporate governance
> standards. Under the NASDAQ Marketplace rules, a company of which more than 50% of
> the voting power is held by an individual, group or another company is a "controlled
> company" and have elected not to comply with certain corporate governance
> requirements, including: the requirement that a majority of the Board consists of
> independent directors; the requirement that we have a nominating and corporate
> governance committee that is composed entirely of independent directors; and the
> requirement that we have a compensation committee that is composed entirely of
> independent directors.
>
> Id.

**E.      The Debtors', TSE's, and Tri-State Entities' Common Directors and Officers**

27.      John Messina is an officer and director of CRS and is or was an officer and/or director of at least twelve of the Tri-State entities. See ECF Doc. No. 1 at 7; Exhibit 4 at 1, 3, 5, 11, 13, 15, 23, 27, 35, 37, 39, and 47.

28.      Joseph Cassera[1] is a director of CRS and is or was an officer and/or director of at least one of the Tri-State Entities. See ECF Doc. No. 1 at 7; Exhibit 4 at 3.

29.      James Foley is a director of CRS and is or was an officer and/or director of at least one of the Tri-State Entities. See ECF Doc. No. 1 at 7; Exhibit 4 at 3.

30.      Yolanda Trippiedi was or is an officer or director of TSE and is or was an officer and/or director of at least fourteen of the Tri-State Entities. See 2015 Florida Profit Corporation Annual Report (the "Florida Annual Report"); Exhibit 4 at 1, 3, 5, 11, 15, 20, 23, 25, 27, 29, 35, 37, 39, and 47. A true and correct copy of the Florida Annual Report is attached hereto as Exhibit 5.

**F.      The Relationship between the Debtors, TSE, and the Tri-State Entities**

31.      TSE and the Tri-State entities provided services to CRS for which CRS paid administrative fees. Exhibit 1 at 17.

32.      At least one of the Tri-State entities – Tri-State Employment Services, Inc. - engaged in business directly with the TSE. See Case No. 15-10243, a balance sheet dated December 31, 2014 (the "Balance Sheet"), ECF Doc. No. 2-2.

33.      According to TSE's Balance Sheet filed at the commencement of its case, Tri-State Employment Services, Inc. is owed $1.22 million although the basis of this liability is not stated on the Balance Sheet. See id.

---

[1] Upon information and believe, Joseph Cassera is Cassera's brother.

**G.    The Debtors, TSE, and the Tri-State Entities Were Located in the Same Building and Shared Services**

34.    The Debtors' principal office was, and continues to be, located at 160 Broadway, 13th Floor, New York, New York. ECF Doc. No. 1

35.    TSE's principal place of business was located in the same building, but on the 15th Floor. 15-10243, ECF Doc. No. 2. at ¶4.

36.    The Tri-State entities also operate or did operate out of the same building. Florida. See Exhibit 4.

37.    TSE and the Debtors shared the same employees. See Exhibit 2 at 43, lines 8-9.

**H.    TSE's Tax Obligations**

38.    TSE owes withholding tax obligations to the Internal Revenue Service (the "IRS") and to at least 19 state tax departments or bureaus. See Case No. 15-10243, List of Creditors Holding 20 Largest Unsecured Claims (the "Top 20 List"), ECF Doc. No. 2-1.

39.    The tax obligations arose from TSE's failure to withhold payroll taxes from the 4th quarter of 2013 and the 4th quarter of 2014. Case No. 15-10243, ECF Doc. No. 3 at ¶ 8.

40.    Neither TSE nor the Debtors have provided an explanation for TSE's failure to withhold the payroll taxes.

41.    The debts owed to the IRS may be as high as $100 million. Case No. 15-10243, ECF Doc. No. 2. at ¶ 5.

42.    The debts owed to the states listed on TSE's Top 20 List aggregate $868,487.12. See 15-10243, ECF Doc. No. 2.

43.    CRS, as the employer of individuals whose withholding taxes were not paid, may be responsible for the tax liabilities. Case No. 15-10243, ECF Doc. No. 142 at 2.

44.    Upon information and belief, Cassera and other officers and directors of the Debtor may be personally liable for the unpaid withholding taxes to the IRS.[2]

I declare under penalty of perjury of the laws of the United States and the foregoing is true and correct.

*/s/ Susan A. Arbeit*

---

[2] Section 6672(a) of the Internal Revenue Code provides:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax on the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**
☒ **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the fiscal year ended January 3, 2014**
**OR**
☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the transition period from          to**

**Commission file number 000-30734**



(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **80-0551965** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**160 Broadway, 13th Floor**
**New York, New York 10038**
(Address of principal executive offices)
**(646) 443-2380**
(Registrant's telephone number, including area code)
Securities registered pursuant to Section 12(b) of the Act: **None**
Securities registered pursuant to Section 12(g) of the Act:
**Common Stock, $0.0001 par value**
(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers in response to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller Reporting Company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐ No ☒.

The aggregate market value of the voting and non-voting common equity held by non-affiliates, computed by reference to the last sale price of such stock on July 5, 2013, was $38,401,836 based upon 17,861,319 shares held by non-affiliates. The number of shares of common stock, $0.0001 par value, outstanding as of April 1, 2014 was 157,845,295.

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements in this Annual Report, excluding those statements that relate purely to historical information, may constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 (the "Securities Act"), as amended, and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended. Forward-looking statements include, without limitation, statements relating to plans, objectives, goals, strategies and future events or performance, as well as the assumptions upon which such statements are based. The words "expect", "estimate", "anticipate", "believe", "intend", "project", "strategy", "future", "opportunity", "plan", "may", "should", "will", "would", "will be", "will continue", "will likely result" and similar expressions or phrases are generally intended to identify forward-looking statements. Such statements are based on current expectations and assumptions that are subject to risks and uncertainties, which may cause actual results to differ materially from the forward-looking statements.

The risks discussed in this Annual Report are not intended to represent a complete list of all risks and uncertainties inherent to our business, and we undertake no obligation to update or publicly revise any forward-looking statements, whether as a result of new information, future events or otherwise.

References to the "Company", "CRS", "we", "us" and "our" in this Annual Report refer to Corporate Resource Services, Inc., including its consolidated subsidiaries, unless otherwise indicated or the context otherwise requires.

Beginning in 2012, our operations are on a "52/53-week" fiscal year ending on the Friday closest to December 31 (the "Fiscal Year"). Prior to 2012, our 52/53-week" fiscal year end used to end on the Friday closest to September 30. The differences in our Fiscal Year and between our Fiscal Year and our year end close dates from previous periods are significant. Therefore, the year over year comparisons discussed within relate to the 53 week Fiscal Year ended January 3, 2014 ("Fiscal Year 2013") which began on December 29, 2012 and the 52 week Fiscal Year ended December 28, 2012 ("Fiscal Year 2012") which began on December 31, 2011.

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **PART I** | | **1** |
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 4 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 12 |
| ITEM 2. | PROPERTIES | 12 |
| ITEM 3. | LEGAL PROCEEDINGS | 13 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 13 |
| | | |
| **PART II** | | **14** |
| ITEM 5. | MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES | 14 |
| ITEM 6. | SELECTED FINANCIAL DATA | 15 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 15 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 24 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 25 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 60 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 60 |
| ITEM 9B. | OTHER INFORMATION | 61 |
| | | |
| **PART III** | | **62** |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 62 |
| ITEM 11. | EXECUTIVE COMPENSATION | 67 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 69 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE | 70 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 71 |
| | | |
| **PART IV** | | **73** |
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 73 |
| | | |
| SIGNATURES | | 78 |

Table of Contents

**PART I**

## ITEM 1. BUSINESS

### Overview

Corporate Resource Services, Inc. (together with its consolidated subsidiaries, "Corporate Resource Services", "CRS", the "Company", "we", "us", and "our", unless the context indicates otherwise) is a diversified technology staffing, recruiting, and consulting services firm. We provide cloud-based enterprise applications and hosting services to professional employer organizations ("PEOs") and staffing companies, as well as diversified staffing, recruiting, and consulting services. The Company offers trained employees in the areas of Insurance, Information Technology, Accounting, Legal, Engineering, Science, Healthcare, Life Sciences, Creative Services, Hospitality, Retail, General Business and Light Industrial Work. Our blended staffing solutions are tailored to our customers' needs and can include customized employee pre-training and testing, on-site facilities management, vendor management, risk assessment and management, market analyses and productivity/occupational engineering studies.

Our ability to deliver broad-based solutions provides our customers a "one stop shop" to fulfill their staffing needs from professional services and consulting to clerical and light industrial positions. Depending on the size and complexity of an assignment, we can create an on-site facility for recruiting, training and administration at the customer location. Our recruiters, who generally focus within their area of expertise, have the latest state-of-the-art recruiting resources available to help our customers secure the best candidates available in today's ever changing marketplace.

We offer our services through our wholly-owned subsidiaries, which include the following companies:

- Accountabilities, Inc. ("Accountabilities") provides administrative and light industrial staffing solutions, primarily to our customers in the Western United States;

- Corporate Resource Development, Inc. ("CRD") provides permanent and temporary professional, administrative and clerical solutions to financial services, entertainment, media, advertising, fashion and other companies through locations primarily in the Northeastern United States;

- The CRS Group, Inc. ("CRS Group") provides software and related hosting and technology services through its Summit Software division;

- Diamond Staffing Services Inc. ("Diamond Staffing") provides administrative, light industrial and professional staffing solutions throughout the United States most heavily concentrated in New Jersey, California and New England;

- Flex Recruitment Plus Limited ("FlexPlus") is a staffing and technology business specializing in the placement of temporary, contract and permanent personnel in the United Kingdom. FlexPlus' innovative on-line recruitment platform, i-Integra, enables it to provide complete end-to-end recruitment solutions to its clients;

- Insurance Overload Services, Inc. ("Insurance Overload") provides professional insurance industry staffing solutions for personnel in claims processing, customer services and related fields throughout the United States;

- Integrated Consulting Group, Inc. ("ICG") provides light industrial staffing solutions to our customers in the Northeastern United States;

- TS Staffing Services, Inc. ("TS Staffing") provides temporary placement solutions across a range of administrative and professional fields throughout the United States, most heavily concentrated in California, the Midwestern United States and Florida.

The type and number of services we offer have grown largely through the acquisition of established offices from general staffing companies.

As of January 3, 2014, we operated approximately 250 staffing and on-site facilities throughout the United States and in the United Kingdom and we offer our services to a wide variety of clients in many industries, ranging from sole proprietorships to Fortune 1000 companies.

Table of Contents

**Seasonality**

Our business is seasonal in nature, with demand for our services generally at its highest point during our third and fourth quarters and lowest during our first quarter. This is normally a result of our customers increasing their temporary workforces for the holiday season and then decreasing them soon thereafter. As a result, we typically experience a seasonal decrease in our first quarter revenues compared with fourth quarter revenues.

**Customers**

We have approximately 5,000 customers over a diverse range of businesses and geographies. We are not dependent on any single customer, or limited segment of customers. Our largest single customer accounted for less than 10% of our total revenue in Fiscal Year 2013.

**Governmental Regulation**

Staffing firms are generally subject to one or more of the following types of government regulations: (i) regulation of the employer/employee relationship between a firm and its flexible staff, (ii) registration, licensing, record keeping and reporting requirements, and (iii) substantive limitations on its operations. Staffing firms are the legal employers of their temporary workers. Therefore, staffing firms like us are governed by laws regulating the employer/employee relationship, such as labor laws, wage and hour regulations, tax withholding and reporting, social security or retirement, anti-discrimination and workers' compensation. We do not anticipate that these legal structures and requirements will have a material effect on our growth or prospects.

There are substantial costs to compliance with governmental regulations. We may incur additional costs if we are unable to comply with any required governmental regulations. Increased government regulation in the jurisdictions in which we operate may prohibit or restrict the types of employment services that we currently provide. Future regulations may also require new or additional benefits be paid to our associates or require us to obtain additional licensing to provide employment services.

In conducting our business, we are required to pay a number of payroll and related expenses, including unemployment taxes, workers' compensation and medical insurance, for our personnel. Unemployment insurance premiums paid by employers typically increase during periods of increased levels of unemployment. Workers' compensation costs may increase in the future if states raise benefit levels and expand the amount of allowable claims. In addition, the Patient Protection and Affordable Care Act ("ACA") and the Health Care and Education Reconciliation Act jointly (the "Health Care Reform Laws"), both of which were passed in 2010 and are scheduled to take effect through 2015, require most individuals to have health insurance, and new healthcare requirements may further increase the costs associated with employing temporary workers. Although the Health Care Reform Laws do not mandate that employers offer health insurance, beginning in 2015 tax penalties will be assessed on large employers who do not offer health insurance that meets certain affordability or benefit requirements. Unless modified by regulations or subsequent legislation, providing such additional health insurance benefits to our temporary workers who qualify for coverage under the Health Care Reform Laws, or the payment of tax penalties if such coverage is not offered to workers who qualify, will increase our costs. If we are unable to raise the rates we charge our customers to cover these costs, such increases in costs could materially harm our business.

**Environmental Concerns**

Because we are involved in a service business, federal, state or local laws that regulate the discharge of materials into the environment do not materially impact us.

**Marketing and Sales**

The temporary staffing industry has experienced dramatic growth over the last 20 years as increasing numbers of employers made a structural shift in favor of temporary staffing solutions. According to the American Staffing Association, U.S. temporary staffing sales grew from $17.0 billion in 1990 to $109.2 billion in 2013, outpacing GDP growth by more than 2.5 times, while temporary help employment grew nearly three times as fast as total nonfarm employment over the same period. Among the factors responsible for the shift toward temporary staffing during this period were:

• reduction in costs related to recruiting, training, employee retention and terminations;

• access to specialized pools of skilled labor, often on an immediate basis;

• ability to shift fixed labor costs to a variable staffing model, enabling a business's workforce to expand and contract based on their customer demands;

• reduction in the amount of benefits provided to employees by utilizing non-employee staff; and

2

Table of Contents

- temporary staffing enables companies to focus on their core competencies rather than administrative burdens related to payroll and benefits.

Temporary staffing employment tends to be more cyclical than the overall labor market. During times of economic growth and expansion, temporary staffing is used to respond to increased demand for products or services before a company is ready to hire permanent employees. Conversely, during periods of economic contraction, temporary employees are the first targets of headcount reductions, as companies rationalize employee count amidst decreasing demand.

Temporary staffing is viewed as a coincident economic and leading employment indicator. In the years since the recession that began in 2007, the temporary staffing industry has gained as a critical structural component of the employment market due to the uncertainty surrounding a sustainable economic recovery and legislative concerns, including the Health Care Reform Laws. The American Staffing Association, or ASA, reported that employers hired a total of 11.0 million temporary and contract employees over the course of 2013.

According to the ASA, for the fourth quarter of 2013, "staffing industry payrolls averaged 3.2 million employees per week, up 3.8% from the third quarter and an increase of 6.1% over the fourth quarter of 2012."

We use a variety of channels for marketing our services, promoting our brand and recruiting employee candidates, including:

- company-paid advertising for open positions and the utilization of our proprietary software to identify contingent workers;
- public relations to promote our services including celebrity endorsements;
- our website and leading job boards;
- job fairs and our national recruiting centers;
- directed selling effort through our national sales team; and
- utilization of client and employee referrals.

Each of our regional staffing and recruiting offices maintains sales and recruiting personnel responsible for effectuating our marketing strategy to clients and candidates.

**Competition**

Our staffing, recruiting and consulting services face competition in attracting clients as well as skilled specialized employment candidates. In providing staffing services, we operate in a competitive, fragmented market and compete for clients and candidates with a variety of organizations that offer similar services. Our principal competitors include:

- traditional national, regional, and local staffing firms, some of which dominate in certain markets;
- internet-based staffing firms and their specialized divisions;
- in-house resources of our clients; and
- independent contractors.

We compete for clients on the basis of the quality of employment personnel, the timely availability of personnel with requisite skills, the scope and price of services, the geographic reach of services and the ability to coordinate blended services. These blended services include providing managed services, vendor management services, and cost-per-unit pricing, all of which we believe differentiate ourselves in the marketplace as partnering with our clients to control their labor costs. While some of our competitors have significantly greater financial resources, generate greater revenues and have greater name recognition than we do, we believe we compete favorably with these competitors by delivering superior services. Even while in growth mode, we pride ourselves on maintaining a personal touch with our client base in order to capitalize on long-term client relationships.

While the general temporary staffing industry is highly competitive with few barriers to entry, smaller to midsize firms often struggle in securing workers compensation insurance, capital to secure such insurance coverage, administrative capabilities to manage unemployment claims, and sources of funding accounts receivable. We believe that the majority of our competitors are local, full-service or specialized operations with less than five offices. Within local markets, typically no single company has a dominant share of the market. We also compete for qualified candidates and customers with larger full-service and specialized competitors in local, regional and national markets. Competitors offering general temporary staffing services nationally and similar to ours include divisions of companies such as TrueBlue, On Assignment, Adecco SA, Kelly Services, Inc., Manpower Inc., Remedy Intelligent Staffing, Express Personnel Services, Inc. and Randstad North America. Some of our principal competitors have greater financial, marketing and other resources than we do. In addition, there are a number of medium-sized

3

Table of Contents

firms that compete with us in certain markets, such as regional or specialized markets, where they may have a stronger presence.

We believe that the competitive factors in obtaining and retaining customers include understanding customers' workforce and specific job requirements, providing qualified temporary personnel and permanent placement candidates in a timely manner, monitoring quality of job performance, identifying sustainable methods to reduce overall costs, and pricing of services. We believe that we add value to our customers by allowing our customers the ability to increase their overall financial performance by utilizing our performance-based staffing solutions. We believe that the primary competitive factors in obtaining qualified candidates for temporary employment assignments are wages, benefits and flexibility of work schedules.

### Employees

As of January 3, 2014, we employed approximately 800 full time and part time employees in our operations.  In Fiscal Years 2013 and 2012, we placed approximately 150,000 and 120,000 temporary staff, respectively, with our customers.

### Access to Company Information

We file or furnish annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any related amendments and supplements thereto with the SEC. You may read and copy any materials we file or furnish with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information regarding the Public Reference Room by calling the SEC at 1-800-732-0330. In addition, the SEC maintains an Internet website at
http://www.sec.gov that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC.

In addition, we make available, free of charge, on our website at http://www.crsco.com our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) under the Exchange Act as soon as reasonably practical after we electronically file such material with, or furnish it to, the SEC.

References to our website addressed in this report are provided as a convenience and do not constitute, and should not be viewed as, an incorporation by reference of the information.

### ITEM 1A. RISK FACTORS

Our business involves a number of risks, many of which are beyond our control. The risks and uncertainties described below could individually or collectively have a material adverse effect on our business, assets, profitability or prospects. While these are not the only risks and uncertainties we face, our management believes that the more significant risks and uncertainties are as follows:

**Our working capital requirements are funded in great measure with the proceeds from our accounts purchase agreements which are treated for accounting purposes as a receivables-backed revolving credit line.**

Our subsidiaries, Accountabilities, CRD, Diamond Staffing, ICG, Insurance Overload, and TS Staffing are parties to account purchase agreements with Wells Fargo Capital Finance, an operating division of Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to which a maximum amount of $80.0 million of accounts receivable can be financed through Wells Fargo, or the Facility. The Facility is personally guaranteed by our majority shareholder. The Facility allows for 90% of qualifying receivables to be funded. The Facility calls for twice weekly net settlement of the additions, required repurchases and customer repayments. The risk of bad debt losses on assigned accounts receivables is retained by us and receivables assigned which become greater than 90 days old (120 days for certain categories of receivables), at Wells Fargo's option, can become ineligible for funding. Any increase in accounts receivables older than 90 days and declared ineligible for funding will decrease amounts available for working capital purposes and could have an adverse effect on our liquidity and financial condition. In the event that our majority shareholder ceases to guarantee the Facility, the facility may be closed.

The Facility expires on June 30, 2015. There can be no assurance that we can secure an alternative arrangements and that such arrangement, if any, will not include terms and conditions less favorable to us than under our current accounts receivable sale agreements. If we are unable to secure alternative arrangements, we may be unable to finance our operations and our operations and working capital would be negatively impacted. If we cannot raise sufficient funds, we may have to liquidate our assets, and might realize significantly less than the values at which they are carried on our financial statements and stockholders may lose all or part of their investment in our common stock.

4

Table of Contents

**Our current financing arrangement has restrictive covenants and additional financial conditions.**

The documents that govern our outstanding financing arrangement with Wells Fargo Bank contain customary negative covenants, financial and operating covenants and business terms that, among other things, restrict our ability to incur certain additional indebtedness.

Failure to comply with any of these covenants, including the financial coverage ratios, could cause an event of default under and/or accelerate some or all of our indebtedness, which would have a material adverse effect on us. Furthermore, the documents that govern our outstanding indebtedness contain certain cross-default provisions with respect to specified other indebtedness, giving the lenders the right to declare a default if we are in default under other loans in some circumstances.

**Our management has identified material weaknesses in our internal control over financial reporting which could, if not remediated, result in material misstatements in our future financial statements. We may be unable to develop, implement and maintain appropriate controls in future periods.**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, and the Sarbanes-Oxley Act of 2002 and SEC rules require that our management report annually on the effectiveness of our internal control over financial reporting and our disclosure controls and procedures. Among other things, our management must conduct an assessment of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act. Our management, with the participation of our President and Chief Executive Officer and our Chief Financial Officer, has determined that we have material weaknesses in our internal control over financial reporting as of January 3, 2014 related to our information technology systems as well as an inadequate control environment around the technical knowledge, application and procedures required to assure compliance with generally accepted accounting principles in the United States ("U.S. GAAP").

A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. We are actively engaged in developing and implementing a remediation plan designed to address such material weaknesses. However, additional material weaknesses in our internal control over financial reporting may be identified in the future. Any failure to implement or maintain required new or improved controls, or any difficulties we encounter in their implementation, could result in additional material weaknesses, or could result in material misstatements in our consolidated financial statements. These misstatements could result in a restatement of our consolidated financial statements, cause us to fail to meet our reporting obligations, reduce our ability to obtain financing or cause investors to lose confidence in our reported financial information, leading to a decline in our stock price.

Although we are working to remedy the ineffectiveness of our internal control over financial reporting, there can be no assurance as to when the remediation plan will be fully developed, when it will be fully implemented or the aggregate cost of implementation. Until our remediation plan is fully implemented, our management will continue to devote significant time and attention to these efforts. If we do not complete our remediation in a timely fashion, or at all, or if our remediation plan is inadequate, there will continue to be an increased risk that we will be unable to timely file future periodic reports with the SEC and that our future consolidated financial statements could contain errors that will be undetected. For more information relating to our internal control over financial reporting (and disclosure controls and procedures) and the remediation plan undertaken by us, see Part II, Item 9A, "Controls and Procedures."

**We have significant working capital requirements and have historically experienced negative working capital balances. If we experience such negative working capital balances in the future, it could have a material adverse effect on our business, financial condition and results of operations.**

We require significant amounts of working capital to operate our business and pay expenses relating to the employment of temporary employees. Temporary personnel are generally paid on a weekly basis while payments from customers are generally received 30 to 60 days after billing. As a result, we must maintain sufficient cash availability to pay temporary personnel prior to receiving payment from customers. We finance our operations primarily through factoring of our receivables to financial institutions with recourse; issuances of debt, including debt issued to related parties; and through cash generated by our operating activities. We have been required to aggressively manage working capital to ensure adequate funds to meet working capital requirements and to service debt. Such steps included working to improve collections and adjusting the timing of cash expenditures, reducing operating expenses where feasible, and seeking to generate cash from a variety of other sources.

There is no assurance that we will generate the necessary net income or operating cash flows to meet our working capital requirements and pay our debt as it becomes due in the future due to a variety of factors, including the cyclical nature of the

Table of Contents

staffing industry and other factors discussed in this "Risk Factors" section. If we are unable to do so, our liquidity would be adversely affected and we would consider taking a variety of actions, including attempting to reduce fixed costs (for example, further reducing the size of our administrative work force), curtailing or reducing planned capital additions, raising additional equity, borrowing additional funds, refinancing existing indebtedness or taking other actions. There can be no assurance, however, that we will be able to successfully take any of these actions, including adjusting expenses sufficiently or in a timely manner, or raising additional equity, increasing borrowings or completing a refinancing on any terms or on terms that are acceptable to us. Our inability to take these actions as and when necessary would materially adversely affect our liquidity, results of operations and financial condition.

**Our business is significantly affected by fluctuations in general economic conditions.**

Demand for staffing services is significantly affected by the general level of economic activity and employment in the United States and the other countries in which we operate. When economic activity increases, temporary employees are often added before full-time employees are hired. As economic activity slows, however, many companies reduce their use of temporary employees before laying off full-time employees. Significant swings in economic activity historically have had a disproportionate impact on staffing industry volumes. We may also experience more competitive pricing pressure during periods of economic downturn. The vast majority of our revenues and earnings are generated by our business operations in the United States. Any significant economic downturn in the United States could have a material adverse effect on our business, financial condition and results of operations.

**Due to the highly competitive nature of and the low barriers of entry to the temporary staffing industry, we may be unable to compete successfully against existing or new competitors.**

We operate in the highly competitive temporary staffing industry, which has low barriers of entry. We compete with larger companies that have greater name recognition, greater financial resources and larger staffs. We also compete with smaller, more specialized entities that are able to concentrate their resources on particular industries or markets. We expect that the level of competition will remain high. To remain competitive, we must provide superior service and performance on a cost-effective basis to customers. Any failure to do so could have a material adverse effect on our existing business and future prospects.

**Impairment in the value of our goodwill, other intangible assets or long lived assets could negatively impact our net income and earnings per share.**

We are required to evaluate our goodwill and intangible assets with indefinite lives annually to determine if impairment has occurred. Long-lived assets and other identifiable intangible assets are also reviewed for impairment whenever events or changes in circumstances indicate that amounts may not be recoverable. If the testing performed indicates that impairment has occurred, we are required to record a non-cash impairment charge for the difference between the carrying amount of the impaired asset and the estimated fair value of the indefinite-lived impaired asset or the implied fair value of goodwill in the period the determination is made. The testing of goodwill and other intangible assets for impairment requires us to make significant estimates about our future performance and cash flows, as well as other assumptions. These estimates can be affected by numerous factors, including changes in economic, industry or market conditions, changes in business operations, changes in competition or potential changes in our stock price and market capitalization. Changes in these factors, or changes in actual performance compared with estimates of our future performance, could indicate impairment has occurred. We cannot accurately predict the amount and timing of any impairment of assets. Should the value of goodwill or other assets become impaired, there could be an adverse effect on us.

**We have historically been, and may continue to be, heavily reliant upon financing from related parties, which presents potential conflicts of interest that may adversely affect our financial condition and results of operations.**

We have historically obtained financing from related parties, including major shareholders, Mr. Robert Cassera, and his affiliated companies, in the form of debt, debt guarantees and issuances of equity securities, to finance working capital, growth and acquisitions. Mr. Cassera and his affiliated companies have the ability to exercise significant control over our financing decisions, which may present conflicts of interest regarding the choice of parties from whom we obtain financing, as well as the terms of financing. No assurance can be given that the terms of financing transactions with Mr. Cassera and his affiliated companies are or will be as favorable as those that could be obtained in arms' length negotiations with third parties. Moreover, because Mr. Cassera and his affiliated companies have the ability to exercise significant control over our financing decisions, there can be no assurance that we would enforce any rights and claims that we have or may have against these parties relating to the transactions.

6

Table of Contents

**Our principal stockholder, whose affiliated entities are engaged in multiple transactions with us, beneficially owned, together with its affiliated entities and persons, approximately 141,647,000 of our outstanding shares of common stock as of January 3, 2014 , and his interests may conflict with our interests and those of our other shareholders.**

Robert Cassera, a member of our Board, beneficially owned approximately 89.7% of our outstanding shares of common stock as of January 3, 2014. Mr. Cassera has interest in and controls a group of affiliated entities ("Tri-State") in addition to his interest and control of us. Transactions between us and Tri-State include Mr. Cassera's guarantee of our subsidiaries' obligations under the Facility with Wells Fargo, the provision of professional employer services to our subsidiaries, and, in the past, the exchange of our indebtedness for shares of our common stock and our acquisitions of Tri-Overload, Tri-Diamond, TS Staffing, and Summit Software. The interests of Mr. Cassera and Tri-State could conflict with our interests and the interests of our other shareholders.

As a result of such ownership, Mr. Cassera has the ability to cause the election of all of the members of the Board, appoint new management and approve actions requiring the approval of our shareholders, including amending our certificate of incorporation and merging us with or into another entity or selling all or substantially all of our assets. The directors elected by Mr. Cassera and Tri-State will be able to make decisions affecting our capital structure, including decisions to issue additional capital stock, implement stock repurchase programs and declare dividends. In addition, certain employees of Tri-State hold management positions in our company, including John Messina, our President, Chief Executive Officer and Chairman of the Board. While we do not have any written policies or procedures in place that address potential conflicts of interest arising from Mr. Messina's employment with TSE and his management responsibilities with us, we intend to present any potential conflicts that may arise in the future to our Audit Committee for their review.

Additionally, if Tri-State's affiliated companies, including TSE, TS Employment, Inc., or TS Employment, and TSE-PEO, Inc., or TSE-PEO, were to cease providing us with professional employer services (which include payroll and related administrative services), we may not be able to secure a comparable provider of such services at agreeable rates. Should we be unsuccessful at finding a comparable provider, we may not be able to secure required workers' compensation insurance on affordable terms. The failure to obtain a comparable provider of workers' compensation insurance at affordable rates would possibly require significant capital requirements that are not currently available to us. In addition, we may not be able to pass these increased costs on to our clients, and this would reduce our profit margins.

**We are a "controlled company" within the meaning of the NASDAQ Marketplace rules and, as a result, qualify for, and rely on, exemptions from certain corporate governance requirements.**

Tri-State and its affiliated persons control a majority of our common stock. As a result, we are a "controlled company" within the meaning of the NASDAQ corporate governance standards. Under the NASDAQ Marketplace rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and have elected not to comply with certain corporate governance requirements, including:

- the requirement that a majority of the Board consists of independent directors;
- the requirement that we have a nominating and corporate governance committee that is composed entirely of independent directors; and
- the requirement that we have a compensation committee that is composed entirely of independent directors.

Accordingly, you do not have the same protections afforded to stockholders of companies that are subject to all of the NASDAQ corporate governance requirements.

**The performance of our subsidiaries and their ability to distribute cash to us may vary, which may negatively affect our ability to service our debt at the parent company level or in other subsidiaries.**

Since we conduct a significant portion of our operations through our subsidiaries, our cash flow and our ability to service our debt depends in great measure upon the earnings of our subsidiaries and the distribution of those earnings to us, or upon loans or other payments of funds by those subsidiaries to us or to sister subsidiaries. The remittance of such cash inflows and the making of such loans and advances by our subsidiaries may be subject to legal or contractual restrictions, depend upon the earnings of those subsidiaries, and be subject to various business considerations, including the ability of such subsidiaries to remit such cash inflows or make such loans and advances in a manner that does not result in substantial tax liability or other costs.

Table of Contents

**If we are unable to execute our acquisitions or investment strategy for growing our business, our competitiveness within the industry may suffer, which in turn could adversely affect our business, financial condition and results of operations. We may also be subject to successor liability as a result of acquisitions we have made.**

We have supplemented our internal growth through numerous acquisitions and purchases of customer lists. In the future, we expect to continue to grow through additional acquisitions, investments or joint ventures. We evaluate potential acquisitions, investments and joint ventures on an ongoing basis. Our acquisitions, investments and joint ventures pose many risks, including:

- we may not be able to identify suitable acquisition candidates;
- we may not be able to compete successfully for available acquisition candidates, complete future acquisitions or investments or accurately estimate their financial effect on our business;
- if the acquisition of a business involves a significant cash expenditure, debt incurrence or integration expense, it could have a material adverse effect on our liquidity, results of operations and cash flows;
- we may have trouble integrating acquired businesses and retaining their personnel which could have a material adverse effect on our operating results;
- in the event that we consummate an acquisition or obtain additional capital through the sale of debt or equity to finance an acquisition, shareholders may experience dilution in their ownership interest;
- acquisitions, investments or joint ventures may disrupt business and distract management from its other responsibilities;
- if our acquisitions or investments ultimately fail, our business could be harmed; and
- completing future acquisitions may be limited by our ability to negotiate purchase terms and/or obtain financing on terms acceptable to us, given our current inability to finance such acquisitions through current cash flows. There can be no assurance that we will be able to negotiate such acceptable purchase or financing terms.

Additionally, we may assume unknown liabilities of the acquired entity. Although we have endeavored to structure these transactions to minimize exposure to unassumed liabilities, it is possible that under common law and certain statutes, creditors of the entities that sold us these operations could attempt to assert that we have successor liability for obligations of the sellers. Even if any such claim is asserted in the future and is ultimately unsuccessful, we could incur substantial fees, expenses and other costs in defending ourselves against it, which could adversely affect our financial condition and results of operations.

**We may encounter difficulties with our international operations and sales which could adversely affect our business, results of operations and financial condition.**

We have recently begun our entry into foreign markets with our acquisition of FlexPlus in the United Kingdom. Our efforts to increase our penetration into this market and other foreign markets are subject to risks inherent to such markets, including the high cost of doing business in such locations. Our efforts may be costly and they may not result in profits, which could adversely affect our business, results of operations and financial condition.

Our international operation subjects us to many risks inherent to international business activities, including:

- Limitations and disruptions resulting from the imposition of government controls;
- Changes in regulatory requirements;
- Economic or political instability;
- Currency fluctuations;
- Difficulties in the collection of receivables;
- Foreign tax consequences;
- Greater difficulty in safeguarding intellectual property; and
- Difficulties in managing overseas subsidiaries and international operations.

We may encounter significant difficulties in connection with operations in international markets as a result of one or more of these factors and our business, results of operations and financial condition could be adversely affected.

**We may be exposed to employment-related claims and costs that could have a materially adverse effect on our business, financial condition and results of operations.**

Due to the nature of our business of placing workers in the workplace of other businesses on a temporary or permanent basis, we are subject to a large number of laws and regulations relating to employment. The risks related to engaging in such business include but are not limited to:

- claims of discrimination and harassment (including sexual harassment claims);

Table of Contents

- wrongful termination or denial of employment;
- violations of employment rights related to employment screening or privacy issues;
- incorrect classification of employees, including independent contractors;
- violations of labor laws;
- violations of wage and hour laws;
- criminal activity;
- claims relating to actions by customers including property damage and personal injury, misuse of proprietary information and misappropriation of assets; and
- immigration-related claims.

In addition, some or all of these claims may give rise to litigation, which could be time-consuming to our management and could have a materially negative effect on our business. In some instances, we have agreed to indemnify our customers against some or all of these types of liabilities. We have policies and guidelines in place to help reduce our exposure to these risks and have purchased insurance policies against certain risks in amounts that we currently believe to be adequate, but our insurance may not be sufficient in amount or scope to cover these types of liabilities, and we may not be able to secure insurance coverage for such risks on affordable terms. Should some or all of these claims arise, they may have a material adverse effect on our business, financial condition and results of operations.

**Improper disclosure of sensitive or private information could result in liability and damage our reputation.**

Our business involves the use, storage and transmission of information about full-time and temporary employees. Additionally, our employees may have access or exposure to customer data and systems, the misuse of which could result in legal liability. We are dependent on the security provisions of vendors who have custodial control of our data. We have established policies and procedures to help protect the security and privacy of this information. It is possible that our security controls over personal and other data and other practices we follow may not prevent the improper access to or disclosure of personally identifiable or otherwise confidential information. Such disclosure could harm our reputation and subject us to liability under our contracts and laws that protect personal data and confidential information, resulting in increased costs or loss of revenue. Further, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions and countries in which we provide services. Our failure to adhere to or successfully implement processes in response to changing regulatory requirements in this area could result in legal liability, additional compliance costs or damage to our reputation in the marketplace.

**We are dependent on a variety of information technology systems and our investigating the implementation of new company-wide ERP system: any disruptions in our systems could adversely impact our ability to effectively manage our business and prepare accurate and timely financial information.**

We are dependent on a variety of information technology telecommunications systems, many of which are legacy systems that we acquired in connection with our acquisitions of businesses. The success of our expansion plans depend upon our IT and telecommunications systems. We are currently investigating the implementation and integration of a company-wide ERP management and financial accounting system that will enhance our senior management's control over daily operating functions.  We may not be able to successfully implement these systems in an effective manner. In addition, we may incur significant increases in costs and encounter extensive delays in the implementation and rollout of these systems. If there are technological impediments, unforeseen complications, errors or breakdowns in implementing these systems, our business, financial condition, results of operations or customer perceptions may be adversely affected.

**Government regulations may significantly increase our costs, result in prohibition or restriction of certain types of employment services or the imposition of additional licensing or tax requirements that may reduce our future earnings.**

Our business is subject to extensive regulation. The cost to comply, and any inability to comply with government regulation could materially harm our business. Increased government regulation in the jurisdictions in which we operate may prohibit or restrict the types of employment services that we currently provide. Future regulations may also require new or additional benefits be paid to our associates or require us to obtain additional licensing to provide employment services. Any future regulations may materially affect our financial condition, results of operations and liquidity because they may make it more difficult or expensive for us to continue to provide employment services.

In conducting our business, we are required to pay a number of payroll and related expenses, including unemployment taxes, workers' compensation and medical insurance, for our personnel.  Unemployment insurance premiums paid by employers

Table of Contents

typically increase during periods of increased levels of unemployment. Workers' compensation costs may increase in the future if states raise benefit levels and expand the amount of allowable claims. In addition, the Patient Protection and Affordable Care Act ("ACA") and the Health Care and Education Reconciliation Act jointly (the "Health Care Reform Laws"), both of which were passed in 2010 and are scheduled to take effect through 2015, require most individuals to have health insurance, and new healthcare requirements may further increase the costs associated with employing temporary workers. Although the Health Care Reform Laws do not mandate that employers offer health insurance, beginning in 2015 tax penalties will be assessed on large employers who do not offer health insurance that meets certain affordability or benefit requirements. Unless modified by regulations or subsequent legislation, providing such additional health insurance benefits to our temporary workers who qualify for coverage under the Health Care Reform Laws, or the payment of tax penalties if such coverage is not offered to workers who qualify, will increase our costs. If we are unable to raise the rates we charge our customers to cover these costs, such increases in costs could materially harm our business.

**Our business is subject to government reviews, investigations and inquiries.**

We are directly and indirectly subject to various federal state and local rules, regulations and orders applicable to our business. From time to time, we are also subject to government inquiries and investigations of our business practices. These inquiries and investigations are costly and consume internal resources. Violation of applicable government rules and regulations could result in civil liability or in cancellation or suspension of existing contracts, either of which could have a material adverse effect on our business.

**We are dependent on obtaining workers' compensation insurance coverage at commercially reasonable terms through TS Employment; unexpected changes in claim trends on our workers' compensation and benefit plans may negatively impact our financial condition.**

Although we are insured through TS Employment for workers' compensation and medical benefit claims, our costs could be affected by unexpected changes in claim trends, which include the severity and frequency of claims, actuarial estimates and medical cost inflation that could result in costs that are significantly higher. There can be no assurance that we will be able to increase the fees charged to our customers in a timely manner and in a sufficient amount to cover increased costs as a result of any changes in claims-related liabilities. The loss of our workers' compensation insurance coverage would prevent us from doing business in the majority of our markets. Further, we cannot be certain that TS Employment will continue to be able to offer us compensation insurance coverage on reasonable terms or that its current and former insurance carriers will be able to pay claims we make under such policies.

**We bear the risk of loss of major clients, nonpayment from our clients and the possible effects of bankruptcy filings by clients, which could adversely affect our financial condition and results of operations.**

Our business strategy is focused on serving large corporate customers. While our strategy is intended to enable us to increase our revenues and earnings from our major corporate customers, the strategy also exposes us to increased risks arising from the possible loss of major customer accounts. If a large client experiences financial difficulty, or is otherwise unable to meet its obligations as they become due, our financial condition and results of operations could be adversely affected. For work performed prior to the termination of a client agreement, we are obligated to pay the agreed-upon fees to TS Employment for providing professional employment services (which include payroll services, administration of employee benefits, workers' compensation insurance coverage and accounts receivable collection services) whether or not our client pays us on a timely basis, or at all. Given the difficult economic environment, there is an increased risk of clients failing to pay or delaying payment, although we are not currently experiencing significant levels of these occurrences. A significant increase in uncollected accounts receivables or customer defaults would have a material adverse effect on our earnings and financial condition. In addition, we would have charge backs on existing accounts receivable and invoices on future sales of accounts receivable generated by such clients under our accounts receivable purchase agreements.

**If we are unable to attract and retain qualified temporary and permanent personnel, the demand for our services could decrease, which in turn could negatively affect our business, financial condition and results of operations.**

The failure to identify, recruit, train and place candidates, as well as retain qualified temporary employees over a long period of time, could materially adversely affect our business. Our success depends on our ability to provide clients with highly qualified and experienced personnel who possess the skills and experience necessary to satisfy their needs. Such individuals are in great demand, particularly in certain geographic areas, and are likely to remain a limited resource for the foreseeable future. Consequently, we must continuously evaluate and upgrade our base of available qualified personnel to keep pace with changing customer needs and emerging technologies. Furthermore, a substantial number of our temporary employees during any given year will terminate their employment with us and accept regular staff employment with our customers and others. There can be

10

Table of Contents

no assurance that qualified candidates will continue to be available to us in sufficient numbers and on acceptable terms. Additionally, we may not be able to develop training programs to respond to our clients' changing needs or retain temporary and permanent personnel who we have trained.

**We are highly dependent on our senior management and their continued performance and productivity; in the past, we experienced significant management turnover, which may result in operational inefficiencies that could negatively affect our business.**

We are highly dependent on the continued efforts of the members of our senior management. The loss of any of the members of our senior management may cause a significant disruption in our business, jeopardize existing customer relationships and have a material adverse effect on our business. Since fiscal year 2009 we have experienced significant turnover in our senior management. In fiscal year 2009, we experienced changes in our President and Chief Executive Officer positions. In fiscal year 2010, our Chief Financial Officer resigned. In fiscal year 2011, we appointed a new Chief Financial Officer and President of Sales. In Fiscal Year 2012, our Chief Financial Officer was terminated and we appointed a successor. On October 8, 2012, our Chief Executive Officer resigned and our President assumed the role of Chief Executive Officer as well as Chairman of the Board. This lack of management continuity, and the resulting lack of long-term experience in their new roles within our Company, could result in operational and administrative inefficiencies and added costs, which could adversely impact our results of operations, stock price and customer relationships, and may make recruiting for future management positions more difficult. In addition, we must successfully integrate any new management personnel that we hire within our organization or who join us through acquisitions in order to achieve our operating objectives, and changes in other key management positions may temporarily affect our financial performance and results of operations as new management becomes familiar with our business. Accordingly, our future financial performance will depend to a significant extent on our ability to motivate and retain key management personnel.

**We are dependent on a variety of information technology systems and are investigating the implementation of a new company-wide ERP system. Any disruptions in our systems could adversely impact our ability to effectively manage our business and prepare accurate and timely financial information.**

We are dependent on a variety of information technology and telecommunications systems, many of which are legacy systems that we acquired in connection with our acquisitions of businesses. The success of our expansion plans depend upon our IT and telecommunications systems. We are currently investigating the implementation and integration of a company-wide ERP management and financial accounting system that will enhance our senior management's control over daily operating functions. We may not be able to successfully implement these systems in an effective manner. In addition, we may incur significant increases in costs and encounter extensive delays in the implementation and roll-out of these systems. If there are technological impediments, unforeseen complications, errors or breakdowns in implementing these systems, our business, financial condition, results of operations or customer perceptions may be adversely affected.

**We may experience business interruptions that could have an adverse effect on our operations; our management information systems are vulnerable to damage and interruption.**

The efficient operation of our business is dependent on our management information systems. If our critical information systems fail or are otherwise unavailable, this could temporarily impact our ability to pay employees, bill customers, service customers, maintain billing and payroll records reliably and pay taxes, which could adversely affect our revenues, operating expenses and financial condition. Our primary computer systems and operations are vulnerable to damage or interruption from power outages, computer and telecommunications failures, computer viruses, cyber-attacks, security breaches, catastrophic events and errors in usage by our employees. Although we have disaster recovery plans and adequate levels of insurance in place, we may not be able to adequately execute these plans in a timely fashion. A prolonged outage, such as the one caused by Hurricane Sandy in October 2012 in the New York Metropolitan Area, could seriously impact our ability to service customers or hire temporary workers.

**Our customer contracts contain termination provisions that could decrease our future revenues and earnings.**

Most of our customer contracts can be terminated by the customer on short notice without penalty. Our customers are, therefore, not contractually obligated to continue to do business with us in the future. This creates uncertainty with respect to the revenues and earnings we may recognize with respect to our customer contracts.

**Stockholder ownership interest in our company may be diluted as a result of future financings or additional acquisitions.**

Table of Contents

We may seek to raise funds from time to time in public or private issuances of equity and such financings may take place in the near future or over the longer term. Sales of our securities offered through future equity offerings may result in substantial dilution to the interests of our current shareholders. The sale of a substantial number of securities to investors, or anticipation of such sales, could make it more difficult for us to sell equity or equity-related securities in the future at a time and at a price that we might otherwise wish to effect sales. In addition, we have issued shares of our common stock for various acquisitions in the past and may do so in the future, which may also result in substantial dilution to the interests of our current shareholders.

**We cannot assure you that our common stock will be remain listed on the NASDAQ Capital Market.**

As a result of the delay in filing our annual report on Form 10-K for the 2013 fiscal year and our quarterly report on Form 10-Q for the first quarter of 2014 with the SEC, we were unable to comply with the listing standards of NASDAQ Stock Market LLC, or NASDAQ. As a result, NASDAQ may remove our stock from listing on the National Capital Market. While we have submitted a plan of compliance with NASDAQ with respect to our regaining compliance with the NASDAQ listing standards, we cannot assure you that NASDAQ will provide us with an exception that will allow us to regain compliance prior to October 20, 2014, or that we will be successful in our efforts to regain compliance. If we are removed from listing on the NASDAQ Capital Market, there can be no assurance that we will be able to re-list our common stock in an expeditious manner or at all. Even if our common stock is re-listed, unless we are able to timely comply with our SEC reporting obligations in the future, our common stock may again be de-listed. If we are de-listed and cannot re-list our common stock or if it is subsequently de-listed again in the future, the price of our common stock will likely be adversely affected and there may be a decrease in the liquidity of our common stock.

**Our stock price could be volatile and, as a result, investors may not be able to resell their shares at or above the price they paid for our common stock.**

Our stock price has in the past, and could in the future, fluctuate as a result of a variety of factors, including those factors previously discussed and the following, many of which are beyond our control:

- the identification of material weaknesses in our internal control over financial reporting;
- fluctuations in our results of operations;
- loss of our listing on a national market for our common stock;
- loss of one or more key customers;
- strategic moves by our competitors, such as product or service announcements or acquisitions;
- regulatory developments;
- litigation;
- general economic conditions, such as a recession;
- general market conditions; and
- other domestic and international macroeconomic factors unrelated to our performance.

The stock market has experienced, and may in the future experience, volatility that has often been unrelated to the operating performance of particular companies. These broad market fluctuations may also adversely affect the market price of our common stock.

## ITEM 1B.    UNRESOLVED STAFF COMMENTS

None.

## ITEM 2.    PROPERTIES

Our corporate headquarters is located at 160 Broadway, 13th Floor, New York, New York, where we have a lease for 5,000 square feet of office space that will expire in January 2016. CRD, our wholly-owned subsidiary, leases approximately 37,000 square feet of office space located at 295 Madison Avenue, New York, New York, for its headquarters and main staffing and recruiting location. CRD's lease expires in May 2015. As of January 3, 2014, we conducted placement activities through our approximately 250 staffing and recruiting offices located in the United States and the United Kingdom, for which all of the locations are leased with terms expiring at various times through 2018. We believe that our existing facilities are adequate and suitable for our current operations; however, we may add or subtract additional facilities from time to time in the future as the need arises.

Table of Contents

**ITEM 3.        LEGAL PROCEEDINGS**

From time to time, we become involved in various investigations, claims and legal proceedings that arise in the ordinary course of our business, including those related to payroll and various employment related matters, typically alleging employment discrimination, labor law and wage and hour violations or enforcing the restrictive covenants in our employment agreements. While there is no expectation that any of these matters will have a material adverse effect on our results of operations, financial position or cash flows, litigation is always subject to inherent uncertainty and we are not able to reasonably predict if any matter will be resolved in a manner that is materially adverse to us.

**ITEM 4.        MINE SAFETY DISCLOSURES**

Not applicable.

13

Table of Contents

## PART II

**ITEM 5.    MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES**

*Price Range of Common Stock*

On September 6, 2013 our stock began trading on the NASDAQ Capital Market ("NASDAQ") under the symbol "CRRS". Prior to that date our common stock traded on the over the counter market ("OTCBB").

The following table shows the reported high and low closing prices for our common stock for the periods indicated, as reported by the NASDAQ or OTCBB as appropriate. The quotations listed below reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not represent actual transactions.

| Fiscal Year ended January 3, 2014 | High | Low |
|---|---|---|
| First fiscal quarter | 1.12 | 0.44 |
| Second fiscal quarter | 2.29 | 1.13 |
| Third fiscal quarter | 5.40 | 2.22 |
| Fourth fiscal quarter | 4.23 | 2.47 |
| | | |
| Fiscal Year ended December 28, 2012 | High | Low |
| First fiscal quarter | 0.88 | 0.44 |
| Second fiscal quarter | 0.75 | 0.30 |
| Third fiscal quarter | 0.60 | 0.40 |
| Fourth fiscal quarter | 0.58 | 0.35 |

As of June 19, 2014, there were approximately 1,045 record holders of our common stock and the closing price of our common stock on that date was $2.79.

*Dividend Policy*

We have not declared or paid any cash dividends on our common stock during the periods presented, and we do not anticipate doing so in the foreseeable future. We currently intend to retain future earnings, if any, to operate our business and finance future growth strategies.

*Equity Compensation Plan Information*

On November 6, 2013, our shareholders approved the 2013 Incentive Award Plan (the "2013 Plan"). The 2013 Plan provides for grants of various types of awards that are designed to attract and retain highly qualified personnel who will contribute to the success of the Company and to provide incentives to participants in the 2013 Plan that are linked directly to increases in shareholder value which we believe will inure to the benefit of all shareholders of our Company. We intend to rely on a combination of multi-year performance awards, options and other stock-based awards for these purposes. The 2013 Plan made 5,000,000 shares of our common stock available for awards. As of January 3, 2014, we have not issued any awards under the 2013 Plan. The 2013 Plan also permits performance-based awards that are paid under it to be tax deductible to us under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), as "performance-based compensation."

On November 6, 2013, our shareholders also approved the 2013 Employee Stock Purchase Plan (the "ESPP"). The purpose of the ESPP is to offer employees an opportunity to purchase stock directly from us at an attractive price, and align wealth creation opportunities with those of our stockholders. The ESPP is intended to broaden employee access to our common stock, by offering all employees of our Company and designated subsidiaries of our Company the opportunity to purchase shares of our common stock through a convenient payroll deduction. The ESPP made 3,000,000 shares of our common stock available for purchase, subject to automatic annual increases. While approved, the ESPP was not available for employee participation as of January 3, 2014.

*Issuances of Unregistered Securities*

During the Fiscal Year ended January 3, 2014, we granted the following unregistered securities (in thousands):

14

Table of Contents

**2013 Grants**

| | Board Members | | Executive Officers | Non-executive Officers | Consultants | Total |
|---|---|---|---|---|---|---|
| Options | 2,000 | * | 3,825 | 75 | — | 5,900 |
| Warrants | — | | — | — | 750 | 750 |
| Common shares | 60 | | 220 | 280 | — | 560 |

* These 2,000 options were issued to our majority shareholder who is also a member of our board of directors.

We believe that all such issuances were exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof.

*Issuer Purchases of Equity Securities*

Not applicable.

## ITEM 6.   SELECTED FINANCIAL DATA

Not applicable.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion in conjunction with our financial statements and related notes. In addition to historical financial information, the following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in Item 1A. "Risk Factors."*

We have revised certain prior period amounts and presentations to reflect our change in fiscal year end and to reflect the correction of certain errors. In particular:

• During the fiscal year ended January 3, 2014, we identified an error in our historical accounting for the factoring of our receivables to Wells Fargo, resulting in an understatement of our assets and liabilities included in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 by $74.8 million and $68.8 million, respectively. The error had no impact on our Consolidated Statement of Operations for the nine months ended October 4, 2013, nor for the fiscal year ended December 28, 2012. The Consolidated Balance Sheet as of December 28, 2012 included herein has been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, net income or net changes in cash for the nine months ended October 4, 2013 and the Fiscal Year ended December 28, 2012.

• During the fiscal year ended January 3, 2014, we also identified an error in our accounting for stock-based compensation expense relating to awards of shares, warrants to acquire common stock, and employee stock options as previously reported. The error resulted in an understatement of our selling, general and administrative expense included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012 by approximately $3.3 million and $0.2 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct this error. The correction had no impact on revenues or net change in cash for the nine months ended October 4, 2013 for the Fiscal Year ended December 28, 2012.

• During the fiscal year ended January 3, 2014, we also identified an error in our accounting for deferred taxes relating to the amortization of indefinite-life intangibles that originated during 2005, resulting in an understatement in liabilities in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 of $1.1 million and $0.9 million, respectively. The error also understated our deferred income tax provision included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012 by approximately $0.2 million and $0.3 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have

15

[Table of Contents](#)

been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, or net change in cash for the nine months ended October 4, 2013 and for the Fiscal Year ended December 28, 2012.

- During the fiscal year ended January 3, 2014, we also identified a number of miscellaneous errors relating to our accounting for cash, accounts receivable, prepaid expenses, accounts payable and accrued liabilities, other liabilities and business combinations that resulted in a net understatement of assets included in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 of $0.5 million and $0.7 million, respectively. These errors also overstated our operating income, taxable income and net income included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 by $0.1 million, $0.2 million and $0.2 million, respectively. IN addition, these errors overstated our operating income in our Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 by $0.7 million, and understated our taxable income and net income included in our Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 by $0.5 million and $0.4 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct these errors.

- During the fiscal year ended January 3, 2014, we also evaluated our consolidation of Abest Power & Gas, LLC ("Abest") our joint venture in retail energy that was formed in January 2013, and determined that Abest is an entity that should not be consolidated. We had presented the results of Abest as a consolidated entity in our consolidated financial statements for each of the first three quarters of 2013. While the Consolidated Balance sheet as of January 3, 2014 and the Consolidated Statement of Operations for the year ended January 3, 2014, included herein, do not include the assets, liabilities or equity of Abest, we do include our investment in Abest under the equity method of investment and report the loss for Abest as a loss on equity investment.

Please refer to the *Prior Period Adjustment* footnote to our Financial Statements included in Item 8 of this 10-K for the quarterly impact of these adjustments. We will present revised amounts when these periods are presented as comparatives in future filings.

## Results of Operations

Beginning in 2012, our operations are on a "52/53-week" fiscal year ending on the Friday closest to December 31 (the "Fiscal Year"). Prior to 2012, our 52/53-week" fiscal year used to end on the Friday closest to September 30. The differences in our Fiscal Year and between our Fiscal Year and our year end close dates from previous periods are significant. Therefore, the year over year comparisons discussed below relate to the 53 week Fiscal Year ended January 3, 2014 ("Fiscal Year 2013") which began December 29, 2012 and the 52 week Fiscal Year ended December 28, 2012 ("Fiscal Year 2012") which began on December 30, 2011.

We completed the following material acquisitions in Fiscal Year 2013:

- On May 7, 2013, our wholly owned subsidiary, CRS Group, Inc. (the "CRS Group") acquired certain assets and assumed certain liabilities of the Summit Software Division ("Summit") of Tri-Tel Communications, Inc., a related party under common control (the "Summit Acquisition"). Accordingly, in accordance with ASC Topic 805, with respect to business combinations for transactions between entities under common control, the merger has been accounted for using Pooling-of-Interest with no adjustment to the historical basis of the assets and liabilities of CRS Group or Summit. Summit's financial position and results of operations have therefore been included in all periods presented as if we had been combined at all times that the entities were under common control. Pursuant to the terms of the agreement, we acquired at estimated fair value certain assets and assumed certain liabilities in exchange for 21,000,000 shares of our common stock, valued at $0.65 per share or $13.75 million, based upon an independent valuation.

- On November 12, 2013, we closed on the acquisition of United Kingdom-based Flex Recruitment Plus, Limited ("Flex Plus"). The results of Flex Plus are included in the results of operations for Fiscal Year 2013 as of the date of the acquisition.

### Fiscal Year ended January 3, 2014 compared to Fiscal Year ended December 28, 2012

*Revenues*

For Fiscal Year 2013, our revenues increased by $139.8 million, or 20.6%, to $819.7 million as compared to $679.8 million for Fiscal Year 2012.

Part of the increase in revenues is attributable to acquisitions that we made late in 2012 and in 2013 that added $28.7 million in revenues. We believe that the 16.4% organic growth in revenues not associated with our acquisitions is among the industry leaders. The growth rate was less than the prior Fiscal Year due to higher comparable prior year revenue, as well as our strategy

16

[Table of Contents](#)

to eliminate a select number of unprofitable accounts. We expect that our sales force, especially those whose previous staffing firms may have exited the industry, will continue to aggressively grow revenues from existing and new customers for the foreseeable future. We expect to be able to supplement this organic growth with strategic acquisition opportunities as they arise and by increasing the number of value-added services we offer to the marketplace.

*Direct Cost of Producing Revenues*

For Fiscal Year 2013, our direct cost of services increased by $123.5 million or 20.6%, to $723.3 million , as compared to $599.8 million for Fiscal Year 2012.

As a percentage of revenues, our cost of producing revenues remained relatively constant at 88.2% in both 2013 and 2012. During 2013, Tri-State reduced the administrative fee that it charges us (the "Administrative Fee") as a PEO from 2.0% to 1.4%. This reduction in the Administrative Fee is the result of a series of negotiations over the course of several months in mid-2012. The negotiations with Tri-State were aimed at determining a fair market value for administrative charges that Tri-State charges us as a PEO. The services Tri-State provides to us include payroll services, workers' compensation coverage and related risk management programs, and payroll tax and employee benefit plan administration. While no thresholds have been predetermined for future reductions of the Administrative Fee, we intend to analyze and discuss the need for future reductions as our payroll volume and other conditions warrant.

The Administrative Fee charged to us represented 37.5% of the Tri-State companies' aggregate administrative fee revenues (TS Employment and other professional employer organizations owned by Tri-State) in 2013. While we have been informed that other customers of Tri-State's PEOs have negotiated similar reductions in the administrative fee charged to them based on the volume of their respective payroll, we believe that we receive excellent value for the services received. We have also terminated select unprofitable accounts which decreased our overall direct costs of services as a percentage of revenue. These decreases were partially offset by increased state unemployment tax rates in the states where we have concentrated businesses and our relatively stronger growth in the light industrial businesses, which traditionally generates lower gross margins.

*Gross Profit*

For Fiscal Year 2013, our gross profit increased by $16.3 million or 20.4% to $96.4 million as compared to $80.0 million for Fiscal Year 2012. As a percentage of revenue, gross profit margin remained at 11.8%. We continue to implement initiatives intended to increase our gross profit, including (i) the diversification of our service offerings, such as Summit's technology and related services; (ii) the continued review of pricing charged to all customers; and (iii) more effective management of unemployment claims to reduce the related state unemployment taxes. We expect to continue to see improvements in gross profit margins as these initiatives yield results. However, we still see the potential for competitive pricing pressures, increased payroll tax costs at the state level and higher workers' compensation insurance costs to act as a drag on our future gross profit margins.

*Selling, General and Administrative Expenses*

For Fiscal Year 2013, selling, general and administrative expenses increased by $9.2 million or 12.4% to $83.7 million, or 10.2% of revenues, as compared to $74.4 million, or 10.9% of revenues for Fiscal Year 2012. The increase was primarily due to increased professional fees, an increase in stock-based compensation expenses of $4.4 million, our NASDAQ listing fees in fiscal 2013, and costs relating to supporting our revenue growth. This increase was offset by our ability to curb and reduce non-personnel costs including our ongoing consolidation of offices and functions in connection with our announced rebranding and consolidation.

Our revenue growth has allowed us to better leverage our fixed costs as indicated by the year-over-year decrease in selling, general and administrative costs as a percentage of revenues. In addition, we have completed and continue to undertake initiatives to reduce selling, general and administrative costs through consolidation of select offices and administrative functions. We expect that the integration of recently acquired operations as well as the continued growth of revenues will continue to reduce selling, general and administrative costs as a percentage of revenues in 2014 and beyond.

*Depreciation and Amortization*

For Fiscal Year 2013, depreciation and amortization expenses decreased by $0.2 million to $1.8 million as compared to $2.0 million for Fiscal Year 2012, primarily due to the timing of acquisitions and the fluctuation in the amortization of acquisition-related long-lived assets.

*Impairment Loss*

Fiscal Year 2013, we determined that certain trademarks and other long lived assets were impaired. In Fiscal Year 2012 we determined that an event that was an indicator of impairment had occurred with regards to our ICG business. We evaluate our goodwill for the ICG business and determined that the goodwill was impaired. For Fiscal Year 2013, we recorded a loss of $0.3 million related to impairments compared to a loss of $0.4 million in Fiscal Year 2012.

Table of Contents

*Income from Operations*

The factors described above resulted in an increase in income from operations of $7.4 million from $3.2 million for Fiscal Year 2012 to $10.6 million in Fiscal Year 2013.

*Interest Expense*

Interest expense includes the net discounts associated with the factoring of accounts receivable, as well as interest on debt associated with our acquisitions and financing our operations. Interest expense increased for Fiscal Year 2013 by $0.1 million compared to Fiscal 2012 to $4.4 million. This increase was due to a higher volume of accounts receivable financing during the 2013 period as our operations grew, partially offset by renegotiated lower borrowing rates as well as transferring our borrowings on Accountabilities and ICG receivables from Amerisource to Wells Fargo in the second and fourth quarters, respectively.

In addition, we recorded $1.7 million and $0.9 million of interest on related party balances for Fiscal Year 2013 and Fiscal Year 2012, respectively. The increase of $0.8 million was due to a higher average loan balance for Fiscal Year 2013 compared to Fiscal Year 2012.

*Loss on Equity Investment*

We recorded a $0.8 million loss on our investment in Abest Power and Gas, LLC ("Abest") using the equity method of accounting. Abest is a joint venture formed in January 2013 with Rosa Power, LLC.

*Loss on Contingent Consideration*

The fair value of contingent consideration is remeasured each quarter and the change is report as a current period gain or loss. Fair value of contingent consideration requires us to make subjective judgments with regards to future events including discount rates. For Fiscal Year 2013, we recorded a loss of $0.1 million in contingent consideration compared to a gain of $0.8 million in Fiscal Year 2012.

*Income Tax (Benefit) Provision*

Income tax expense was $0.6 million for the year ended January 3, 2014, reflecting an effective tax rate of 18.2%.  Our January 3, 2014 effective tax rate differed from the federal statutory rate of 34% due to the benefit of a valuation allowance release of certain deferred tax assets offset by a tax expense associated with indefinite lived intangibles and state and local income taxes.  For the year ended December 28, 2012, we recorded income tax expense of $0.5 million due to tax expense associated with indefinite lived intangibles and state and local income taxes.

We do not record U.S. income tax expense for foreign earnings which we intend to reinvest indefinitely to expand our international operations. If in the future we decide to repatriate such foreign earnings, U.S. income tax expense and our effective tax rate could increase or decrease in that period.

*Net Income (Loss)*

The factors described above resulted in net income of $2.8 million for Fiscal Year 2013 as compared to a net loss of $1.7 million for Fiscal Year 2012.

**Liquidity and Capital Resources**

*Cash Flows*

We have relied on factoring our trade receivables prior to collection, funding from related parties and, periodically, proceeds from short term borrowings and issuance of our common stock to satisfy our working capital requirements and to fund acquisitions. Management believes that the funding from related parties has advantages to us, including a quick response to funding requirements and a lack of restrictive covenants. Management anticipates that we will continue to rely, in part, on related parties for our short-term financing needs, as well as other sources of funding. In the future, we may need to raise additional funds through debt or equity financings to satisfy our working capital needs, and to take advantage of business opportunities, including growth of our existing business and acquisitions. To the extent that funds are not available to meet our operating needs, we may have to seek additional reductions in operating expenditures.

Our net income for Fiscal Year 2013 provided additional cash flow compared with our net losses in Fiscal Year 2012. We continued to improve on our working capital management, as evidenced by our lower reliance on factoring of our trade receivables and the funding from related parties in Fiscal Year 2013 as compared to Fiscal Year 2012. In Fiscal Year 2013, our net borrowings under our receivable-based facility and related loans payable from Wells Fargo totaled $4.2 million, down from $20.0 million in Fiscal 2012. Similarly, our net borrowings under loans payable and advances from related parties decreased to $3.8 million in Fiscal Year 2013 from $8.4 million in Fiscal Year 2012. We used $24.9 million of our working capital in Fiscal Year 2012 to fund an increase in our accounts receivable, as compared to only $9.7 million in Fiscal Year 2013. Our improved

[Table of Contents](#)

cash flow in Fiscal Year 2013 also enabled us to use $4.8 million to fund acquisitions of new businesses and the purchase of customer lists and another $2.7 million to fund an equity investment in Abest Power & Gas, as compared to only $0.8 million to fund acquisitions of new businesses and the purchase of customer lists in Fiscal Year 2012.

We believe that improving cash flows from operating activities through improved profitability, the refinancing of our asset-based credit facility and other working capital management will enable us to finance our growth through acquisitions or other initiatives. We also believe these sources of cash will be sufficient to fund the monitoring fees contemplated by the extension of our Facility with Wells Fargo, should they be necessary.

*Sales of Common Stock*

On March 30, 2012 and July 30, 2012 we converted $12.0 million and $2.1 million of our debt with TS Employment into 25,962,788 and 4,543,488 shares of our common stock, respectively. The number of shares issued to TS Employment under these conversion agreements was calculated based upon an independent valuation of our common stock at $0.4622 per share.

*Working Capital*

As of January 3, 2014, we had working capital of $15.5 million as compared to December 28, 2012 at which time our current liabilities exceeded our current assets by $3.7 million. The improvement of $2.2 million was primarily due to our improved profitability and operating cash flow. We also continue to engage in several activities to further increase current assets and/or decrease current liabilities, including seeking additional reductions in operating expenditures and increases in operating efficiencies. In order to service our debt, maintain our current level of operations, as well as fund the increased costs of being a public reporting company and our growth initiatives, we must be able to generate or obtain sufficient amounts of cash flow and working capital. Our management has engaged, and continues to engage, in activities to accomplish these objectives, including focusing on increased profitability and raising new outside capital. Our existing asset-based factoring facility with Wells Fargo is scheduled to expire on June 30, 2015. In addition, Management has been negotiating with a number of potential lenders to refinance the borrowings under the Wells Fargo credit facility. Based on the above activities, we believe that we have adequate resources to meet our operating needs for the next twelve months.

Our subsidiaries are currently participating in accounts purchase agreements with Wells Fargo, under which the maximum amount of trade receivables that can be sold by our subsidiaries in the aggregate is $80 million. As collections reduce previously sold receivables, the subsidiaries may replenish these with new receivables. As of January 3, 2014 and December 28, 2012, trade receivables of $73.5 million and $69.2 million, had been sold and remained outstanding, and amounts due from Wells Fargo for collected reserves totaled $8.6 million and $8.9 million, respectively. Interest charged on the amount of receivables sold prior to collection is charged at an annual rate equal to the 90-day London Interbank Offered Rate plus 4.25% to 6.17% per annum. Receivables sold may not include amounts that are over 90 days past due.

Under the terms of the Wells Fargo agreements, with the exception of CRD permanent placement receivables, Wells Fargo advances 90% of the assigned receivables' value upon sale, and the remaining 10% upon final collection. Under the terms of CRD's agreement, the financial institution advances 65% of value of the assigned CRD permanent placement receivables' value upon sale, and the remaining 35% upon final collection. The aggregate of trade receivables from the permanent placement business that CRD may sell to Wells Fargo at any one time is $1.3 million.

Accountabilities participated in the Wells Fargo facility until June 13, 2011, when they entered into a similar two year receivable-backed credit facility with Amerisource Funding, Inc. ("Amerisource") and ICG entered into a similar agreement on October 18, 2011. Accountabilities and ICG returned to participating in the Facility on June 13, 2013 and November 1, 2013, respectively.

Interest expense charged under the Wells Fargo trade accounts receivable factoring agreement is included in interest expense in the accompanying Consolidated Statements of Operations and amounted to $3.6 million and $3.1 million for the fiscal years ended January 3, 2014 and December 28, 2012, respectively. Interest expense charged under the Amerisource facility are included in the accompanying Consolidated Statements of Operations and amounted to $0.7 million and $1.1 million for the fiscal years ended January 3, 2014 and December 28, 2012, respectively. Tri-State and Robert Cassera, which together with affiliated persons owned approximately 89.7% of our outstanding shares of common stock as of the date hereof, have guaranteed our obligations to Wells Fargo.

The terms of our new agreements with Wells Fargo that we entered into on June 20, 2014, provide for significantly higher financing charges beginning in September 2014. We are seeking to replace our financing facility as soon as possible, but cannot assure you that we will be able to do so before the amended provisions go into effect, or at all.

19

Table of Contents

**Critical Accounting Policies**

The preceding discussion and analysis of our financial condition and results of operations is based upon our financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") and the rules of the SEC. The preparation of these financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods.

The following represents a summary of the critical accounting policies, which our management believes are the most important to the portrayal of our financial condition and results of operations and involve inherently uncertain issues that require management's most difficult, subjective or complex judgments.

*Fiscal Year*

Beginning in 2012, our operations are on a "52/53-week" fiscal year ending on the Friday closest to December 31. The year over year comparisons relate to a 53 week Fiscal Year ended January 3, 2014 ("Fiscal Year 2013") which began December 29, 2012 and the 52 week Fiscal Year ended December 28, 2012 ("Fiscal Year 2012") which began on December 30, 2011.

*Consolidation*

The accompanying consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. Intercompany transactions have been eliminated in consolidation. Our Flex Plus foreign subsidiary in the U.K. is not subject to political, economic, or currency restrictions.

We have ownership and other interests in various entities, including corporations, partnerships, and limited liability companies. For each such entity, we evaluate our ownership and other interests to determine whether we should consolidate the entity or account for our ownership interest as an investment. As part of our evaluation, we initially determine whether the entity is a variable interest entity ("VIE") and, if so, whether we are the primary beneficiary of the VIE. An entity is generally a VIE if it meets any of the following criteria: (i) the entity has insufficient equity to finance its activities without additional subordinated financial support from other parties, (ii) the equity investors cannot make significant decisions about the entity's operations, or (iii) the voting rights of some investors are not proportional to their obligations to absorb the expected losses of the entity or receive the expected returns of the entity and substantially all of the entity's activities involve or are conducted on behalf of the investor with disproportionately few voting rights. We consolidate VIEs for which we are the primary beneficiary, regardless of our ownership or voting interests. The primary beneficiary is the party involved with the VIE that (i) has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance, and (ii) has the obligation to absorb gains or losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. We periodically make judgments in determining whether entities in which we invest are VIEs. If so, we make judgments to determine whether we are the primary beneficiary and are thus required to consolidate the entity.

If it is concluded that an entity is not a VIE, then we consider our proportional voting interests in the entity. We consolidate majority-owned subsidiaries in which a controlling interest is maintained. Controlling interest is determined by majority ownership and the absence of significant third-party participating rights.

Ownership interests in entities for which we have significant influence and are not consolidated under our consolidation policy are accounted for as equity method investments. Related party transactions between the Company and its equity method investees, if any, have not been eliminated.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Significant estimates and assumptions are used for, but are not limited to: (1) revenue recognition; (2) asset impairments; (3) depreciable lives of assets; (4) fair value of stock-based compensation; (5) allocation of direct and indirect cost of sales; (6) fair value of identifiable purchased tangible and intangible assets in a business combination; (7) fair value of reporting units for goodwill impairment test; and (8) the estimate of income taxes. Actual results could significantly differ from those estimates.

Table of Contents

*Revenue Recognition*

Revenue is generally recognized when persuasive evidence of an arrangement exists, products have been delivered or services have been rendered, the fee is fixed or determinable, and collection is reasonably assured. The vast majority of our arrangements do not fall within the scope of the multiple-deliverable guidance. For those arrangements within the scope of the multiple-deliverable guidance, a deliverable constitutes a separate unit of accounting when it has stand-alone value and there are no customer-negotiated refunds or return rights for the delivered elements. For multiple-element arrangements, composed only of software products and related services or only services, we allocate revenue to each element in an arrangement based on a selling price hierarchy. The selling price for a deliverable is based on its vendor-specific objective evidence ("VSOE") if applicable, third-party evidence ("TPE") if VSOE is not available, or estimated selling price ("ESP"), if neither VSOE nor TPE is available. Total transaction revenue is allocated to the multiple elements based on each element's relative selling price compared to the total selling price. All our elements allocations are based on ESP.

The following revenue recognition policies define the manner in which we account for specific transaction types:

*Staffing Services*

Revenue is primarily derived from supplying contingent staff to our customers or providing other services on a time and material basis. Contingent staff primarily consist of contingent employees working under contract for a fixed period of time or on a specific customer project. Revenue is also derived from permanent placement services, which are generally recognized after placements are made and when the fees are not contingent upon any future event.

Reimbursable costs, including those related to travel and out-of-pocket expenses, are also included in net revenue, and equivalent amounts of reimbursable costs are included in direct cost of staffing services revenue.

Under certain of our service arrangements, contingent staff is provided to customers through contracts involving other vendors or contractors. When we are the principal in the transaction and therefore the primary obligor for the contingent staff, we record the gross amount of the revenue and expense from the service arrangement. When we act only as an agent for the customer and are not the primary obligor for the contingent staff, we record revenue net of vendor or contractor costs.

We are generally the primary obligor when we are responsible for the fulfillment of the services under the contract, even if the contingent workers are neither our employees nor directly contracted by us. Usually in these situations the contractual relationship with the vendors and contractors is exclusively with us and we bear customer credit risk and generally have latitude in establishing vendor pricing and have discretion in vendor or contractor selection.

*Software Systems*

Revenue primarily relates to sales of staffing support software systems and enhancements to existing systems. These arrangements generally contain multiple elements including software development and customization, sale of software licenses, installation, implementation and integration services, as well as post-contract customer support ("PCS"). Revenue is recognized under these arrangements following the FASB revenue recognition requirements, including guidance on software transaction and multiple element arrangements. To date, the revenue recorded for software or related services under this accounting treatment has been minimal.

*Subscription Revenues*

Subscription and other recurring revenues include fees for access rights to software solutions that are offered under a subscription-based delivery model where the users do not take possession of the software. Under this model, the software applications are hosted by us and the customer accesses and uses the software on an as-needed basis over the Internet. To date, the revenue recorded under this accounting treatment has been minimal.

*Business Combinations*

We have made strategic acquisitions to expand our footprint, establish strategic partnerships and/or to obtain technology that is complementary to our product offerings and strategy. We evaluate each investment in a business to determine if we should account for the investment as a cost-basis investment, an equity investment, a business combination, or a common control transaction. An investment in which we do not have a controlling interest and which we are not the primary beneficiary but where we have the ability to exert significant influence is accounted for under the equity method of accounting. For those investments that we account for in accordance ASC 805, *Business Combinations*, we record the assets acquired and liabilities assumed at our estimate of their fair values on the date of the business combination. Our assessment of the estimated fair value of each of these can have a material effect on our reported results as intangible assets are amortized over various lives.

Table of Contents

Furthermore, a change in the estimated fair value of an asset or liability often has a direct impact on the amount to recognize as goodwill, which is an asset that is not amortized. Often determining the fair value of these assets and liabilities assumed requires an assessment of the expected use of the asset, the expected cost to extinguish a liability or our expectations related to the timing and the successful completion of the integration of the business. Such estimates are inherently difficult and subjective and can have a material impact on our financial statements. We account for business combinations under a method similar to the pooling of interest method ("Pooling of Interest") when the combination is with a business under common control with us by our majority shareholder.

*Equity-Based Compensation*

We grant equity-based awards, such as stock options and restricted stock or restricted stock units, to certain key employees and consultants to create a clear and meaningful alignment between compensation and shareholder return and to enable the employees and consultants to develop and maintain a stock ownership position. While the majority of our equity awards feature time-based vesting, performance-based equity awards, which are awarded from time to time to certain key Company executives, vest as a function of performance, and may also be subject to the recipient's continued employment which also acts as a significant retention incentive.

Equity-based compensation cost is measured at the grant date, based on the fair value of the award and is recognized as expense over the employee requisite service period. In order to determine the fair value of stock options on the date of grant, we apply the Black-Scholes option-pricing model. Inherent in the model are assumptions related to risk-free interest rate, dividend yield, expected stock-price volatility and option life.

The risk-free rate assumed in valuing the options is based on the U.S. Treasury yield curve in effect at the time of grant for the expected term of the option. The dividend yield assumption is based on the lack of a historical and future expectation of dividend payouts. While the risk-free interest rate and dividend yield are less subjective assumptions, typically based on objective data derived from public sources, the expected stock-price volatility and option life assumptions require a level of judgment which make them critical accounting estimates.

We use an expected stock-price volatility based on the average expected volatilities of a sampling of companies with similar attributes to us, including industry, stage of life cycle, size and financial leverage.

The expected option term, representing the period of time that options granted are expected to be outstanding, is estimated using our limited historical post vesting exercise and employee termination behavior.

We estimate forfeitures using our historical experience, which is adjusted over the requisite service period based on the extent to which actual forfeitures differ or are expected to differ, from such estimates. Because of the significant amount of judgment used in these calculations, it is reasonably likely that circumstances may cause the estimate to change.

With regard to the weighted-average option life assumption, we consider the exercise behavior of past grants and model the pattern of aggregate exercises.

We settle the exercise of stock options with newly issued shares.

With respect to grants of performance based awards, we assess the probability that such performance criteria will be met in order to determine the compensation expense. Consequently, the compensation expense is recognized straight-line over the vesting period. If that assessment of the probability of the performance condition being met changes, we would recognize the impact of the change in estimate in the period of the change. As with the use of any estimate, and owing to the significant judgment used to derive those estimates, actual results may vary.

We have elected to treat future awards with only service conditions and with graded vesting as one award. Consequently, the total compensation expense would be recognized straight-line over the entire vesting period, so long as the compensation cost recognized at any date at least equals the portion of the grant date fair value of the award that is vested at that date.

*Accounts Receivable and Related Allowance*

We maintain an allowance for doubtful accounts for estimated losses resulting from our clients failing to make required payments for services rendered. Management estimates this allowance based upon knowledge of the financial condition of our clients, review of historical receivables and reserve trends and other pertinent information. If the financial condition of our clients deteriorates or there is an unfavorable trend in aggregate receivable collections, additional allowances may be required.

Table of Contents

We review the adequacy of the allowance for uncollectible accounts receivable on a quarterly basis and, if necessary, increase or decrease the balance by recording a charge or credit to SG&A expenses for the portion of the adjustment relating to uncollectible accounts receivable, and a charge or credit to revenue from services for the portion of the adjustment relating to sales allowances.

We fund our accounts receivable via a receivables-backed credit facility (the "Facility") with a financial institution. We receive 90% of the face value of qualified, as defined, receivables. Since we retain risk of loss on the receivables, the agreement provides that receivables that are older than 90 days (120 days in certain categories of receivables) cease to be qualified at the discretion of the financial institution. In most cases, our customer pays the financial institution directly for the receivables under the Facility. The Facility calls for net settlement twice weekly. The Facility is additionally guaranteed by our majority shareholder. We record each cash amount advanced and repaid as an increase or decrease to Loan Payable respectively. We record customer payments made directly to the lender as a reduction in Accounts Receivable and Loan Payable.

*Intangible Assets*

Goodwill and other intangible assets with indefinite lives are not subject to amortization but are tested for impairment annually or whenever events or changes in circumstances indicate that the asset might be impaired. We perform an annual impairment analysis to test for impairment or earlier if there is an indication that the asset might be impaired. Intangible assets with finite lives are subject to amortization over the period we are expected to benefit.

*Income Taxes*

We account for income taxes using the asset and liability method. Under this method, deferred income taxes are recognized for estimated tax consequences in future years of differences between the tax basis of assets and liabilities and their financial reporting amounts at each year-end, based on enacted tax laws and statutory rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established to reduce deferred tax assets to the amount expected to be realized when, in Management's opinion, it is more likely than not that the future tax benefits from some portion of the deferred tax assets will not be realized.

U.S. GAAP requires that, in applying the liability method, the financial statement effects of an uncertain tax position be recognized based on the outcome that is more likely than not to occur. Under this criterion the most likely resolution of an uncertain tax position should be analyzed based on technical merits and on the outcome that will likely be sustained under examination.

*Recently Adopted Accounting Standards*

In January 2013, the FASB issued ASU No. 2013-01, *Balance Sheet (Topic 210): Clarifying the Scope of Disclosures about Offsetting Assets and Liabilities*. ASU No. 2013-01 limits the scope of these disclosures to recognized derivative instruments, repurchase agreements and reverse repurchase agreements, and securities borrowing and lending transactions to the extent they are offset in the balance sheet or subject to an enforceable master netting arrangement or similar agreement. This ASU was effective retrospectively for fiscal years beginning on or after January 1, 2013, and interim periods within those annual periods.
This disclosure-only guidance became effective for us for fiscal year 2013 first quarter, with retrospective application required. We currently do not hold any financial or derivative instruments within the scope of this guidance that are offset in our consolidated balance sheets or are subject to an enforceable master netting arrangement. The adoption of this guidance did not have an impact on our results of operations, financial position or cash flows.

*Recently Issued Accounting Standards to be Adopted*

In May 1014, FASB issued ASU No. 2014-09, *Revenue from Contracts and Customers (Topic 606),* to clarify the principles for recognizing revenue to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards ("IFRS") that would (1) provide a more robust framework for addressing revenue recognition; (2) improve comparability of revenue recognition practice across entities , industries, jurisdictions, and capital market; and (3) provide more useful information to users of financial statements through improved disclosure requirements. This standard is effective for annual reporting periods beginning after December 15, 2016. We are currently evaluating the effect the adoption of this standard will have, if any, on our consolidated financial statements.

In April 2014, FASB issued ASU No. 2014-08, *Presentation of Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of Entity,* changes the

23

Table of Contents

criteria for reporting discontinued operations while enhancing disclosure requirements. This ASU addresses sources of confusion and inconsistent application related to financial reporting of discontinued operations guidance in U.S. GAAP. Under this guidance, a discontinued operation is defined as a disposal of a component or group of components that is disposed of or is classified as held for sale and represents a strategic shift that has a major effect on an entity's operations and financial results. This ASU is effective prospectively for fiscal years, and interim periods within those years, beginning after December 15, 2014. This ASU is effective for us prospectively on January 03, 2015. We do not anticipate that the adoption of this standard will have a material impact on our consolidated financial statements.

In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740): Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*. ASU No. 2013-11 requires that entities with an unrecognized tax benefit and a net operating loss carryforward or similar tax loss or tax credit carryforward in the same jurisdiction as the uncertain tax position present the unrecognized tax benefit as a reduction of the deferred tax asset for the loss or tax credit carryforward rather than as a liability, when the uncertain tax position would reduce the loss or tax credit carryforward under the tax law, thereby eliminating diversity in practice regarding this presentation issue. This ASU is effective prospectively for the fiscal years, and interim periods within those years, beginning after December 15, 2013. This ASU is effective for us prospectively on January 4, 2014, and we are evaluating the potential impact of this adoption on our consolidated financial statements.

In March 2013, the FASB issued ASU No. 2013-05, *Foreign Currency Matters (Topic 830): Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of Certain Subsidiaries or Groups of Assets within a Foreign Entity or of an Investment in a Foreign Entity*. This new standard is intended to resolve diversity in practice regarding the release into net income of a cumulative translation adjustment ("CTA") upon derecognition of a subsidiary or group of assets within a foreign entity. ASU No. 2013-05 is effective prospectively for fiscal years (and interim reporting periods within those years) beginning after December 15, 2013. This ASU is effective for us prospectively on January 4, 2014. We do not anticipate that the adoption of this standard will have a material impact on our consolidated financial statements.

In February 2013, the FASB issued ASU No. 2013-04, *Liabilities (Topic 450): Obligation Resulting from Joint and Several Liability Arrangements for Which the Total Amount of the Obligation is Fixed at the Reporting Date*. This authoritative guidance is for the recognition, measurement, and disclosure of obligations resulting from joint and several liability arrangements for which the total amount of the obligations within the scope of this guidance is fixed at the reporting date. It does not apply to certain obligations that are addressed within existing guidance in U.S. GAAP. This guidance requires an entity to measure in-scope obligations with joint and several liability (e.g., debt arrangements, other contractual obligations, settled litigations, judicial rulings) as the sum of the amount the reporting entity agreed to pay on the basis of its arrangement among its co-obligors and any additional amount it expects to pay on behalf of its co-obligors. In addition, an entity is required to disclose the nature and amount of the obligation. ASU 2013-04 is effective retrospectively for fiscal years, and interim periods within those years, beginning after December 15, 2014. This ASU is effective for us retrospectively on January 4, 2013, and we are evaluating the potential impact of this adoption on our consolidated financial statements.

## ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Not applicable.

24

Table of Contents

**ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO FINANCIAL STATEMENTS**
**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**

|  | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firms | 26 |
| Consolidated Balance Sheets as of January 3, 2014 and December 28, 2012 | 28 |
| Consolidated Statements of Operations and Consolidated Statements of Comprehensive Income (Loss) for the Fiscal Years ended January 3, 2014 and December 28, 2012 | 29 |
| Consolidated Statement of Stockholders' Equity as of January 3, 2014 and December 28, 2012 | 30 |
| Consolidated Statements of Cash Flows for the Fiscal Years ended January 3, 2014 and December 28, 2012 | 31 |
| Notes to Consolidated Financial Statements | 32 |

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders of Corporate Resource Services, Inc.

We have audited the accompanying consolidated balance sheet of Corporate Resource Services, Inc. and Subsidiaries (the "Company"), as of January 3, 2014 and the related consolidated statements of operations and comprehensive income (loss), cash flows and stockholders' equity for the fiscal year ended January 3, 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Corporate Resource Services, Inc. and Subsidiaries as of January 3, 2014 and the results of their operations and their cash flows for the fiscal year ended January 3, 2014 in conformity with accounting principles generally accepted in the United States of America.

As discussed in note 3 to the financial statements, the Company has significant transactions with related parties.

/s/ Crowe Horwath LLP

CERTIFIED PUBLIC ACCOUNTANTS

New York, New York

June 30, 2014

---

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders of Corporate Resource Services, Inc.

We have audited the accompanying consolidated balance sheet of Corporate Resource Services, Inc. and Subsidiaries (the "Company"), as of December 28, 2012 and the related consolidated statements of operations, cash flows and stockholders' equity for each of the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purposes of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Corporate Resource Services, Inc. and Subsidiaries as of December 28, 2012 and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ Rosen Seymour Shapss Martin & Company LLP
CERTIFIED PUBLIC ACCOUNTANTS

New York, New York
December 20, 2013, except for
Note 16 dated
June 30, 2014

27

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(amounts in thousands except per share data)**

| | | As of January 3, 2014 | | As of December 28, 2012 |
|---|---|---|---|---|
| | | | | (Revised) |
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash | $ | 32 | $ | 154 |
| Accounts receivable, net of allowance for doubtful accounts of $2,291 and $3,285 as of January 3, 2014 and December 28, 2012, respectively | | 96,739 | | 86,356 |
| Unbilled receivables | | 10,815 | | 9,543 |
| Related party receivables | | 2,335 | | — |
| Other current assets | | 1,220 | | 389 |
| Total current assets | | 111,141 | | 96,442 |
| | | | | |
| Property and equipment, net | | 1,285 | | 1,906 |
| Intangible assets, net | | 8,546 | | 5,136 |
| Goodwill | | 19,682 | | 15,409 |
| Equity investment | | 1,952 | | — |
| Other assets | | 520 | | 521 |
| Total assets | $ | 143,126 | $ | 119,414 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities** | | | | |
| Accounts payable and accrued liabilities | $ | 7,578 | $ | 6,277 |
| Accrued wages and related obligations - due to related party | | 9,449 | | 9,649 |
| Borrowings under receivables-based credit facility | | 73,460 | | 69,224 |
| Loan payable – related party | | 748 | | 12,730 |
| Loan payable | | 1,600 | | |
| Contingent consideration | | 658 | | 423 |
| Long-term debt | | 2,159 | | 1,075 |
| Long-term debt - related party | | — | | 750 |
| Total current liabilities | | 95,652 | | 100,128 |
| Long-term debt, net of current portion | | 1,069 | | 434 |
| Loan payable - related party, net of current portion | | 15,000 | | — |
| Contingent consideration, net of current portion | | 2,615 | | 831 |
| Deferred income taxes | | 1,880 | | 917 |
| Other liabilities | | 36 | | 244 |
| Total liabilities | | 116,252 | | 102,554 |
| | | | | |
| **Commitments and contingencies** | | — | | — |
| | | | | |
| **Stockholders' equity** | | | | |
| Preferred stock, $0.0001 par value, 5,000,000 shares authorized; zero shares issued and outstanding | | — | | — |
| Common stock, $0.0001 par value; shares authorized: 225,000 at January 3, 2014 and 145,000 at December 28, 2012; shares issued and outstanding: 158,015 at January 3, 2014 and 159,341 at December 28, 2012* | | 16 | | 16 |
| Additional paid-in capital | | 31,760 | | 22,492 |
| Accumulated deficit | | (4,976) | | (5,648) |
| Accumulated other comprehensive income | | 74 | | |
| Total stockholders' equity | | 26,874 | | 16,860 |
| Total liabilities and stockholders' equity | $ | 143,126 | $ | 119,414 |

\* Shares issued exceeds shares authorized at December 31, 2012 due to the effect of a method similar to a pooling of interest accounting requiring the shares to be reported for accounting purposes prior to the authorization and issuance of the shares related to the transaction.

*The accompanying notes are an integral part of these consolidated financial statements.*

28

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(amounts in thousands except per share data)

| | For the Fiscal Year ended | |
|---|---|---|
| | January 3, 2014 | December 28, 2012 |
| | | (Revised) |
| Revenues | $ 819,593 | $ 679,759 |
| Revenues - related parties | 80 | 80 |
| **Revenues** | **819,673** | **679,839** |
| Cost of revenue - related parties | 717,233 | 596,166 |
| Cost of revenues | 6,064 | 3,643 |
| **Cost of revenues** | **723,297** | **599,809** |
| **Gross profit** | **96,376** | **80,030** |
| Selling, general and administrative expenses - related parties | 49,095 | 47,864 |
| Selling, general and administrative expenses | 29,292 | 25,717 |
| Non-cash equity compensation | 5,279 | 856 |
| Depreciation and amortization | 1,794 | 2,012 |
| Impairments of intangible assets and goodwill | 309 | 408 |
| **Income from operations** | **10,607** | **3,173** |
| Interest expense | (4,446) | (4,344) |
| Interest expense – related parties | (1,693) | (861) |
| Loss from equity investment | (791) | — |
| Fair value adjustment in contingent consideration | (149) | 802 |
| Other income (expense) | (140) | 11 |
| **Income (loss) before income taxes** | **3,388** | **(1,219)** |
| Provision for income taxes | (612) | (518) |
| **Net income (loss)** | **$ 2,776** | **$ (1,737)** |
| Total net income (loss) per share: | | |
| Basic | $ 0.02 | $ (0.01) |
| Diluted | $ 0.02 | $ (0.01) |
| Weighted average shares outstanding: | | |
| Basic | 159,283 | 148,377 |
| Diluted | 162,517 | 148,377 |

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
(amounts in thousands)

| | For the Fiscal Year ended | |
|---|---|---|
| | January 3, 2014 | December 28, 2012 |
| | | (Revised) |
| **Net income (loss)** | $ 2,776 | $ (1,737) |
| Foreign currency translation adjustment | 74 | — |
| **Comprehensive income (loss)** | $ 2,850 | $ (1,737) |

*The accompanying notes are an integral part of these consolidated financial statements.*

29

[Table of Contents](#)

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**
**(amounts in thousands, except share amounts)**

| | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income | Accumulated Deficit | Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balances as of December 30, 2011 (as reported)** | **105,015,000** | **$  11** | **$  11,316** | **$  —** | **$  (5,249)** | **$  6,078** |
| Summit Acquisition Pooling-of-Interest* | 21,000,000 | 2 | (2,082) | — | 1,958 | (122) |
| Adjustment due to revisions | 475,000 | | (1,695) | — | (620) | (2,315) |
| **Balances as of December 30, 2011 (revised)** | **126,490,000** | **13** | **7,539** | **—** | **(3,911)** | **3,641** |
| Conversion of related party loan payable to equity | 30,506,000 | 3 | 14,097 | — | — | 14,100 |
| Retirement of Common Stock | (185,000) | | | | | — |
| Stock-based compensation | 2,530,000 | — | 856 | — | — | 856 |
| Net loss for the Fiscal Year ended December 28, 2012 | — | — | — | — | (1,737) | (1,737) |
| **Balances as of December 28, 2012 (Revised)** | **159,341,000** | **16** | **22,492** | **—** | **(5,648)** | **16,860** |
| Exercise of Options - Cash less | 49,000 | — | — | — | — | — |
| Summit Acquisition Pooling-of-Interest* | — | — | 3,989 | — | (2,104) | 1,885 |
| Stock-based compensation | 559,000 | — | 5,279 | — | — | 5,279 |
| Retirement of common stock | (1,934,000) | | | | | — |
| Foreign currency translation adjustment | — | — | — | 74 | — | 74 |
| Net income for the Fiscal Year ended January 3, 2014 | — | — | — | — | 2,776 | 2,776 |
| **Balances as of January 3, 2014** | **158,015,000** | **$  16** | **$  31,760** | **$  74** | **$  (4,976)** | **$  26,874** |

\* Please see *Related Parties*

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**CONSOLIDATED CASH FLOW STATEMENTS:**
**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | For the Fiscal Year ended | |
|---|---|---|
| | January 3,<br>2014 | December 28,<br>2012 |
| | | (Revised) |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 2,776 | $ (1,737) |
| Adjustments to reconcile net income (loss) to cash flows (used in) provided by operating activities: | | |
| Depreciation and amortization | 1,794 | 2,012 |
| Impairment of goodwill and intangible assets | 309 | 408 |
| Bad debt net of write-offs | 994 | 707 |
| Non-cash equity compensation | 5,279 | 856 |
| Loss on equity investment | 791 | — |
| Deferred rent | (209) | — |
| Change in fair value of contingent consideration | 149 | (802) |
| Changes in operating assets and liabilities, net of acquisitions: | | |
| Accounts receivable | (9,336) | (24,883) |
| Unbilled receivables | (1,272) | (843) |
| Accounts receivable - related party | (2,335) | — |
| Prepaid expenses and other current assets | (750) | (350) |
| Accrued wages and related obligations – due related party | (200) | 3,429 |
| Accounts payable and accrued liabilities | 539 | (4,634) |
| Other liabilities | — | 54 |
| Deferred tax liabilities | 269 | 317 |
| Net cash provided by (used in) operating activities | (1,202) | (25,466) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (1,477) | (857) |
| Cash paid for business combinations, net of cash acquired of $28 for the fiscal year ended January 3, 2013 | (1,966) | (831) |
| Equity investment | (2,743) | — |
| Net cash used in investing activities | (6,186) | (1,688) |
| **Cash flows from financing activities:** | | |
| Receivables-based credit facility, net | 2,681 | 19,985 |
| Loan payable - related party, net | 5,347 | 8,420 |
| Loan payable - proceeds | 1,600 | — |
| Loan payable - repayments | — | (101) |
| Long-term debt - repayments | (1,057) | (615) |
| Payments on contingent consideration | (489) | (491) |
| Net cash provided by financing activities | 7,332 | 27,198 |
| Effect of foreign currency exchange rates on cash | (66) | — |
| Net change in cash | (122) | 44 |
| Cash at beginning of period | 154 | 110 |
| Cash at end of period | $ 32 | $ 154 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.    Description of the Company and its Business**

Corporate Resource Services, Inc. (together with its consolidated subsidiaries, "Corporate Resource Services", "CRS", the "Company", "we", "us", and "our", unless the context indicates otherwise) is a diversified technology, staffing, recruiting, and consulting services firm. We provide cloud-based enterprise applications and hosting services to PEO and staffing companies, as well as diversified staffing, recruiting, and consulting services. The Company offers trained employees in the areas of Insurance, Information Technology, Accounting, Legal, Engineering, Science, Healthcare, Life Sciences, Creative Services, Hospitality, Retail, General Business and Light Industrial Work. Our blended staffing solutions are tailored to our customers' needs and can include customized employee pre-training and testing, on-site facilities management, vendor management, risk assessment and management, market analysis and productivity/occupational engineering studies.

Our ability to deliver broad-based solutions provides our customers a "one stop shop" to fulfill their staffing needs from professional services and consulting to clerical and light industrial positions. Depending on the size and complexity of an assignment, we can create an on-site facility for recruiting, training and administration at the customer location. Our recruiters, who generally focus within their area of expertise, have the resources available to help our customers secure the best candidates available in today's ever changing marketplace.

We offer our services through our wholly-owned specialty recruiting and staffing subsidiaries, which include the following companies: Accountabilities, Inc. ("Accountabilities"); Corporate Resource Development, Inc. ("CRD"); CRS Group, Inc. ("CRS Group"); Flex Recruitment Plus Limited ("FlexPlus"); Insurance Overload Services, Inc. ("Insurance Overload"); Integrated Consulting Group, Inc. ("ICG"); TS Staffing Services, Inc. ("TS Staffing"); and Diamond Staffing Services, Inc. ("Diamond Staffing"), among others.

The type and number of services we offer have grown largely through the acquisition of established offices from general staffing companies.

We operate approximately 250 staffing and on-site facilities throughout the United States and in the United Kingdom and we offer our services to a wide variety of clients in many industries, ranging from sole proprietorships to Fortune 1000 companies.

Our majority shareholder, the beneficial owner of approximately 89.7% and 89.9% of our outstanding shares of common stock as of January 3, 2014 and December 28, 2012, respectively, has the ability to exercise control over us.

**2.    Summary of Significant Accounting Policies**

*Fiscal Year*

Beginning in 2012, our operations are on a "52/53-week" fiscal year ending on the Friday closest to December 31. The year over year comparisons relate to a 53 week Fiscal Year ended January 3, 2014 ("Fiscal Year 2013") which began on December 29, 2012 and the 52 week Fiscal Year ended December 28, 2012 ("Fiscal Year 2012") which began on December 30, 2011.

*Consolidation*

The accompanying consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. Intercompany transactions have been eliminated in consolidation. Our FlexPlus foreign subsidiary in the U.K. is not subject to political, economic, or currency restrictions.

We have ownership and other interests in various entities, including corporations, partnerships, and limited liability companies. For each such entity, we evaluate our ownership and other interests to determine whether we should consolidate the entity or account for our ownership interest as an investment. As part of our evaluation, we initially determine whether the entity is a variable interest entity ("VIE") and, if so, whether we are the primary beneficiary of the VIE. An entity is generally a VIE if it meets any of the following criteria: (i) the entity has insufficient equity to finance its activities without additional subordinated financial support from other parties, (ii) the equity investors cannot make significant decisions about the entity's operations, or (iii) the voting rights of some investors are not proportional to their obligations to absorb the expected losses of the entity or receive the expected returns of the entity and substantially all of the entity's activities involve or are conducted on behalf of the investor with disproportionately few voting rights. We consolidate VIEs for which we are the primary beneficiary, regardless of our ownership or voting interests. The primary beneficiary is the party involved with the VIE that (i) has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance, and (ii) has the obligation to absorb gains

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

or losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE. We periodically make judgments in determining whether entities in which we invest are VIEs. If so, we then make judgments to determine whether we are the primary beneficiary and are thus required to consolidate the entity.

If it is concluded that an entity is not a VIE, then we consider our proportional voting interests in the entity. We consolidate majority-owned subsidiaries in which a controlling interest is maintained. Controlling interest is determined by majority ownership and the absence of significant third-party participating rights.

Ownership interests in entities for which we have significant influence and are not consolidated under our consolidation policy are accounted for as equity method investments. Related party transactions between the Company and its equity method investees, if any, have not been eliminated. Please see *Acquisitions and Joint Ventures.*

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and the rules of the Securities and Exchange Commission ("SEC"). We have revised certain prior period amounts and presentations to reflect our change in fiscal year end and to reflect the correction of certain errors. In particular:

- During the Fiscal Year ended January 3, 2014, we identified an error in our historical accounting for the factoring of our receivables to Wells Fargo, resulting in an understatement of our assets and liabilities included in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 by $74.8 million and $68.8 million, respectively. The error had no impact on our Consolidated Statement of Operations for the nine months ended October 4, 2013, nor for the Fiscal Year ended December 28, 2012. The Consolidated Balance Sheet as of December 28, 2012 included herein has been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, net income or net changes in cash for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012.

- During the Fiscal Year ended January 3, 2014, we also identified an error in our accounting for stock-based compensation expense relating to awards of shares, warrants to acquire common stock, and employee stock options as previously reported. The error resulted in an understatement of our selling, general and administrative expense included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012 by approximately $3.3 million and $0.2 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct this error. The correction had no impact on revenues or net change in cash for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012.

- During the Fiscal Year ended January 3, 2014, we also identified an $0.9 million error in our accounting for deferred taxes relating to the amortization of indefinite-life intangibles that originated during 2005, resulting in an understatement in liabilities in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 of $1.1 million and $0.9 million, respectively. The error also understated our deferred income tax provision included in our Consolidated Statement of Operations for the nine months ended October 3, 2013 and Fiscal Year ended December 28, 2012 by approximately $0.2 million and $0.3 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, or net change in cash for the nine months ended October 4, 2013 and for the Fiscal Year ended December 28, 2012.

- During the Fiscal Year ended January 3, 2014, we also identified a number of miscellaneous errors relating to our accounting for cash, accounts receivable, prepaid expenses, accounts payable, and accrued liabilities, other liabilities and business combinations that resulted in an understatement of assets included in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 of $0.5 million and $0.7 million, respectively. These errors also overstated our operating income, taxable income and net income included in its Consolidated Statement of Operations for the nine months ended October 4, 2013 by $0.1 million, $0.2 million and $0.2 million, respectively. In addition, these errors overstated our operating income in our Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 by $0.7 million, and understated our taxable income and net income included in our Consolidated

33

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Statement of Operations for the Fiscal Year ended December 28, 2012 by $0.5 million and $0.4 million, respectively. The Consolidated Statement of Operations for the fiscal year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct these errors.

- During the Fiscal Year ended January 3, 2014, we also evaluated our consolidation of Abest Power & Gas, LLC ("Abest"), our joint venture in retail energy, and was formed in January 2013, and determined that Abest is an entity that should not be consolidated. We had presented the results of Abest as a consolidated entity in our consolidated financial statements for each of the first three quarters of 2013. While the Consolidated Balance sheet as of January 3, 2014 and the Consolidated Statement of Operations for the year ended January 3, 2014, included herein, do not include the assets, liabilities or equity of Abest, we do include our investment in Abest under the equity method of investment and report the loss for Abest as a loss on equity investment.

Please see *Prior Period Adjustment* footnote for the quarterly impact of these adjustments. We will present revised amounts when these periods are presented as comparatives in future filings.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Significant estimates and assumptions are used for, but are not limited to: (1) revenue recognition; (2) asset impairments; (3) depreciable lives of assets; (4) fair value of stock-based compensation; (5) allocation of direct and indirect cost of sales; (6) fair value of identifiable purchased tangible and intangible assets in a business combination; (7) fair value of reporting units for goodwill impairment test; and (8) the estimate of income taxes. Actual results could significantly differ from those estimates.

*Revenue Recognition*

Revenue is generally recognized when persuasive evidence of an arrangement exists, products have been delivered or services have been rendered, the fee is fixed or determinable, and collection is reasonably assured. The vast majority of our arrangements do not fall within the scope of the multiple-deliverable guidance. For those arrangements within the scope of the multiple-deliverable guidance, a deliverable constitutes a separate unit of accounting when it has stand-alone value and there are no customer-negotiated refunds or return rights for the delivered elements. For multiple-element arrangements, composed only of software products and related services or only services, we allocate revenue to each element in an arrangement based on a selling price hierarchy. The selling price for a deliverable is based on its vendor-specific objective evidence ("VSOE") if applicable, third-party evidence ("TPE") if VSOE is not available, or estimated selling price ("ESP"), if neither VSOE nor TPE is available. Total transaction revenue is allocated to the multiple elements based on each element's relative selling price compared to the total selling price. All our elements allocations are based on ESP.

The following revenue recognition policies define the manner in which we account for specific transaction types:

*Staffing Services*

Revenue is primarily derived from supplying contingent staff to our customers or providing other services on a time and material basis. Contingent staff primarily consist of contingent employees working under contract for a fixed period of time or on a specific customer project. Revenue is also derived from permanent placement services, which is generally recognized after placements are made and when the fees are not contingent upon any future event.

Reimbursable costs, including those related to travel and out-of-pocket expenses, are also included in net revenue, and equivalent amounts of reimbursable costs are included in direct cost of staffing services revenue.

Under certain of our service arrangements, contingent staff is provided to customers through contracts involving other vendors or contractors. When we are the principal in the transaction and therefore the primary obligor for the contingent staff, we record the gross amount of the revenue and expense from the service arrangement. When we act only as an agent for the customer and are not the primary obligor for the contingent staff, we record revenue net of vendor or contractor costs.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We are generally the primary obligor when we are responsible for the fulfillment of the services under the contract, even if the contingent workers are neither our employees nor directly contracted by us. Usually in these situations the contractual relationship with the vendors and contractors is exclusively with us and we bear customer credit risk and generally have latitude in establishing vendor pricing and have discretion in vendor or contractor selection.

*Software Systems*

Revenue primarily relates to sales of staffing support software systems and enhancements to existing systems. These arrangements generally contain multiple elements including software development and customization, sale of software licenses, installation, implementation and integration services, as well as post-contract customer support ("PCS"). Revenue is recognized under these arrangements following the FASB revenue recognition requirements, including guidance on software transaction and multiple element arrangements. To date, the revenue recorded for software or related services under this accounting treatment have been minimal.

*Subscription Revenues*

Subscription and other recurring revenues include fees for access rights to software solutions that are offered under a subscription-based delivery model where the users do not take possession of the software. Under this model, the software applications are hosted by us and the customer accesses and uses the software on an as-needed basis over the Internet. To date, the revenue recorded under this accounting treatment has been minimal.

## Business Combinations

We have made strategic acquisitions to expand our footprint, establish strategic partnerships and/or to obtain technology that is complementary to our product offerings and strategy. We evaluate each investment in a business to determine if we should account for the investment as a cost-basis investment, an equity investment, a business combination, or a common control transaction. An investment in which we do not have a controlling interest and which we are not the primary beneficiary but where we have the ability to exert significant influence is accounted for under the equity method of accounting. For those investments that we account for in accordance ASC 805, *Business Combinations*, we record the assets acquired and liabilities assumed at our estimate of their fair values on the date of the business combination. Our assessment of the estimated fair value of each of these can have a material effect on our reported results as intangible assets are amortized over various lives. Furthermore, a change in the estimated fair value of an asset or liability often has a direct impact on the amount to recognize as goodwill, which is an asset that is not amortized. Often determining the fair value of these assets and liabilities assumed requires an assessment of the expected use of the asset, the expected cost to extinguish a liability or our expectations related to the timing and the successful completion of the integration of the business. Such estimates are inherently difficult and subjective and can have a material impact on our financial statements. We account for business combinations under a method similar to the pooling-of-interest method ("Pooling-of-Interest") when the combination is with a business under common control with us by our majority shareholder.

## Equity-Based Compensation

We grant equity-based awards, such as stock options and restricted stock or restricted stock units, to certain key employees and consultants to create a clear and meaningful alignment between compensation and shareholder return and to enable the employees and consultants to develop and maintain a stock ownership position. While the majority of our equity awards feature time-based vesting, performance-based equity awards, which are awarded from time to time to certain key Company executives, vest as a function of performance, and may also be subject to the recipient's continued employment which also acts as a significant retention incentive.

Equity-based compensation cost is measured at the grant date, based on the fair value of the award and is recognized as expense over the employee requisite service period. In order to determine the fair value of stock options on the date of grant, we apply the Black-Scholes option-pricing model. Inherent in the model are assumptions related to risk-free interest rate, dividend yield, expected stock-price volatility and option life.

The risk-free rate assumed in valuing the options is based on the U.S. Treasury yield curve in effect at the time of grant for the expected term of the option. The dividend yield assumption is based on the lack of a historical and future expectation of dividend payouts. While the risk-free interest rate and dividend yield are less subjective assumptions, typically based on objective data derived from public sources, the expected stock-price volatility and option life assumptions require a level of judgment which make them critical accounting estimates.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We use an expected stock-price volatility based on the average expected volatilities of a sampling of companies with similar attributes to us, including industry, stage of life cycle, size and financial leverage.

The expected option term, representing the period of time that options granted are expected to be outstanding, is estimated using our limited historical post vesting exercise and employee termination behavior.

We estimate forfeitures using our historical experience, which is adjusted over the requisite service period based on the extent to which actual forfeitures differ or are expected to differ from such estimates. Because of the significant amount of judgment used in these calculations, it is reasonably likely that circumstances may cause the estimate to change.

With regard to the weighted-average option life assumption, we consider the exercise behavior of past grants and model the pattern of aggregate exercises.

We settle the exercise of stock options with newly issued shares.

With respect to grants of performance based awards, we will assess the probability that such performance criteria will be met in order to determine the compensation expense. Consequently, the compensation expense is recognized straight-line over the vesting period. If that assessment of the probability of the performance condition being met changes, we would recognize the impact of the change in estimate in the period of the change. As with the use of any estimate, and owing to the significant judgment used to derive those estimates, actual results may vary.

We have elected to treat future awards with only service conditions and with graded vesting as one award. Consequently, the total compensation expense would be recognized straight-line over the entire vesting period, so long as the compensation cost recognized at any date at least equals the portion of the grant date fair value of the award that is vested at that date.

*Accounts Receivable and Related Allowance*

We maintain an allowance for doubtful accounts for estimated losses resulting from our clients failing to make required payments for services rendered. Management estimates this allowance based upon knowledge of the financial condition of our clients, review of historical receivables and reserve trends and other pertinent information. If the financial condition of our clients deteriorates or there is an unfavorable trend in aggregate receivable collections, additional allowances may be required. We review the adequacy of the allowance for uncollectible accounts receivable on a quarterly basis and, if necessary, increase or decrease the balance by recording a charge or credit to SG&A expenses for the portion of the adjustment relating to uncollectible accounts receivable, and a charge or credit to revenue from services for the portion of the adjustment relating to sales allowances.

We fund our accounts receivable via a receivables-backed credit facility (the "Facility") with a financial institution. We receive 90% of the face value of qualified, as defined, receivables. Since we retain risk of loss on the receivables, the agreement provides that receivables that are older than 90 days (120 days in certain categories of receivables) cease to be qualified at the discretion of the financial institution. In most cases, our customer pays the financial institution directly for the receivables under the Facility. The Facility calls for net settlement twice weekly. Additionally, the Facility is additionally guaranteed by our majority shareholder. We record each cash amount advanced and repaid as an increase or decrease to the Facility respectively. We record customer payments made directly to the lender as a reduction in Accounts receivable and the Facility.

*Property and Equipment*

Property and equipment are stated at cost, less accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Furniture and fixtures | 5 years |
| Office equipment | 3 years |
| Computer equipment | 3 years |
| Software | 3 years |
| Leasehold improvements | Shorter of life or term of lease |

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Long lived tangible assets are tested for impairment when there are indicators of impairment. Indicators of impairment include: changes in the value of property and equipment; changes in expected future operating income; changes in business trends and prospects; and changes in demand, competition and other economic factors.

*Segment Reporting*

Operating segments are components of an enterprise about which separate financial information is available and that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and assess performance. Two or more operating segments may be aggregated into a single reportable segment if they have similar economic characteristics and are similar in the following areas: the nature of products and services; nature of production processes; type or class of customer; methods used to distribute products or provide services; and the nature of the regulatory environment, if applicable. We have aggregated our three operating segments into one reportable segment - staffing. All of our staffing operating segments have similar types of products, contracts, customers and employees. In addition, we have similar long-term average margins across the operating segments. Therefore, we believe we meet the criteria for aggregating operating segments into a single reporting segment. We have two operating segments, professional staffing and Summit Software that do not meet the size criteria to be its own reporting segment and therefore is required to be aggregated into the single reporting segment. Our chief operating decision maker is our Chief Executive Officer, who reviews financial information presented on a Company-wide basis for purposes of allocating resources and evaluating financial performance. In fiscal year 2012 all of our assets were located in the United States. In fiscal 2013, with the acquisition of FlexPlus we acquired and operate facilities in the United kingdom. As of January 3, 2014. 97% of our assets are located in the United States.

*Intangible Assets*

Goodwill represents the excess cost of an acquisition over the fair value of the net assets acquired. We account for goodwill and intangible assets with indefinite useful lives in accordance with relevant accounting guidance related to goodwill and other intangible assets, which states that goodwill and intangible assets with indefinite useful lives should not be amortized, but instead tested for impairment at least annually at the reporting unit level. Our policy is to perform this annual impairment test in the fourth quarter, using a measurement date as of the first day of our fiscal fourth quarter or more frequently if impairment indicators arise. Impairment indicators include, among other conditions, cash flow deficits, a historical or anticipated decline in revenue or operating profit, adverse legal or regulatory developments and a material decrease in the fair value of some or all of the assets.

The guidance provides an option for an entity to first assess qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not (that is, a likelihood of more than 50%) that the fair value of a reporting unit is greater than its carrying amount. If, after assessing the totality of events or circumstances, an entity determines it is not more likely than not that the fair value of a reporting unit is less than its carrying amount, performing the two-step (quantitative) impairment test is unnecessary.

In order to perform the qualitative or quantitative testing, we determine if it is appropriate to use the operating segment, as defined under guidance for segment reporting, as the reporting unit, or one level below the operating segment, depending on whether certain criteria are met. In identifying the reporting units management considers the economic characteristics of the reporting units including the products and services provided, production processes, types or classes of customer and product distribution.

If we determine that for a particular reporting unit that it is more likely than not (that is, a likelihood of more than 50%) that the fair value of a reporting unit is less than its carrying amount, we perform the first step of the two-step impairment test.

We perform this impairment test by first comparing the fair value of our reporting units to their respective carrying amount. Since reported quoted market prices exactly comparable to our reporting units are not available, when determining the estimated fair value of a reporting unit, we utilize a blend of discounted future cash flows, market multiples of similar companies that have quoted prices, and market capitalization reconciliation. Developing the estimate of the discounted future cash flows require significant judgment and projections of future financial performance. The key assumptions used in developing the discounted future cash flows are the projection of future revenues and expenses, working capital requirements, residual growth rates and the weighted average cost of capital. In developing our financial projections, we consider historical data, current internal estimates and market growth trends. Changes to any of these assumptions could materially change the fair value of the reporting unit. We reconcile the aggregate fair value of our reporting units to our adjusted market capitalization as a

37

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

supporting calculation. The adjusted market capitalization is calculated by multiplying the average share price of our common stock for the last ten trading days prior to the measurement date by the number of outstanding common shares and adding a control premium.

If the carrying value of the reporting units exceeds the fair value we would then compare the implied fair value of our goodwill to the carrying amount in order to determine the amount of the impairment, if any.

*Cash*

We consider cash on hand and deposits in banks as cash.

*Related Parties*

We have significant transactions with our majority shareholder who is the beneficial owner of approximately 89.7% and 89.9% of our outstanding shares of common stock as of January 3, 2014 and December 28, 2012, respectively, and had the ability to exercise control over us.

We classify assets and liabilities to related parties on our balance sheet as follows:
- "Related party receivables" represent amounts due from a related party.
- "Accrued wages and related obligations – due to related party" represent accrued wages, taxes and other related items that have not yet been invoiced.
- "Loan payable - related party" represents amounts due for items that have been invoiced.
- "Long term debt - related party" represents the amount due for long-term borrowings from a related party that is considered a current liability.
- "Loan payable - related party, net of current portion" represents the total amount due for long-term borrowings from a related party less the current portion of the debt.

We classify revenue and expenses from related parties in our Consolidated Statements of Operations as follows:
- "Revenues from related parties" are revenues for sales of services and software to related parties.
- "Cost of revenue - related parties" are PEO fees and reimbursements for our staffing service provided by related parties.
- "Selling, general and administrative expenses - related parties" represents PEO fees for selling, general and administrative expenses incurred on our behalf.
- "Interest Expense - related party" is interest expense incurred for related party loans and advances.

In addition, we had related party transactions involving acquisitions and debt extinguishment in exchange for our common stock. Please see *Related Party Transactions*.

*Per Share Information*

We present both basic and diluted earnings per share amounts ("EPS"). Basic EPS is calculated by dividing net income by the weighted average number of common shares outstanding during the period. Diluted EPS reflects any potential dilution that could occur if securities or other contracts to issue common stock, such as options, convertible notes and convertible preferred stock, were exercised or converted into common stock or could otherwise cause the issuance of common stock that then shared in earnings. During any period in which we report a loss, we do not adjust the number of shares outstanding for potentially dilutive securities for dividing into the net loss, since such adjustment would be anti-dilutive.

*Income Taxes*

We account for income taxes using the asset and liability method. Under this method, deferred income taxes are recognized for estimated tax consequences in future years of differences between the tax basis of assets and liabilities and their financial reporting amounts at each year-end, based on enacted tax laws and statutory rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established to reduce deferred tax assets to the amount expected to be realized when, in Management's opinion, it is more likely than not that the future tax benefits from some portion of the deferred tax assets will not be realized.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. GAAP requires that, in applying the liability method, the financial statement effects of an uncertain tax position be recognized based on the outcome that is more likely than not to occur. Under this criterion the most likely resolution of an uncertain tax position should be analyzed based on technical merits and on the outcome that will likely be sustained under examination.

*Fair Value of Financial Instruments*

We believe that of our financial instruments including: cash; accounts receivable; accounts payable and accrued liabilities; and loans payable - related party which are reflected at their carrying value in the consolidated financial statements approximate fair value due to their short-term maturities. The fair value of contingent considerations, including current maturities, is estimated based on analysis of outcome probabilities and applying a discounted cash flow analysis, based on the estimated current incremental borrowing rates for similar types of securities.

*Translation of Foreign Currencies*

Our international subsidiaries operate using local functional currencies. Foreign currency denominated assets and liabilities are translated into U.S. dollars at exchange rates in effect at the balance sheet date, and income and expense accounts and cash flow items are translated at average monthly exchange rates during the respective periods. Net exchange gains or losses resulting from the translation of foreign financial statements and the effect of exchange rates on intercompany transactions of a long-term investment nature are recorded as a separate component of equity in accumulated other comprehensive income. Any foreign currency gains or losses related to transactions are included in operating results.

*Advertising Expenses*

Advertising expenses from continuing operations, are expensed as incurred and are included in selling, general administrative expense. Advertising expense was $0.9 million and $1.0 million in fiscal year 2013 and 2012, respectively.

*Recently Adopted Accounting Standards*

In January 2013, the FASB issued ASU No. 2013-01, *Balance Sheet (Topic 210): Clarifying the Scope of Disclosures about Offsetting Assets and Liabilities*. ASU No. 2013-01 limits the scope of these disclosures to recognized derivative instruments, repurchase agreements and reverse repurchase agreements, and securities borrowing and lending transactions to the extent they are offset in the balance sheet or subject to an enforceable master netting arrangement or similar agreement. This ASU was effective retrospectively for fiscal years beginning on or after January 1, 2013, and interim periods within those annual periods.
This disclosure-only guidance became effective for us for fiscal year 2013 first quarter, with retrospective application required. We currently do not hold any financial or derivative instruments within the scope of this guidance that are offset in our consolidated balance sheets or are subject to an enforceable master netting arrangement. The adoption of this guidance did not have an impact on the Company's results of operations, financial position or cash flows.

*Recently Issued Accounting Standards to be Adopted*

In May 1014, FASB issued ASU No. 2014-09, *Revenue from Contracts and Customers (Topic 606),* to clarify the principles for recognizing revenue to develop a common revenue standard for U.S. GAAP and International Financial Reporting Standards ("IFRS") that would (1) provide a more robust framework for addressing revenue recognition; (2) improve comparability of revenue recognition practice across entities , industries, jurisdictions, and capital market; and (3) provide more useful information to users of financial statements through improved disclosure requirements. This standard is effective for annual reporting periods beginning after December 15, 2016. We are currently evaluating the effect the adoption of this standard will have, if any, on our consolidated financial statements.

In April 2014, FASB issued ASU No. 2014-08, *Presentation of Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of Entity,* changes the criteria for reporting discontinued operations while enhancing disclosure requirements. This ASU addresses sources of confusion and inconsistent application related to financial reporting of discontinued operations guidance in U.S. GAAP. Under this guidance, a discontinued operation is defined as a disposal of a component or group of components that is disposed of or is classified as held for sale and represents a strategic shift that has a major effect on an entity's operations and financial results. This ASU is effective prospectively for fiscal years and interim periods within those years beginning after December 15, 2014.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

This ASU is effective for us prospectively on January 2, 2015. We do not anticipate that the adoption of this standard will have a material impact on our consolidated financial statements.

In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740): Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*. ASU No. 2013-11 requires that entities with an unrecognized tax benefit and a net operating loss carryforward or similar tax loss or tax credit carryforward in the same jurisdiction as the uncertain tax position present the unrecognized tax benefit as a reduction of the deferred tax asset for the loss or tax credit carryforward rather than as a liability, when the uncertain tax position would reduce the loss or tax credit carryforward under the tax law, thereby eliminating diversity in practice regarding this presentation issue. This ASU is effective prospectively for the fiscal years and interim periods within those years beginning after December 15, 2013. This ASU is effective for us prospectively on January 4, 2014, and we are evaluating the potential impact of this adoption on our consolidated financial statements.

In March 2013, the FASB issued ASU No. 2013-05, *Foreign Currency Matters (Topic 830): Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of Certain Subsidiaries or Groups of Assets within a Foreign Entity or of an Investment in a Foreign Entity*. This new standard is intended to resolve diversity in practice regarding the release into net income of a cumulative translation adjustment ("CTA") upon derecognition of a subsidiary or group of assets within a foreign entity. ASU No. 2013-05 is effective prospectively for fiscal years, and interim reporting periods within those years, beginning after December 15, 2013. This ASU is effective for us prospectively on January 4, 2014. We do not anticipate that the adoption of this standard will have a material impact on our consolidated financial statements.

In February 2013, the FASB issued ASU No. 2013-04, *Liabilities (Topic 450): Obligation Resulting from Joint and Several Liability Arrangements for Which the Total Amount of the Obligation is Fixed at the Reporting Date*. This authoritative guidance is for the recognition, measurement, and disclosure of obligations resulting from joint and several liability arrangements for which the total amount of the obligations within the scope of this guidance is fixed at the reporting date. It does not apply to certain obligations that are addressed within existing guidance in U.S. GAAP. This guidance requires an entity to measure in-scope obligations with joint and several liability (e.g., debt arrangements, other contractual obligations, settled litigations, judicial rulings) as the sum of the amount the reporting entity agreed to pay on the basis of its arrangement among its co-obligors and any additional amount it expects to pay on behalf of its co-obligors. In addition, an entity is required to disclose the nature and amount of the obligation. ASU 2013-04 is effective retrospectively for fiscal years, and interim periods within those years, beginning after December 15, 2014. This ASU is effective for us retrospectively on January 4, 2015, and we are evaluating the potential impact of this adoption on our consolidated financial statements.

**3.    Related Party Transactions**

Tri-State, a related party, provides professional employer services to us as part of a co-employment arrangement where Tri-State is the employer of record and we are the worksite employer. Professional employer services provided by Tri-State include payroll services, administration of employee benefits, workers' compensation insurance coverage, customer invoicing and accounts receivable collection services. These arrangements allow us to reduce certain insurance risks and costs. Due to the timing and payment of invoices received, the aggregate amount payable for accrued wages and related obligations provided by Tri-State was $9.4 million and $9.6 million as of January 3, 2014 and December 28, 2012, respectively.

We are charged the wages and associated payroll taxes for the employee plus an agreed upon rate for workers' compensation and health insurance as well as an administrative fee. The total amount charged by Tri-State for the Fiscal Years 2013 and 2012 was $717.2 million and $596.2 million, respectively.

The amounts owed to Tri-State are classified as related party loans payable. The principal amount increases or decreases based on periodic borrowings or repayments, and each subsidiary of the Company is charged interest at the rate of 12% per annum of their net loan payable. The related party loans payable are due on demand, subject to the restrictions described below. On June 20, 2014, in conjunction with our amendments to the Wells Fargo Accounts Purchase Agreements, Tri-State agreed that we would not be required to reduce the outstanding balance on the related party loans payable below $15 million for a period of at least one year. We recognized $1.7 million and $0.9 million of related party interest expense for Fiscal Years 2013 and 2012, respectively.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On March 30, 2012, we entered into an agreement to convert $12.0 million of the loan payable to Tri-State into 25,962,788 shares of common stock, at a value per share of $0.4622 Additionally, on July 31, 2012, we and Tri-State agreed to convert an additional $2.1 million of the loan into 4,543,488 shares of common stock, at a value per share of $0.4622. These conversions are reflected in the loan payable - related party balance, after giving effect to the conversions noted above as of January 3, 2014 and December 28, 2012.

On May 7, 2013, our wholly owned subsidiary, CRS Group acquired certain assets and assumed certain liabilities of the Summit Software Division ("Summit") of Tri-Tel Communications, Inc., a related party under common control (the "Summit Acquisition"). Accordingly, in accordance with ASC Topic 805, with respect to business combinations for transactions between entities under common control, the merger has been accounted for using Pooling-of-Interest with no adjustment to the historical basis of the assets and liabilities of CRS Group or Summit. Summit financial position and results of operations have therefore been included in all periods presented as if we had been combined at all times the entities were under common control. Pursuant to the terms of the agreement, we acquired certain assets and assumed certain liabilities in exchange for 21,000,000 shares of our common stock, valued at $0.65 per share or $13.75 million, based upon an independent valuation.

**4.    Acquisitions and Joint Ventures**

*Formation of Abest Power & Gas, LLC Joint Venture*

In January 2013, we entered into the retail energy services industry through the formation of Abest, a joint venture with Rosa Power, LLC. Based on the level of equity investment at risk, Abest is a VIE. While we and Rosa Power, LLC are partners who share equally in voting control, power is not shared because Rosa Power, LLC, through its owner, the President of Abest, directs the significant activities of Abest that most significantly impact its economic performance including selection of vendors, systems, marketing, pricing, balancing energy purchase commitments against energy sales commitments as well as selection and retention of key management personnel. Accordingly, we have determined that we are not the primary beneficiary of Abest and account for our investment in Abest using the equity method. Since the formation of Abest through January 3, 2014, we have contributed $2.7 million to Abest. The contributions did not impact our ownership interest, voting control or governance rights related to Abest.

While we have no further funding commitments pursuant to the operating agreement, we may provide additional funding to Abest, if necessary. The partnership agreement calls for preferential distributions until our funding has been recouped. Abest's subsequent cash distributions will be shared equally between us and Rosa Power, LLC.

In accordance with the venture agreement, losses generated by Abest are generally allocated to both investors based on their proportionate ownership interests. However, we have recorded our portion of Abest's losses based upon accounting policies for equity method investments. The accumulated operating losses at Abest exceeded the equity contributed to Abest. In accordance with the accounting guidance, we have recorded 100% of Abest's net losses against the carrying value of the investment. We will continue to record 100% of Abest's operating losses as long as we provide all the funding to Abest and Abest's accumulated losses continue to exceed the equity contributed. All of Abest's future net income will initially be recorded by us until we recover losses absorbed in excess of our equity ownership interest.

The carrying value of the Company's investment in Abest was $1.9 million as of January 3, 2014, net of $0.8 million in accumulated investment loss. Abest's condensed balance sheet as of December 31, 2013 is as follows (in thousands):

41

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| Assets | | |
|---|---|---|
| **Current assets** | | |
| Cash | $ | 15 |
| Restricted cash | | 903 |
| Accounts receivable | | 728 |
| Prepaid expenses | | 357 |
| **Total current assets** | | 2,003 |
| Other assets | | 19 |
| **Total assets** | $ | 2,022 |
| | | |
| **Liabilities and Equity** | | |
| Current liabilities | $ | 70 |
| Member units | | 2,743 |
| Accumulated deficit | | (791) |
| **Total liabilities and equity** | $ | 2,022 |

*Strategic Minor Acquisitions*

We continue to acquire diverse staffing firms to augment our growth strategy. We made acquisitions with aggregate purchase prices of $7.8 million and $1.7 million for the Fiscal Years 2013 and 2012, respectively. We recorded additions to intangible assets excluding goodwill in the amount of $4.7 million and $1.6 million for the Fiscal Years 2013 and 2012, respectively. We recorded additions to goodwill in the amount of $4.2 million and $1.0 million for the Fiscal Years 2013 and 2012, respectively. During 2013, all of our strategic minor acquisitions, with the exception of FlexPlus, were made by TS Staffing. TS Staffing acquired certain asset and liabilities of: Personally Yours, Inc., which is based in Florida; Temploy, Inc., whose business is concentrated in Southern California; Personnel Solutions, Inc., which is based in Iowa; and Cameo Employment Services, Inc, which is based in California. Our CRS Group subsidiary acquired 100% of the outstanding stock of FlexPlus, whose business is based in the United Kingdom, as a wholly-owned subsidiary of CRS Group.

On May 7, 2013 our CRS Group subsidiary completed the Summit Acquisition from Tri-Tel, a related party that has been accounted for using Pooling-of-Interests in accordance with U.S. GAAP. Pursuant to the terms of the agreement, we acquired certain assets and assumed certain liabilities in exchange for 21,000,000 shares of our common stock, valued at $13.75 million, based upon independent valuation of our common stock and of Summit's business operations. Please see *Related Party Transactions.*

The foregoing acquisitions were not material to our financial condition or results of operations. Additionally, the pro-forma consolidated statements of income as if the results of these acquisitions had been included in our consolidated results for Fiscal Years ended January 3, 2014 and December 28, 2012, would not have been materially different from our reported consolidated statements of income for these periods.

**5.   Concentrations of Credit Risk**

At times, cash balances on deposit exceed federally insured limits; however, to date, we have not experienced any losses in such accounts and management believes that the risk of loss is negligible. With respect to accounts receivable, our concentration of credit risk is limited due to the large number of customers comprising our customer base and their dispersion across different business and geographic areas. We monitor our exposure to credit losses and maintain an allowance for anticipated losses. To reduce credit risk, we perform credit checks on our customers. No single customer accounted for more than 10% of revenue for the years ended January 3, 2014 and December 28, 2012.

**6.   Accounts receivable**

Our subsidiaries Accountabilities, CRD, Insurance Overload, ICG, Diamond Staffing, and TS Staffing are parties to account purchase agreements with Wells Fargo Capital Finance, an operating division of Wells Fargo, N.A., or Wells Fargo, pursuant to which, a maximum amount of $80.0 million of accounts receivable can be financed through Wells Fargo, or the Facility. The aggregate amount of trade receivables from the permanent placement business that CRD may fund through the Facility at any one time is $1.3 million. The Facility is personally guaranteed by our majority shareholder. The Facility allows for 90% of qualifying receivables be funded with certain exceptions related to permanent placement related receivables. The Facility allows for funding of 65% of qualifying receivable related to permanent placement. The Facility requires that our customers pay those receivables assigned to Wells Fargo directly to Wells Fargo. The risk of bad debt losses on assigned accounts receivables is retained by us and receivables funded which become greater than 90 days old (120 days for certain health-care related receivables), at Wells Fargo's option, can be required to be removed from eligible receivables from our outstanding

[Table of Contents](#)

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

balance. We pay Wells Fargo a fee for the funded balance outstanding daily at rate equal to an annual rate of the 90-day London Interbank Offered Rate plus 4.25% to 6.17% per annum which is included in interest expense. The Facility calls for twice weekly net settlement of the additions, required reductions and customer repayments. In the event that our majority shareholder ceases to guarantee the Facility, the Facility may be closed. The Facility was extended June 20, 2014 to expire on June 30, 2015. Please see *Subsequent Events*.

Accountabilities participated in the Facility until June 13, 2011, when they entered into a similar two year receivable-backed credit facility with Amerisource Funding, Inc. ("Amerisource") and ICG entered into a similar agreement on October 18, 2011. Accountabilities and ICG returned to participating in the Facility on June 13, 2013 and November 1, 2013, respectively.

During the Fiscal Year ended January 3, 2014, we re-evaluated the accounts receivable sale agreement in accordance with the accounting guidance and have concluded that the agreement should be treated as a financing arrangement for U.S. GAAP. Accordingly we record each cash amount advanced and repaid as an increase or decrease to Loan Payable respectively. We record customer payments made directly to the lender as a reduction in Accounts Receivable and Loan Payable.

Previously we recorded the agreement as sale of receivables. This resulted in an understatement of our assets and an understatement of our liabilities included in our Consolidated Balance Sheet as of December 28, 2012 by $68.8 million. The error had no impact on our Consolidated Statements of Operations for the year ended December 28, 2012. The Consolidated Balance Sheet as of December 28, 2012 included herein has been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, net income or net cash flows for the year ended December 28, 2012. For further discussion please see note *Prior Period Adjustments*.

Fees charged under the Facility are included in interest expense in the accompanying Consolidated Statements of Operations and amounted to $3.6 million and $3.1 million for the Fiscal Years ended January 3, 2014 and December 28, 2012, respectively. Fees charged under Amerisource are included in interest expense in the accompanying Consolidated Statements of Operations and amounted to $0.7 million and $1.1 million for the Fiscal Years ended January 3, 2014 and December 28, 2012, respectively.

**7.    Property and Equipment**

Property and equipment consisted of the following (in thousands):

|  | As of | | | |
|---|---|---|---|---|
|  | January 3, 2014 | | December 28, 2012 | |
|  |  | | (Revised) | |
| Furniture and fixtures | $ | 1,310 | $ | 1,303 |
| Office equipment |  | 894 |  | 748 |
| Computer equipment |  | 609 |  | 238 |
| Software |  | 419 |  | 229 |
| Leasehold improvements |  | 179 |  | 1,022 |
|  |  | 3,411 |  | 3,540 |
| Less accumulated depreciation and amortization |  | (2,126) |  | (1,634) |
|  | $ | 1,285 | $ | 1,906 |

The December 28, 2012 balance was revised to include balances of the Summit Acquisition under the Pooling-of-Interest. We recorded depreciation expense for the Fiscal Years ended January 3, 2014 and December 28, 2012 of $0.7 million and $0.4 million, respectively.

**8.    Intangible Assets and Goodwill**

We performed our annual qualitative assessment for indicators of goodwill impairment as of October 1, 2013 and determined that no events existed or circumstances lead to a determination that it is more likely than not (that is, a likelihood of more than 50%) that the fair value of a reporting unit is less than its carrying amount. Based on this assessment we determined that we were not required to perform a step one analysis. We continue to monitor for indicators of impairment and will evaluate our goodwill, indefinite lived intangibles, and long lived assets as conditions warrant.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We performed our annual assessment for goodwill impairment as of October 1, 2012 on a quantitative basis (also known as a step 1 analysis). As a result of our step 1 analysis, we determined that one of our units required a step 2 analysis. Upon completion of our step 2 analysis it was determined that our goodwill was not impaired.

We had an indicator of impairment in January 2012. In January 2012, a sales executive from ICG Inc. and 14 other sales, administration and operations personnel resigned from the Company and began operating a competing temporary placement firm. Based on the anticipated decrease in revenues in our ICG Inc. subsidiary, we evaluated our goodwill and long lived assets in accordance with the accounting guidance and recorded impairment of goodwill of $0.4 million for Fiscal Year 2012.

In Fiscal Year 2013, in order to enhance customer recognition of the scope of our services, we determined to transition the majority of our businesses to operate under the Corporate Resource Services brand. We determined that certain trade names would be phased out and therefore we have impaired the carrying value of certain of our trade names in the amount of $0.2 million. We also impaired the carrying value of a non-compete agreement by $0.1 million that was renegotiated for a shorter period of time.

The following tables summarize our intangible assets and their carrying values (in thousands):

| | As of January 3, 2014 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross | Accumulated Impairment | Accumulated Amortization | Adjustment | * | Net | | Useful Lives |
| Customer lists and relationships | $ 17,474 | $ — | $ (10,056) | $ 92 | | $ 7,510 | | 3 to 10 years |
| Backlog | 338 | | (338) | — | | — | | 6 to 10 years |
| Non-competition agreements | 2,119 | (112) | (1,722) | — | | 285 | | 2 to 5 years |
| Trade name | 1,040 | (197) | (112) | 20 | | 751 | | 20 years |
| Intellectual Property | 466 | | (466) | — | | — | | 5 years |
| Lease agreements | 250 | — | (250) | — | | — | | 5 years |
| Total | $ 21,687 | $ (309) | $ (12,944) | $ 112 | | $ 8,546 | | |
| Goodwill | $ 19,622 | $ — | | $ 60 | | $ 19,682 | | Indefinite Life |

*Adjustments for the period consisted of changes in carrying value attributable to periodic foreign currency valuation adjustments.

| | As of December 28, 2012 (Revised) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Gross | Accumulated Impairment | Accumulated Amortization | Adjustment | * | Net | | Useful Lives |
| Customer lists and relationships | $ 13,494 | $ — | $ (9,123) | $ — | | $ 4,371 | | 3 to 10 years |
| Backlog | 338 | — | (338) | — | | — | | 6 to 10 years |
| Non-competition agreements | 2,019 | — | (1,589) | — | | 430 | | 2 to 5 years |
| Trade name | 424 | — | (90) | — | | 334 | | 20 years |
| Intellectual Property | 466 | | (466) | — | | — | | 5 years |
| Lease agreements | 250 | — | (249) | — | | 1 | | 3 years |
| Total | $ 16,991 | $ — | $ (11,855) | $ — | | $ 5,136 | | |
| Goodwill | $ 15,817 | $ (408) | | $ — | | $ 15,409 | | Indefinite life |

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes our changes in intangible assets, net (in thousands):

| | As of December 28, 2012 (Revised) | Additions | Amortization | Adjustment | * | Impairments | As of January 3, 2014 |
|---|---|---|---|---|---|---|---|
| Customer lists and relationships | $ 4,371 | $ 3,980 | $ (933) | $ 92 | $ | $ — | $ 7,510 |
| Backlog | — | — | — | — | | — | — |
| Non-competition agreements | 430 | 100 | (133) | — | | (112) | 285 |
| Trade name | 334 | 616 | (22) | 20 | | (197) | 751 |
| Intellectual Property | — | — | — | — | | — | — |
| Lease agreements | 1 | — | (1) | — | | — | — |
| Total | $ 5,136 | $ 4,696 | $ (1,089) | $ 112 | $ | $ (309) | $ 8,546 |
| Goodwill (indefinite life) | $ 15,409 | $ 4,213 | | $ 60 | $ | $ — | $ 19,682 |

\* *Adjustments for the period consisted of changes in carrying value attributable to periodic foreign currency valuation adjustments.*

We recorded amortization expense of $1.1 million and $1.6 million for the Fiscal Years ended January 3, 2014 and December 28, 2012, respectively. Estimated intangible asset amortization expense (based on existing intangible assets) for the Fiscal Year ending (in thousands):

| | | |
|---|---|---|
| January 2, 2015 | $ | 1,486 |
| January 1, 2016 | | 1,416 |
| December 30, 2016 | | 913 |
| December 29, 2017 | | 747 |
| December 28, 2018 | | 739 |
| Thereafter | | 3,245 |
| Total | $ | 8,546 |

**9.    Liabilities**

*Accounts Payable and Accrued Liabilities*

Accounts payable and accrued liabilities consist of the following (in thousands)

| | January 3, 2014 | December 28, 2012 (Revised) |
|---|---|---|
| Accrued expenses | $ 440 | $ 480 |
| Accounts payable | 2,128 | 2,122 |
| Sales, use and other taxes | 1,612 | 143 |
| Customer deposits | 205 | 215 |
| Deferred revenue | 348 | 314 |
| Other | 2,845 | 3,003 |
| Total Accounts Payable and Accrued Liabilities | $ 7,578 | $ 6,277 |

*Borrowings Under Receivables-based Credit Facility*

We have account purchase agreements that are treated for accounting purposes as a receivables-backed financing. Please see *Accounts Receivable* for details concerning the Facility.

*Loan Payable – Related Party*

We have historically relied on funding from related parties in order to meet our liquidity needs. Please see *Related parties.*

*Long-Term Debt*

In the course of various acquisitions, we issue debt to the sellers as part of the compensation. These obligations often do not have stated rates of interest and are payable in uneven payments or repayments dependent on sales. We have imputed an interest rate for these instruments based on discounted cash flow analysis. These obligations do not include obligations that are contingent on the acquisition reaching certain milestones. Please see *Contingent Consideration* for a review of those instruments.

Long-term debt at January 3, 2014 and December 28, 2012 consists of the following (in thousands, except payment amount):

45

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| Instrument | Matures | Interest Rate | Payments required | Balance as of January 3, 2014 | Short Term portion | Balance as of December 28, 2012 | Short Term portion |
|---|---|---|---|---|---|---|---|
| | | | | | | (Revised) | |
| Instrument A | 3/7/2014 | 5.4% * | Lump sum payable March 7, 2015 | $ 869 | $ 385 | $ — | $ — |
| Instrument B | 11/12/2014 | 5.1% * | Lump sum payable November 12, 2014 | 793 | 786 | — | — |
| Instrument C | 2/21/2014 | 3.5% * | Lump sum $225,000 due on Feb 21, 2014 and on May 24, 2015 | 438 | 216 | — | — |
| Instrument D | 10/17/2015 | 10.8% * | $100,000 semi-annual through October 17, 2015 | 353 | 166 | — | — |
| Instrument E | 1/1/2015 | 4.6% * | $27,885 per month for 26 months commencing on December 1, 2012 to January 1, 2015 | 298 | 129 | 671 | 315 |
| Instrument F | 7/12/2018 | 10.0% | Due on demand any time through July 12, 2018 | 264 | 264 | — | — |
| Instrument G | Variable | —% | $1.25 million payable in amounts equal to .75% of sales until liquidated | 1 | 1 | 557 | 557 |
| Instrument H** | 1/31/2104 | 10.0% | Lump sum payable on January 31, 2014 | 1,600 | 1,600 | — | — |
| Instrument I | 12/31/2012 | 5.4% | 11 payments of $11,363 per month through December 31, 2012 | — | — | 11 | 11 |
| Other Instruments | Various | 5.5% | Various | 212 | 212 | 270 | 192 |
| | | | | $ 4,828 | $ 3,759 | $ 1,509 | $ 1,075 |

*Imputed interest rate*
*Classified as loan payable on the consolidated balance sheet*

The aggregate amounts of long-term debt maturing after January 3, 2014 are as follows (in thousands):

| Fiscal year ended: | | |
|---|---|---|
| 1/2/2015 | $ | 3,759 |
| 1/1/2016 | | 1,069 |
| Total | $ | 4,828 |

*Contingent Consideration*

In the course of various acquisitions, we assume certain obligation to the sellers as part of the purchase consideration. These obligations are not fixed in amount but rather are subject to acquisitions achieving certain results or reaching certain milestones. At the date of acquisition and at the end of each quarter, we estimated the fair value of the contingent consideration by applying various probabilities and discount factors to each of the various performance milestones as further discussed in note *Summary of Significant Accounting Policies - Business Combinations* and in note *Fair Value*. We evaluated our outstanding contingent consideration at January 3, 2014 and December 28, 2012 and it consists of the following at fair value (in

46

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

thousands):

| Contingent Consideration | Matures | Payments Required | Balance as of January 3, 2014 | Short Term Portion | Balance as of December 28, 2012 | Short Term Portion |
|---|---|---|---|---|---|---|
| | | | | | (Revised) | |
| Contingent Consideration A | 9/7/2019 | 1.5% of sales of acquired business through 09/07/2013 and 1% of sales thereafter until September 07, 2019 | $    789 | $    179 | $    1,025 | $    308 |
| Contingent Consideration B | 9/26/2015 | 0.5% of revenues of acquired business up to $125 or through September 26, 2015, whichever occurs first | $    125 | $    125 | $    229 | $    115 |
| Contingent Consideration C | Perpetual | 5.00% of revenue generated from a certain client in perpetuity | $    2,359 | $    354 | $    — | $    — |
| | | | $    3,273 | $    658 | $    1,254 | $    423 |

## 10.  Fair Value Measurements

We categorize our liabilities recorded at fair value based upon the fair value hierarchy. The levels of fair value hierarchy are as follows:

- Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that we have the ability to access.

- Level 2 inputs utilize other-than-quoted prices that are observable, either directly or indirectly. Level 2 inputs include quoted prices for similar assets and liabilities in active markets, and inputs such as interest rates and yield curves that are observable at commonly quoted intervals.

- Level 3 inputs are unobservable and are typically based on our own assumptions, including situations where there is little, if any, market activity.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, we categorize such liabilities based on the lowest level input that is significant to the fair value measurement in its entirety. Our assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment and considers factors specific to the asset.

Both observable and unobservable inputs may be used to determine the fair value of positions that are classified within the Level 3 category. As a result, the unrealized gains and losses for assets within the Level 3 category presented below may include changes in fair value that were attributable to both observable (e.g. changes in market interest rates) and unobservable (e.g. changes in historical company data) inputs.

The major category of liabilities measured on a recurring basis, at fair value, as of January 3, 2014 and December 28, 2012 are as follows (in thousands):

| | As of January 3, 2014 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Contingent consideration | $    — | $    — | $    3,273 | $    3,273 |

| | As of December 28, 2012 (Revised) | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Contingent consideration | $    — | $    — | $    1,254 | $    1,254 |

47

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A reconciliation of the amount in Level 3 for the Fiscal Year ended January 3, 2014 is as follows (in thousands):

| | Level 3 |
|---|---|
| Balance as of December 28, 2012 (Revised) | $ 1,254 |
| Addition | 2,359 |
| Payment | (489) |
| Fair value adjustment | 149 |
| Balance as of January 3, 2014 | $ 3,273 |

A reconciliation of the amount in Level 3 for the Fiscal Year ended December 28, 2012 is as follows (in thousands):

| | Level 3 |
|---|---|
| Balance as of December 30, 2011 | $ 2,265 |
| Addition | 282 |
| Payment | (491) |
| Fair value adjustment | (802) |
| Balance as of December 28, 2012 (Revised) | $ 1,254 |

We estimated the fair value of the contingent consideration by applying various probabilities and discount factors to each of the various performance milestones as further discussed in note *Summary of Significant Accounting Policies - Business Combinations*. These fair value measurements are based on significant inputs not observable in the market and thus represent a Level 3 measurement as defined in the guidance. We utilized discount rates for the time value of the contingent payments and we estimated probabilities related to the anticipated revenue- or gross margin-related contingent payments. These rates were determined based on the nature of the milestone, the risks and uncertainties involved and the time period until the milestone was measured. The estimating of probabilities and discounts requires significant judgment and the results may vary materially from the estimates.

We measure certain assets for fair value on a non-recurring basis when there are indications of impairment. In Fiscal Years 2013 and 2012 we measured certain assets consistent with Level 3 measurement principles using an income approach based on a discounted cash flow model in order to determine the amount of impairment, if any. In Fiscal Year 2013 and Fiscal Year 2012, we recorded a $0.3 million and $0.4 million impairment and reduced the carrying value for the impaired assets by the same amount.

**11. Accumulated Other Comprehensive Income**

Beginning with our acquisition of FlexPlus in the United Kingdom in Fiscal Year 2013, we became subject to the guidance ASC 830 - *Foreign Currency Matters*. This requires us to translate our assets and liabilities from the functional currency, British Pounds, to reporting currency, which is United States Dollars. These translation adjustments are recorded as other comprehensive income and aggregated in accumulated other comprehensive income. We had no accumulated comprehensive income as of December 28, 2012.

The components of accumulated other comprehensive income are (in thousands):

| As of January 3, 2014 | Gross | | Taxes | | Net | |
|---|---|---|---|---|---|---|
| Translation adjustments | $ | 74 | $ | — | $ | 74 |
| Accumulated other comprehensive income | $ | 74 | $ | — | $ | 74 |

**12.  Stock-Based Compensation**

Compensation expense for stock options and warrants are determined based on the grant date fair value of the award calculated using the Black-Scholes options-pricing model. The assumptions used in the valuation model varied by grant date. The table below indicates the approximate values used to compute the price of the options and warrants:

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | For the Fiscal Year ended | |
| --- | --- | --- |
| | January 3, 2014 | December 28, 2012 |
| Expected life from the date of grant | 5.0 to 6.0 years | 5.5 years |
| Expected stock price volatility | 50% | 50% |
| Expected dividend yield | — | — |
| Risk-free interest rate | 1.7% to 1.0% | 0.7% |
| Estimated forfeiture rate | —% | —% |

The expected life for granted stock options is based on observed historical exercise patterns of the previously granted options adjusted to reflect the change in vesting and expiration dates. The expected volatility is based on considerations of implied volatility from the historical volatility of our common stock and comparable companies. Since our current outstanding options were not issued pursuant to a plan and we do not have any historical indication that any of the holders of our options will cause their options to be forfeited, we could not estimate a forfeiture rate. Historically, we have not declared dividends in the past and we do not anticipate that any dividends will be declared, therefore we did not include expected dividends in our computation . The dividend yield is based on the historical dividend yield over the expected term of the options granted. The risk-free interest rate is based on the continuous compounded yield on U.S. Treasury Constant Maturity Rates with a remaining term equal to the expected term of the option.

Compensation expense for restricted stock units and unregistered common shares are measured using the grant-date fair value of the shares granted and is recognized on a straight-line basis over the required vesting period. For shares vesting immediately, compensation expense is recognized on the date of grant. Fair value is determined at current market price, and when applicable, at a discount from the current market price to reflect a lack of liquidity resulting from the equities being restricted and low trading volume in our stock.

Effective October 22, 2009, our Board of Directors terminated the Accountabilities Equity Incentive Plan ("the Plan"). As of December 28, 2012, in accordance with the terms of the Plan, all stock grants had vested.

We issued various unregistered securities to employees and consultants in Fiscal Years 2013 and 2012 that were not issued pursuant to a qualified plan. The following tables detail those issuances (in thousands):

| 2013 Grants | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Board Members | Executive Officers | Non-executive Officers | Consultants | Total |
| Options | 2,000  * | 3,825 | 75 | — | 5,900 |
| Warrants | — | — | — | 750 | 750 |
| Common shares | 60 | 220 | 280 | — | 560 |

* These 2,000 options were granted to our majority owner who is also a member of our board of directors.

| 2012 Grants | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Board Members | Executive Officers | Non-executive Officers | Consultants | Total |
| Options | — | — | — | 1,000 | 1,000 |
| Common shares - unregistered | — | 300 | 230 | 2,000 | 2,530 |

On November 6, 2013, the shareholders approved the 2013 Incentive Award Plan (the "2013 Plan"). The 2013 Plan provides for grants of various types of awards that are designed to attract and retain highly qualified personnel who will contribute to the success of the Company and to provide incentives to participants in this 2013 Plan that are linked directly to increases in shareholder value which will therefore inure to the benefit of all shareholders of our Company. We intend to rely on a combination of multi-year performance awards, options and other stock-based awards for these purposes.

The 2013 Plan made 5,000,000 shares of our Common Stock available for awards. As of January 3, 2014, we have not issued any awards under the 2013 Plan. The 2013 Plan also permits performance-based 2013 awards paid under it to be tax deductible to us under Section 162(m) of the Internal Revenue Code of 1986, as amended, as "performance-based compensation".

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On November 6, 2013, our shareholders also approved the 2013 Employee Stock Purchase Plan (the "ESPP"). The purpose of the ESPP is to offer employees an opportunity to purchase stock directly from us at an attractive price, and align wealth creation opportunities with those of our stockholders. The ESPP is intended to broaden employee access to our common stock, by offering all employees of our Company and designated subsidiaries of our Company the opportunity to purchase shares of our common stock through a convenient payroll deduction. ESPP made 3,000,000 shares of our common stock available for purchase, subject to automatic annual increases. While approved, the ESPP was not available for employee participation as of January 3, 2014.

We had the following activity in options that are not subject to a plan for the Fiscal Years ended January 3, 2014 and December 28, 2012:

| Options | Shares (in thousands) | Weighted- Average Exercise Price | Weighted- Average Remaining Contractual Term | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| **Outstanding at December 31, 2011** | **50** | **0.66** | | **2** |
| Granted | 1,000 | 0.44 | | |
| **Outstanding at December 28, 2012** | **1,050** | **0.45** | **10 years** | **—** |
| Granted | 5,900 | 0.62 | | |
| Exercised | (50) | 0.44 | | |
| Cancelled | (50) | 0.66 | | |
| **Outstanding at January 3, 2014** | **6,850** | **0.60** | **9 years** | **16,050** |

| Warrants | Number of Warrants (in thousands) | Weighted- Average Exercise Price | Warrants Exercisable (in thousands) | Weighted- Average Exercise Price |
|---|---|---|---|---|
| **Outstanding at December 31, 2011** | **—** | **—** | **—** | **—** |
| Granted | — | — | — | — |
| **Outstanding at December 28, 2012** | **—** | **—** | **—** | **—** |
| Granted | 750 | 1.00 | — | 1.00 |
| **Outstanding at January 3, 2014** | **750** | **1.00** | **—** | **1.00** |

| Unregistered Common Stock | Unregistered Common Stock (in thousands) | Weighted Average Grant Price |
|---|---|---|
| **Restricted shares at December 31, 2011** | | |
| Granted | 1,000 | .45 |
| Vested | (250) | .45 |
| **Restricted shares at December 28, 2012** | **750** | **.45** |
| Granted | — | — |
| Vested | (750) | .45 |
| **Restricted shares at January 3, 2014** | **—** | **—** |
| | | |
| Unrestricted grants during the Fiscal Year ended December 28, 2012 | 1,530 | .41 |
| Unrestricted grants during the Fiscal Year ended January 3, 2014 | 560 | 1.54 |

The following table details the amount of our compensation expense and remaining compensation expense related to our grants of options, warrants, and Restricted Share Units ("RSU"), which we expect to recognize over the next three years (in thousands):

50

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | For the Fiscal Year Ended January 3, 2014 | | For the Fiscal Year Ended December 28, 2012 | |
| | Compensation Expense | Remaining Expense | Compensation Expense | Remaining Expense |
|---|---|---|---|---|
| Options | $ 3,923 | $ 11,201 | $ 9 | $ 216 |
| Warrants | 186 | 905 | — | — |
| RSU | — | 102 | 102 | — |
| Common Shares | 1,170 | — | 745 | 311 |
| | $ 5,279 | $ 12,106 | $ 856 | $ 527 |

**13.  Income Taxes**

The components of income tax expense (benefit) for the Fiscal Years 2013 and 2012 are as follows (in thousands):

| | January 3, 2014 | December 28, 2012 |
|---|---|---|
| | | (Revised) |
| Current expense: | | |
| Federal | $ 35 | $ 40 |
| State | 339 | 164 |
| Foreign | — | — |
| Current expense | 374 | 204 |
| | | |
| Deferred expense (benefit): | | |
| Federal | 227 | 267 |
| State | 17 | 47 |
| Foreign | (6) | — |
| Deferred expense (benefit) | 238 | 314 |
| Total income tax expense(benefit) | $ 612 | $ 518 |

A reconciliation of income tax expense and the amount computed by applying the statutory federal income tax rate to the income before provision for income taxes is as follows (in thousands):

| | January 3, 2014 | December 28, 2012 |
|---|---|---|
| | | (Revised) |
| Tax computed at federal statutory rate | $ 1,152 | $ (415) |
| Increase (decrease) in income taxes resulting from: | | |
| State tax, net of U.S. federal tax | 239 | 169 |
| Permanent differences | 267 | 38 |
| Intangible amortization | — | 313 |
| Foreign tax rate differential on current income | 4 | — |
| Change in valuation allowance | (1,050) | 413 |
| Total income tax expense (benefit) | $ 612 | $ 518 |

The components of deferred tax assets (liabilities) are as follows (in thousands):

[Table of Contents](#)

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | January 3, 2014 | December 28, 2012 |
|---|---|---|
| | | (Revised) |
| Assets: | | |
| Allowance for doubtful accounts | $    877 | $    1,255 |
| Accrued bonus | 123 | — |
| Intangible assets | 1,690 | 1,481 |
| Stock based compensation | 1,619 | 298 |
| Federal net operating loss | — | 1,916 |
| State net operating loss | 444 | 593 |
| U.K. net operating loss | 5 | — |
| Transaction costs | 122 | 107 |
| Charitable contributions | — | 7 |
| Tax credits | 49 | 238 |
| Gross deferred tax assets | $    4,929 | $    5,895 |

| | January 3, 2014 | December 28, 2012 |
|---|---|---|
| | | (Revised) |
| Liabilities: | | |
| Rents | $    (6) | $    (6) |
| Goodwill | (1,161) | (917) |
| U.K. intangibles and fixed assets | (724) | — |
| Depreciation | (130) | (51) |
| Gross deferred tax liabilities | (2,021) | (974) |
| Less: valuation allowance | (4,788) | (5,838) |
| Net deferred tax asset/(liability) | $    (1,880) | $    (917) |
| | | |
| Net current deferred tax assets | 29 | 33 |
| Net long-term deferred tax assets | (29) | (33) |
| Net long-term deferred tax liabilities | (1,880) | (917) |
| Net deferred tax assets (liability) | $    (1,880) | $    (917) |

Income before provision for income taxes by jurisdiction is as follows (in thousands):

| | January 3, 2014 | December 28, 2012 |
|---|---|---|
| | | (Revised) |
| U.S. income | $    3,388 | $    (1,219) |
| Non-U.S. income (loss) | (30) | — |
| Total income before provision for income taxes | $    3,358 | $    (1,219) |

As of January 3, 2014 and December 28, 2012, we had approximately $2.0 million and $7.7 million, respectively, of federal net operating loss carry forwards ("NOLs") available to offset future taxable income which begin to expire in 2031. As of January 3, 2014 and December 28, 2012, we had approximately $7.6 million and $20.0 million, respectively, of state NOLs which begin to expire in 2031.

We have not provided for U.S. federal income taxes on undistributed earnings from non-U.S. subsidiaries as of January 4, 2014 because such earnings are intended to be reinvested indefinitely outside of the United States. If in the future we decide to repatriate such foreign earnings, we would incur incremental U.S. federal and state income tax. However, our intent is to keep

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

these funds indefinitely reinvested outside of the United States and not to repatriate them to fund our U.S. operations. To date, results related to these operations have been insignificant.

As of January 3, 2014 and December 28, 2012, we maintained a valuation allowance of $4.8 million and $5.8 million, respectively, against our deferred tax assets. In assessing the realizability of deferred tax assets, we assess the available positive and negative evidence to estimate if sufficient future taxable income will be generated to utilize existing deferred tax assets. Based on our assessment, we have provided a full valuation allowance against our net deferred tax assets as it is not more likely than not that the assets will be utilized.

We recorded our unrecognized tax benefits as a reduction of deferred tax assets on the accompanying consolidated balance sheets. The aggregate changes in the balance of our gross unrecognized tax benefits for the years ended January 3, 2014 and December 28, 2012 are as follows (in thousands):

|  | January 3, 2014 | December 28, 2012 |
|---|---|---|
|  |  | (Revised) |
| Gross unrecognized tax benefits as of beginning of period | $ 838 | $ 810 |
| Increases based on tax positions related to the current year | — | 28 |
| Total gross unrecognized tax benefits as of end of period | $ 838 | $ 838 |

As of January 3, 2014, there were no unrecognized benefits that would affect our effective tax rate, if recognized.

We recognize accrued interest and penalties, if any, related to uncertain tax positions through income tax expense. We did not recognize any interest and penalties for the years ended January 3, 2014 and December 28, 2012. We do not anticipate any material changes in these reserves in the next 12 months. Our federal income tax returns for the 2002 through 2012 tax years remain open to examination by the IRS. In addition, our state income tax returns for the 2002 through 2012 tax years also remain open to examination by state taxing authorities.

**14. Reconciliation of earning per share**

Diluted loss per share for Fiscal Year 2012 is not computed because any potential common shares would reduce the reported loss per share and, therefore, have an anti-dilutive effect. Such potential additional shares of Common Stock are included in the computation of diluted earnings per share for Fiscal Year 2013. The following table sets forth the computation of basic and diluted per share information (amounts in thousands):

|  | Years Ended | |
|---|---|---|
|  | January 3, 2014 | December 28, 2012 |
| **Denominator:** |  |  |
| Weighted average shares of common stock outstanding | 159,283 | 148,377 |
| Dilutive effect of options, stock warrants, and restricted stock | 3,234 | — |
| Weighted average shares of common stock outstanding, assuming dilution | 162,517 | 148,377 |

Basic income (loss) per common share is computed using the basic weighted average number of common shares outstanding during the period. Diluted income (loss) per common share is computed using the basic weighted average number of common shares and common equivalent shares outstanding during the period. For the Fiscal Year 2012, the effect of approximately 0.8 million common equivalent shares were excluded from the calculation of diluted net loss per share because their inclusion would have been anti-dilutive due to the net loss sustained during the period.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

---

### 15.   Supplemental Disclosure of Cash Flow Information

| | For the Fiscal Year ended | |
| --- | --- | --- |
| | January 3, 2014 | December 28, 2012 |
| Cash paid for interest | 4,102 | 2,939 |
| Cash paid for taxes | — | — |
| Non-cash investing and financing activities: | | |
| Conversion of loans payable to related party to unregistered common shares | — | 14,100 |
| Assets acquired for issuance of debt | 160 | 802 |
| Contingent consideration assumed in acquisition | 2,359 | 282 |
| Deferred acquisition consideration at fair value | 2,777 | — |

### 16.   Prior Period Adjustments (unaudited)

We have revised certain prior period amounts and presentations to reflect our change in fiscal year end and to reflect the correction of certain errors. In particular:

- During the fiscal year ended January 3, 2014, we identified an error in our historical accounting for the factoring of our receivables to Wells Fargo, resulting in an understatement of our assets and liabilities included in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 by $74.8 million and $68.8 million, respectively. The error had no impact on our Consolidated Statement of Operations for the nine months ended October 4, 2013, nor for the fiscal year ended December 28, 2012. The Consolidated Balance Sheet as of December 28, 2012 included herein has been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, net income or net changes in cash for the nine months ended October 4, 2013 and the Fiscal Year ended December 28, 2012.

- During the fiscal year ended January 3, 2014, we also identified an error in our accounting for stock-based compensation expense relating to awards of shares, warrants to acquire common stock, and employee stock options as previously reported. The error resulted in an understatement of our selling, general and administrative expense included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012 by approximately $3.3 million and $0.2 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct this error. The correction had no impact on revenues or net change in cash for the Fiscal Year ended December 28, 2012.

- During the fiscal year ended January 3, 2014, we also identified an error in our accounting for deferred tax liabilities relating to the amortization of indefinite-life intangibles that originated during 2005, resulting in an understatement in liabilities in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 of $1.1 million and $0.9 million, respectively. The error also understated our deferred income tax provision included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 and Fiscal Year ended December 28, 2012 by approximately $0.2 million and $0.3 million, respectively. The Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct this error. The correction had no impact on revenues, operating income, taxable income, or net change in cash for the Fiscal Year ended December 28, 2012.

- During the fiscal year ended January 3, 2014, we also identified a number of miscellaneous errors relating to our accounting for cash, accounts receivable, prepaid expenses, accounts payable and accrued liabilities, other liabilities and business combinations that resulted in an understatement of assets included in our Consolidated Balance Sheet as of October 4, 2013 and December 28, 2012 of $0.5 million and $0.7 million, respectively. These errors also overstated our operating income, taxable income and net income included in our Consolidated Statement of Operations for the nine months ended October 4, 2013 by $0.1 million, $0.2 million and $0.2 million, respectively, overstated our operating income in our Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 by $0.7 million, and understated our taxable income and net income included in our Consolidated Statement of Operations for the Fiscal Year ended December 28, 2012 by $0.5 million and $0.4 million, respectively. The Consolidated Statement

---

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

of Operations for the Fiscal Year ended December 28, 2012 and the Consolidating Balance Sheet as of December 28, 2012 included herein have been revised to correct these errors.

- During the fiscal year ended January 3, 2014, we also evaluated our consolidation of Abest Power & Gas, LLC, our joint venture in retail energy, and determined that Abest is an entity that should not be consolidated. We had presented the results of Abest as a consolidated entity in our financial statements for each of the first three quarters of 2013. While the Consolidated Balance sheet as of January 3, 2014 and the Consolidated Statement of Operations for the year ended January 3, 2014, included herein, do not include the assets, liabilities or equity of Abest, we do include our investment in Abest under the equity method of investment and report the loss for Abest as a loss on equity investment.

The impact of the revisions on the consolidated balance sheets and consolidated statements of income by quarter is outlined in the tables below. The corrections had no impact on our compliance with any contractual obligations.

The following tables presents selected balance sheet data by fiscal quarter as previously reported compared to revised amounts for the previously disclosed changes, excluding any effect for Pooling-of-Interest related to our Summit acquisition (in thousands) (unaudited):

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 30, 2012 | | June 29, 2012 | | September 28, 2012 | | December 28, 2012 | |
| | As Previously Reported (1) | As Revised* | As Previously Reported (2) | As Revised* | As Previously Reported (3) | As Revised* | As Previously Reported (4) | As Revised* |
| Current assets | $ 21,941 | $ 70,466 | $ 23,166 | $ 71,575 | $ 30,422 | $ 92,276 | $ 27,954 | $ 96,519 |
| Total assets | 39,370 | 86,957 | 39,656 | 87,711 | 48,280 | 110,336 | 50,747 | 119,049 |
| Current liabilities | 19,490 | 68,602 | 22,566 | 70,588 | 31,030 | 90,940 | 27,309 | 95,708 |
| Total liabilities | 21,337 | 70,442 | 24,067 | 73,442 | 33,541 | 96,973 | 29,219 | 99,209 |
| Owner's equity | 18,033 | 16,515 | 15,589 | 14,269 | 14,739 | 13,363 | 21,528 | 19,840 |
| Total liabilities and owner's equity | $ 39,370 | $ 86,957 | $ 39,656 | $ 87,711 | $ 48,280 | $ 110,336 | $ 50,747 | $ 119,049 |

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | April 5, 2013 | | July 5, 2013 | | October 4, 2013 | |
| | As Previously Reported (5) | As Revised* | As Previously Reported (6) | As Revised | As Previously Reported (7) | As Revised |
| Current assets | $ 33,921 | $ 101,701 | $ 35,148 | $ 107,866 | $ 39,874 | $ 113,401 |
| Total assets | 59,017 | 126,438 | 59,855 | 132,712 | 66,328 | 140,308 |
| Current liabilities | 35,016 | 104,881 | 34,691 | 109,985 | 37,109 | 113,522 |
| Total liabilities | 37,560 | 106,805 | 36,993 | 111,951 | 39,368 | 115,497 |
| Owner's equity | 21,457 | 19,633 | 22,862 | 20,761 | 26,960 | 24,811 |
| Total liabilities and owner's equity | $ 59,017 | $ 126,438 | $ 59,855 | $ 132,712 | $ 66,328 | $ 140,308 |

* The revised amounts do not reflect the effect of the Summit Acquisition Pooling-of-Interest

The following tables presents a condensed Consolidated Statements of Operations per fiscal quarter as previously reported compared to revised amounts for the previously disclosed changes (in thousands) (unaudited):

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | For the fiscal quarter ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 30, 2012 | | June 29, 2012 | | September 28, 2012 | | December 28, 2012 | |
| | As Previously Reported (5) | As Revised* | As Previously Reported (6) | As Revised* | As Previously Reported (7) | As Revised* | As Previously Reported (4) | As Revised* |
| Revenue | $ 144,678 | $ 144,678 | $ 154,082 | $ 154,082 | $ 180,409 | $ 180,409 | $ 200,158 | $ 200,181 |
| Cost of revenue | 128,381 | 128,381 | 135,540 | 135,540 | 158,832 | 158,832 | 176,824 | 176,781 |
| Gross margin | 16,297 | 16,297 | 18,542 | 18,542 | 21,577 | 21,577 | 23,334 | 23,400 |
| Selling, general, administrative and other expenses | 18,068 | 18,654 | 19,258 | 20,203 | 18,899 | 20,245 | 19,816 | 21,732 |
| Net income (loss) before income taxes | (2,743) | (2,590) | (2,231) | (1,661) | 1,392 | 1,332 | 2,007 | 1,668 |
| Income tax benefit(provision) | — | 124 | — | (349) | — | (45) | — | (158) |
| Net Income (loss) | $ (2,743) | $ (2,466) | $ (2,231) | $ (2,010) | $ 1,392 | $ 1,287 | $ 2,007 | $ 1,510 |

| | For the fiscal quarter ending | | | | | |
|---|---|---|---|---|---|---|
| | April 5, 2013 | | July 5, 2013 | | October 4, 2013 | |
| | As Previously Reported (5) | As Revised* | As Previously Reported (6) | As Revised | As Previously Reported (7) | As Revised |
| Revenue | $ 194,218 | $ 194,218 | $ 199,195 | $ 199,126 | $ 208,957 | $ 208,637 |
| Cost of revenue | 172,569 | 172,569 | 176,169 | 176,106 | 183,040 | 182,680 |
| Gross margin | 21,649 | 21,649 | 23,026 | 23,020 | 25,917 | 25,957 |
| Selling, general, administrative and other expenses | 20,249 | 21,980 | 19,199 | 21,703 | 20,184 | 24,176 |
| Net income before income taxes | 37 | (331) | 1,956 | 1,317 | 4,284 | 1,781 |
| Income tax benefit(provision) | 82 | (48) | 71 | (62) | 113 | (78) |
| Net Income | $ 119 | $ (379) | $ 2,027 | $ 1,255 | $ 4,397 | $ 1,703 |

* *The revised amounts do not reflect the effect of the Summit Acquisition Pooling-of-Interest*

1  on our Form 10-Q for the fiscal quarter ended March 30, 2012
2  on our Form 10-Q for the fiscal quarter ended June 29, 2012
3  on our Form 10-Q for the fiscal quarter ended September 28, 2012
4  on our Form 10-QT for the fiscal quarter ended December 28, 2012
5  on our Form 10-Q for the fiscal quarter ended April 5, 2013
6  on our Form 10-Q for the fiscal quarter ended July 5, 2013
7  on our Form 10-Q for the fiscal quarter ended October 4, 2013

## 17.   Commitments and Contingencies

*Lease Commitments*

We have operating leases, primarily for office premises. The following table is a schedule by Fiscal Year of future minimum lease commitments under operating leases as of January 3, 2014 (in thousands):

| Fiscal year ending: | | |
|---|---|---|
| January 2, 2015 | $ | 2,275 |
| January 1, 2016 | | 1,317 |
| December 30, 2016 | | 282 |
| December 29, 2017 | | 74 |
| December 28, 2018 | | 17 |
| Thereafter | | — |
| Total | $ | 3,965 |

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In Fiscal Years 2013 and 2012 we recorded $3.9 million and $4.0 million in rent expense, respectively.

In addition to operating lease agreements, we have entered into non-cancelable contract obligations totaling $0.4 million. These obligations primarily relate to various on-line job search engines. See the *Debt* and *Related Party* footnotes to these consolidated financial statements for additional commitments.

*Employment Agreements*

We have employment agreements with certain key members of management, requiring mutual termination notice periods. These agreements provide those employees with a specified severance amount in the event the employee is terminated without good cause as defined in the applicable agreement.

*Legal Proceedings*

From time to time, we become involved in various investigations, claims and legal proceedings that arise in the ordinary course of our business, including those related to payroll and various employment related matters, typically alleging employment discrimination, labor law and wage and hour violations or enforcing the restrictive covenants in our employment agreements. While there is no expectation that any of these matters will have a material adverse effect on our results of operations, financial position or cash flows, litigation is always subject to inherent uncertainty and we are not able to reasonably predict if any matter will be resolved in a manner that is materially adverse to us.

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**18. Subsequent Events**

*Staff Management Group, LLC*

On January 31, 2014 we closed an asset purchase agreement to acquire Staff Management Group, LLC of New Jersey ("SMG"), a staffing company engaged in the business of providing temporary employment services and related support services in New Jersey and Pennsylvania.

We paid the following consideration (in thousands)(unaudited):

|  | January 31, 2014 |
|---|---|
| Cash* | $ 5,000 |
| Fair value of promissory note (par value of $5,000) | 4,751 |
| Total purchase price | $ 9,751 |

* Paid with proceeds from borrowings from related parties.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the acquisition date. We utilized third-party valuations of the tangible and intangible assets acquired. The amounts below are preliminary and are subject to change (in thousands)(unaudited):

|  | January 31, 2014 |
|---|---|
| Property and equipment | $ 16 |
| Customer relationships | 6,276 |
| Assembled workforce | 515 |
| Non-compete agreement | 1,121 |
| Goodwill | 1,823 |
| Total purchase price | $ 9,751 |

In accordance with the accounting guidance, we are required to provide estimated pro-forma revenue and income (loss) from continuing operations before income taxes as if SMG had been included in our consolidated results as of December 31, 2011 and after applying our accounting policies to material amounts and also adjusting the results of SMG to reflect the additional amortization that would have been expensed assuming the fair value adjustments to intangible assets had been applied on December 31, 2011. As of the date of this report, we did not have sufficient information to be able to present the required pro-forma disclosure or historical financial information. We expect to file the required disclosures on a Form 8-K as soon as such information becomes available to us.

*Alar Staffing Corp.*

On February 10, 2014 we closed an asset purchase agreement to acquire Alar Staffing Corp. of Southern California ("Alar"), a staffing company engaged in the business of providing temporary employment services and related support services.

We paid the following consideration (in thousands) (unaudited):

|  | February 10, 2014 |
|---|---|
| Cash* | $ 1,000 |
| Fair value of subsequent payments | 1,768 |
| Total purchase price | $ 2,768 |

* Paid with proceeds from borrowings from related parties.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the acquisition date. We utilized third-party valuations of the tangible and intangible assets acquired. The amounts below are preliminary and are subject to change (in thousands)(unaudited):

Table of Contents

**CORPORATE RESOURCE SERVICES, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | February 10, 2014 |
|---|---|
| Property and equipment | $ 70 |
| Sales Representative Network | 1,565 |
| Goodwill | 1,133 |
| Total purchase price | $ 2,768 |

In accordance with the accounting guidance, we are required to provide estimated pro-forma revenue and income (loss) from continuing operations before income taxes as if Alar had been included in our consolidated results as of December 31, 2011 and after applying our accounting policies to material amounts and also adjusting the results of Alar to reflect the additional amortization that would have been expensed assuming the fair value adjustments to intangible assets had been applied on December 31, 2011. As of the date of this report, we did not have sufficient information to be able to present the required pro-forma disclosure or historical financial information.

### Nationwide Security Services, Inc.

On February 28, 2014 we closed an asset purchase agreement to acquire Nationwide Screening Services, Inc. of New Jersey ("NSS"), a company engaged in the business of providing background checks for potential hires within the United States. The company was previously headquartered in Farmingdale, NY.

We paid the following consideration (in thousands)(unaudited):

| | February 28, 2014 |
|---|---|
| Fair value of contingent consideration | 1,644 |
| Total purchase price | $ 1,644 |

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the acquisition date. We utilized third-party valuations of the tangible and intangible assets acquired. The amounts below are preliminary and are subject to change (in thousands)(unaudited):

| | February 28, 2014 |
|---|---|
| Unidentifiable intangible assets | 1,644 |
| Total purchase price | $ 1,644 |

In accordance with the accounting guidance, we are required to provide estimated pro-forma revenue and income (loss) from continuing operations before income taxes as if NSS had been included in our consolidated results as of December 31, 2011 and after applying our accounting policies to material amounts and also adjusting the results of NSS to reflect the additional amortization that would have been expensed assuming the fair value adjustments to intangible assets had been applied on December 31, 2011. As of the date of this report, we did not have sufficient information to be able to present the required pro-forma disclosure or historical financial information.

### Wells Fargo Bank, National Association Agreement

On June 20, 2014 Corporate Resource Services, Inc. and its associated entities (Accountabilities, Inc,; Diamond Staffing Services, Inc.; Insurance Overload Services, Inc.; TS Staffing Services, Inc.; Corporate Resource Development Inc.; and Integrated Consulting Group, Inc.) each executed an amendment to their Account Purchase Agreement with Wells Fargo (the "Agreements") that effectively extends the term of the existing Agreements through June 30, 2015, provides for an aggregate of $80 million in financing of receivables at an annual rate equal to LIBOR plus 4.25% to 6.17%, establishes financial covenants and milestones for the Company to maintain, and provides for other fees over the course of the term.

The amounts owed to Tri-State are related party loans payable. The principal amount increases or decreases based on periodic borrowings or repayments, and each subsidiary of the Company is charged interest at the rate of 12% per annum of their net loan payable. On June 20, 2014, as required by Wells Fargo, Tri-State agreed that they would not demand payment of the outstanding balance on the related party loans payable of at least $15 million for a period of at least one year. Other than the $15 million amount, for a period of at least one year, the related party loans are due on demand.

Table of Contents

**ITEM 9.      CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

On December 27, 2013, our Audit Committee dismissed Rosen Seymour Shapss Martin & Company LLP ("RSSM") as our independent registered public accounting firm.

The reports of RSSM on the financial statements for the years ended December 28, 2012, September 28, 2012 and September 30, 2011 contained no adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principle.

During the Fiscal Years ended September 28, 2012 and September 30, 2011 and through December 27, 2013, there were no: (i) disagreements with RSSM on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of RSSM, would have caused them to make reference to the subject matter of the disagreements in connection with its reports on the financial statements for such years; or (ii) "reportable events" as that term is described in Item 304(a)(1)(v) of Regulation S-K. A letter from RSSM addressed to the Commission agreeing with the above statements was filed as Exhibit 16.1 to our Form 8-K filed with the Commission on January 3, 2014.

Also on December 27, 2013, our Audit Committee engaged Crowe Horwath LLP ("Crowe Horwath") as our independent registered public accounting firm effective as of January 3, 2014 , the date Crowe Horwath completed its client acceptance procedures and formally accepted the Registrant as a client.

**ITEM 9A.     CONTROLS AND PROCEDURES**

The information contained in this section covers management's evaluation of our disclosure controls and procedures and our assessment of our internal control over financial reporting as of January 3, 2014.

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, are controls and other procedures that are designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified by the rules and forms promulgated by the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. As a result of this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of January 3, 2014 because of the material weaknesses set forth below.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate "internal control over financial reporting", as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. Our system of internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect every misstatement. An evaluation of effectiveness is subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may decrease over time.

Our internal control over financial reporting includes those policies and procedures that (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized use, acquisition, or disposition of our assets that could have a material effect on the consolidated financial statements.

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of the Fiscal Year ended January 3, 2014. In making this assessment, we

Table of Contents

utilized the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control - Integrated Framework (1992).

A material weakness is a deficiency or a combination of deficiencies in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. As a result of this evaluation, we concluded that our internal control over financial reporting was not effective as of January 3, 2014 because of the material weaknesses set forth below.

The following is a summary of our material weaknesses as of January 3, 2014:

• **Financial Accounting and Reporting**

Management identified that we had: inadequate controls over journal entries and approvals; had inadequate account reconciliation controls; lacked sufficient personnel with knowledge, experience, and training in U.S. GAAP; lacked a formalized process for determining, documenting, communicating, implementing, monitoring or updating accounting policies and procedures; and lacked effective controls over the period-end financial close and reporting processes. The foregoing weaknesses resulted in actual or potential misstatements in many accounts including: accounts receivable; equity based compensation; equity method intangible assets including goodwill; and provision for income taxes. Based on the nature of noted deficiencies, management concluded that each of these deficiencies resulted in a reasonable possibility that a material misstatement in our interim our annual financial statements would not be prevented or detected on a timely basis, and as such, each of these constitutes a material weakness.

• **Information Technology General Controls**

Management identified a number of deficiencies related to the design, implementation and effectiveness of certain information technology general controls, including segregation of duties, user access, change management, data back-ups, and hardware security, some of which have a direct impact on our financial reporting. Based on the nature and interrelationship of the noted deficiencies, management concluded that these deficiencies, in the aggregate, resulted in a reasonable possibility that a material misstatement in our interim or annual financial statements would not be prevented or detected on a timely basis, and as such, constitutes a material weakness.

This Annual Report on Form 10-K does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. We are not required to provide an attestation by our independent registered public accounting firm pursuant to rules of the SEC for smaller reporting companies.

**Changes in Internal Control Over Financial Reporting**

Our management performed extensive procedures designed to ensure the reliability of our financial reporting. In addition to other internal processes undertaken, procedures performed included, but were not limited to the following actions: (a) dedicating significant resources, including the engagement of subject matter specialists to support management in its efforts to complete our financial filings and (b) performing extensive, substantive reviews of our accounting for revenue recognition, cost of revenue, income and expense classification, stock compensation, and tax provisions.

While there were no changes made to our internal control over financial reporting from October 4, 2013 through January 3, 2014, our efforts to improve our internal controls are ongoing and focused on expanding our organizational capabilities to improve our control environment and on implementing process changes to strengthen our internal control and monitoring activities. Some of the proposed improvements include: the development of new or improved policies and procedures; the hiring of additional personnel in areas that the current personnel do not have sufficient knowledge and experience; implement training procedures on U.S. GAAP and the revised policies and procedures; and strengthening general controls around our information technology systems.

**ITEM 9B.    OTHER INFORMATION**

**None.**

PART III

ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

BOARD OF DIRECTORS

Our Board of Directors is presently composed of eight members, John Messina, James Altucher, Karen Amato, Joseph Cassera, Robert Cassera, Thomas Clarke, Jr., James Foley and Larry Melby. Mr. Messina serves as Chairman of the Board of Directors.

Our Board of Directors has determined that Ms. Amato and Messrs. Clarke and Melby are "independent" as that term is defined under the applicable rules and regulations of the SEC. There are no family relationships between any director and an executive officer except that Messrs. John Cassera and Robert Cassera are brothers.

### Information about the Directors

In accordance with our By-Laws, each member of our Board of Directors holds office until the next annual meeting of stockholders. At each annual general meeting of stockholders, the successors to our directors will be elected to serve until the next annual meeting or until their successors are duly elected and qualified. Set forth below is information regarding our current directors:

| Name | Age | Position | Director Since |
|------|-----|----------|----------------|
| John Messina | 47 | President, Chief Executive Officer and Chairman | 2007 |
| Joseph Cassera | 54 | Director | 2009 |
| Robert Cassera | 51 | Director | 2009 |
| James Altucher | 45 | Director | 2012 |
| James Foley | 52 | Director | 2012 |
| Karen Amato | 48 | Director | 2013 |
| Thomas J. Clarke, Jr. | 57 | Director | 2013 |
| Larry Melby | 53 | Director | 2013 |

### Business Experience and Qualifications of Directors

*John Messina* was appointed President in March 2009, Chairman of the Board on May 21, 2012 and Chief Executive Officer on October 10, 2012. Mr. Messina joined the Board in April 2007 and has served as Executive Vice President of Tri-State Employment Services, Inc., or TSE, since January 1998. Mr. Messina has been employed by TSE since 1997. Prior to joining TSE, Mr. Messina worked in the transportation industry and has been an entrepreneur in several small businesses. Mr. Messina brings extensive experience in temporary staffing services, as well as executive management and entrepreneurial experience to our Company.

*James Altucher* was named to the Board on September 13, 2012 and brings a wide range of investment experience to our Company.  He was the founder of Stockpickr LLC and served as its Chief Executive Officer from June 2006 to April 2007 when it was acquired by TheStreet.com (NASDAQ: TST), where Mr. Altucher remained through March 2009.  From March 2009 to September 2010, he was a member of the Board of Directors of Bit.ly, Inc., a URL shortening and bookmarking service, and has served on the Board of Directors of Optimal, Inc., a social meeting advertising and analytics platform, since November 2012.  In addition, Mr. Altucher was a managing partner at Formula Capital Management LLC, an alternative asset management firm that runs a fund of hedge funds, from November 2004 to January 2010. He also is a columnist for the Financial Times as well as other blogs and publications and the author of the New York Times' bestseller "Choose yourself", "Trade Like a Hedge Fund", "Trade Like Warren Buffett" and "SuperCa$h." Previously, Mr. Altucher was a managing partner at technology venture capital firm 212 Ventures and was the founder of Vaultus and Reset Inc. He holds a bachelor's degree from Cornell and was a doctoral candidate at Carnegie Mellon University.

*Karen Amato* was named to the Board on August 8, 2013 and brings a wide range of accounting and auditing experience to our Company.  A former partner at the Big Four accounting firm KPMG, Karen has had an extensive career in public accounting, servicing clients ranging from large public companies to smaller private entities and in a variety of industries. After leaving KPMG in September 2011 after twenty-three years, Ms. Amato has been providing consulting services since February 2012, advising on accounting and SEC requirements. She is a member of the Board of Governors of the Long Island Chapter of the Institute of Internal Auditors and was named one of the Top 50 Women in Business by the Long Island Business News in 2010. Ms. Amato received her Bachelor Degree from Hofstra University and is a Certified Public Accountant licensed in New York.

*Joseph Cassera* has served as a Director since September 2009. Mr. Cassera has served as Vice President of Operations of TSE since January 2001. Prior to joining TSE, Mr. Cassera served as the Senior Network Administrator overseeing information technology operations and other wide area network activities for Siemens AG from 1986 to September 2001. Mr. Cassera brings extensive experience in temporary staffing and information technology to our Company.

*Robert Cassera* has served as a Director since February 2009. Mr. Cassera is the founder, sole owner, and has been the president and director of TSE since 1993. TSE itself and through several wholly-owned subsidiaries, including TSE-PEO, Inc. and TS Employment, Inc., primarily offers professional employer organization related services to privately-held and public companies, as well as to other professional employer organizations. Mr. Cassera brings extensive entrepreneurial, temporary staffing and management experience to our Company.

*Thomas J. Clarke, Jr.* has served as a Director since April 2013. Mr. Clarke serves as the Chief Executive Officer of Weiss Group, LLC, a leading provider of independent research, since July 2010. From 1999 through 2009, he served as Chief Executive Officer of TheStreet.com, Inc., (NASDAQ:TST) a financial media company. From 2002 through 2008, Mr. Clarke also served as Chairman of TheStreet.com. From 1998 through 1999, he served as President of Thomson Financial Investor Relations, following the acquisition of Technimetrics, Inc. by Thomson Financial. From 1984 through 1998, Mr. Clarke served in executive positions of increasing responsibility at Technimetrics, a global information company, rising to Chief Executive Officer from 1992 through the company's sale in 1998. From 1980 through 1984, he served as Operations Manager for McAuto Systems Group, Incorporated, a Medicaid billing processor. Mr. Clarke currently serves on the Board of Reis, Inc. (NASDAQ:REIS), a provider of commercial real estate information and analysis. He is also a mentor to students at Columbia University involved in the Executive Masters Program focusing on technology. Mr. Clarke received a B.S. degree in marketing from St. John's University and an M.B.A. degree from Hofstra University. Mr. Clarke brings extensive management and public company experience to our Company.

*James Foley* was named to the Board on May 21, 2012. Mr. Foley has been Chief Operating Officer of TSE since 1997 (as well as Chief Financial Officer from 1997 to 2004) and consults with the Board on insurance and operational matters as well as assisting our management team in acquisitions and other valuations. Prior to joining TSE, Mr. Foley was a Financial Risk Manager in the Treasury Department of Chase Manhattan Bank, N.A. Mr. Foley has a B.A. in Economics from Wagner College. Mr. Foley brings extensive knowledge and risk management experience to our Company.

*Larry Melby* was elected to the Board on February 5, 2013. Mr. Melby has, since September 2009, held the position of Chief Executive Officer of Select Specialty Hospital in Lake Worth, Florida. Previously, and from May 2003 until July 2008, he was the Chief Executive Officer of Town and Country Hospital in Tampa. From September 2001 until March 2003 he served as Chief executive officer of the Hollywood Medical Center of Hollywood, Florida. Mr. Melby was instrumental in establishing these facilities as healthcare leaders in South Florida. Mr. Melby also served as CEO of HCA Grant Center Hospital and HCA Deering Hospital, both in Miami. Mr. Melby has held other executive positions such as Chief Operating Officer for University Hospital in Tamarac, Florida and CEO of the Charter Hospital of Miami. Throughout Mr. Melby's career, he has earned leadership roles with major national healthcare organizations like Tenet, HCA, Columbia and IASIS. Mr. Melby brings extensive managerial experience and knowledge of the health care industry to our Company.

**Committees of the Board of Directors**

In May 2008, the Board assumed the responsibilities of the audit committee after the departure of the independent directors that served on the Board and the audit committee. In 2012, our Board of Directors did not operate through committees. In April 2013, with the appointment of a third independent director, we had a sufficient number of directors to form an audit committee. With the appointment of Ms. Amato to the Board, we now have an audit committee that is in compliance with the requirements of the NASDAQ Stock Market, Inc. Marketplace Rules and the rules of the Securities and Exchange Commission ("SEC"). The Audit Committee of the Board of Directors is comprised of Ms. Amato, who serves as chairperson, Mr. Clarke and Mr. Melby. The Board of Directors has determined that all of the Audit Committee members are independent, as that term is defined under the enhanced independence standards for audit committee members in the Securities and Exchange Act of 1934. The Board of Directors has also determined that Mr. Axelrod is an Audit Committee Financial Expert as that term is defined in rules issued pursuant to the Sarbanes-Oxley Act of 2002.

We do not have a compensation committee or nominating committee as we are deemed to be a "controlled company," which is defined to be a company with more than 50% of the voting power for the election of directors held by an individual, a group or another company.

**Director Qualifications**

The Board evaluates each individual in the context of the membership of the Board as a group, with the objective of having a group that can best perpetuate the success of the business and represent stockholder interests through the exercise of sound judgment using its diversity of background and experience in the various areas. Each director should be an individual of high character and integrity. In determining whether to recommend a director for re-election, the Board also considers the director's past attendance at meetings, participation in and contributions to the activities of the Board and the Company and other qualifications and characteristics.

Each director must ensure that other existing and anticipated future commitments do not materially interfere with the members' service as a director. Any employee director must submit his or her offer of resignation from the Board in writing upon termination of employment with the Company.

**Communications with the Board of Directors**

Stockholders may communicate with our Board of Directors at the following address:

The Board of Directors
c/o Gina L. Russo, Secretary
160 Broadway, 13th Floor,
New York, New York 10038

Communications are distributed to the Board of Directors or to any individual director, as appropriate, depending on the facts and circumstances outlined in the communication. In addition, material that is unduly hostile, threatening, illegal or similarly unsuitable will be excluded, with the provision that any communication that is filtered out must be made available to any non-management director upon request.

**Code of Conduct**

We have adopted a Code of Business Conduct that applies to all of our directors, executive officers and employees, including our Chief Executive Officer, our Chief Financial Officer and other senior financial officers. We have posted our Code of Conduct on our website at www.crsco.com and will post on our website any subsequent amendments thereto (other than technical, administrative or non-substantive amendments) and any waivers of provisions contained in our Code of Conduct for directors, executive officers or employees.

**Board Leadership and Role in Risk Oversight**

We believe that our Board provides strong overall management of the Company. The Board of Directors believes that Mr. Messina's service as Board Chair, President and Chief Executive Officer is appropriate and is in the best interests of the Board, the Company and its stockholders. Mr. Messina was appointed President in March 2009, Chairman of the Board on May 21, 2012 and Chief Executive Officer on October 10, 2012. He brings valuable insight given his tenure with us, as well as his knowledge of our industry.

Our Board of Directors as a whole has responsibility for risk oversight. The oversight responsibility of the Board is enabled by management reporting processes that are designed to provide visibility to the Board about the identification, assessment, and management of critical risks and management's risk mitigation strategies. These areas of focus include strategic, operational, financial and reporting, succession and compensation, compliance, and other risks.

## Involvement in Legal Proceedings

To the best of our knowledge, during the past ten years, none of our directors or executive officers were involved in one of the following: (1) any bankruptcy petition filed by or against any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within two years prior to that time; (2) any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offenses); (3) being subject to any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of any competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his involvement in any type of business, securities or banking activities; and (4) being found by a court of competent jurisdiction (in a civil action), the SEC or the Commodities Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended or vacated.

**Section 16(a) Beneficial Ownership Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our executive officers, directors and persons who own more than 10% of a registered class of our equity securities to file with the Securities and Exchange Commission initial statements of beneficial ownership, reports of changes in ownership and annual reports concerning their ownership of common stock and other of our equity securities, on Forms 3, 4 and 5 respectively. Executive officers, directors and greater than 10% shareholders are required by Commission regulations to furnish us with copies of all Section 16(a) reports they file.

**Director Compensation**

Until recently, we did not have a compensation policy for our Board members and they did not receive compensation for their service on the Board in 2012. Beginning in 2013 we began to issue on an annual basis, 20,000 restricted shares of our Common Stock to each of our independent directors as compensation for their services. We did not have any equity compensation plan for our directors or executive officers in Fiscal Year 2012.

**Executive Officers**

Each officer serves at the discretion of our Board of Directors and holds office until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. There are no family relationships among any of our executive officers. Set forth below is information regarding our executive and certain key officers as of January 3, 2014.

| Name | Age | Position |
|------|-----|----------|
| John Messina | 47 | President, Chief Executive Officer and Chairman |
| Michael J. Golde | 45 | Chief Financial Officer and Treasurer |
| Mark S. Levine | 53 | Chief Operating Officer |
| Gina L. Russo, Esq. | 30 | Secretary |
| Frank Vaccaro | 57 | President of Sales |

*John Messina* was appointed President in March 2009, Chairman of the Board on May 21, 2012 and Chief Executive Officer on October 10, 2012. Mr. Messina joined the Board in April 2007 and has served as Executive Vice President of TSE since January 1998. Mr. Messina has been employed by TSE since 1997. Prior to joining TSE, Mr. Messina worked in the transportation industry and has been an entrepreneur in several small businesses. Mr. Messina brings extensive experience in temporary staffing services, as well as executive management and entrepreneurial experience to our Company.

*Michael J. Golde* was appointed Chief Financial Officer on May 21, 2012 and Treasurer on October 10, 2012. Prior to starting work with the Company as Vice-President of Finance in January 2012, Mr. Golde had served as the Chief Financial Officer of Wimba, Inc. from October 2007 to June 2009 and Integra Realty Resources, Inc. from July 2009 to January 2012. In addition, from February 2011 to January 2012 he was the President and Chief Executive Officer of Multiple Intelligence, Inc. a provider of financial and accounting, business valuation and merger and acquisition advisory services and Chief Financial Officer of Canrock Ventures, LLC. Mr. Golde has a total of over 20 years of financial and accounting experience including as Controller of Randstad North America from 1994 to 1999 and Chief Financial Officer of Accretive Solutions from 1999 to 2007. Mr. Golde received a Bachelor of Business Administration and a Master of Business Administration from Pace University in 1990 and was a Senior Associate at Coopers & Lybrand (now PricewaterhouseCoopers) from 1990 to 1994.

*Mark S. Levine* has served as Chief Operating Officer of our Accountabilities subsidiary since February 2007 and became the Company's Chief Operating Officer on May 21, 2012. From 2001 until joining the Company, he served as Executive Vice President of Accretive Solutions, Inc., a professional staffing services firm. From 1997 until 2001, he was Chief Marketing Officer of Stratus Services Group, Inc., a national staffing firm. From 1995 until 1997, Mr. Levine was Regional Vice President of CoReStaff Services, Inc., a staffing services provider. From 1993 until 1995, Mr. Levine was employed in various capacities by Norrell Services, including Regional Vice President. Mr. Levine brings his extensive experience in the temporary staffing industry and management to the Company.

*Gina L. Russo, Esq.* was appointed Secretary on October 10, 2012 and is an attorney duly admitted in New York and New Jersey. She specializes in corporate law and labor and employment law. Ms. Russo joined TSE in 2007 and has served as Assistant General Counsel to Tri-State since May 2008. She received a Bachelor of Arts from Marist College and a Juris Doctor from Brooklyn Law.

*Frank Vaccaro* was appointed President of Sales on January 31, 2011. Mr. Vaccaro previously served as the Chief Executive Officer and President of Diamond Staffing Services Inc.(which entity was acquired by the Company on January 31, 2011) since January 2009, and in February 2010 was appointed as the Company's Senior Vice President of Sales, a position that he filled in a part-time capacity. From 2003 through December 2008, Mr. Vaccaro was President and the primary shareholder of a national staffing company, also named Diamond Staffing Services Inc.

66

[Table of Contents](#)

**ITEM 11.    EXECUTIVE COMPENSATION**

**Employment Arrangements**

*John P. Messina, President, Chief Executive Officer and Chairman*

Mr. John P. Messina did not have an employment contract in 2012.  For 2012, Mr. Messina received annual compensation of $140,000. Mr. Messina also received health benefits, a monthly membership for a health and fitness facility as well as a complete annual physical. We entered into an employment contract with Mr. Messina on September 23, 2013. The employment agreement provides for a term of employment of one year with automatic one year renewals. During the term of the agreement, Mr. Messina will receive an annual salary of $208,000, which the Company may increase at its discretion and he will be eligible to receive a discretionary bonus, based on his performance if and when determined by our Board of Directors.  Mr. Messina also receives health benefits, a monthly membership for a health and fitness facility as well as a complete annual physical.  In addition, the amount of severance compensation that would be payable to Mr. Messina in the event of the termination of his employment without cause would be equal to one year's salary.

*Michael J. Golde, Chief Financial Officer*

We entered into an employment agreement with Michael J. Golde, our Chief Financial Officer and Treasurer, on January 30, 2012 and amended it on May 21, 2012, when the Board named him Chief Financial Officer.  The amended employment agreement provides for a term of employment beginning on May 21, 2012 and ending on May 21, 2015 with automatic one year renewals. During the term of the agreement, Mr. Golde will receive an annual salary of $294,000, which the Company may increase at its discretion and will be eligible to receive a discretionary bonus, based on his performance if and when determined by the Company's President, Chief Executive Officer and the Board.  During the term of the agreement the Company will pay him $500 monthly for the expenses incurred for the cost of maintaining an automobile for business use, including lease costs, gas, maintenance and insurance.  In addition, during the term of the agreement Mr. Golde will be entitled to participate in such plans and programs as the Company may adopt from time to time in accordance with the terms of those plans and programs.

*Mark S. Levine, Chief Operating Officer*

We entered into an employment agreement with Mark Levine, Accountabilities' Chief Operating Officer, in January 2007, which provided for an annual base salary of $230,000 per annum and entitles Mr. Levine to an annual bonus of $25,000 or 2% of Accountabilities earnings before interest, taxes and amortization, whichever is greater.  In addition, in April 2007, we issued 500,000 shares of restricted stock to Mr. Levine.  In Fiscal Year 2012 these restricted shares became fully vested.  On May 21, 2012, Mr. Levine was named Chief Operating Officer of the Company and his salary was increased to $300,000, which the Company may further increase at its discretion and he may be eligible to receive a discretionary bonus, based on his performance if and when determined by the Company's President, Chief Executive Officer and the Board.  In addition, Mr. Levine was issued 300,000 shares of the Company's common stock that vested immediately. During his tenure, Mr. Levine will be entitled to participate in such plans and programs as the Company may adopt from time to time in accordance with the terms of those plans and programs.  The agreement with Mr. Levine has an indefinite term, unless terminated by either party, and provides that Mr. Levine is entitled to three months' severance pay, payable over a three month period if he is terminated without cause.  If Mr. Levine terminates the agreement, he shall not be entitled to any severance pay.  As of September 28, 2012, the amount of severance compensation that would be payable to Mr. Levine in the event of a termination without cause would be $75,000.

*Frank Vaccaro, President of Sales*

On January 31, 2011, we entered into an employment agreement with Frank Vaccaro, our President of Sales. The employment agreement provides for an initial term of employment of five years, with an additional renewal period of three years unless either the Company or Mr. Vaccaro deliver prior written notice to the other at least 60 days in advance of completion of the initial five-year term. During the first year of employment, Mr. Vaccaro will receive an annual salary of approximately $1,125,000, and during the remaining period of employment, Mr. Vaccaro will receive an annual salary of $750,000.   Mr. Vaccaro's employment agreement provides that for each year that he remains employed through the end of the Fiscal Year he will receive a bonus equal to 0.1% of the amount that (i) the aggregate amount of revenue received by the Company's subsidiaries (other than any newly acquired businesses during the fiscal year of acquisition, if acquired after January 31, 2011) during the applicable fiscal year exceeds the aggregate amount of revenues received by such subsidiaries during the immediately preceding Fiscal Year, and (ii) with respect to any newly acquired businesses during the fiscal year of acquisition, acquired after January 31, 2011, the revenue generated by such business after the date of acquisition in the amount that it exceeds a pro-rated amount of such new business' revenue in the twelve-month period prior to the acquisition by the Company.

Table of Contents

Mr. Vaccaro's employment agreement also provided that he will receive an initial grant of 750,000 shares of common stock prior to March 2, 2011, annual reimbursement for a $5,000,000 personal life insurance policy, a car allowance of $2,500 per month and four weeks paid vacation per year.

Mr. Vaccaro's employment agreement provides that it will be terminated by his death and may be terminated by the Company upon his disability or for "cause". Upon termination of Mr. Vaccaro's employment or upon his disability or if the termination of his employment is deemed "without cause" (as defined in his employment agreement), Mr. Vaccaro will be entitled to receive, (i) his salary for the remainder of the initial year if the termination occurs within the first year of Mr. Vaccaro's employment, and (ii) $750,000 if the termination occurs after the first year of his employment, in each case payable over a twelve-month period, less applicable taxes and withholding. The Company will also pay to or on behalf of Mr. Vaccaro during such 12 month period the premium cost for COBRA continuation of family medical insurance coverage, the premium for his life insurance policy and the car allowance.

For a description of the compensation paid to Mr. Messina, our Chief Executive Officer, President and Chairman of the Board,  please see Item 13 – Certain Relationships and Related Transactions and Director Independence.

### Summary Compensation Table

The following table sets forth information concerning the total compensation awarded to, earned by or paid during the Fiscal Years ended January 3, 2014 and December 28, 2012 to our Chief Executive Officer, and our two next most highly compensated executive officers, whom we sometimes refer to herein as the "Named Officers".

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Deferred Compensation Earnings ($) | Non-qualified Deferred Compensation Earnings ($) | All Other Compensation (2) ($) | Total |
|---|---|---|---|---|---|---|---|---|---|
| John P. Messina Chief Executive Officer, President and Chairman | 2013 | $ 208,000 (1) | $ — | $ — | $ 5,647,884 | $ — | $ — | $ — | $ 5,855,884 |
| | 2012 | 192,000 | — | — | — | — | — | — | 192,000 |
| Frank Vaccaro President of Sales | 2013 | 629,808 | — | — | 1,647,083 | — | — | 108,530 | 2,385,421 |
| | 2012 | 750,000 | — | — | — | — | — | 99,451 | 849,451 |
| Mark S. Levine Chief Operating Officer | 2013 | 300,000 | — | — | 1,270,774 | — | — | 43,590 | 1,614,364 |
| | 2012 | 300,000 | — | 128,400 | — | — | — | 29,732 | 458,132 |

(1)  Beginning on January 1, 2012 Mr. Messina began receiving compensation from the Company in addition to his salary from TSE.

(2)  Represents automobile lease payments and health, life and disability insurance premiums paid by the Company.

68

Table of Contents

**Outstanding Equity Awards at Fiscal Year-End**

The following table provides information about all equity compensation awards held by the named Executive Officers as of January 3, 2014:

OUTSTANDING EQUITY AWARDS

| | | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Date of Grant | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) (3) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| John Messina | 7/18/13 | — | 2,000,000 | — | $ 0.65 | 1/31/23 | $ | | — | $ — |
| Frank Vaccaro | 7/18/13 | 625,000 | — | — | 0.65 | 1/31/23 | | | — | — |
| Mark Levine | 7/18/13 | — | 450,000 | — | 0.65 | 1/31/23 | | | — | — |

**Compensation of Our Board of Directors**

The members of the Board did not receive any compensation for such service during Fiscal Year 2012. Beginning in Fiscal Year 2013 we began to issue on an annual basis, 20,000 restricted shares of our Common Stock to each of our independent directors as compensation for their services.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table sets forth certain information as of January 3, 2014 with respect to our Common Stock that is beneficially owned by (i) each director and executive officer, (ii) each person known to us to beneficially own more than five percent of the shares of Common Stock, and (iii) all directors and executive officers as a group. Except as otherwise indicated, the mailing address for each person listed in the table is 160 Broadway, 13th Floor, New York, NY 10038.

69

Table of Contents

| Name | Amount and Nature of Beneficial Ownership | | Percentage of Outstanding Shares (1) | |
|---|---|---|---|---|
| John Messina | 320,300 | | * | |
| Michael J. Golde | 205,050 | (2) | * | |
| Frank Vaccaro | 1,380,050 | (3) | * | |
| Mark Levine | 1,062,550 | (4) | * | |
| Gina L. Russo | 250 | | * | |
| James Altucher | 3,000,000 | (5) | 1.9 | % |
| Karen Amato | 20,000 | | * | |
| Joseph Cassera | 300 | | * | |
| Robert Cassera | 141,647,354 | (6) | 89.1 | % |
| Thomas J. Clarke, Jr | 20,000 | | * | |
| James Foley | 300 | | * | |
| Larry Melby | 28,726 | | * | |
| All Executives Officers and Directors as a Group (12 persons) | 147,684,880 | | 92.9 | % |

\* Less than 1%

(1)    Percentages are based on 158,015,295 shares of Common Stock outstanding as of January 3, 2014.  Additionally, options to purchase 1,825,000 shares of Common Stock that have vested or will vest within the next 60 days (see notes (2), (3) and (4)) have been included the calculation of the Company's total number of shares of Common Stock for those applicable individuals and the group total.

(2)    Includes vested options to purchase up to 200,000 shares of Common Stock exercisable through January 31, 2023, but as to which shares Mr. Golde disclaims beneficial ownership.

(3)    Includes vested options to purchase up to 625,000 shares of Common Stock exercisable through January 31, 2023 and 5,000 shares of Common Stock owned by an adult that lives in Mr. Vaccaro's household, but as to which shares he disclaims beneficial ownership.

(4)    Includes 50,000 shares of Common Stock owned by two children who live in Mr. Levine's household, but as to which shares he disclaims beneficial ownership.

(5)    Pursuant to a Business Advisory Consulting Agreement our Company entered into on October 11, 2012 with Spruce Goose, Inc., an affiliate of Mr. Altucher, we: (a) issued 1,000,000 shares of Common Stock ; (b) undertook to issue an additional 100,000 shares of Common Stock each month from January through October 2013 all of which have been vested and issued as of January 3, 2014 have been included in Mr. Altucher's beneficial ownership, but as to which he disclaims beneficial ownership; and (c) issued options to purchase up to 1,000,000 additional shares of Common Stock, vesting in monthly increments over 12 months, and exercisable through January 31, 2023, all of which have vested as January 3, 2014 included in Mr. Altucher's beneficial ownership, but as to which he disclaims beneficial ownership.

(6)    Includes 47,806,743 shares of Common Stock held of record by TSE and 21,000,000 shares of Common Stock issued to Tri-Tel Communications, Inc.

**ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

*Related Party Transactions*

We entered into a Master Service Agreement with Tri-State's affiliates TS Employment and TSE-PEO on August 27, 2010. These agreements provide for the provision of professional employer services for the Company and its subsidiaries. The majority shareholder of the Company who, with Tri-State and its wholly-owned affiliates, is beneficial owner of approximately 89.1% of our outstanding common stock as of the date hereof.

Tri-State provides professional employer services to us as part of a co-employment arrangement where Tri-State is the employer of record and we are the worksite employer. Professional employer services provided by Tri-State include payroll services,

Table of Contents

administration of employee benefits, workers' compensation insurance coverage, customer invoicing and accounts receivable collection services. These arrangements allow us to reduce certain insurance risks and costs. Due to the timing and payment of invoices received, the aggregate amount payable for accrued wages and related obligations provided by Tri-State was $9.4 million and $9.6 million as of January 3, 2014 and December 28, 2012, respectively.

We are charged an amount equal to the actual wages and associated payroll taxes for the employee plus an agreed upon rate for workers' compensation and health insurance as well as an administrative fee. The total amount charged by Tri-State for the Fiscal Years 2013 and 2012 was $717.2 million and $596.2 million, respectively. Tri-State charges us their current market rate for services, which is consistent with the amounts that it charges its other customers with its affiliate Group of PEOs.

The amounts owed to Tri-State are classified as related party loans payable. The principal amount increases or decreases based on periodic borrowings or repayments, and each subsidiary of the Company is charged interest at the rate of 12% per annum of their net loan payable. We recognized $1.7 million and $0.9 million of related party interest expense for Fiscal Years 2013 and 2012, respectively.

On March 30, 2012, we entered into an agreement to convert $12.0 million of the loan payable to Tri-State into 25,962,788 shares of common stock, at a value per share of $0.4622 Additionally, on July 31, 2012, we and Tri-State agreed to convert an additional $2.1 million of the loan into 4,543,488 shares of common stock, at a value per share of $0.4622. These conversions are reflected in the loan payable - related party balance, after giving effect to the conversions noted above as of January 3, 2014 and December 28, 2012.

On May 7, 2013, our wholly owned subsidiary, CRS Group, Inc. (the "CRS Group") acquired certain assets and assumed certain liabilities of the Summit Software Division ("Summit") of Tri-Tel Communications, Inc., a related party under common control (the "Summit Acquisition"). Accordingly, in accordance with ASC Topic 805, with respect to business combinations for transactions between entities under common control, the merger has been accounted for using Pooling-of-Interest with no adjustment to the historical basis of the assets and liabilities of CRS Group or Summit. Summit financial position and results of operations have therefore been included in all periods presented as if we had been combined at all times the entities were under common control. Pursuant to the terms of the agreement, we acquired certain assets and assumed certain liabilities in exchange for 21,000,000 shares of our common stock, valued at $0.65 per share or $13.75 million, based upon an independent valuation.

The following table provides data with respect to the largest aggregate balances, year ending balances, net proceeds paid and interest paid under our related party loans (amounts in thousands, except for interest rates):

| Related Party Liabilities | Fiscal Year Ended January 3, 2014 | | | | Fiscal Year ending December 28, 2012 | | | | |
| | Largest Aggregate Balance | Ending Balance | Net Proceeds (Principal Paid) | Interest Paid | Largest Aggregate Balance | Ending Balance | Net Proceeds (Principal Paid) | Interest Paid | Interest Rate |
|---|---|---|---|---|---|---|---|---|---|
| Accrued wages and related party obligations - due to related party | $ 15,959 | $ 9,499 | $ (165,127) | N/A | $ 15,167 | $ 9,649 | $ (141,052) | N/A | N/A |
| Current portion of related party long-term debt | 750 | — | (750) | N/A | 750 | 750 | — | N/A | N/A |
| Loan payable - related party | 13,589 | 12,730 | (762,749) | 1,693 | 16,068 | 15,748 | (646,024) | 861 | 12% |

*Director Independence*

Our Board of Directors has determined that Ms. Amato and Messrs. Clarke and Melby are "independent" as that term is defined under the applicable rules and regulations of the SEC. There are no family relationships between any director and an executive officer except that Messrs. John Cassera and Robert Cassera are brothers.

**ITEM 14.    PRINCIPAL ACCOUNTING FEES AND SERVICES**

**Fees for Professional Services Rendered, Accrued for or Billed by Our Independent Registered Public Accountants**

Table of Contents

Our financial statements for Fiscal Year 2012 have been audited by Rosen Seymour Shapss Martin and Company LLP, an independent registered public accounting firm. On December 27, 2013, our Audit Committee replaced Rosen Seymour Shapss Martin & Company LLP as our independent registered public accounting firm and engaged Crowe Horwath LLP as our independent registered public accounting firm effective January 3, 2014. Our financial statements for Fiscal Year 2013 have been audited by Crowe Horwath LLP.

The following table sets forth the aggregate fees billed to us for the Fiscal Years ended January 3, 2014 and December 28, 2012 by our independent auditors for such Fiscal Years (in thousands):

| | for the Fiscal Year ended | |
| --- | --- | --- |
| | January 3, 2014 | December 28, 2012 |
| Audit Fees | $ 1,893 | $ 241 |
| Audit-Related Fees | 80 | 59 |
| Tax Fees | 158 | 73 |
| All Other Fees | 2 | 11 |
| Total | $ 2,133 | $ 384 |

Audit fees represent amounts billed for professional services rendered for the audit of our annual financial statements and the reviews of the financial statements included in our quarterly reports on Form 10-Q for the fiscal year. Audit-Related Fees include amounts billed for professional services rendered in connection with our SEC filings.  The Board has considered whether provision of the non-audit services described above is compatible with maintaining the independent auditors' independence and has determined that such services did not adversely affect their independence.

Table of Contents

## PART IV

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a)        Financial Statements.

The index of the financial statements filed herewith is presented on page 25.

(b)        Exhibit Index.

| Exhibit Number | Exhibit Description | Form | Incorporated by Reference Exhibit | Filing Date/ Period End Date |
|---|---|---|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of January 10, 2011 by and among TS Staffing Corp., Tri-Diamond Staffing Inc., Diamond Staffing, Inc., Corporate Resource Services, Inc. and Diamond Staffing Services, Inc. | 10-Q | 2.4 | February 16, 2011 |
| 2.2 | Amendment No. 1, dated as of January 28, 2011, to the Agreement and Plan of Merger, dated as of January 10, 2011 by and among TS Staffing Corp., Tri-Diamond Staffing Inc., Diamond Staffing, Inc., Corporate Resource Services, Inc. and Diamond Staffing Services, Inc. | 10-Q | 2.5 | February 16, 2011 |
| 2.3 | Acquisition and Share Exchange Agreement dated as of November 21, 2011 by and among Corporate Resource Services, Inc. TS Staffing Services, Inc., and Mr. Robert Cassera. | 8-K | 2.1 | November 25, 2011 |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant. | DEF14A | A | October 8, 2013 |
| 3.2 | Amended and Restated By-Laws of the Registrant. | 8-K | 3.2 | February 24, 2010 |
| 10.1* | 2013 Equity Incentive Plan of the Registrant. | DEF14A | B | October 8, 2013 |
| 10.2* | 2013 Employee Stock Purchase Plan of the Registrant. | DEF14A | C | October 8, 2013 |
| 10.3 | Registration Rights Agreement dated as of August 27, 2010 by and between Corporate Resource Services, Inc. and TS Staffing Corp. | 8-K | 10.1 | September 1, 2010 |
| 10.4 | Master Services Agreement (PEO Services) dated August 27, 2010 by and between Corporate Resource Services, Inc. and TSE-PEO, Inc. | 8-K | 10.1 | September 2, 2010 |
| 10.5 | Master Services Agreement (PEO Services) dated August 27, 2010 by and between Corporate Resource Services, Inc. and TS Employment, Inc. | 8-K | 10.2 | September 2, 2010 |
| 10.6* | Employment Agreement, dated as of January 31, 2011, by and between Corporate Resource Services, Inc. and Frank Vaccaro. | 8-K | 10.1 | February 1, 2011 |
| 10.7* | Employment Agreement, dated January 30, 2007, by and  between Accountabilities, Inc. and Mark Levine. | 10-K | 10.4 | December 28, 2011 |
| 10.8* | Executive Employment Agreement dated as of January 30, 2012 and Amendment to Executive Employment Agreement dated as of May 21, 2012, by and between Corporate Resource Services, Inc. and Michael J. Golde. | 8-K | 10.1 | May 22, 2012 |
| 10.9 | Account Purchase Agreement, dated August 27, 2010 between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | September 1, 2010 |

73

Table of Contents

| | | | | |
|---|---|---|---|---|
| 10.10 | First Amendment to Account Purchase Agreement dated November 21, 2011, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.21 | December 21, 2012 |
| 10.11 | Second Amendment to Account Purchase Agreement dated March 29, 2012, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | April 23, 2012 |
| 10.12 | Third Amendment to Account Purchase Agreement dated October 1, 2012, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | June 21, 2013 |
| 10.13 | Fourth Amendment to Account Purchase Agreement dated June 13, 2013, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.7 | June 21, 2013 |
| 10.14 | Fifth Amendment to Account Purchase Agreement dated August 27, 2013, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | September 17, 2013 |
| 10.15 | Tenth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | June 26, 2014 |
| 10.16 | Account Purchase Agreement, dated November 2, 2010, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | November 5, 2010 |
| 10.17 | First Amendment to Account Purchase Agreement dated November 21, 2011, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.24 | December 21, 2012 |
| 10.18 | Second Amendment to Account Purchase Agreement dated January 1, 2012, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.25 | December 21, 2012 |
| 10.19 | Third Amendment to Account Purchase Agreement dated March 29, 2012, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | April 23, 2012 |
| 10.20 | Fourth Amendment to Account Purchase Agreement dated October 1, 2012, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | June 21, 2013 |
| 10.21 | Fifth Amendment to Account Purchase Agreement dated June 13, 2013, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.8 | June 21, 2013 |
| 10.22 | Sixth Amendment to Account Purchase Agreement dated August 27, 2013, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | September 17, 2013 |
| 10.23 | Eleventh Amendment to Account Purchase Agreement dated June 20, 2014, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | June 26, 2014 |
| 10.24 | Account Purchase Agreement, dated as of January 31, 2011, between Wells Fargo Bank, National Association and Diamond Staffing Services, Inc. | 8-K | 10.1 | February 1, 2011 |
| 10.25 | First Amendment to Account Purchase Agreement dated November 21, 2011, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.27 | December 21, 2011 |

Table of Contents

| | | | | |
|---|---|---|---|---|
| 10.26 | Second Amendment to Account Purchase Agreement dated March 29, 2012, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | April 23, 2012 |
| 10.27 | Third Amendment to Account Purchase Agreement dated October 1, 2012, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.5 | June 21, 2013 |
| 10.28 | Fourth Amendment to Account Purchase Agreement dated June 13, 2013, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.9 | June 21, 2013 |
| 10.29 | Fifth Amendment to Account Purchase Agreement dated August 27, 2013, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | September 17, 2013 |
| 10.30 | Tenth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | June 26, 2014 |
| 10.31 | Amended and Restated Account Purchase Agreement dated November 21, 2011, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | November 25, 2011 |
| 10.32 | First Amendment to Account Purchase Agreement dated March 29, 2012, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | April 23, 2012 |
| 10.33 | Second Amendment to Account Purchase Agreement dated October 1, 2012, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.6 | June 21, 2013 |
| 10.34 | Third Amendment to Account Purchase Agreement dated June 13, 2013, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.10 | June 21, 2013 |
| 10.35 | Fourth Amendment to Account Purchase Agreement dated August 27, 2013, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | September 17, 2013 |
| 10.36 | Ninth Amendment to Account Purchase Agreement dated June 20, 2014, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | June 26, 2014 |
| 10.37 | Account Purchase Agreement dated June 13, 2013 by and between Accountabilities, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | June 21, 2013 |
| 10.38 | Amendment to Account Purchase Agreement and other Documents dated June 13, 2013 by and between Accountabilities, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | June 21, 2013 |
| 10.39 | First Amendment to Account Purchase Agreement dated August 27, 2013, by and between Accountabilities, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.5 | September 17, 2013 |
| 10.40 | Continuing Guaranty, dated June 13, 2013, executed by Accountabilities, Inc. in favor of Wells Fargo Bank, National Association. | 8-K | 10.11 | June 21, 2013 |
| 10.41 | Sixth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Accountabilities, Inc. and Wells Fargo Bank, National Association.. | 8-K | 10.5 | June 26, 2014 |
| 10.42 | Conversion Agreement dated March 30, 2012, by and between Corporate Resource Services, Inc., its subsidiaries and TS Employment, Inc. | 10-K/A | 10.31 | May 7, 2013 |

Table of Contents

| | | | | |
|---|---|---|---|---|
| 10.43 | Amended and Restated Commission Agreement, dated August 24, 2013 by and among The Tuttle Agency, Inc., Segue Search of New Jersey Inc., Tuttle Agency of New Jersey, Inc., Tuttle Specialty Services Inc., Rosenthal & Rosenthal, Inc., Integrated Consulting Group, Inc. and Tri-State Employment Services, Inc. | 8-K | 10.32 | May 7, 2013 |
| 10.44 | Account Purchase Agreement dated November 1, 2013, by and between Integrated Consulting Group, Inc. and Wells Fargo Bank, National Association | 8-K | 10.6 | June 26, 2014 |
| 10.45 | Fourth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Integrated Consulting Group, Inc.. and Wells Fargo Bank, National Association. | 8-K | 10.7 | June 26, 2014 |
| 10.46 | Conversion Agreement dated July 31, 2012, by and between Corporate Resource Services, Inc., its subsidiaries and TS Employment, Inc. | 8-K | 10.33 | May 7, 2013 |
| 10.47 | Acquisition and Share Exchange Agreement dated as of November 21, 2011 by and among Corporate Resource Services, Inc. TS Staffing Services, Inc., and Mr. Robert Cassera. | 8-K | 2.1 | November 25, 2011 |
| 10.48 | Asset Purchase Agreement dated as of May 7, 2013, by and among Tri-Tel Communications, Inc., the CRS Group, Inc, and Corporate Resource Services Inc. | 8-K/A | 2.1 | July 19, 2013 |
| 10.49 | Asset Purchase Agreement dated as of January 31, 2014, by and between Staff Management Group, LLC and Diamond Staffing Services, Inc. | 8-K/A | 2.1 | February 14, 2014 |
| 10.50* | Employment Agreement, dated as of January 23, 2013, by and between Corporate Resource Services, Inc. and John Messina. | 8-K | 10.1 | October 4, 2013 |
| 10.51* | Option held by Michael J. Golde to purchase common shares of Corporate Resource Services, Inc. | 8-K | 10.1 | June 26, 2013 |
| 21.1** | Subsidiaries of Corporate Resource Services, Inc. | | | |
| 23.1** | Consent of Crowe Horwath LLP, Independent Registered Public Accounting Firm. | | | |
| 23.2** | Consent of Rosen Seymour Shapss Martin & Company LLP, Independent Registered Public Accounting Firm. | | | |
| 31.1** | Certification of Principal Executive Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002. | | | |
| 31.2** | Certification of Principal Financial Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002. | | | |
| 32.1** | Certification of Principal Executive Officer pursuant to Section 906 of Sarbanes-Oxley Act of 2002. | | | |
| 32.2** | Certification of Principal Financial Officer pursuant to Section 906 of Sarbanes-Oxley Act of 2002. | | | |
| 101.INS | XBRL Instance | | | |
| 101.XSD | XBRL Schema | | | |
| 101.PRE | XBRL Presentation | | | |
| 101.CAL | XBRL Calculation | | | |

Table of Contents

101.DEF    XBRL Definition

*    Compensation agreement

**    Filed herewith electronically.

Table of Contents

## SIGNATURES

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on behalf of the undersigned, thereunto duly authorized.**

CORPORATE RESOURCE SERVICES, INC.

By: /s/ John P. Messina, Sr.
_____

John P. Messina, Sr.
Chief Executive Officer

Date:  June 30, 2014

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|:---:|---|
| /s/ John P. Messina, Sr.<br>John P. Messina, Sr. | Chief Executive Officer, President and Chairman<br>(Principal Executive Officer) | June 30, 2014 |
| /s/ Michael J. Golde<br>Michael J. Golde | Chief Financial Officer and Treasurer<br>(Principal Financial and Accounting Officer) | June 30, 2014 |
| /s/ Joseph Cassera<br>Joseph Cassera | Director | June 30, 2014 |
| /s/ Robert Cassera<br>Robert Cassera | Director | June 30, 2014 |
| /s/ James Altucher<br>James Altucher | Director | June 30, 2014 |
| /s/ James Foley<br>James Foley | Director | June 30, 2014 |
| /s/ James Foley<br>Karen Amato | Director | June 30, 2014 |
| /s/ Thomas J. Clarke, Jr.<br>Thomas J. Clarke, Jr. | Director | June 30, 2014 |
| /s/ Larry Melby<br>Larry Melby | Director | June 30, 2014 |

Table of Contents

EXHIBIT INDEX

| Exhibit Number | Exhibit Description | Form | Incorporated by Reference Exhibit | Filing Date/ Period End Date |
|---|---|---|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of January 10, 2011 by and among TS Staffing Corp., Tri-Diamond Staffing Inc., Diamond Staffing, Inc., Corporate Resource Services, Inc. and Diamond Staffing Services, Inc. | 10-Q | 2.4 | February 16, 2011 |
| 2.2 | Amendment No. 1, dated as of January 28, 2011, to the Agreement and Plan of Merger, dated as of January 10, 2011 by and among TS Staffing Corp., Tri-Diamond Staffing Inc., Diamond Staffing, Inc., Corporate Resource Services, Inc. and Diamond Staffing Services, Inc. | 10-Q | 2.5 | February 16, 2011 |
| 2.3 | Acquisition and Share Exchange Agreement dated as of November 21, 2011 by and among Corporate Resource Services, Inc. TS Staffing Services, Inc., and Mr. Robert Cassera. | 8-K | 2.1 | November 25, 2011 |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant. | DEF14A | A | October 8, 2013 |
| 3.2 | Amended and Restated By-Laws of the Registrant. | 8-K | 3.2 | February 24, 2010 |
| 10.1* | 2013 Equity Incentive Plan of the Registrant. | DEF14A | B | October 8, 2013 |
| 10.2* | 2013 Employee Stock Purchase Plan of the Registrant. | DEF14A | C | October 8, 2013 |
| 10.3 | Registration Rights Agreement dated as of August 27, 2010 by and between Corporate Resource Services, Inc. and TS Staffing Corp. | 8-K | 10.1 | September 1, 2010 |
| 10.4 | Master Services Agreement (PEO Services) dated August 27, 2010 by and between Corporate Resource Services, Inc. and TSE-PEO, Inc. | 8-K | 10.1 | September 2, 2010 |
| 10.5 | Master Services Agreement (PEO Services) dated August 27, 2010 by and between Corporate Resource Services, Inc. and TS Employment, Inc. | 8-K | 10.2 | September 2, 2010 |
| 10.6* | Employment Agreement, dated as of January 31, 2011, by and between Corporate Resource Services, Inc. and Frank Vaccaro. | 8-K | 10.1 | February 1, 2011 |
| 10.7* | Employment Agreement, dated January 30, 2007, by and between Accountabilities, Inc. and Mark Levine. | 10-K | 10.4 | December 28, 2011 |
| 10.8* | Executive Employment Agreement dated as of January 30, 2012 and Amendment to Executive Employment Agreement dated as of May 21, 2012, by and between Corporate Resource Services, Inc. and Michael J. Golde. | 8-K | 10.1 | May 22, 2012 |
| 10.9 | Account Purchase Agreement, dated August 27, 2010 between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | September 1, 2010 |
| 10.10 | First Amendment to Account Purchase Agreement dated November 21, 2011, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.21 | December 21, 2012 |
| 10.11 | Second Amendment to Account Purchase Agreement dated March 29, 2012, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | April 23, 2012 |

Table of Contents

| | | | | |
|---|---|---|---|---|
| 10.12 | Third Amendment to Account Purchase Agreement dated October 1, 2012, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | June 21, 2013 |
| 10.13 | Fourth Amendment to Account Purchase Agreement dated June 13, 2013, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.7 | June 21, 2013 |
| 10.14 | Fifth Amendment to Account Purchase Agreement dated August 27, 2013, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | September 17, 2013 |
| 10.15 | Tenth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Insurance Overload Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | June 26, 2014 |
| 10.16 | Account Purchase Agreement, dated November 2, 2010, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | November 5, 2010 |
| 10.17 | First Amendment to Account Purchase Agreement dated November 21, 2011, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.24 | December 21, 2012 |
| 10.18 | Second Amendment to Account Purchase Agreement dated January 1, 2012, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.25 | December 21, 2012 |
| 10.19 | Third Amendment to Account Purchase Agreement dated March 29, 2012, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | April 23, 2012 |
| 10.20 | Fourth Amendment to Account Purchase Agreement dated October 1, 2012, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | June 21, 2013 |
| 10.21 | Fifth Amendment to Account Purchase Agreement dated June 13, 2013, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.8 | June 21, 2013 |
| 10.22 | Sixth Amendment to Account Purchase Agreement dated August 27, 2013, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | September 17, 2013 |
| 10.23 | Eleventh Amendment to Account Purchase Agreement dated June 20, 2014, by and between Corporate Resource Development, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | June 26, 2014 |
| 10.24 | Account Purchase Agreement, dated as of January 31, 2011, between Wells Fargo Bank, National Association and Diamond Staffing Services, Inc. | 8-K | 10.1 | February 1, 2011 |
| 10.25 | First Amendment to Account Purchase Agreement dated November 21, 2011, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 10-K | 10.27 | December 21, 2011 |
| 10.26 | Second Amendment to Account Purchase Agreement dated March 29, 2012, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | April 23, 2012 |
| 10.27 | Third Amendment to Account Purchase Agreement dated October 1, 2012, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.5 | June 21, 2013 |

| | | | | |
|---|---|---|---|---|
| 10.28 | Fourth Amendment to Account Purchase Agreement dated June 13, 2013, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.9 | June 21, 2013 |
| 10.29 | Fifth Amendment to Account Purchase Agreement dated August 27, 2013, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | September 17, 2013 |
| 10.30 | Tenth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Diamond Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.3 | June 26, 2014 |
| 10.31 | Amended and Restated Account Purchase Agreement dated November 21, 2011, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | November 25, 2011 |
| 10.32 | First Amendment to Account Purchase Agreement dated March 29, 2012, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | April 23, 2012 |
| 10.33 | Second Amendment to Account Purchase Agreement dated October 1, 2012, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.6 | June 21, 2013 |
| 10.34 | Third Amendment to Account Purchase Agreement dated June 13, 2013, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.10 | June 21, 2013 |
| 10.35 | Fourth Amendment to Account Purchase Agreement dated August 27, 2013, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | September 17, 2013 |
| 10.36 | Ninth Amendment to Account Purchase Agreement dated June 20, 2014, by and between TS Staffing Services, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.4 | June 26, 2014 |
| 10.37 | Account Purchase Agreement dated June 13, 2013 by and between Accountabilities, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.1 | June 21, 2013 |
| 10.38 | Amendment to Account Purchase Agreement and other Documents dated June 13, 2013 by and between Accountabilities, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.2 | June 21, 2013 |
| 10.39 | First Amendment to Account Purchase Agreement dated August 27, 2013, by and between Accountabilities, Inc. and Wells Fargo Bank, National Association. | 8-K | 10.5 | September 17, 2013 |
| 10.40 | Continuing Guaranty, dated June 13, 2013, executed by Accountabilities, Inc. in favor of Wells Fargo Bank, National Association. | 8-K | 10.11 | June 21, 2013 |
| 10.41 | Sixth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Accountabilities, Inc. and Wells Fargo Bank, National Association.. | 8-K | 10.5 | June 26, 2014 |
| 10.42 | Conversion Agreement dated March 30, 2012, by and between Corporate Resource Services, Inc., its subsidiaries and TS Employment, Inc. | 10-K/A | 10.31 | May 7, 2013 |
| 10.43 | Amended and Restated Commission Agreement, dated August 24, 2013 by and among The Tuttle Agency, Inc., Segue Search of New Jersey Inc., Tuttle Agency of New Jersey, Inc., Tuttle Specialty Services Inc., Rosenthal & Rosenthal, Inc., Integrated Consulting Group, Inc. and Tri-State Employment Services, Inc. | 8-K | 10.32 | May 7, 2013 |
| 10.44 | Account Purchase Agreement dated November 1, 2013, by and between Integrated Consulting Group, Inc. and Wells Fargo Bank, National Association | 8-K | 10.6 | June 26, 2014 |

Table of Contents

| 10.45 | Fourth Amendment to Account Purchase Agreement dated June 20, 2014, by and between Integrated Consulting Group, Inc.. and Wells Fargo Bank, National Association. | 8-K | 10.7 | June 26, 2014 |
| 10.46 | Conversion Agreement dated July 31, 2012, by and between Corporate Resource Services, Inc., its subsidiaries and TS Employment, Inc. | 8-K | 10.33 | May 7, 2013 |
| 10.47 | Acquisition and Share Exchange Agreement dated as of November 21, 2011 by and among Corporate Resource Services, Inc. TS Staffing Services, Inc., and Mr. Robert Cassera. | 8-K | 2.1 | November 25, 2011 |
| 10.48 | Asset Purchase Agreement dated as of May 7, 2013, by and among Tri-Tel Communications, Inc., the CRS Group, Inc, and Corporate Resource Services Inc. | 8-K/A | 2.1 | July 19, 2013 |
| 10.49 | Asset Purchase Agreement dated as of January 31, 2014, by and between Staff Management Group, LLC and Diamond Staffing Services, Inc. | 8-K/A | 2.1 | February 14, 2014 |
| 10.50* | Employment Agreement, dated as of January 23, 2013, by and between Corporate Resource Services, Inc. and John Messina. | 8-K | 10.1 | October 4, 2013 |
| 10.51* | Option held by Michael J. Golde to purchase common shares of Corporate Resource Services, Inc. | 8-K | 10.1 | June 26, 2013 |
| 21.1** | Subsidiaries of Corporate Resource Services, Inc. | | | |
| 23.1** | Consent of Crowe Horwath LLP, Independent Registered Public Accounting Firm. | | | |
| 23.2** | Consent of Rosen Seymour Shapss Martin & Company LLP, Independent Registered Public Accounting Firm. | | | |
| 31.1** | Certification of Principal Executive Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002. | | | |
| 31.2** | Certification of Principal Financial Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002. | | | |
| 32.1** | Certification of Principal Executive Officer pursuant to Section 906 of Sarbanes-Oxley Act of 2002. | | | |
| 32.2** | Certification of Principal Financial Officer pursuant to Section 906 of Sarbanes-Oxley Act of 2002. | | | |
| 101.INS | XBRL Instance | ** | | |
| 101.XSD | XBRL Schema | ** | | |
| 101.PRE | XBRL Presentation | ** | | |
| 101.CAL | XBRL Calculation | ** | | |
| 101.DEF | XBRL Definition | ** | | |

\*　Compensation agreement
\*\*　Filed herewith electronically.

82

Exhibit 21.1

### SUBSIDIARIES OF THE REGISTRANT

| Name of Subsidiary | Jurisdiction of Incorporation |
| --- | --- |
| Accountabilities, Inc. | Delaware |
| Corporate Resource Development, Inc. | Delaware |
| Insurance Overload Services, Inc. | Delaware |
| Integrated Consulting Group, Inc. | Delaware |
| Diamond Staffing Services, Inc. | Delaware |
| TS Staffing Services, Inc. | Texas |
| The CRS Group, Inc. | Delaware |
| Flex-Plus LTD | United Kingdom |

**Exhibit 23.1**

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statement No. 333-192699 on Form S-8 of Corporate Resource Services, Inc. of our report dated June 30, 2014 relating to the financial statements as of and for the year ended January 3, 2014, appearing in this Annual Report on Form 10-K.

/s/ Crowe Horwath LLP
New York, New York
June 30, 2014

**EXHIBIT 23.2**

### CONSENT OF INDEPENDENT AUDITORS

Board of Directors
Corporate Resource Services, Inc.

We consent to the incorporation of our report dated December 20, 2013, except for Noted 16 dated June 30, 2014 on our audit of the consolidated financial statements of Corporate Resource Services, Inc. for the year ended December 28, 2012 included in this Form 10-K.

/s/ Rosen Seymour Shapss Martin & Company, LLP

Rosen Seymour Shapss Martin & Company, LLP

New York, New York
June 30, 2014

Exhibit 31.1

**CERTIFICATION**

I, John P. Messina, Sr., certify that:

1.    I have reviewed this annual report on Form 10-K for the fiscal year ended January 3, 2014 of Corporate Resource Services, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date:                June 30, 2014


/s/ John P. Messina, Sr.

_____

John P. Messina, Sr.
Chief Executive Officer (Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION**

I, Michael J. Golde, certify that:

1.    I have reviewed this annual report on Form 10-K for the fiscal year ended January 3, 2014 of Corporate Resource Services, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

   c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: June 30, 2014

/s/ Michael J. Golde
Michael J. Golde
Chief Financial Officer (Principal Financial Officer)

**Exhibit 32.1**

**Corporate Resource Services, Inc.**

Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

(18 U.S.C. Section 1350)

In connection with the annual report of Corporate Resource Services, Inc. (the "Company") on Form 10-K for the fiscal year ended January 3, 2014 as filed with the Securities and Exchange Commission on or about the date hereof (the "Report"), I, John P. Messina, Sr., Chief Executive Officer of the Company, certify, to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.     the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     the information in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated:    June 30, 2014                                  By:    /s/ John P. Messina, Sr.

                                                                    John P. Messina, Sr.

                                                                    Chief Executive Officer (Principal Executive Officer)

**Exhibit 32.2**

**Corporate Resource Services, Inc.**

Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

(18 U.S.C. Section 1350)

In connection with the annual report of Corporate Resource Services, Inc. (the "Company") on Form 10-K for the fiscal year ended January 3, 2014 as filed with the Securities and Exchange Commission on or about the date hereof (the "Report"), I, Michael J. Golde, Chief Financial Officer of the Company, certify, to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.    the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    the information in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated:    June 30, 2014                    By:    /s/ Michael J. Golde

                                   Michael J. Golde

                                   Chief Financial Officer (Principal Financial Officer)

EXHIBIT 2

**In Re:**

*TS EMPLOYMENT, INC.*

*Case No. 15-10243-mg*

*August 18, 2015*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone*



Min-U-Script® with Word Index

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 15-10243-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


TS EMPLOYMENT, INC.,


            Debtor.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            August 18, 2015

            2:13 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2   Status Conference

3

4   (CC: Doc # 127, 132, 135, 138, 141) Chapter 11 Trustee's

5   Application to Transfer Venue of the Chapter 11 Cases of

6   Corporate Resource Services, Inc. and Its Affiliated Entities

7   From the United States Bankruptcy Court for the District of

8   Delaware to This District

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Esther Accardi

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

```
 1
 2   A P P E A R A N C E S :
 3   TOGUT, SEGAL & SEGAL LLP
 4        Attorneys for Trustee
 5        One Penn Plaza
 6        New York, NY 10119
 7
 8   BY:   ALBERT TOGUT, ESQ.
 9        LAUREN L. PEACOCK, ESQ.
10
11
12   UNITED STATES DEPARTMENT OF JUSTICE
13        Office of the U.S. Trustee
14        201 Varick Street
15        Suite 1006
16        New York, NY 10014
17
18   BY:   BRIAN S. MASUMOTO, ESQ.
19
20
21
22
23
24
25
```

**4**

1

2  GELLERT SCALI BUSENKELL & BROWN, LLC

3        Attorneys for Corporate Resource Services, et al.

4        913 North Market Street

5        10th Floor

6        Wilmington, DE 19801

7

8  BY:   RONALD S. GELLERT, ESQ.

9

10

11  WILMER CUTLER PICKERING HALE AND DORR LLP

12        Special Counsel for Corporate Resource Services

13        60 State Street

14        Boston, MA 02109

15

16  BY:   BENJAMIN W. LOVELAND, ESQ.

17

18

19  OTTERBOURG P.C.

20        Attorneys for Wells Fargo

21        230 Park Avenue

22        New York, NY 10169

23

24  BY:   JONATHAN N. HELFAT, ESQ.

25

1

2   DICKSTEIN SHAPIRO LLP

3        Attorneys for Ad Hoc Committee of CRS Creditors

4        1633 Broadway

5        New York, NY 10019

6

7   BY:   BARRY N. SEIDEL, ESQ.

8

9

10  UNITED STATES SECURITIES AND EXCHANGE COMMISSION

11        3 World Financial Center

12        New York, NY 10281

13

14  BY:   ALAN S. MAZA, ESQ.

15

16

17  UNITED STATES DEPARTMENT OF JUSTICE

18        The United States Attorney's Office

19        86 Chambers Street

20        3rd Floor

21        New York, NY 10007

22

23  BY:   MONICA P. FOLCH, ESQ.

24

25

TS EMPLOYMENT, INC.                                          6

1                      P R O C E E D I N G S

2              THE COURT:  Okay.  TS Employment, Inc., 15-10243.

3              Now's your turn.

4              MR. TOGUT:  Yep, now it's my turn.

5              THE COURT:  All right, Mr. Togut.

6              MR. TOGUT:  All right.  Thank you, Your Honor.

7              THE COURT:  No, actually, let me get the rest of the

8     appearances --

9              MR. TOGUT:  Sure.

10             THE COURT:  -- to the motion.  Okay.  I have your

11    appearance, Mr. Togut.

12             Who else?

13             MR. TOGUT:  Thank you.

14             MR. GELLERT:  Good afternoon, Your Honor.  Ron Gellert

15    from Gellert Scali Busenkell & Brown.  I have been admitted pro

16    hac vice.  Thank you, Your Honor.

17             THE COURT:  Okay.  Anybody else want --

18             MR. LOVELAND:  Good afternoon, Your Honor.  Benjamin

19    Loveland from WilmerHale.  We're proposed special counsel to

20    the Corporate Resource Services debtors.

21             MR. HELFAT:  Good afternoon, Your Honor.  Jonathan

22    Helfat, Otterbourg PC for Wells Fargo Bank.

23             MR. SEIDEL:  Good afternoon, Your Honor.  Barry Seidel

24    from Dickstein Shapiro on behalf of the ad hoc committee of CRS

25    creditors.

TS EMPLOYMENT, INC.                                7

1          THE COURT:  Anybody else?

2          All right, Mr. Togut.

3          MR. TOGUT:  And with me, Your Honor, is my colleague

4    Lauren Peacock.

5          THE COURT:  Okay.

6          MR. TOGUT:  I'll give you a heads-up before I start.

7    I'm on the tail end of a cold; if I start coughing I apologize.

8          THE COURT:  Just stay away from me, Mr. Togut?

9          MR. TOGUT:  Huh?

10         THE COURT:  Just stay away from me, Mr. Togut.

11         MR. TOGUT:  I have nothing to hand up.

12         THE COURT:  Okay.

13         MR. TOGUT:  Okay.  Your Honor, we have two things on

14   the calendar.  The first is a status report on the trustee's

15   administration.  This is in the nature of a report.  It's not a

16   motion, so we'll say what we say and then we'll get onto the

17   adversarial part of the program, which is the venue motion.

18         And you're getting an abbreviated report.  The trustee

19   has already been asked to report to the IRS, to the SEC and to

20   the United States Trustee.  And each of those presentations

21   lasted about an hour and a half.  This will be a few minutes.

22         So we want to give you an update.  The trustee's been

23   working since the end of February, so it's some five and a half

24   months.  And our professional employer organization, PEO, was

25   formed five years ago.  Just so you know, this trustee has had

TS EMPLOYMENT, INC.                                                    8

1   experience in other PEO cases, so the United States Trustee
2   actually appointed somebody who had prior experience in this
3   industry.
4           Our debtor and CRS conducted a one billion dollar
5   business.  And the third leg of the stool is TSE.  I'm sorry,
6   TSE, CRS and then Tri-State.  You're going to hear references
7   to those three companies.
8           All three of those companies are majority-owned and
9   managed by one individual, Robert Cassera.  He and certain
10  family members and close associates ran this enterprise.
11          CRS is a public company; it was the public face of the
12  business.  TSE, the debtor before you, was the back office
13  fulfiller of orders, if I can put it in that way.  And Tri-
14  State, which is also a privately held company owns staffing and
15  PEO business that service TSE and CRS.  It also -- Tri-State
16  also managed us.
17          For a PEO to operate, it needs a very good software
18  system, because it has to precisely capture and record payroll
19  data.  It has to account for and process related obligations.
20  It has to maintain controls over cash received from customers.
21  And it has to keep track of payroll taxes.  That's how a PEO is
22  supposed to operate.  This debtor did not operate in that
23  fashion.
24          This debtor really had no control over its software
25  systems.  They and the purse strings were controlled by CRS and

TS EMPLOYMENT, INC.                                                    9

1   Tri-State.  What payroll taxes got paid, when they got paid,

2   and how much they got paid, was not determined by our debtor.

3            MR. GELLERT:  Your Honor, if I may.  It seems to be

4   testimony --

5            THE COURT:  Could you sit down, please.

6            Could you sit down, please.

7            MR. GELLERT:  Of course, Your Honor.

8            MR. TOGUT:  Thank you.  This is the trustee's

9   report --

10            THE COURT:  Go ahead, Mr. Togut.

11            MR. TOGUT:  -- it's the trustee's view of the facts.

12            THE COURT:  Go ahead, Mr. Togut.

13            MR. TOGUT:  Thank you.

14            This approach made operations less transparent, and

15   susceptible to manipulation, and in our view, improper

16   activities.

17            So TSE, your debtor, was not allowed to manage its own

18   affairs.  Its software systems were owned or controlled by CRS.

19   It did not have a financial staff of its own.  It had an

20   outside accountant, very tiny firm with three partners, Ernie

21   Kasoff (sic) PC CPA.  And Kasoff had access to TSE software,

22   and he was able to make entries, and he was able to make

23   adjustments, but TSE could not monitor or reject his

24   adjustments.

25            This debtor did not have any space of its own.  It

TS EMPLOYMENT, INC.                                      10

1   shared offices in New York with CRS and Tri-State.  It shared

2   services and it shared the exact same customer base.  It shared

3   access to the CRS lenders for the funds to operate.  There was

4   a highly complex system of bank accounts at Wells Fargo,

5   JPMorgan, and Santander.

6           CRS clients paid into the Wells-controlled lockbox

7   account.  Wells lent money back to CRS.  CRS paid your debtor

8   for PEO services based on CRS invoices.

9           At the end of every day, money not required that day

10  were transferred to a Tri-State-controlled account.  And so

11  within twenty-four hours of receipt, the TSE monies were gone.

12  Tri-State decided who to pay, when to pay them, and how much

13  would be paid.

14          We relied on the same loans that were made to CRS.

15  Neither business could operate without access to these same

16  funds.  So you had CRS, the public face, making sales to

17  provide customer service, and TSE was the administrative and

18  back office operation of the same business enterprise.  And the

19  cash flowed and was managed by Tri-State.

20          We believe, based on the investigation so far, that

21  these corporate forums were artificial distractions.  They were

22  used to obfuscate what appeared to be fraudulent activities.

23  This is our view.

24          THE COURT:  Well, let me ask you the hundred-million-

25  dollar question --

1              MR. TOGUT:  Yes.

2              THE COURT:  -- which I think I asked the first day and

3      a number of times thereafter.  What happened to the hundred

4      million dollars?  Did it get transferred from CRS to TSE?

5              MR. TOGUT:  As far as we've been able to follow the

6      trail, yes.

7              THE COURT:  And then what happened to it once it came

8      into TSE?

9              MR. TOGUT:  That trail we haven't been able to follow

10     yet.  So I can't answer that question.  But we were definitely

11     short one hundred million dollars.

12             THE COURT:  But you're able to trace it into TSE?

13             MR. TOGUT:  Yes, Your Honor.

14             THE COURT:  Okay, go ahead.

15             MR. TOGUT:  Tri-State -- went to Tri-State.

16             THE COURT:  It came -- no, my question is did it first

17     come from CRS into TS Employment?

18             MR. TOGUT:  Yes.

19             THE COURT:  All right, and from there you believe it

20     went to Tri-State?

21             MR. TOGUT:  Yes.

22             THE COURT:  Okay, go ahead.

23             MR. TOGUT:  TSE never had independent management, and

24     it was forced to rely on Tri-State for all management and

25     operational functions.  So the same officers of both CRS and

1  Tri-State wore multiple hats.  And Robert Cassera is all over

2  these corporate enterprises.  And it was done without regard to

3  corporate distinctions.

4         The primary victims were IRS and other taxing

5  authorities.  TSE was built to be a cost plus marginal fee

6  business.  And so it was constructed so that you could make a

7  little or you could lose a little.  And through the year 2013,

8  that's how it was operated.  But then after 2013, TSE lost a

9  lot.

10         In 2014, Your Honor, TSE recorded a forty-eight

11  million dollar net loss.  And as you know, it grew to be one

12  hundred million.  And some of this was because of Workmen's

13  Compensation costs charged by Tri-State and because of --

14         THE COURT:  The forty-eight million loss was which

15  year?

16         MR. TOGUT:  2014.

17         THE COURT:  Okay.

18         MR. TOGUT:  -- and because of management fees also

19  charged by Tri-State to our debtor.

20         The trustee has located tens of billions of dollars of

21  questionable book entries charged by Tri-State on the eve of

22  our debtor's bankruptcy petition.  And as I said, the shortfall

23  in revenue is nine figures.

24         Now, concerning the trustee's administration, while

25  our focus, the trustee, Mesirow and my firm, is TSE, to

1  reconstruct this debtor's activities, we had to follow the
2  transactions wherever they took us.  And they took us, your
3  Honor, to CRS and Tri-State.  It's the only way we could make
4  sense of this jigsaw puzzle.

5         Before the trustee's appointment, TSE was being
6  managed and run by a CRO appointed by Wells, Barry Kasoff.  The
7  trustee became concerned about the manner in which Kasoff was
8  conducting the business, and he terminated Kasoff's service.

9         The trustee operated the business in the months of
10  February, March, and April.  And he's paid more than three and
11  a half million dollars of Chapter 11 payroll taxes.  He's
12  filed -- our trustee has filed more than 400 payroll tax
13  returns.  And Wells, in the courtroom today and in force, has
14  been paid in full, and has, as we understand it, an additional
15  three and a half million dollars above that, which is being
16  held in reserve.

17         I won't detail for the Court today what's been done to
18  get access to the books and records.  You know most of that
19  from the discovery disputes with CRS and Tri-State that have
20  already been before you.

21         I can tell --

22         THE COURT:  Has the trustee had access to Tri-State's
23  books and records?

24         MR. TOGUT:  We have had some, yes, Your Honor.  We've
25  gotten records from more than six different sources.  And we've

TS EMPLOYMENT, INC.                                    14

1    gotten more than five million e-mails, the SEC pleadings says

2    six million, but some of those are duplicates.  And we have

3    possession of tens of thousands of undelivered W-2s that we're

4    trying to make sense of.  There were banker boxes filled with

5    W-2s that have gone to no employee, and we're trying to figure

6    out if they're phantom employees, or they existed and somebody

7    just couldn't find them, or what.  But as I say, tens of

8    thousands of these W-2s.  And that work is continuing.

9           We believe, Your Honor, that we have in this case a

10   cash-skimming scheme, and the trustee's investigation is

11   continuing.  And that concludes the trustee's report.

12          THE COURT:  Thank you.  Let's move to the venue

13   motion.

14          MR. TOGUT:  Yes, Your Honor.  Just one second.

15          MR. MAZA:  Excuse me, Your Honor.  I just want to make

16   an appearance.  Alan Maza from the SEC.

17          THE COURT:  Thank you.  Is anybody from the U.S.

18   Attorney's office making an appearance?

19          MS. FOLCH:  Yes, Your Honor.  Monica Folch, U.S.

20   Attorney's --

21          THE COURT:  I'm sorry, I can't hear you.

22          MS. FOLCH:  Monica Folch from the U.S. Attorney's

23   office.

24          THE COURT:  Thank you very much.

25          MR. MASUMOTO:  And Brian Masumoto from the Office of

1  United States Trustee.

2          THE COURT:  Thank you, Mr. Masumoto.

3          MR. TOGUT:  Okay.  Onto the venue motion.

4          Your Honor, CRS's filing in Delaware is all about --

5  all about frustrating the trustee's investigation, and nothing

6  else.

7          CRS sought out the Delaware court because it is

8  concerned that its cases will be jointly administered with this

9  one, that a thorough investigation of the complex fraud that

10  occurred at both companies will occur.  CRS should be

11  concerned, because the reality is that these debtor affiliates

12  are very much connected.  And they need to be looked at

13  together.  That is precisely why, just two business days after

14  the CRS filing, the trustee sought to change venue pursuant to

15  28 U.S.C. Section 1412.  And he made that motion to rectify the

16  injustice and the inconvenience that would result from the CRS

17  Chapter 11 case staying in Delaware.

18          Everyone agrees that a transfer of venue is fact-

19  specific.  So let's get straight to the facts.

20          Although CRS takes issue with my metaphors, CRS and

21  TSE --

22          THE COURT:  They're not the first to do that, though,

23  Mr. Togut.  Go ahead.

24          MR. TOGUT:  But you never misunderstand me.

25          THE COURT:  I understand you.  Go ahead.

1          MR. TOGUT:  CRS and TSE were and remain joined at the

2    hip.  Before these cases were commenced, TSE relied upon CRS,

3    its life support, to operate.  TSE did not have its own

4    employees and was directed by CRS along with another Cassera-

5    controlled entity, Tri-State.  To use CRS's own language, TSE

6    "could not exist but for CRS" and, of course, these funds from

7    CRS, CRS's New York-based secured lender Wells Fargo.

8          CRS also relied upon TSE.  CRS needed TSE to process

9    payroll and secure insurance for its thousands of part-time

10   employees, and it did so at bargain-basement prices.  CRS

11   relied upon TSE so much prior to the filing, that CRS

12   represented to this Court in its opposition that it "could not

13   continue to wind down operations without the continued

14   involvement of TSE."  It's one of the reasons, Your Honor, that

15   this trustee decided to continue operating the TSE business

16   following the petition date, because without that, CRS never

17   could have realized on its accounts receivable and Wells Fargo

18   never could have been paid down to zero.

19         THE COURT:  Am I correct that TSE is no longer

20   operating?

21         MR. TOGUT:  Yes, Your Honor.

22         THE COURT:  Is CRS still operating?

23         MR. TOGUT:  According to their papers, they are not.

24   They're still collecting on some assets, but they're no longer

25   operating.

1        THE COURT:  Okay.

2        MR. TOGUT:  As CRS has recounted multiple times, CRS

3    caused TSE to file for bankruptcy here --

4        THE COURT:  Just up the street from --

5        MR. TOGUT:  -- to placate --

6        THE COURT:  Just up the street from your office, or

7    down the street from your office, right?

8        MR. TOGUT:  Right.  Right.  Because their lender,

9    Wells Fargo, wanted the TSE case in this court, and wanted

10   court supervision of the money that was going from CRS to TSE.

11   And TSE had no choice but to find itself in this court because

12   of its reliance on CRS.

13       Since that filing, CRS has been a recurring player in

14   this case providing debtor-in-possession financing, and again

15   to use CRS's own language, funding the trustee's investigation

16   to the extent of one million dollars.

17       Due to this common corpus of fact, it makes no sense

18   to administer the cases in two courts.  It would also serve

19   judicial economy to have both cases in this court.  That is

20   because issues that are relevant to the CRS case will also be

21   relevant to this case, and the reverse is also true.  Decisions

22   made by Your Honor will affect CRS.  And decisions made by the

23   judge overseeing the CRS case will affect TSE.  This, alone, is

24   sufficient to justify the transfer of the CRS case -- cases to

25   this district.  But that is not all.

1       As CRS explained in its first-day declaration, and as

2   this Court is well aware, the exact same event, the mysterious

3   disappearance of over one hundred million dollars in

4   withholding taxes, caused both TSE and CRS to file for

5   bankruptcy.  While CRS calls the trustee's investigation into

6   doubt by referring to it as mere speculation, it cannot be

7   disputed that the IRS intends to pursue large claims, to the

8   tune of some 300 million dollars, with penalties and interest,

9   against both estates and for the same missing funds, and that

10  those claims will involve the same general nexus of facts.

11      CRS may attempt to avoid that liability, but the law

12  does not allow an entity to avoid its responsibility to the IRS

13  merely because it relied on another entity or individual to pay

14  its taxes.  As a result, the trustee need not prove a full-

15  blown fraud occurred to show that justice will be served by the

16  immediate transfer of the CRS cases to New York.

17      Transfer to New York will also be convenient for

18  everyone involved.  Again, I direct the Court's attention to

19  the facts.

20      First, CRS creditors are here.  Six of its top thirty

21  creditors are in New York, and another three are in Northern

22  New Jersey.  That makes a third of the creditors.  None are in

23  Delaware.  Over ninety-four percent of the unsecured debt --

24  over ninety-four percent of the unsecured debt held by its top

25  thirty creditors is held by New Yorkers.  While CRS may dispute

1    some of those claims, what does not change is the location of

2    those creditors.

3              THE COURT:  So in your papers you say 94.46 percent of

4    CRS's unsecured debt for its top thirty creditors were held by

5    New Yorkers; is that a correct figure?

6              MR. TOGUT:  Yep.

7              THE COURT:  Okay.  That's in your brief.

8              MR. TOGUT:  Okay.

9              THE COURT:  I just want to be sure.

10             MR. TOGUT:  Yep.

11             THE COURT:  Okay.

12             MR. TOGUT:  Ms. Peacock says yep.

13             THE COURT:  Okay.

14             MR. TOGUT:  Yep.  The SEC, which has joined in the

15   trustee's application, is in this district.  And the same is

16   true for the IRS.  And the ad hoc committee that's here today

17   does not object to a transfer of venue to this district.

18             Second, Your Honor, CRS is physically located here.

19   Its office and books and records are here at 160 Broadway.  Its

20   certified public accountants are here.  Most of its management

21   is here.

22             THE COURT:  Is there any management left?

23             MR. TOGUT:  You have to ask CRS.

24             THE COURT:  Well, they shared an office, I mean -- am

25   I correct that TSE and CRS still share the same offices?

1          MR. TOGUT:  Yes, Your Honor.

2          THE COURT:  Okay.  Are there any employees there?

3          MR. GELLERT:  May I speak, Your Honor.

4          THE COURT:  No.  Let me -- ask your --

5          MR. TOGUT:  I think --

6          THE COURT:  Ask your trustee.

7          MR. TOGUT:  -- the CRO has some CRS people still

8    working for him.

9          THE COURT:  Okay.

10          MR. TOGUT:  The new CRO.

11          THE COURT:  All right.

12          MR. TOGUT:  I believe that to be the answer.

13          THE COURT:  Okay.

14          MR. TOGUT:  The CRS New York-based lawyers are here.

15    And, by the way, they're being -- there's an application

16    pending in Delaware to retain the New York firms in Delaware.

17          Third, Your Honor, due to the many New York

18    connections, the witnesses are here.  To name a few, CRS's

19    majority owner, Robert Cassera, has an office here.  Most of

20    the management or former management is here.  The employees are

21    here, and the secured lender is here.

22          Finally, and most important --

23          THE COURT:  Have you sought to take any testimony from

24    Mr. Cassera in the trustee's investigation?

25          MR. TOGUT:  We have sought to interview him.  There

1   was a preliminary conversation, but lately he's not talking.

2           Finally, and most importantly, this Court is already

3   familiar with the facts surrounding CRS by virtue of its

4   familiarity with the other half, TSE.  We've been here almost

5   six months.

6           What would be inconvenient is to leave the CRS cases

7   in Delaware.  That is because there is not a single connection

8   to Delaware other than it's the state of its incorporation.

9   And they cite a RadioShack decision, but we can't find the

10  decision, regarding a secured lender's right to reserve on

11  account of an indemnity claim.

12          But even if favorable law were to exist to trump all

13  of the other factors that I've articulated, there is no direct

14  precedent in Delaware because the RadioShack court never ruled

15  on the issue there.  Nor has CRS pointed to any bad precedent

16  in New York.  It's just -- that argument is just a red herring.

17          At its core, the CRS opposition is not about venue at

18  all.  The real concern that the cases may be substantively

19  consolidated and that there'll be a single trustee.

20          THE COURT:  Well, they can --

21          MR. TOGUT:  But neither iss --

22          THE COURT:  But there could be -- the issue of a

23  trust -- the cases aren't here yet.

24          MR. TOGUT:  Right.

25          THE COURT:  And assuming they were here, somebody's

TS EMPLOYMENT, INC.                                      22

1 got to make a mo -- if there's going to be a motion for the

2 appointment of a Chapter 11 trustee, then it's up to the -- in

3 the first instance, up to the U.S. Trustee to decide who to

4 select.  And I understand their argument, from a footnote in

5 their brief, that they claim that there are claims between the

6 debtors, but that's frequently the case.  So a single trustee

7 often is faced with a situation being a trustee for multiple

8 entities and with interdebtor claims, and that doesn't preclude

9 the U.S. Trustee from applying a single trustee if that's the

10 appropriate and most efficient, cost-effective way to do it.

11    MR. TOGUT:  Yes, Your Honor.  And in any event, it's

12 not ripe.

13    THE COURT:  It's not ripe?

14    MR. TOGUT:  That whole line is just not ripe.

15    THE COURT:  It just seems to be the real subtext of

16 what this fight is all about.

17    MR. TOGUT:  It is.  The trustee in CRS will fight over

18 whether the two estates are adverse or a single ball of wax.

19 But that's for another day.

20    What is before the Court now is venue.

21    THE COURT:  Is the issue going to be for another day

22 whether these cases shall all be converted to Chapter 7?

23    MR. TOGUT:  That may happen too.

24    Your Honor, based upon the undisputed facts, it will

25 serve both justice and convenience for all concerned if the CRS

TS EMPLOYMENT, INC.                                                    23

1  cases are to come to this district.

2          THE COURT:  Let me ask you another question.  Tri-

3  State is not a debtor in any court at this stage, is that

4  correct?

5          MR. TOGUT:  That is correct.

6          THE COURT:  Where is it?  Is it still in the same

7  offices?

8          MR. TOGUT:  So far as we know, it is.

9          THE COURT:  Must be a lovely --

10          MR. TOGUT:  It may end up here, too.

11          So, Your Honor, we respectfully say to the Court we

12  don't even think this is a close call, and we ask that you

13  grant the application and transfer the CRS cases to this Court.

14          THE COURT:  Thank you, Mr. Togut.

15          MR. TOGUT:  Thank you.

16          THE COURT:  Is there anybody else who wants to speak

17  in support of the motion to transfer venue?

18          Come on up.

19          MR. MAZA:  Good afternoon, Your Honor.  Alan Maza from

20  the SEC in New York.

21          We second what the trustee just presented.  A lot of

22  our argument, as provided in the joinder, overlaps with the

23  arguments set forth by the trustee's counsel.

24          The SEC has an investigation pending.  Obviously, I'm

25  not at liberty to disclose details.  However, it's clear to us

1   that, based on the myriad of facts that are inherent in this

2   matter, outside of what we see as insignificant to the totality

3   of everything's that's been presented, that merely that the CRS

4   is incorporated in the State of Delaware is just insufficient

5   to warrant that a separate bankruptcy proceeding be continued

6   over there, when there's so much in terms of the other factors

7   before Your Honor, including the fact that we are in New York

8   as well.

9           THE COURT:  Thank you, Mr. Maza.

10          Does anybody else wish to speak in support?  Come on

11  up.

12          MS. FOLCH:  Good afternoon, Your Honor.  Monica Folch

13  on behalf of the IRS.

14          I don't know if you had the opportunity to --

15          THE COURT:  I did, I read your papers.

16          MS. FOLCH:  Thank you.  I apologize for late filing.

17  But, in essence, everything that the trustee has said supports,

18  I think overwhelmingly, the transfer of the CRS bankruptcy to

19  New York.  And as we stated in our papers, the IRS has a very

20  strong interest, obviously, in the proper administration of

21  both cases, and therefore, the efficiencies and the fairness

22  issues here really militate in favor of transferring the CRS

23  bankruptcy to New York, to this Court.

24          THE COURT:  Thank you, Ms. Folch.

25          MS. FOLCH:  Thank you.

1           THE COURT:  Okay, Mr. Gellert.

2           MR. GELLERT:  Thank you, Your Honor.

3           Again, Ronald Gellert from Gellert Scali Busenkell &

4    Brown on behalf of the debtors, the CRS debtors, the Delaware

5    debtors as we call them, because there's a handful of them.

6           Your Honor, we begin -- I think that you hit the nail

7    on the head, this really talks about what the trustee's true

8    intentions are.  We feel this venue motion --

9           THE COURT:  This is a motion to change venue.

10          MR. GELLERT:  Right.

11          THE COURT:  There is no issue pending before me today

12   about whether a Chapter 11 trustee will be appointed; if a

13   motion is made and is granted, who the U.S. Trustee, in the

14   first instance, will select to be the Chapter 11 trustee; so I

15   don't even want to hear about it today, Mr. Gellert.

16          MR. GELLERT:  Well, Your Honor, and I'm not going to

17   testify from this podium about what the intertwined or not

18   intertwined.

19          THE COURT:  I don't think you're going to testify at

20   all, but go ahead and make your argument.

21          MR. GELLERT:  Well, I've heard a lot of recitation of

22   fact that no one was able to cross.  So, if you would, Your

23   Honor, I mean, what I'd like to do is actually put on a witness

24   who would be able to testify, at Your Honor's indulgence, if I

25   could.

TS EMPLOYMENT, INC.                                        26

1        THE COURT:  I don't need any witnesses today.  Let's

2   go; keep arguing.

3        MR. GELLERT:  Okay.

4        THE COURT:  I have your papers.  If you wanted to put

5   in any evidence, you could have put it into a declaration.

6        MR. GELLERT:  There is a declaration, Your Honor.

7        THE COURT:  That's before me; I've read all the

8   papers.

9        MR. GELLERT:  Okay.  He's a good witness.

10       THE COURT:  I'm glad.

11       MR. GELLERT:  He could give a lot of information.

12       Some of the questions you asked, let me get to that

13  right before we start.

14       They actually don't work in the same office; they're

15  on different floors of the same building, so they're not all

16  hanging out together as that picture might have been painted.

17  There are separate employees.  There's about a handful of

18  employees --

19       THE COURT:  Who hired you?

20       MR. GELLERT:  The board of directors of CRS.

21       THE COURT:  Does the board still exist?

22       MR. GELLERT:  They do; there's a handful of stray

23  people who are board members.  They --

24       THE COURT:  Go through -- I want you to tell me about

25  the governance of CRS.

1          MR. MAZA:  Sure.

2          THE COURT:  What was the governing structure at the

3   time that TS Employment filed its Chapter 11 case in New York?

4   How has it changed since then?

5          MR. GELLERT:  Okay.  At the time of the CRS -- I mean

6   the TSE filing, there was a -- John Messina was the CEO.  John

7   Messina was an employee of both TSE and CRS.  Mr. Messina no

8   longer works for the company.  Mr. Messina has been let go.

9          THE COURT:  When was he let go?

10          MR. GELLERT:  He was let go after the retention of Mr.

11   Victor as CRO of the company.  And that was in July.

12          THE COURT:  How many board mem --

13          MR. GELLERT:  There are three board members.

14          THE COURT:  What was the board at the time of the TSE

15   filing, and what's the board today?

16          MR. GELLERT:  The board -- they're the same board.

17          THE COURT:  So what's the facts; tell me.

18          UNIDENTIFIED SPEAKER:  There were seven board members

19   at --

20          MR. GELLERT:  You can't talk now.

21          THE COURT:  Do you know?

22          MR. GELLERT:  He does know.

23          THE COURT:  Do you know?

24          MR. GELLERT:  Oh, I don't know the makeup of the board

25   at the time of the TSE filing.

TS EMPLOYMENT, INC.                                    28

1       THE COURT:  How many board members are there now?

2       MR. GELLERT:  Three board members now.

3       THE COURT:  And were they board members at the time

4  that TSE filed its Chapter 11 case?

5       MR. GELLERT:  They were part of the board.

6       Now, that --

7       THE COURT:  Did they have D&O insurance?

8       MR. GELLERT:  Yes, I believe there is D&O insurance,

9  but that was a pre-existing policy.

10       THE COURT:  Yeah.

11       MR. GELLERT:  It wasn't something that they picked up.

12       THE COURT:  How much D&O insurance is there?

13       MR. GELLERT:  I want to say it's about five million,

14  but I could be wrong.

15       THE COURT:  Okay.  All right.  Who hired the CRO?

16       MR. GELLERT:  The board of the directors.

17       Now, if I can go back?

18       THE COURT:  Who was on the board at the time that the

19  CRO was --

20       MR. GELLERT:  Okay.  So let's go back a step if you

21  would.

22       Your Honor, so at the time of the TS -- the discovery,

23  that CRS discovered that the TS --

24       THE COURT:  The miraculous discovery of a hundred-

25  million-dollar shortfall that was just an oversight by

1    somebody?

2            MR. GELLERT:  Well, as testified -- or I'm sorry.  As

3    mentioned, the money did go from CRS to TSE.  And so, yes, CRS

4    was, in fact, quite surprised that the money did not go where

5    it was supposed to go.

6            So at that point in time, Your Honor, CRS was actually

7    in the process of trying to refinance its debt.  Had somebody

8    that was very close to actually agreeing to refinance the debt.

9    When the discovery of the TSE money gone missing, that party

10   backed out, and at that point, Wells Fargo decided they were no

11   longer going to fund receivables as they were doing.

12           So what happened at that point is Wells Fargo said

13   they only way we're going -- the only thing we're going to

14   fund, is a wind-down, and you have to have Mr. Robert Riiska --

15           THE COURT:  My questions are really about the

16   governance; I'd like to know who was --

17           MR. GELLERT:  Well, I want to tell you --

18           THE COURT:  I know the story about Wells Fargo.  Mr.

19   Helfat has told me all about it at prior hearings.

20           MR. GELLERT:  Sure.

21           THE COURT:  So I'm very familiar with that.

22           MR. GELLERT:  So at Wells' --

23           THE COURT:  I'd like to know about the governance of

24   CRS.

25           MR. GELLERT:  Sure.  At Wells' insistence, the board

1    of directors approved Mr. Riiska as the CRO.  Through the wind-
2    down process, which was run mainly through Mr. Riiska, because
3    he was making the decisions at that time -- he was an
4    independent third party doing it, some would say for the
5    benefit of Wells Fargo, or at the direction of Wells Fargo, but
6    he was working for the company, making the decisions for the
7    company with respect to the wind-down.

8            And in fact, the wind-down process was pretty
9    successful.  They were able to migrate all their employees, the
10   TSE employees, have them paid, and as well as getting Wells
11   Fargo more than overpaid for the amount, we believe.  So that
12   process was actually quite effective, and it was a third party
13   who was put into that process.

14           At the time that the CRS board, the three-member
15   board, in late June, early July started coming back to the
16   bankruptcy process, it was apparent that they were not going to
17   be able to agree with Wells about what was going to happen with
18   that money.  The board decided to meet -- decided because of
19   that, as well as some pending litigation -- a lot of pending
20   litigation that was mounting, about thirty-something pieces of
21   litigation, a lot of employee-based, all in California.
22   There's a big action in Florida, where debtors -- Del Monte's
23   asserting a ten million dollar claim.  CRS is asserting an
24   eight million-dollar counterclaim, which they believe will
25   ultimately allow CRS to recover a substantial amount.  So that

1   is a large asset that CRS is recovering down in Florida.

2            At that time, the board realized that they were not

3   going to be able to come to an agreement with Wells about Wells

4   returning this sort of overage, this reserve that's been

5   discussed.  And at that time, the board fired Mr. Riiska and

6   hired Mr. Victor to run the bankruptcy process.

7            And Mr. -- I don't know how familiar you are with Mr.

8   Victor; Mr. Victor, again, is a -- has no relationship to these

9   parties, to the board, or the officers, directors or what have

10  you, any of these companies.  He is a well-respected bankruptcy

11  professional put into run the process, especially run through

12  the bankruptcy process.

13           So at this juncture -- so then what happened there,

14  about a week or so after the bankruptcy files, Mr. Victor fires

15  all the officers, except for Mr. Ewen, who's the controller of

16  the company, who actually was put in to help maintain SEC

17  controls, which were not well kept from what I understand,

18  until his involvement, which I think was March 2014.

19           So we have Mr. Victor running the company as CRO at

20  this point.  We have Mr. Ewen who's running the sort of the

21  day-to-day operations of the collections and --

22           THE COURT:  What --

23           MR. GELLERT:  There's a handful of employees, about

24  five -- maybe five full-time at this point.

25           THE COURT:  All at 160 Broadway?

TS EMPLOYMENT, INC.                                          32

1       MR. GELLERT:  On the 13th floor, not on the floors of

2  TSE or wherever Tri-State --

3       THE COURT:  160 Broadway, just up the street?

4       MR. GELLERT:  That's correct, Your Honor.

5       THE COURT:  Okay.

6       MR. GELLERT:  Oh, I see where you're going with that.

7       But, again, there's only --

8       THE COURT:  Go ahead.

9       MR. GELLERT:  But yet, there's only a few employees.

10  And it's funny because Mr. Ewen actually has no problem

11  traveling to Delaware.  And all the records that are supposedly

12  at 160 Broadway are actually electronic and capable of being

13  accessed from anywhere, with the proper passwords, what have

14  you.

15       Look, I see where this is going, Your Honor.  So if I

16  could just get into --

17       THE COURT:  Actually, my questions -- I'll let you

18  make your argument, but I also want to hear what's happened

19  since the bankruptcy proceeding was filed in Delaware.

20       MR. GELLERT:  Oh, sure.  Well, I can certainly go

21  through that.

22       Your Honor, we've done a lot to maintain the status

23  quo with respect to the big issues.  Obviously, the Wells Fargo

24  issue is a big issue.  So we respect the trustee's desire to

25  participate in the cases and to have an inter -- because they

TS EMPLOYMENT, INC.                                      33

1  clearly have an interest what happens to these assets,

2  especially the Wells Fargo reserve that we've been talking

3  about and the Del Monte case, as well.  We haven't proceeded

4  strongly on that either, because again, we're waiting for input

5  and waiting to see what happens with respect to all this.

6          So we know that they're going to try and get this

7  venue transfer.  We believe it's a gateway tactic to get

8  themselves appointed as the Chapter 11 trustee.  And so --

9          THE COURT:  You think that's a gateway tactic as

10  opposed to your filing in Delaware?

11          MR. GELLERT:  Well, Your Honor, if I was able to put

12  testimony on, Mr. Ewen would testify to the fact that they sat

13  as a board and they interviewed --

14          THE COURT:  Did they sit at 160 Broadway when they

15  made the decision?

16          MR. GELLERT:  No, Mr. -- actually, Mr. Messina is a

17  New Jersey resident, central New Jersey resident; I think he

18  does a lot of it by the phone.

19          THE COURT:  He hadn't been fired yet?

20          MR. GELLERT:  He hadn't been fired at the time, right.

21          But, Your Honor, the board made a determination; they

22  interviewed firms from New York, interview firms in Delaware.

23  In fact, it's interesting that one of the firms in New York

24  albeit asking for money than they had in terms of a retainer,

25  did actually advise them Delaware was a good venue because of

1    the law that would be able to help them against Wells Fargo,

2    which is one of the very issues why TSE --

3            THE COURT:  Two different firms appeared for CRS at

4    virtually every hearing I had in this case.

5            MR. GELLERT:  I'm sorry, I missed the front of that

6    question.

7            THE COURT:  Two law firms in New York appeared for CRS

8    at virtually every hearing I had in the TSE case.  You're aware

9    of that, right?

10           MR. GELLERT:  Right.  Your Honor, one was SEC counsel,

11   and the other was representing the company for the TSE

12   bankruptcy.  But what I understand is that money that they were

13   going to require to run the bankruptcy process was more than

14   the company had available to it and could not pay for it.  So

15   they searched for other options, again, one of those options

16   being Delaware because of the law, because of the cost-

17   effectiveness.  So they felt that it was going to be a million-

18   dollar-plus savings to run the case in Delaware from that

19   perspective.  It's not --

20           THE COURT:  So tell me what's happened in Delaware

21   bankruptcy court --

22           MR. GELLERT:  Sure.

23           THE COURT:  -- since the cases were filed.

24           MR. GELLERT:  Since the cases were filed, we've

25   obtained relief on a consensual basis for cash collateral

1   through the final cash collateral hearing date, which is set

2   for August 20th at this point.

3              THE COURT:  Tell me about that, Mr. Gellert.

4              MR. GELLERT:  Sure.

5              THE COURT:  You got an interim order approving use of

6   cash collateral.

7              MR. GELLERT:  Um-hum.

8              THE COURT:  Right?  And that was extended and then

9   vacated --

10             MR. GELLERT:  Yes, Your Honor.

11             THE COURT:  -- a couple of days ago?  Why was

12  that -- why was --

13             MR. GELLERT:  There was some language in the order --

14             THE COURT:  What about it -- did you do a bait and

15  switch on the Court by changing the terms of the cash

16  collateral order and not tell the judge you had done so?

17             MR. GELLERT:  No, Your Honor.

18             THE COURT:  Do you know what I'm talking about, Mr.

19  Gellert?

20             MR. GELLERT:  Yes, I do, Your Honor, and I don't think

21  that Judge Walrath found that there was a bait and switch as

22  much as --

23             THE COURT:  She found that you had changed the terms

24  from the interim cash collateral order that had been presented.

25  Correct?

1          MR. GELLERT:  Right.  And I explained --

2          THE COURT:  And you didn't -- and you hadn't told her

3    about that change when you presented a proposed extension to

4    the cash collateral order.  Isn't that true?

5          MR. GELLERT:  Well, we -- well, Your Honor --

6          THE COURT:  Isn't that true, Mr. Gellert?

7          MR. GELLERT:  In our certification of counsel, we

8    noted that the parties came to the resolution as set forth in

9    the order.

10          THE COURT:  Did you tell Judge Walrath, in seeking an

11    extension of ca --

12          MR. GELLERT:  In the certification.

13          THE COURT:  Let me finish my question.

14          Did you tell Judge Walrath, in seeking an extension of

15    the use of cash collateral, that you had changed the terms on

16    which cash collateral was being extended?

17          MR. GELLERT:  At the hearing, yes.

18          THE COURT:  Before or after she vacated the order

19    because you changed the terms without telling her?

20          MR. GELLERT:  She vacated the order because -- not

21    based on changing the terms, but because an objection arose

22    after we submitted the certification of counsel.

23          THE COURT:  The trustee here had filed an objection to

24    any activity in the Delaware cases before you sought the

25    extension of the use of cash collateral.  Correct?

1          MR. GELLERT:  That is correct.  And we circulated

2     the --

3          THE COURT:  And you didn't tell Judge Walrath that you

4     had changed the terms on which you were seeking use of cash

5     collateral before you presented that proposed order to her, did

6     you?  You having trouble remembering --

7          MR. GELLERT:  Well, I'm trying to remember the --

8          THE COURT:  -- what happened just a few days ago?

9          MR. GELLERT:  -- I'm trying to remember the series of

10    events, because we got the proposed change from Wells Fargo --

11         THE COURT:  Mr. Gellert, let me not keep you in the

12    dark.  I mean I've been speaking with Judge Walrath about these

13    cases since they were first filed --

14         MR. GELLERT:  I understand, Your Honor.

15         THE COURT:  -- in Delaware and she learned about the

16    existence of the cases here.

17         MR. GELLERT:  Right.

18         THE COURT:  And so --

19         MR. GELLERT:  No, I understand.  My point was we

20    circulated the order --

21         THE COURT:  Do you know what would happen --

22         MR. GELLERT:  -- to the trustee.

23         THE COURT:  -- if you ever did something like that in

24    front of me?

25         MR. GELLERT:  We circulated the order --

TS EMPLOYMENT, INC.                                        38

1           THE COURT:  You made changes to an order presenting it

2     to the Court as an extension of cash collateral without telling

3     the Court that you had changed the substantive terms?

4           MR. GELLERT:  Your Honor, first, let me -- there's two

5     parts to that.

6           First, we circulated the order to the TSE trustee's

7     counsel, and I do -- and I did recognize at the hearing I did

8     not give them enough time to further comment on it.

9           We had discussed, over the weekend, the fact that

10    there was not a material change to the order.

11          THE COURT:  Oh, you had told the -- you had told the

12    trustee there'd been no material change?

13          MR. GELLERT:  Right, because the only change in the

14    order, Your Honor -- I don't know how much you know about that

15    order -- the only thing in the order --

16          THE COURT:  Well, I understand that the material

17    change was that you agreed to provide a lien on recovery --

18          MR. GELLERT:  No.

19          THE COURT:  -- on avoidance actions.

20          MR. GELLERT:  That's not correct, Your Honor, because

21    it was only under 507(b) and all we were doing was preserving

22    their rights under 507(b) to assert a claim whether there

23    was -- if there was diminution of value.  And there is not

24    going to be diminution of value, which is why the CRO felt, in

25    his business judgment, that it wasn't --

1      THE COURT:  So why did Judge Walrath vacate the order

2  that she had entered?

3      MR. GELLERT:  Because she wanted us to go back and try

4  and negotiate a form of order that would -- that all parties

5  could consent to.  And we went back; we were not able to do

6  that.  We came back for another hearing.  And in fact, what

7  happened was, the judge said okay, let's strike that language

8  and we will have everybody reserve their rights for whether or

9  not they can assert a 507(b) priority based on diminution of

10  value.  The same thing that we did, we took out is effectively

11  what happened at the end of the day.

12      THE COURT:  You took it out after she vacated the

13  order because you had added it without telling her.

14      MR. GELLERT:  No, no, no.  We took language out of the

15  first order.

16      See, the first order had language in there saying that

17  they could assert a claim to the extent they had one under

18  507(b).  They wanted the language out.  We felt it was a

19  nonissue because --

20      THE COURT:  What other relief are you seeking from the

21  Delaware court?

22      MR. GELLERT:  Typical first day stuff which will now

23  be second day:  cash management, utilities, there's retention

24  applications for the debtor's counsel, some special counsel,

25  SEC counsel, ordinary course professionals, people who collect

TS EMPLOYMENT, INC.                                        40

1   receivables for the most part.

2          THE COURT:  So a lot of that's going to become moot if

3   a Chapter 11 trustee is appointed.  Correct?

4          MR. GELLERT:  I would suspect that that, of course, is

5   not -- and that's one of the issues that we have is there's no

6   stay here.  We have an obligation to proceed with the case.

7   And we're proceeding with the things we can, that is, the

8   noncontroversial, nonbig issues.  And what we've proceeded with

9   are very basic things that are just moving the case on.  One of

10  which is --

11         THE COURT:  Are you also proposing --

12         MR. GELLERT:  -- to set up a sale of receivables.

13         THE COURT:  Yes, I was going to ask were you

14  proposing -- because I also understand you're also proposing

15  363 sales.

16         MR. GELLERT:  Yes.  Right.  And the 363 sale is for a

17  set of receivables that are over six months old.  And the point

18  being there is we want to get a process started so that if the

19  ordinary course professionals who cannot recover these aged

20  receivables, we have a process set up to get them involved as

21  soon as possible.  Obviously, I don't think there's any dispute

22  that receivables lose value every day that there are on --

23         THE COURT:  Let's come back to the venue issue.  We'll

24  deal with that right now.

25         MR. GELLERT:  Okay.  So that's what's going on there,

1   and the hearing is the 20th.  So one thing that we would need

2   to do if the venue is actually changed is to talk about a

3   hearing where we can get a final cash collateral hearing, at a

4   minimum.  To the extent that all the other things you'd like to

5   take some time to review, that's fine, but I don't think

6   holding up cash collateral would be a good thing at this point.

7          So let's get to venue.  Your Honor, obviously, we know

8   the venue's appropriate in Delaware.  I don't think anybody's

9   disputed the fact that venue's appropriate in Delaware.  It's

10  been incorporated there for years.  It's not a venue tactic.

11  And the fact that it has limited contacts with Delaware is not

12  an outcome determinative fact.  So we have to look at 1408, the

13  remainder.

14         We know --

15         THE COURT:  No, we have to look at 1412.

16         MR. GELLERT:  We know the Court may transfer venue

17  based on the interest of justice or convenience to the parties.

18  It's obviously, as Your Honor knows, a broad standard, but it's

19  a -- it's not a shall; it's a may.

20         So we frame this with two guiding principles.  Courts

21  give substantial weight to the debtor's choice, and Your Honor

22  has recognized that:  EB Capital, and then there's Enron, and

23  Caesars, all the other cases; and the burden of proof rests

24  solely on the party moving to transfer venue.  Again, the same

25  line of cases.

1            And here, even keeping in mind that even if there's a

2    slight balance that way, it doesn't inure to the benefit of the

3    movant.

4            So I'll skip the argument with respect to this

5    intertwined ball of wax and all those things because --

6            THE COURT:  Why you going to skip that argument?

7            MR. GELLERT:  Well, Your Honor, I --

8            THE COURT:  Because the cases support transferring

9    venue among affiliates, in particular, where they're

10   intertwined.

11           MR. GELLERT:  Well, that --

12           THE COURT:  That's part of the argument that Mr. Togut

13   has made in his papers.

14           MR. GELLERT:  But not in every case, Your Honor.  In

15   fact --

16           THE COURT:  But you -- go ahead.

17           MR. GELLERT:  But you look at the Pope Vineyard case.

18   The party there was a subsidiary of the -- the debtor was a

19   subsidiary of the parent debtor, but yet they maintained

20   separate books and records, separate accounts.  They had

21   separate assets and liabilities.

22           THE COURT:  Were there offices in the same location,

23   the books and records in the same location, and their employees

24   common employees?  Were they?

25           MR. GELLERT:  Separate creditors.

1          THE COURT:  Could you answer my question?

2          MR. GELLERT:  I think -- I thought that was a --

3          THE COURT:  Could you answer my question?

4          MR. GELLERT:  Yes.  But I thought it was -- yes.

5          THE COURT:  I --

6          MR. GELLERT:  No.  Not to my knowledge they were not.

7          THE COURT:  Oh, really?

8          MR. GELLERT:  Although actually, some of them were

9   common employees and common officers in those two cases.

10          THE COURT:  And common offices?

11          MR. GELLERT:  Yes.  Common officers, officers.

12          THE COURT:  Common offices?

13          MR. GELLERT:  Officer.

14          THE COURT:  The only office they had is in one

15   location, in one city?

16          MR. GELLERT:  Well, actually --

17          THE COURT:  Is that the case?

18          MR. GELLERT:  No, Your Honor.  That's not the case in

19   CRS, actually.  In fact, during the sort of the heyday of the

20   company when they were a billion dollar company, CRS actually

21   had offices in over thirty locations across the country.

22          THE COURT:  Okay.  At the time of the TSE filing,

23   there was one office --

24          MR. GELLERT:  No, Your Honor.

25          THE COURT:  -- at 160 Broadway?  No?

TS EMPLOYMENT, INC.                                    44

1          MR. GELLERT:  No.  At the time of the filing, which

2    was early on, remember, before -- that was promptly after

3    discovery, the company was still proceeding.  The company,

4    subsequently, during that wind-down process from February to

5    the present, then wound down, then removed them --

6          THE COURT:  How many offices do they have?

7          MR. GELLERT:  Now?

8          THE COURT:  No, then.

9          MR. GELLERT:  Thirty plus.

10         THE COURT:  At the time of the filing of the TS

11   Employment case, TSE had thirty offices?

12         MR. GELLERT:  Oh, no, not TSE; CRS.

13         THE COURT:  CRS had thirty offices?

14         MR. GELLERT:  Yes, Your Honor.  All over the country,

15   because they had these facilities --

16         THE COURT:  Somebody behind you is shaking his head

17   no.

18         UNIDENTIFIED SPEAKER:  No, there was 250, Your Honor.

19         MR. GELLERT:  I'm sorry; 250.

20         THE COURT:  Okay.

21         MR. GELLERT:  Your Honor, so there are plenty of

22   offices --

23         THE COURT:  At the time of the filing of the CRS

24   bankruptcy, how many offices were there?

25         MR. GELLERT:  There's one, Your Honor.  They,

1    effectively, had to breach all the leases --

2            THE COURT:  So at the time of the --

3            MR. GELLERT:  -- or transfer the leases.

4            THE COURT:  -- at the time of the filing by CRS and

5    its affiliates --

6            MR. GELLERT:  Five months separated, right.

7            THE COURT:  -- at the time of that filing, it was one

8    office at 160 Broadway?

9            MR. GELLERT:  At the time of the CRS filing, that's

10   right.

11           THE COURT:  Okay.

12           MR. GELLERT:  But if we're looking at the Pope

13   Vineyard facts, Pope Vineyard facts, we're talking about the

14   common officers, but still separate creditors, separate assets

15   and liabilities, which we have here, Your Honor.

16           Think about what's going on with the creditor body of

17   this particular -- the CRS case.  Over 500 creditors.  And in

18   fact, some of the things that -- some of the statistics that

19   we've talked about, or that were mentioned, were a little

20   misleading.

21           THE COURT:  Do you disagree that 94.46 percent of

22   CRS's unsecured debt of its top thirty creditors is held by New

23   Yorkers?

24           MR. GELLERT:  It depends if you count disputed debt or

25   not.  If it's not dispute -- if you count disputed debt, then

1    that's fine.  But did you know that over -- only four percent
2    of the entire creditor body, forty-one creditors out of a
3    creditor body of in excess of 500, only four percent are New
4    York.  In fact, 139 of those creditors are California; 139 are
5    Illinois.
6         THE COURT:  So would you like to transfer the case to
7    California?
8         MR. GELLERT:  No.  My point, Your Honor, is that this
9    is a national case with national contracts and that New York,
10   in fact, has one of the smallest number of creditors involved
11   in the case.  Yes, they might have a large number but -- a
12   large amount -- but small numbers; small, small numbers; four
13   percent only.  So if you look at amount only, you're missing
14   the numerosity of it all which I think both should be a factor
15   if you only look at those statistics.
16        So there isn't really the intertwined case that
17   appears to be.  Yes, we've heard a lot of rumor and a lot of
18   innuendo and not a lot of testimony about these facts, and I
19   think testimony would make things a little bit clearer about
20   the fact the parties are, in fact, not this ball of wax, not
21   conjoined twins, or comingled, or tied at the hip or what have
22   you.
23        THE COURT:  You fight this point in your brief, but
24   you have to agree, I assume, that CRS and the Delaware debtors
25   are affiliates within the meaning of Section 101(2)(b)?

1          MR. GELLERT:  Your Honor, we do.

2          THE COURT:  Okay.

3          MR. GELLERT:  But --

4          THE COURT:  You didn't but now you do.

5          MR. GELLERT:  No, I'm sorry; we do dispute that.

6          THE COURT:  You do?  Really?

7          MR. GELLERT:  Mildly.

8          THE COURT:  Read the Code.  Tell me what is it that
9   you dispute?

10          MR. GELLERT:  Your Honor, because the one thing that
11   we mentioned with respect to that, and this is really not a
12   point that we were going to even argue today, but the only
13   point on that is that the control of Robert Messina, as
14   indicated --

15          THE COURT:  Cassera.

16          MR. GELLERT:  Yes, I'm sorry; Cassera -- as indicated
17   by the trustee is not there.

18          THE COURT:  So if I follow your theory, then in every
19   insolvent debtor case where the shares of affiliates were owned
20   by a common entity, you would disregard there being affiliates
21   because they're insolvent, and therefore, there's nothing to
22   return to equity?  The Code doesn't mean that.

23          MR. GELLERT:  Well, if you look at the --

24          THE COURT:  Do you have any case that supports your
25   argument that TSE and all of the Delaware debtors are

TS EMPLOYMENT, INC.                                48

 1   affiliates of each other?

 2          MR. GELLERT:  Your Honor, which is why --

 3          THE COURT:  That they're not affiliates?

 4          MR. GELLERT:  -- we don't hotly contest the point.  I

 5   think that -- I think it's fair to say --

 6          THE COURT:  So you agree that within the meaning of

 7   the Code, they're affiliates.  Correct?

 8          MR. GELLERT:  I think that's appropriate --

 9          THE COURT:  Okay.

10          MR. GELLERT:  -- which is why we moved onto the other

11   arguments.

12          THE COURT:  Let's go onto the next point.

13          MR. GELLERT:  Right.  The other thing, I think, that

14   is of note at this point is that the TSE trustee seems to

15   suggest that the CRS parties are thwarting the investigation,

16   and I don't think that's necessarily the case as well.

17          CRS has provided -- look, they both have access to the

18   documents.  TSE came in here on an ex parte motion when they

19   knew -- when they had access as it were.  They provided a lot

20   of documents.  They provided money for the investigation.  But

21   interestingly, through the whole process, no one's come and

22   talked to Mr. Ewen or any of the other parties who sort of run

23   the day-to-day operation of the debtors but might actually know

24   some of this information that they might be asking.

25          So to say there's a lack of cooperation is a little

TS EMPLOYMENT, INC.                                    49

1    disingenuous when it hasn't been fully sought.  And the stuff

2    that has been sought has been provided.  So that's a little

3    disingenuous.  We think that that's kind of red herring

4    argument, too, as to sort of the need to have these cases heard

5    on a conjoined basis.

6          Your Honor, in terms of the interest of justice

7    standard, because they're not as intertwined as everybody would

8    like to think, or as some parties like to think, there isn't a

9    mandate of transfer of venue here.  There's not a guarantee of

10   debt.  There's not a determination of liability for CRS, for

11   TSE's obligations.  It's just not there.  It's not at that

12   point.  All it's been is conjecture and innuendo and saying,

13   well, I think this is where the investigation is going to end

14   up.  And if we talk about transferring venue based on what

15   things may happen, then that ends up leading to a pretty

16   slippery slope of well, it could happen and therefore, we

17   probably should disregard the debtor's choice of where they'd

18   like to go because we think this is where it might end up.

19   Maybe this motion is not ripe.

20         The majority of the issues, actually, in the case,

21   won't even involve TSE when we've got 4,498 other creditors

22   that need to be administered.  Yes, we recognize that one of

23   the biggest issues will be the dispute with TSE about their

24   claim, but more importantly, the claim that we have against TSE

25   for -- help beginning the ruination of the company.  And so we

1   feel that there's a big dispute there.

2          And Your Honor, I would concede that one court can

3   handle that issue, and I would concede that if Delaware handles

4   ninety-eight percent of the other creditors' claims, and this

5   Court handles the one because it's a -- the motion, it's either

6   going to be brought as a claim objection in this case or the

7   claim objection of the TSE case, in some respect, where there's

8   going to be the claims raised on both sides.  So yes, there is

9   judicial economy if we had one court decide that particular

10  issue, but that's the only issue where the same facts are going

11  to be at issue.

12         The IRS claim really only involves what TSE didn't pay

13  and, therefore, should CRS have the liability because TSE

14  didn't pay it.  So that's not really a separate fact pattern

15  that needs to be --

16         THE COURT:  So Mr. Messina was the CEO of both CRS and

17  TSE?

18         MR. GELLERT:  No, he was not the CEO of TSE at all.

19         THE COURT:  I misunderstood you, then, earlier.

20         UNIDENTIFIED SPEAKER:  I don't believe that he was

21  anything to TSE.  Sorry.

22         THE COURT:  Well -- go ahead, Mr. Gellert.

23         MR. GELLERT:  We're not going to --

24         THE COURT:  No.  Go ahead, Mr. Gellert.

25         MR. GELLERT:  Your Honor, it's our contention that he

1  was not involved with -- not an officer of TSE at the time of

2  that missing money.

3         THE COURT:  Over what period of time did the hundred

4  million dollars disappear?

5         MR. GELLERT:  Your Honor, CRS knows that they paid the

6  money that they were required to pay to TSE and the money went

7  missing.

8         Your Honor, I've asked that question as well; how does

9  that money go missing?  I know you're very curious about that

10 too.  And the CRS creditors sit there, and I asked Mr. Ewen

11 over and over, say how don't you know?  And he's like, we paid

12 it where it was supposed to go and we get -- once the notice

13 comes back that the money hadn't been paid, that's when we

14 first learned.

15        THE COURT:  When did they get the notice the money

16 hadn't been paid?

17        MR. GELLERT:  It's January 27th, 2015.  And they get

18 that notice and they say what the hell is going on here?  How

19 do you not pay that money over?  And then the rest, as you

20 know, happened.

21        THE COURT:  Did they ask Mr. Cassera?

22        MR. GELLERT:  I really don't know.

23        THE COURT:  Do you know?  Did you inquire?

24        MR. GELLERT:  I asked who did you ask, right.  And

25 from my understanding, that Mr. Cassera really wasn't involved

1   in the day-to-day operations of those companies at that point.

2             THE COURT:  Do you know whether Mr. Cassera was asked

3   what happened to the money?

4             MR. GELLERT:  I don't believe that the company, CRS,

5   expected Mr. Cassera to know the answer to that.  I don't -- I

6   do not --

7             THE COURT:  Could you answer my question?

8             MR. GELLERT:  I do not know whether they asked Mr.

9   Cassera.  I have a witness who might be able to testify about

10  that.

11            THE COURT:  There may be a time when he has to --

12            MR. GELLERT:  Okay.

13            THE COURT:  -- but it's not going to be today.

14            MR. GELLERT:  Well, I would like to make a record --

15            THE COURT:  You filed your papers.

16            MR. GELLERT:  I did.

17            THE COURT:  You read all your papers.  You made your

18  record.

19            MR. GELLERT:  But you're asking questions that are

20  outside of --

21            THE COURT:  I'm asking questions that go really to the

22  heart of this case but --

23            MR. GELLERT:  But it's not really to the heart of --

24            THE COURT:  -- not today's venue change motion.

25  Really?

1          MR. GELLERT:  -- venue transfer, Your Honor.

2          THE COURT:  No, that's right.  That's right.

3          MR. GELLERT:  Yes.

4          THE COURT:  I don't have to know the answers to those

5    questions to decide the venue motion.

6          MR. GELLERT:  Right.

7          THE COURT:  I agree.  It's just idle curiosity about

8    what happened to the hundred million dollars and who was asked

9    about it.

10         MR. GELLERT:  Well, it's funny, because we want to

11   know also.  We want to know what the TSE trustee has found.

12   And so far from what I heard today, the TSE trustee doesn't

13   know.  I don't know that the TSE trustee has asked Tri-State,

14   and I don't know why they haven't asked Tri-State or haven't

15   gotten those answers in the last six months.

16         THE COURT:  Okay.  All right.

17         MR. GELLERT:  So I'm curious about --

18         THE COURT:  And the answer -- you want to stay on the

19   venue motion?

20         MR. GELLERT:  Your Honor, so we talked about judicial

21   economy.  I think I know where Your Honor stands on that.  Our

22   point is that there's litigation pending all over the country.

23   There's creditors from all over the country.  There's no

24   learning curve for Judge --

25         THE COURT:  Well, there isn't going to be litigation

 1   pending all over the country against CRS because of the

 2   automatic stay.

 3            MR. GELLERT:  Sure, Your Honor, but that's sort of

 4   where the creditor body is spread.  Our point is is that

 5   there's things -- this is a national company.  It's not a New

 6   York-only company.  It's not a Delaware-only company.  It's an

 7   everywhere company.  All over the country.  So the creditor

 8   body represents creditors from all over the place.  So that's

 9   why we said if you talk about judicial economy, creditors have

10   to either come here or they have to come to Delaware to make

11   their case.  And so there's not a particular hardship for

12   creditors to go to one or the other.  I think that was

13   recognized in Enron and a lot of the other cases that talked

14   about that.

15            Also, Your Honor, there's really not a big learning

16   curve for Judge Walrath with respect to these cases because

17   before Your Honor hasn't been the substantial amount of

18   activity in the TSE case before Your Honor.  Now, I know that

19   they've been doing a lot behind the scenes, but that's not

20   something that Judge Walrath would even know about in order to

21   get caught up on the TSE issues.  And again, I even concede the

22   fact that it would make sense for one judge to hear that

23   particular issue.

24            THE COURT:  Tell me why was the case filed in

25   Delaware?  Cases, plural.

TS EMPLOYMENT, INC.                                    55

1          MR. GELLERT:  Okay.  So we'll go back to the analysis

2   of the board of directors at the time when making a decision.

3          THE COURT:  The analysis of the board members who were

4   board members at the time of the conduct that's --

5          MR. GELLERT:  Board members of CRS.

6          THE COURT:  -- at issue regarding the missing hundred

7   million dollars.  The three board members that remained --

8          MR. GELLERT:  Right.

9          THE COURT:  -- you're telling me were board members at

10  the time the money went missing.  Right?

11         MR. GELLERT:  The three board members of the company

12  that paid the money over to TSE, yes.

13         THE COURT:  And they decided to file in Delaware

14  rather than down the street in New York from where they were

15  located.  Right?

16         MR. GELLERT:  Your Honor, I talked about the cost-

17  effectiveness, and we talked about the RadioShack ruling which

18  would have been very helpful to recover the money from Wells

19  Fargo.

20         THE COURT:  Let me see the RadioShack ruling.

21         MR. GELLERT:  Well, Your Honor, we've appended the

22  transcript where Chief Judge Shannon went through his analysis

23  with respect to it.

24         Yes, is it binding?  No.  Is it something that can be

25  followed and do the Delaware judges tend to follow the chief

1    judge?  Yeah, on occasion they do.  So we believe that it's

2    something -- and our --

3            THE COURT:  Was that a ruling regarding whether

4    affiliates should be filed in different courts?

5            MR. GELLERT:  Of course not, Your Honor.

6            THE COURT:  Okay.  Well, that's what this case is

7    about.  It's whether affiliates --

8            MR. GELLERT:  You --

9            THE COURT:  -- should be filed in different districts.

10           MR. GELLERT:  Your Honor, you asked what the rationale

11   was for filing the case in Delaware, and besides the cost-

12   effectiveness that they felt that they would achieve there,

13   there was law that they felt was helpful to their cause with

14   respect to the single largest asset of the estate which

15   was -- or, is this Wells Fargo reserve.

16           So in order to get the best result with respect to the

17   single asset of the estate, they felt that it was important to

18   get the most advantageous law to achieve that.

19           And Your Honor, it wasn't one party telling them that.

20   It was several parties who also advised them of the same thing:

21   that the Delaware holding of Chief Judge Shannon would have an

22   impact and would be favorable in terms of the determination of

23   the outcome of whether Wells Fargo could maintain a significant

24   reserve for indemnity rights which may or may not exist.

25           THE COURT:  Wells Fargo's contract, what's the

TS EMPLOYMENT, INC.                                    57

 1  governing law in the contract?  Could you answer that question?

 2            MR. GELLERT:  Your Honor --

 3            THE COURT:  Could you answer that question?

 4            MR. GELLERT:  New York, but I don't think a Delaware

 5  court is incapable of handling that --

 6            THE COURT:  Do you think that New York law governs the

 7  outcome of Wells Fargo's rights?

 8            MR. GELLERT:  It's interesting, because it arose under

 9  the 363 scenario.  And so we bring it on under a 542 turnover

10  or 506 determination of secured status.

11            THE COURT:  And what law governs what's property of

12  the estate?

13            MR. GELLERT:  Well, ultimately, state law.  There is

14  no particular --

15            THE COURT:  What law governs --

16            MR. GELLERT:  Yes, there's no --

17            THE COURT:  -- the determination of what is property

18  of the estate?

19            MR. GELLERT:  Ultimately, state law would determine

20  it.

21            THE COURT:  Oh, and that's -- is that New York law

22  that governs the Wells Fargo agreement?

23            MR. GELLERT:  Your Honor --

24            THE COURT:  Is it?

25            MR. GELLERT:  It is, Your Honor.  I --

TS EMPLOYMENT, INC.                                          58

1        THE COURT:  Okay.

2        MR. GELLERT:  -- listen, Your Honor, I understand --

3        THE COURT:  I don't want to have to pull teeth to get

4    an answer from you.

5        MR. GELLERT:  I acknowledge this, but they're not

6    these -- as simple as you'd like to present.  And Your Honor, I

7    don't come before you with any animosity.  And I don't

8    understand --

9        THE COURT:  But I don't have any animosity toward you

10   either, Mr. Gellert.

11       MR. GELLERT:  I'm sensing a little bit.

12       THE COURT:  Nope.

13       MR. GELLERT:  From where I'm sitting.

14       THE COURT:  When people don't answer my questions when

15   I ask questions, yes, you will hear my annoyance showing very

16   clearly.  Okay.

17       MR. GELLERT:  And Your Honor, I'm just trying to make

18   sure I answer you.

19       THE COURT:  So when I ask a question, I expect an

20   answer and then if you wish to go on and argue, I'll permit you

21   to do so.  But when I ask a question, I expect a direct answer

22   to the question first.

23       MR. GELLERT:  And I have been answering a lot of the

24   questions, Your Honor.  I've been trying to make sure that --

25       THE COURT:  It's been pulling teeth but I've been

1  getting answers.

2          MR. GELLERT:  Okay.  I've been trying to make sure I

3  answer.

4          THE COURT:  That you don't do in my courtroom.

5          MR. GELLERT:  I'd like to make sure the answers are

6  proper and appropriate and correct.  So sometimes delaying an

7  answer to make sure that what I'm about to say is correct

8  which, I think, that Your Honor would appreciate.

9          Your Honor, the issues 3, 4 and 5 of the interest of

10  justice, the fair trial, the forum, deciding controversy and

11  the enforcement of judgment, I don't know that any of those are

12  really at issue.  I don't think they're really relevant.  I

13  think you can get a fair trial.  I don't know that there's any

14  specific reason why this forum has to decide a controversy over

15  another.  And enforcement of judgment, I don't think is an

16  issue either.

17          So we look at the choice of forum, and again, we go

18  back to the deference provided to the debtor in their choice of

19  filing.  We've provided a basis -- economic justification for

20  filing in Delaware as well as a legal determination.  In fact,

21  the Caesars court decided -- made her finding that that is a

22  substantial justification for making a decision on where to

23  file.  So when you have favorable law --

24          THE COURT:  Do any of those cases involve filing

25  affiliates in different districts?

1          MR. GELLERT:  Caesars did not.  Caesars, obviously,

2     was the involuntary versus the voluntary.

3          THE COURT:  Okay.  So point me to a case that involved

4     a motion to change venue where affiliates were filed in

5     different districts.

6          MR. GELLERT:  Your Honor, the Palm Lake Plaza case was

7     a case where there were affiliates that ended up in different

8     districts because one of them had real estate outside of the

9     district in which the first case was pending.  So therefore,

10    the court decided it was important to have that second case

11    decided in the state where the real estate was pending.  So it

12    was --

13         THE COURT:  Is there an issue here about real estate

14    in different districts?

15         MR. GELLERT:  No, Your Honor --

16         THE COURT:  Okay.

17         MR. GELLERT:  -- but the point there is that

18    affiliates --

19         THE COURT:  So do you have -- okay.  You said that

20    Palm Lakes, which permitted filings in different districts, the

21    Second District, there was real property located and you gave

22    that as the reason supporting different venue.  And my question

23    is you acknowledged that there is no -- that's not an issue

24    here.  Do you have any cases where -- that don't involve

25    property in different districts?

1        MR. GELLERT:  Your Honor, I don't.  But interestingly

2    enough, the TSE trustee whose burden it is to prove venue

3    doesn't provide anything saying that you have to have them in

4    the same location.  So it cuts both ways.  It's their burden.

5        THE COURT:  What about Andover Data Services?

6        MR. GELLERT:  Sure.

7        THE COURT:  It's a 1983 Southern District case that

8    transferred venue.  The first filed jurisdiction affiliate

9    where, among other things, the action of the first filed case

10   affected the second filed in it.

11       MR. GELLERT:  Well, Your Honor, the thing in Andover

12   was that the debts of the parties were deemed to be so

13   intertwined that if one party defaulted, the other party would

14   be obligated under there.  We don't have -- we have separate

15   debts.  We have separate assets.  We have separate creditors

16   here.  So it doesn't mandate them.  There's a different set of

17   facts in Andover than that exists here.

18       THE COURT:  The IRS has argued that CRS is the

19   employer of individuals whose withholding taxes were not paid

20   and may also be responsible for the tax liability.  Isn't that

21   going to be potentially a shared liability of CRS and of TSE?

22       MR. GELLERT:  Clearly, to date, they have not filed a

23   claim.  We do not believe that they actually have a justifiable

24   basis to sustain a claim against CRS.

25       THE COURT:  Okay.  Anything else, your best points?

1          MR. GELLERT:  Your Honor, I think -- let me just see

2   if I missed anything.  We would want to reiterate the fact that

3   the burden rests on the trustee.  The --

4          THE COURT:  They don't dispute that point.

5          MR. GELLERT:  I think that's true.

6          THE COURT:  Go ahead.  What's your next --

7          MR. GELLERT:  I think that it's the fact that the

8   debtor's choice of venue bears great deference.  I think all

9   the courts say that.

10          THE COURT:  You've made that point several times.

11          MR. GELLERT:  I'm sorry.

12          THE COURT:  You have any additional points you want to

13  make?

14          MR. GELLERT:  Your Honor, the biggest thing that, I

15  think, we can say is that we cannot transfer venue based on

16  conjecture or happenstance or where even there's a belief or a

17  hope that these things will come to fruition as the trustee

18  would like.  And if we start making venue changes based on that

19  kind of minimal information, then I think we've really opened

20  the door to something that allows cases to be transferred from

21  pretty much anything as long as the allegation -- as long as

22  there's a creative enough allegation that seems to fly.

23          THE COURT:  Okay.  Anybody else want to be heard in

24  opposition to the motion to transfer venue?

25          All right.  I don't need to hear a reply.

1        The motion to transfer venue is granted.  The

2   selection of the venue most consistent with the interests of

3   justice and convenience of the parties simply is not a close

4   question; all of the cases belong in New York.

5        The Delaware debtor's decision to file in Delaware was

6   a cynical effort to avoid judicial scrutiny that accompanies

7   having all of these cases administered in the same court.

8        I will issue a written opinion this afternoon.

9        Let's talk about -- before you all depart, let's talk

10  about what happens now.  I will enter this decision within a

11  half-hour or forty minutes.  I will e-mail a copy to Judge

12  Walrath so she's aware of what's happened.

13       I understand from Judge Walrath that you had a hearing

14  scheduled for August 20th, certainly with respect to cash

15  collateral.  I don't know with respect to what else.

16       MR. GELLERT:  Your Honor, there's about eleven things

17  on.  Some of those things were second-day cash management, the

18  utilities, the retention of professionals, and then the sale

19  hearing.  One of them is the sale of some of the noncore asset

20  as well as setting up the procedures for the remainder of the

21  receivables --

22       THE COURT:  Well, I'm --

23       MR. GELLERT:  -- at a later date.

24       THE COURT:  -- going to enter a separate order

25  scheduling a case management conference for all of the cases

1 once they're transferred.  And it seems to me, there are at

2 least six issues that need to be addressed promptly.

3            One, should all the cases be jointly administered?

4            Two, should a Chapter 11 trustee be appointed in the

5 additional cases?

6            Three, may the same Chapter 11 trustee oversee all of

7 the cases in light of the claims between the debtors?

8            Four, may the debtor's estates in all of these cases

9 be substantively consolidated?

10           Five, should any or all of the cases be converted to

11 cases under Chapter 7?

12           And six, how will these cases be funded if they remain

13 in Chapter 11?

14           I'll include that list of six issues in my order -- in

15 my opinion.

16           It seems to me, Mr. Togut and Mr. Gellert, the first

17 order of business is for the two of you to confer and to see

18 what it is that you can agree on.  There are, as I said, I

19 mean, I've had brief conversations with Judge Walrath, not

20 extensive, and we didn't discuss the merits of any particular

21 decision.  She advised me of, generally, what was happening in

22 Delaware, and obviously, the docket is a public docket.  The

23 one exception to that would be about the extension of cash

24 collateral -- use of cash collateral, the changing of the

25 terms.

1        There are -- until these cases actually hit my docket,

2   I can't enter orders in them.  It does seem to me that there

3   ought to be some noncontroversial things that you all ought to

4   be able to agree on.

5        Mr. Helfat, I assume you're still the guy with the

6   money.

7        MR. HELFAT:  As I'm sure the other parties would say,

8   so far.

9        UNIDENTIFIED SPEAKER:  Yes.

10        THE COURT:  Just watch Mr. Togut's hand going into

11   your pocket.

12        MR. HELFAT:  I know.  Believe me.

13        Your Honor, subject to seeing a budget, subject to

14   agreement of the parties, we're not opposed to continued use of

15   cash collateral assuming the parties can agree on a budget.  We

16   have used a budget, to date, in Delaware, but if the parties

17   can agree, we would, on these circumstances, consider

18   continuing the use.

19        THE COURT:  All right.

20        MR. TOGUT:  Let me also tell you, in Delaware, we

21   filed not substantive objections to all these motions.  The

22   motions were made after we made the change of venue motion.

23        THE COURT:  I know.  And you wanted me to stay

24   anything that went on in the Delaware cases.  In the meantime,

25   I didn't do that because I have complete confidence in Judge

TS EMPLOYMENT, INC.                                          66

1   Walrath.

2              MR. TOGUT:  Right.  And we never filed a motion to

3   that effect.  It was dropped in a --

4              THE COURT:  Right.

5              MR. TOGUT:  -- in a pleading.  But the point is we

6   have not substantively responded to anything other than the

7   cash collateral motion.  And I've asked the Court in scheduling

8   the case management conference, to bear in mind that we need

9   some time to -- now, that we know what court the case is in, to

10  substantively respond to those motions.  We filed a

11  placeholder.  We haven't filed any --

12             THE COURT:  Okay.

13             MR. TOGUT:  -- any substantive response.

14             THE COURT:  Mr. Loveland is that your name?

15             MR. SEIDEL:  Seidel.

16             THE COURT:  Seidel.  Wrong -- my pad -- I had the

17  wrong place on my pad.  I'm sorry, Mr. Seidel.

18             MR. SEIDEL:  Not a problem.  On behalf of the ad hoc

19  committee --

20             THE COURT:  Yes.

21             MR. SEIDEL:  -- I just wanted to say I rise to endorse

22  what Mr. Togut said; we have only an ad hoc committee at the

23  moment.

24             THE COURT:  Right.  I know the U.S. Trustee didn't

25  appoint a committee.

1          MR. SEIDEL:  Right.

2          THE COURT:  I read your paper and I understand.

3          MR. SEIDEL:  Exactly.  And to the extent that the U.S.

4    Trustee is now going to appoint a committee, that committee

5    would need time to properly respond to the venue motion.

6          THE COURT:  Well, I think -- look, no surprise to any.

7    I don't know what your all going to -- I don't know what, Mr.

8    Masumoto, what your office if going to do; the TSE trustee got

9    appointed when I granted the U.S. Trustee's motion for

10   appointment of a Chapter 11 trustee.  I don't know whether

11   others -- whether your client, Mr. Togut, is going to make such

12   a mot -- whether there's going to be a motion for appointment

13   of a trustee.  Whether there's a committee, not absolutely

14   determinative, but usually if there's a trustee there's not but

15   that's -- that'll be up to the U.S. Trustee again.

16         So I guess I just want to be sure that once the cases

17   hit my docket, because I can't do anything with them until they

18   do, that if there's immediate relief that doesn't alter the

19   status quo, let's put it that way, you'll get a prompt hearing

20   and on very short notice.  So --

21         MR. TOGUT:  Okay.  We'll see what we can work out.  We

22   might be able to submit a stip on cash collateral and we'll

23   take it from there.

24         THE COURT:  Okay.  Mr. Masumoto, now that they're

25   coming here, do you have anything you want to say?

1          MR. MASUMOTO:  Your Honor, I'm not in a position to

2    indicate any decision regarding a trustee or the committee at

3    this time.  As Your Honor pointed out, and as the parties

4    recognize, the issue today was one of venue.  Until the venue

5    issue is settled, the U.S. Trustee is not in a position to give

6    any advanced opinion as to what might occur.

7          Now that the venue motion has been granted, the issues

8    that Your Honor -- the six issues you mentioned as well as any

9    ancillary issues will be directly addressed by the U.S.

10   Trustee.

11         THE COURT:  Thank you, Mr. Masumoto.

12         Because I've had to do this very quickly, this isn't

13   going to be a particularly lengthy opinion, but it will get

14   out.  It will get filed today, and I will send it to Judge

15   Walrath.  But you deal with the clerk's office in Delaware

16   about --

17         MR. TOGUT:  Okay.

18         THE COURT:  -- trying to move along the process and

19   getting the cases.  Sometimes they tend to get lost in the

20   shuffle.

21         Delaware's pretty good about it, as our clerk's office

22   is.  Okay?

23         MR. TOGUT:  And thank you, Your Honor.

24         THE COURT:  All right.  We're adjourned.

25         (Whereupon these proceedings were concluded at 3:32 p.m.)

69

1

2                              I N D E X

3

4                              RULINGS

5                                        PAGE      LINE

6    Motion to transfer venue granted.      63        1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

70

1

2                         C E R T I F I C A T I O N

3

4    I, Esther Accardi, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   ESTHER ACCARDI

11   AAERT Certified Electronic Transcriber CET**D 485

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  August 19, 2015

18

19

20

21

22

23

24

25

TS EMPLOYMENT, INC.
Case No. 15-10243-mg

August 18, 2015

## #

**#607 (1)**
2:22

## A

**abbreviated (1)**
7:18
**able (16)**
9:22,22;11:5,9,12;
25:22,24;30:9,17;
31:3;33:11;34:1;
39:5;52:9;65:4;
67:22
**above (1)**
13:15
**absolutely (1)**
67:13
**Accardi (1)**
2:20
**access (7)**
9:21;10:3,15;
13:18,22;48:17,19
**accessed (1)**
32:13
**accompanies (1)**
63:6
**According (1)**
16:23
**account (4)**
8:19;10:7,10;
21:11
**accountant (1)**
9:20
**accountants (1)**
19:20
**accounts (3)**
10:4;16:17;42:20
**achieve (2)**
56:12,18
**acknowledge (1)**
58:5
**acknowledged (1)**
60:23
**across (1)**
43:21
**action (2)**
30:22;61:9
**actions (1)**
38:19
**activities (3)**
9:16;10:22;13:1
**activity (2)**
36:24;54:18
**actually (22)**
6:7;8:2;25:23;
26:14;29:6,8;30:12;
31:16;32:10,12,17;
33:16,25;41:2;43:8,
16,19,20;48:23;
49:20;61:23;65:1

**Ad (5)**
5:3;6:24;19:16;
66:18,22
**added (1)**
39:13
**additional (3)**
13:14;62:12;64:5
**addressed (2)**
64:2;68:9
**adjourned (1)**
68:24
**adjustments (2)**
9:23,24
**administer (1)**
17:18
**administered (4)**
15:8;49:22;63:7;
64:3
**administration (3)**
7:15;12:24;24:20
**administrative (1)**
10:17
**admitted (1)**
6:15
**advanced (1)**
68:6
**advantageous (1)**
56:18
**adversarial (1)**
7:17
**adverse (1)**
22:18
**advise (1)**
33:25
**advised (2)**
56:20;64:21
**affairs (1)**
9:18
**affect (2)**
17:22,23
**affected (1)**
61:10
**affiliate (1)**
61:8
**Affiliated (1)**
2:6
**affiliates (15)**
15:11;42:9;45:5;
46:25;47:19,20;48:1,
3,7;56:4,7;59:25;
60:4,7,18
**afternoon (7)**
6:14,18,21,23;
23:19;24:12;63:8
**again (11)**
17:14;18:18;25:3;
31:8;32:7;33:4;
34:15;41:24;54:21;
59:17;67:15
**against (5)**
18:9;34:1;49:24;
54:1;61:24
**aged (1)**

**40:19**
**ago (3)**
7:25;35:11;37:8
**agree (8)**
30:17;46:24;48:6;
53:7;64:18;65:4,15,
17
**agreed (1)**
38:17
**agreeing (1)**
29:8
**agreement (3)**
31:3;57:22;65:14
**agrees (1)**
15:18
**ahead (12)**
9:10,12;11:14,22;
15:23,25;25:20;
32:8;42:16;50:22,
24;62:6
**al (1)**
4:3
**ALAN (3)**
5:14;14:16;23:19
**albeit (1)**
33:24
**allegation (2)**
62:21,22
**allow (2)**
18:12;30:25
**allowed (1)**
9:17
**allows (1)**
62:20
**almost (1)**
21:4
**alone (1)**
17:23
**along (2)**
16:4;68:18
**alter (1)**
67:18
**Although (2)**
15:20;43:8
**among (2)**
42:9;61:9
**amount (5)**
30:11,25;46:12,
13;54:17
**analysis (3)**
55:1,3,22
**ancillary (1)**
68:9
**Andover (3)**
61:5,11,17
**animosity (2)**
58:7,9
**annoyance (1)**
58:15
**apologize (2)**
7:7;24:16
**apparent (1)**
30:16

**appearance (3)**
6:11;14:16,18
**appearances (1)**
6:8
**appeared (3)**
10:22;34:3,7
**appears (1)**
46:17
**appended (1)**
55:21
**Application (4)**
2:5;19:15;20:15;
23:13
**applications (1)**
39:24
**applying (1)**
22:9
**appoint (2)**
66:25;67:4
**appointed (7)**
8:2;13:6;25:12;
33:8;40:3;64:4;67:9
**appointment (4)**
13:5;22:2;67:10,
12
**appreciate (1)**
59:8
**approach (1)**
9:14
**appropriate (5)**
22:10;41:8,9;48:8;
59:6
**approved (1)**
30:1
**approving (1)**
35:5
**April (1)**
13:10
**argue (2)**
47:12;58:20
**argued (1)**
61:18
**arguing (1)**
26:2
**argument (10)**
21:16;22:4;23:22;
25:20;32:18;42:4,6,
12;47:25;49:4
**arguments (2)**
23:23;48:11
**arose (2)**
36:21;57:8
**articulated (1)**
21:13
**artificial (1)**
10:21
**assert (3)**
38:22;39:9,17
**asserting (2)**
30:23,23
**asset (4)**
31:1;56:14,17;
63:19

**assets (5)**
16:24;33:1;42:21;
45:14;61:15
**associates (1)**
8:10
**assume (2)**
46:24;65:5
**assuming (1)**
21:25;65:15
**attempt (1)**
18:11
**attention (1)**
18:18
**Attorneys (3)**
4:3,20;5:3
**Attorney's (4)**
5:18;14:18,20,22
**August (2)**
35:2;63:14
**authorities (1)**
12:5
**automatic (1)**
54:2
**available (1)**
34:14
**Avenue (1)**
4:21
**avoid (3)**
18:11,12;63:6
**avoidance (1)**
38:19
**aware (3)**
18:2;34:8;63:12
**away (2)**
7:8,10

## B

**back (13)**
8:12;10:7,18;
28:17,20;30:15;39:3,
5,6;40:23;51:13;
55:1;59:18
**backed (1)**
29:10
**bad (1)**
21:15
**bait (2)**
35:14,21
**balance (1)**
42:2
**ball (2)**
22:18;42:5;46:20
**Bank (2)**
6:22;10:4
**banker (1)**
14:4
**Bankruptcy (17)**
2:7;12:22;17:3;
18:5;24:5,18,23;
30:16;31:6,10,12,14;
32:19;34:12,13,21;
44:24

**bargain-basement (1)**
16:10
**BARRY (3)**
5:7;6:23;13:6
**base (1)**
10:2
**based (10)**
10:8,20;22:24;
24:1;36:21;39:9;
41:17;49:14;62:15,
18
**basic (1)**
40:9
**basis (4)**
34:25;49:5;59:19;
61:24
**bear (1)**
66:8
**bears (1)**
62:8
**became (1)**
13:7
**become (1)**
40:2
**begin (1)**
25:6
**beginning (1)**
49:25
**behalf (4)**
6:24;24:13;25:4;
66:18
**behind (2)**
44:16;54:19
**belief (1)**
62:16
**belong (1)**
63:4
**benefit (2)**
30:5;42:2
**BENJAMIN (2)**
4:16;6:18
**besides (1)**
56:11
**best (2)**
56:16;61:25
**big (5)**
30:22;32:23,24;
50:1;54:15
**biggest (2)**
49:23;62:14
**billion (2)**
8:4;43:20
**billions (1)**
12:20
**binding (1)**
55:24
**bit (2)**
46:19;58:11
**blown (1)**
18:15
**board (33)**
26:20,21,23;27:12,
13,14,15,16,18,

24;28:1,2,3,5,16,18;
29:25;30:14,15,18;
31:2,5,9;33:13,21;
55:2,3,4,5,7,9,11
**body (5)**
45:16;46:2,3;54:4,
8
**book (1)**
12:21
**books (5)**
13:18,23;19:19;
42:20,23
**Boston (1)**
4:14
**both (13)**
11:25;15:10;
17:19;18:4,9;22:25;
24:21;27:7;46:14;
48:17;50:8,16;61:4
**boxes (1)**
14:4
**breach (1)**
45:1
**Brian (1)**
14:25
**brief (1)**
19:7;22:5;46:23;
64:19
**bring (1)**
57:9
**broad (1)**
41:18
**Broadway (8)**
5:4;19:19;31:25;
32:3,12;33:14;
43:25;45:8
**brought (1)**
50:6
**BROWN (3)**
4:2;6:15;25:4
**budget (3)**
65:13,15,16
**building (1)**
26:15
**built (1)**
12:5
**burden (4)**
41:23;61:2,4;62:3
**BUSENKELL (3)**
4:2;6:15;25:3
**business (12)**
8:5,12,15;10:15,
18;12:6;13:8,9;
15:13;16:15;38:25;
64:17

**C**

**ca (1)**
36:11
**Caesars (4)**
41:23;59:21;60:1,
1

**calendar (1)**
7:14
**California (3)**
30:21;46:4,7
**call (2)**
23:12;25:5
**calls (1)**
18:5
**came (5)**
11:7,16;36:8;39:6;
48:18
**can (16)**
8:13;13:21;21:20;
28:17;32:20;39:9;
40:7;41:3;50:2;
55:24;59:13;62:15;
64:18;65:15,17;
67:21
**capable (1)**
32:12
**Capital (1)**
41:22
**capture (1)**
8:18
**case (49)**
14:9;15:17;17:9,
14,20,21,23,24;22:6;
27:3;28:4;33:3;34:4,
8,18;40:6,9;42:14,
17;43:17,18;44:11;
45:17;46:6,9,11,16;
47:19,24;48:16;
49:20;50:6,7;52:22;
54:11,18,24;56:6,11;
60:3,6,7,9,10;61:7,9;
63:25;66:8,9
**Cases (46)**
2:5;8:1;15:8;16:2;
17:18,19,24;18:16;
21:6,18,23;22:22;
23:1,13;24:21;
32:25;34:23,24;
36:24;37:13,16;
41:23,25;42:8;43:9;
49:4;54:13,16,25;
59:24;60:24;62:20;
63:4,7,25;64:3,5,7,8,
10,11,12;65:1,24;
67:16;68:19
**cash (23)**
8:20;10:19;34:25;
35:1,6,15,24;36:4,
15,16,25;37:4;38:2;
39:23;41:3,6;63:14,
17;64:23,24;65:15;
66:7;67:22
**cash-skimming (1)**
14:10
**Cassera (11)**
8:9;12:1;20:19,24;
47:15,16;51:21,25;
52:2,5,9
**Cassera- (1)**

16:4
**caught (1)**
54:21
**cause (1)**
56:13
**caused (2)**
17:3;18:4
**CC (1)**
2:4
**Center (1)**
5:11
**central (1)**
33:17
**CEO (3)**
27:6;50:16,18
**certain (1)**
8:9
**certainly (2)**
32:20;63:14
**certification (3)**
36:7,12,22
**certified (1)**
19:20
**Chambers (1)**
5:19
**change (12)**
15:14;19:1;25:9;
36:3;37:10;38:10,12,
13,17;52:24;60:4;
65:22
**changed (7)**
27:4;35:23;36:15,
19;37:4;38:3;41:2
**changes (2)**
38:1;62:18
**changing (3)**
35:15;36:21;64:24
**Chapter (17)**
2:4,5;13:11;15:17;
22:2,22;25:12,14;
27:3;28:4;33:8;40:3;
64:4,6,11,13;67:10
**charged (3)**
12:13,19,21
**Chief (3)**
55:22,25;56:21
**choice (6)**
17:11;41:21;
49:17;59:17,18;62:8
**circulated (4)**
37:1,20,25;38:6
**circumstances (1)**
65:17
**cite (1)**
21:9
**city (1)**
43:15
**claim (12)**
21:11;22:5;30:23;
38:22;39:17;49:24,
24;50:6,7,12;61:23,
24
**claims (8)**

18:7,10;19:1;22:5,
8;50:4,8;64:7
**clear (1)**
23:25
**clearer (1)**
46:19
**clearly (3)**
33:1;58:16;61:22
**clerk's (2)**
68:15,21
**client (1)**
67:11
**clients (1)**
10:6
**close (4)**
8:10;23:12;29:8;
63:3
**Code (3)**
47:8,22;48:7
**cold (1)**
7:7
**collateral (19)**
34:25;35:1,6,16,
24;36:4,15,16,25;
37:5;38:2;41:3,6;
63:15;64:24,24;
65:15;66:7;67:22
**colleague (1)**
7:3
**collect (1)**
39:25
**collecting (1)**
16:24
**collections (1)**
31:21
**coming (2)**
30:15;67:25
**comingled (1)**
46:21
**commenced (1)**
16:2
**comment (1)**
38:8
**COMMISSION (1)**
5:10
**Committee (10)**
5:3;6:24;19:16;
66:19,22,25;67:4,4,
13;68:2
**common (9)**
17:17;42:24;43:9,
9,10,11,12;45:14;
47:20
**companies (5)**
8:7,8;15:10;31:10;
52:1
**company (21)**
8:11,14;27:8,11;
30:6,7;31:16,19;
34:11,14;43:20,20;
44:3,3;49:25;52:4;
54:5,6,6,7;55:11
**Compensation (1)**

12:13

**complete (1)**
65:25

**complex (2)**
10:4;15:9

**concede (3)**
50:2,3;54:21

**concern (1)**
21:18

**concerned (4)**
13:7;15:8,11;
22:25

**concerning (1)**
12:24

**concluded (1)**
68:25

**concludes (1)**
14:11

**conduct (1)**
55:4

**conducted (1)**
8:4

**conducting (1)**
13:8

**confer (1)**
64:17

**Conference (3)**
2:2;63:25;66:8

**confidence (1)**
65:25

**conjecture (2)**
49:12;62:16

**conjoined (2)**
46:21;49:5

**connected (1)**
15:12

**connection (1)**
21:7

**connections (1)**
20:18

**consensual (1)**
34:25

**consent (1)**
39:5

**consider (1)**
65:17

**consistent (1)**
63:2

**consolidated (2)**
21:19;64:9

**constructed (1)**
12:6

**contacts (1)**
41:11

**contention (1)**
50:25

**contest (1)**
48:4

**continue (2)**
16:13,15

**continued (3)**
16:13;24:5;65:14

**continuing (3)**

14:8,11;65:18

**contract (2)**
56:25;57:1

**contracts (1)**
46:9

**control (2)**
8:24;47:13

**controlled (3)**
8:25;9:18;16:5

**controller (1)**
31:15

**controls (2)**
8:20;31:17

**controversy (2)**
59:10,14

**convenience (3)**
22:25;41:17;63:3

**convenient (1)**
18:17

**conversation (1)**
21:1

**conversations (1)**
64:19

**converted (2)**
22:22;64:10

**cooperation (1)**
48:25

**copy (1)**
63:11

**core (1)**
21:17

**Corporate (7)**
2:6;4:3,12;6:20;
10:21;12:2,3

**corpus (1)**
17:17

**cost (1)**
12:5

**cost- (3)**
34:16;55:16;56:11

**cost-effective (1)**
22:10

**costs (1)**
12:13

**coughing (1)**
7:7

**Counsel (10)**
4:12;6:19;23:23;
34:10;36:7,22;38:7;
39:24,24,25

**count (2)**
45:24,25

**counterclaim (1)**
30:24

**country (6)**
43:21;44:14;
53:22,23;54:1,7

**couple (1)**
35:11

**course (6)**
9:7;16:6;39:25;
40:4,19;56:5

**Court (288)**

2:7;6:2,5,7,10,17;
7:1,5,8,10,12;9:5,10,
12;10:24;11:2,7,12,
14,16,19,22;12:14,
17;13:17,22;14:12,
17,21,24;15:2,7,22,
25;16:12,19,22;17:1,
4,6,9,10,11,19;18:2;
19:3,7,9,11,13,22,24;
20:2,4,6,9,11,13,23;
21:2,14,20,22,25;
22:13,15,20,21;23:2,
3,6,9,11,13,14,16;
24:9,15,23,24;25:1,
9,11,19;26:1,4,7,10,
19,21,24;27:2,9,12,
14,17,21,23;28:1,3,7,
10,12,15,18,24;
29:15,18,21,23;
31:22,25;32:3,5,8,
17;33:9,14,19;34:3,
7,20,21,23;35:3,5,8,
11,14,15,18,23;36:2,
6,10,13,18,23;37:3,8,
11,15,18,21,23;38:1,
2,3,11,16,19;39:1,12,
20,21;40:2,11,13,23;
41:15,16;42:6,8,12,
16,22;43:1,3,5,7,10,
12,14,17,22,25;44:6,
8,10,13,16,20,23;
45:2,4,7,11,21;46:6,
23;47:2,4,6,8,15,18,
24;48:3,6,9,12;50:2,
5,9,16,19,22,24;51:3,
15,21,23;52:2,7,11,
13,15,17,21,24;53:2,
4,7,16,18,25;54:24;
55:3,6,9,13,20;56:3,
6,9,25;57:3,5,6,11,
15,17,21,24;58:1,3,9,
12,14,19,25;59:4,21,
24;60:3,10,13,16,19;
61:5,7,18,25;62:4,6,
10,12,23;63:7,22,24;
65:10,19,23;66:4,7,
9,12,14,16,20,24;
67:2,6,24;68:11,18,
24

**courtroom (2)**
13:13;59:4

**courts (4)**
17:18;41:20;56:4;
62:9

**Court's (1)**
18:18

**CPA (1)**
9:21

**creative (1)**
62:22

**creditor (5)**
45:16;46:2,3;54:4,
7

**Creditors (22)**
5:3;6:25;18:20,21,
22;19:2,4;42:25;
45:14,17,22;46:2,4,
10;49:21;51:10;
53:23;54:8,9,12;
61:15

**creditors' (1)**
50:4

**CRO (9)**
13:6;20:7,10;
27:11;28:15,19;
30:1;31:19;38:24

**cross (1)**
25:22

**CRS (107)**
5:3;6:24;8:4,6,11,
15,25;9:18;10:1,3,6,
7,7,8,14,16;11:4,17,
25;13:3,19;15:7,10,
14,16,20,20;16:1,2,4,
6,7,8,8,10,11,16,22;
17:2,2,10,12,13,20,
22,23,24;18:1,4,5,11,
16,20,25;19:18,23,
25;20:7,14;21:3,6,
15,17,22;17,25;
23:13;24:3,18,22;
25:4;26:20,25;27:5,
7;28:23;29:3,3,6,24;
30:14,23,25;31:1;
34:3,7;43:19,20;
44:12,13,23;45:4,9,
17;46:24;48:15,17;
49:10;50:13,16;51:5,
10;52:4;54:1;55:5;
61:18,21,24

**CRS's (7)**
15:4;16:5,7;17:15;
19:4;20:18;45:22

**curiosity (1)**
53:7

**curious (2)**
51:9;53:17

**curve (2)**
53:24;54:16

**customer (2)**
10:2,17

**customers (1)**
8:20

**CUTLER (1)**
4:11

**cuts (1)**
61:4

**cynical (1)**
63:6

**D**

**D&O (3)**
28:7,8,12

**dark (1)**
37:12

**data (2)**
8:19;61:5

**date (5)**
16:16;35:1;61:22;
63:23;65:16

**day (9)**
10:9,9;11:2;22:19,
21;39:11,22,23;
40:22

**days (3)**
15:13;35:11;37:8

**day-to-day (3)**
31:21;48:23;52:1

**DE (1)**
4:6

**deal (2)**
40:24;68:15

**debt (9)**
18:23,24;19:4;
29:7;8;45:22,24,25;
49:10

**debtor (15)**
8:4,12,22,24;9:2,
17,25;10:7;12:19;
15:11;23:3;42:18,
19;47:19;59:18

**debtor-in-possession (1)**
17:14

**debtors (10)**
6:20;22:6;25:4,4,
5;30:22;46:24;
47:25;48:23;64:7

**debtor's (8)**
12:22;13:1;39:24;
41:21;49:17;62:8;
63:5;64:8

**debts (2)**
61:12,15

**decide (4)**
22:3;50:9;53:5;
59:14

**decided (9)**
10:12;16:15;
29:10;30:18,18;
55:13;59:21;60:10,
11

**deciding (1)**
59:10

**decision (9)**
21:9,10;33:15;
55:2;59:22;63:5,10;
64:21;68:2

**Decisions (4)**
17:21,22;30:3,6

**declaration (3)**
18:1;26:5,6

**deemed (1)**
61:12

**defaulted (1)**
61:13

**deference (2)**
59:18;62:8

**definitely (1)**

11:10
**Del (2)**
30:22;33:3
**Delaware (44)**
2:8;15:4,7,17;
18:23;20:16,16;21:7,
8,14;24:4;25:4;
32:11,19;33:10,22,
25;34:16,18,20;
36:24;37:15;39:21;
41:8,9,11;46:24;
47:25;50:3;54:10,
25;55:13,25;56:11,
21;57:4;59:20;63:5,
5;64:22;65:16,20,24;
68:15
**Delaware-only (1)**
54:6
**Delaware's (1)**
68:21
**delaying (1)**
59:6
**depart (1)**
63:9
**DEPARTMENT (1)**
5:17
**depends (1)**
45:24
**desire (1)**
32:24
**detail (1)**
13:17
**details (1)**
23:25
**determination (6)**
33:21;49:10;
56:22;57:10,17;
59:20
**determinative (2)**
41:12;67:14
**determine (1)**
57:19
**determined (1)**
9:2
**DICKSTEIN (2)**
5:2;6:24
**different (13)**
13:25;26:15;34:3;
56:4,9;59:25;60:5,7,
14,20,22,25;61:16
**diminution (3)**
38:23,24;39:9
**direct (3)**
18:18;21:13;58:21
**directed (1)**
16:4
**direction (1)**
30:5
**directly (1)**
68:9
**directors (5)**
26:20;28:16;30:1;
31:9;55:2

**disagree (1)**
45:21
**disappear (1)**
51:4
**disappearance (1)**
18:3
**disclose (1)**
23:25
**discovered (1)**
28:23
**discovery (5)**
13:19;28:22,24;
29:9;44:3
**discuss (1)**
64:20
**discussed (2)**
31:5;38:9
**disingenuous (2)**
49:1,3
**dispute (8)**
18:25;40:21;
45:25;47:5,9;49:23;
50:1;62:4
**disputed (4)**
18:7;41:9;45:24,
25
**disputes (1)**
13:19
**disregard (2)**
47:20;49:17
**distinctions (1)**
12:3
**distractions (1)**
10:21
**District (9)**
2:7,8;17:25;19:15,
17;23:1;60:9,21;
61:7
**districts (5)**
56:9;59:25;60:5,8,
14,20,25
**Doc (2)**
2:4
**docket (4)**
64:22,22;65:1;
67:17
**documents (2)**
48:18,20
**dollar (5)**
8:4;10:25;12:11;
30:23;43:20
**dollar-plus (1)**
34:18
**dollars (11)**
11:4,11;12:20;
13:11,15;17:16;18:3,
8;51:4;53:8;55:7
**done (4)**
12:2;13:17;32:22;
35:16
**door (1)**
62:20
**DORR (1)**

4:11
**doubt (1)**
18:6
**down (9)**
9:5,6;16:13,18;
17:7;30:2;31:1;44:5;
55:14
**dropped (1)**
66:3
**Due (2)**
17:17;20:17
**duplicates (1)**
14:2
**during (2)**
43:19;44:4

**E**

**earlier (1)**
50:19
**early (2)**
30:15;44:2
**EB (1)**
41:22
**economic (1)**
59:19
**economy (4)**
17:19;50:9;53:21;
54:9
**effect (1)**
66:3
**effective (1)**
30:12
**effectively (2)**
39:10;45:1
**effectiveness (3)**
34:17;55:17;56:12
**efficiencies (1)**
24:21
**efficient (1)**
22:10
**effort (1)**
63:6
**eight (1)**
30:24
**either (5)**
33:4;50:5;54:10;
58:10;59:16
**electronic (1)**
32:12
**eleven (1)**
63:16
**else (9)**
6:12,17;7:1;15:6;
23:16;24:10;61:25;
62:23;63:15
**e-mail (1)**
63:11
**e-mails (1)**
14:1
**employee (2)**
14:5;27:7
**employee-based (1)**

30:21
**employees (14)**
14:6;16:4,10;20:2,
20;26:17,18;30:9,10;
31:23;32:9;42:23,
24;43:9
**employer (2)**
7:24;61:19
**Employment (4)**
6:2;11:17;27:3;
44:11
**end (7)**
7:7,23;10:9;23:10;
39:11;49:13,18
**ended (1)**
60:7
**endorse (1)**
66:21
**ends (1)**
49:15
**enforcement (2)**
59:11,15
**enough (3)**
38:8;61:2;62:22
**Enron (2)**
41:22;54:13
**enter (3)**
63:10,24;65:2
**entered (1)**
39:2
**enterprise (2)**
8:10;10:18
**enterprises (1)**
12:2
**entire (1)**
46:2
**Entities (2)**
2:6;22:8
**entity (4)**
16:5;18:12,13;
47:20
**entries (2)**
9:22;12:21
**equity (1)**
47:22
**Ernie (1)**
9:20
**eScribers (1)**
2:21
**especially (2)**
31:11;33:2
**ESQ (6)**
4:8,16,24;5:7,14,
23
**essence (1)**
24:17
**estate (7)**
56:14,17;57:12,
18;60:8,11,13
**estates (3)**
18:9;22:18;64:8
**Esther (1)**
2:20

**et (1)**
4:3
**eve (1)**
12:21
**even (10)**
21:12;23:12;
25:15;42:1,1;47:12;
49:21;54:20,21;
62:16
**event (2)**
18:2;22:11
**events (1)**
37:10
**everybody (2)**
39:8;49:7
**Everyone (2)**
15:18;18:18
**everything's (1)**
24:3
**everywhere (1)**
54:7
**evidence (1)**
26:5
**Ewen (6)**
31:15,20;32:10;
33:12;48:22;51:10
**ex (1)**
48:18
**exact (2)**
10:2;18:2
**Exactly (1)**
67:3
**except (1)**
31:15
**exception (1)**
64:23
**excess (1)**
46:3
**EXCHANGE (1)**
5:10
**Excuse (1)**
14:15
**exist (4)**
16:6;21:12;26:21;
56:24
**existed (1)**
14:6
**existence (1)**
37:16
**exists (1)**
61:17
**expect (2)**
58:19,21
**expected (1)**
52:5
**experience (2)**
8:1,2
**explained (2)**
18:1;36:1
**extended (2)**
35:8;36:16
**extension (6)**
36:3,11,14,25;

38:2;64:23
**extensive (1)**
64:20
**extent (4)**
17:16;39:17;41:4;
67:3

## F

**face (2)**
8:11;10:16
**faced (1)**
22:7
**facilities (1)**
44:15
**fact (24)**
17:17;24:7;25:22;
29:4;30:8;33:12,23;
38:9;39:6;41:9,11,
12;42:15;43:19;
45:18;46:4,10,20,20;
50:14;54:22;59:20;
62:2,7
**fact- (1)**
15:18
**factor (1)**
46:14
**factors (2)**
21:13;24:6
**facts (13)**
9:11;15:19;18:10,
19;21:3;22:24;24:1;
27:17;45:13,13;
46:18;50:10;61:17
**fair (3)**
48:5;59:10,13
**fairness (1)**
24:21
**familiar (3)**
21:3;29:21;31:7
**familiarity (1)**
21:4
**family (1)**
8:10
**far (5)**
10:20;11:5;23:8;
53:12;65:8
**Fargo (20)**
4:20;6:22;10:4;
16:7,17;17:9;29:10,
12,18;30:5,5,11;
32:23;33:2;34:1;
37:10;55:19;56:15,
23;57:22
**Fargo's (2)**
56:25;57:7
**fashion (1)**
8:23
**favor (1)**
24:22
**favorable (3)**
21:12;56:22;59:23
**February (3)**

7:23;13:10;44:4
**fee (1)**
12:5
**feel (2)**
25:8;50:1
**fees (1)**
12:18
**felt (6)**
34:17;38:24;
39:18;56:12,13,17
**few (4)**
7:21;20:18;32:9;
37:8
**fight (3)**
22:16,17;46:23
**figure (2)**
14:5;19:5
**figures (1)**
12:23
**file (5)**
17:3;18:4;55:13;
59:23;63:5
**filed (23)**
13:12,12;27:3;
28:4;32:19;34:23,
24;36:23;37:13;
52:15;54:24;56:4,9;
60:4;61:8,9,10,22;
65:21;66:2,10,11;
68:14
**files (1)**
31:14
**filing (20)**
15:4,14;16:11;
17:13;24:16;27:6,15,
25;33:10;43:22;
44:1,10,23;45:4,7,9;
56:11;59:19,20,24
**filings (1)**
60:20
**filled (1)**
14:4
**final (2)**
35:1;41:3
**Finally (2)**
20:22;21:2
**Financial (2)**
5:11;9:19
**financing (1)**
17:14
**find (3)**
14:7;17:11;21:9
**finding (1)**
59:21
**fine (2)**
41:5;46:1
**finish (1)**
36:13
**fired (3)**
31:5;33:19,20
**fires (1)**
31:14
**firm (2)**

9:20;12:25
**firms (6)**
20:16;33:22,22,
23;34:3,7
**first (19)**
7:14;11:2,16;
15:22;18:20;22:3;
25:14;37:13;38:4,6;
39:15,16,22;51:14;
58:22;60:9;61:8,9;
64:16
**first-day (1)**
18:1
**five (8)**
7:23,25;14:1;
28:13;31:24,24;
45:6;64:10
**Floor (3)**
4:5;5:20;32:1
**floors (2)**
26:15;32:1
**Florida (2)**
30:22;31:1
**flowed (1)**
10:19
**fly (1)**
62:22
**focus (1)**
12:25
**FOLCH (10)**
5:23;14:19,19,22,
22;24:12,12,16,24,
25
**follow (5)**
11:5,9;13:1;47:18;
55:25
**followed (1)**
55:25
**following (1)**
16:16
**footnote (1)**
22:4
**force (1)**
13:13
**forced (1)**
11:24
**form (1)**
39:4
**formed (1)**
7:25
**former (1)**
20:20
**forth (2)**
23:23;36:8
**forty (1)**
63:11
**forty-eight (2)**
12:10,14
**forty-one (1)**
46:2
**forum (3)**
59:10,14,17
**forums (1)**

10:21
**found (3)**
35:21,23;53:11
**four (2)**
46:1,3,12;64:8
**frame (1)**
41:20
**fraud (2)**
15:9;18:15
**fraudulent (1)**
10:22
**frequently (1)**
22:6
**front (2)**
34:5;37:24
**fruition (1)**
62:17
**frustrating (1)**
15:5
**fulfiller (1)**
8:13
**full (1)**
13:14
**full- (1)**
18:14
**full-time (1)**
31:24
**fully (1)**
49:1
**functions (1)**
11:25
**fund (2)**
29:11,14
**funded (1)**
64:12
**funding (1)**
17:15
**funds (4)**
10:3,16;16:6;18:9
**funny (2)**
32:10;53:10
**further (1)**
38:8

## G

**gateway (2)**
33:7,9
**gave (1)**
60:21
**GELLERT (195)**
4:2,8;6:14,14,15;
9:3,7;20:3;25:1,2,3,
3,10,15,16,21;26:3,6,
9,11,20,22;27:5,10,
13,16,20,22,24;28:2,
5,8,11,13,16,20;29:2,
17,20,22,25;31:23;
32:1,4,6,9,20;33:11,
16,20;34:5,10,22,24;
35:3,4,7,10,13,17,19,
20;36:1,5,6,7,12,17,
20;37:1,7,9,11,14,17,

19,22,25;38:4,13,18,
20;39:3,14,22;40:4,
12,16,25;41:16;42:7,
11,14,17,25;43:2,4,6,
8,11,13,16,18,24;
44:1,7,9,12,14,19,21,
25;45:3,6,9,12,24;
46:8;47:1,3,5,7,10,
16,23;48:2,4,8,10,
13;50:18,22,23,24,
25;51:5,17,22,24;
52:4,8,12,14,16,19,
23;53:1,3,6,10,17,
20;54:3;55:1,5,8,11,
16,21;56:5,8,10;
57:2,4,8,13,16,19,23,
25;58:2,5,10,11,13,
17,23;59:2,5;60:1,6,
15,17;61:1,6,11,22;
62:1,5,7,11,14;
63:16,23;64:16
**general (1)**
18:10
**generally (1)**
64:21
**glad (1)**
26:10
**Good (11)**
6:14,18,21,23;
8:17;23:19;24:12;
26:9;33:25;41:6;
68:21
**governance (3)**
26:25;29:16,23
**governing (2)**
27:2;57:1
**governs (1)**
57:6,11,15,22
**grant (1)**
23:13
**granted (4)**
25:13;63:1;67:9;
68:7
**great (1)**
62:8
**grew (1)**
12:11
**guarantee (1)**
49:9
**guess (1)**
67:16
**guiding (1)**
41:20
**guy (1)**
65:5

## H

**hac (1)**
6:16
**HALE (1)**
4:11
**half (5)**

7:21,23;13:11,15;
21:4
**half-hour (1)**
63:11
**hand (2)**
7:11;65:10
**handful (4)**
25:5;26:17,22;
31:23
**handle (1)**
50:3
**handles (2)**
50:3,5
**handling (1)**
57:5
**hanging (1)**
26:16
**happen (5)**
22:23;30:17;
37:21;49:15,16
**happened (13)**
11:3,7;29:12;
31:13;32:18;34:20;
37:8;39:7,11;51:20;
52:3;53:8;63:12
**happening (1)**
64:21
**happens (3)**
33:1,5;63:10
**happenstance (1)**
62:16
**hardship (1)**
54:11
**hats (1)**
12:1
**head (2)**
25:7;44:16
**heads-up (1)**
7:6
**hear (7)**
8:6;14:21;25:15;
32:18;54:22;58:15;
62:25
**heard (5)**
25:21;46:17;49:4;
53:12;62:23
**hearing (12)**
34:4,8;35:1;36:17;
38:7;39:6;41:1,3,3;
63:13,19;67:19
**hearings (1)**
29:19
**heart (2)**
52:22,23
**held (6)**
8:14;13:16;18:24;
25:19:4;45:22
**HELFAT (7)**
4:24;6:21,22;
29:19;65:5,7,12
**hell (1)**
51:18
**help (3)**

31:16;34:1;49:25
**helpful (2)**
55:18;56:13
**herring (2)**
21:16;49:3
**heyday (1)**
43:19
**highly (1)**
10:4
**hip (2)**
16:2;46:21
**hired (3)**
26:19;28:15;31:6
**hit (3)**
25:6;65:1;67:17
**Hoc (5)**
5:3;6:24;19:16;
66:18,22
**holding (2)**
41:6;56:21
**Honor (107)**
6:6,14,16,18,21,
23;7:3,13;9:3,7;
11:13;12:10;13:3,
24;14:9,14,15,19;
15:4;16:14,21;
17:22;19:18;20:1,3,
17;22:11,24;23:11,
19;24:7,12;25:2,6,
16,23;26:6;28:22;
29:6;32:4,15,22;
33:11,21;34:10;
35:10,17,20;36:5;
37:14;38:4,14,20;
41:7,18,21;42:7,14;
43:18,24;44:14,18,
21,25;45:15;46:8;
47:1,10;48:2;49:6;
50:2,25;51:5,8;53:1,
20,21;54:3,15,17,18;
55:16,21;56:5,10,19;
57:2,23,25;58:2,6,
17,24;59:8,9;60:6,
15;61:1,11;62:1,14;
63:16;65:13;68:1,3,
8,23
**Honor's (1)**
25:24
**hope (1)**
62:17
**hotly (1)**
48:4
**hour (1)**
7:21
**hours (1)**
10:11
**Huh (1)**
7:9
**hundred (7)**
11:3,11;12:12;
18:3;51:3;53:8;55:6
**hundred- (1)**
28:24

**hundred-million- (1)**
10:24

# I

**idle (1)**
53:7
**Illinois (1)**
46:5
**immediate (2)**
18:16;67:18
**impact (1)**
56:22
**important (3)**
20:22;56:17;60:10
**importantly (2)**
21:2;49:24
**improper (1)**
9:15
**Inc (2)**
2:6;6:2
**incapable (1)**
57:5
**include (1)**
64:14
**including (2)**
24:7
**inconvenience (1)**
15:16
**inconvenient (1)**
21:6
**incorporated (2)**
24:4;41:10
**incorporation (1)**
21:8
**indemnity (2)**
21:11;56:24
**independent (2)**
11:23;30:4
**indicate (1)**
68:2
**indicated (2)**
47:14,16
**individual (2)**
8:9;18:13
**individuals (1)**
61:19
**indulgence (1)**
25:24
**industry (1)**
8:3
**information (3)**
26:11;48:24;62:19
**inherent (1)**
24:1
**injustice (1)**
15:16
**innuendo (2)**
46:18;49:12
**input (1)**
33:4
**inquire (1)**
51:23

**insignificant (1)**
24:2
**insistence (1)**
29:25
**insolvent (2)**
47:19,21
**instance (2)**
22:3;25:14
**insufficient (1)**
24:4
**insurance (4)**
16:9;28:7,8,12
**intends (1)**
18:7
**intentions (1)**
25:8
**inter (1)**
32:25
**interdebtor (1)**
22:8
**interest (6)**
18:8;24:20;33:1;
41:17;49:6;59:9
**interesting (2)**
33:23;57:8
**interestingly (2)**
48:21;61:1
**interests (1)**
63:2
**interim (2)**
35:5,24
**intertwined (7)**
25:17,18;42:5,10;
46:16;49:7;61:13
**interview (2)**
20:25;33:22
**interviewed (2)**
33:13,22
**into (10)**
10:6;11:8,12,17;
18:5;26:5;30:13;
31:11;32:16;65:10
**inure (1)**
42:2
**investigation (11)**
10:20;14:10;15:5,
9;17:15;18:5;20:24;
23:24;48:15,20;
49:13
**invoices (1)**
10:8
**involuntary (1)**
60:2
**involve (4)**
18:10;49:21;
59:24;60:24
**involved (6)**
18:18;40:20;
46:10;51:1,25;60:3
**involvement (2)**
16:14;31:18
**involves (1)**
50:12

**IRS (9)**
7:19;12:4;18:7,12;
19:16;24:13,19;
50:12;61:18
**iss (1)**
21:21
**issue (21)**
15:20;21:15,22;
22:21;25:11;32:24,
24;40:23;50:3,10,10,
11;54:23;55:6;
59:12,16;60:13,23;
63:8;68:4,5
**issues (15)**
17:20;24:22;
32:23;34:2;40:5,8;
49:20,23;54:21;
59:9;64:2,14;68:7,8,
9

# J

**January (1)**
51:17
**Jersey (3)**
18:22;33:17,17
**jigsaw (1)**
13:4
**John (2)**
27:6,6
**joinder (1)**
23:22
**joined (2)**
16:1;19:14
**jointly (2)**
15:8;64:3
**JONATHAN (2)**
4:24;6:21
**JPMorgan (1)**
10:5
**judge (21)**
17:23;35:16,21;
36:10,14;37:3,12;
39:1,7;53:24;54:16,
20,22;55:22;56:1,21;
63:11,13;64:19;
65:25;68:14
**judges (1)**
55:25
**judgment (3)**
38:25;59:11,15
**judicial (5)**
17:19;50:9;53:20;
54:9;63:6
**July (2)**
27:11;30:15
**juncture (1)**
31:13
**June (1)**
30:15
**jurisdiction (1)**
61:8
**JUSTICE (7)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(6) half-hour - JUSTICE

5:17;18:15;22:25;
41:17;49:6;59:10;
63:3
**justifiable (1)**
61:23
**justification (2)**
59:19,22
**justify (1)**
17:24

## K

**Kasoff (4)**
9:21,21;13:6,7
**Kasoff's (1)**
13:8
**keep (3)**
8:21;26:2;37:11
**keeping (1)**
42:1
**kept (1)**
31:17
**kind (2)**
49:3;62:19
**knew (1)**
48:19
**knowledge (1)**
43:6
**knows (2)**
41:18;51:5

## L

**lack (1)**
48:25
**Lake (1)**
60:6
**Lakes (1)**
60:20
**language (7)**
16:5;17:15;35:13;
39:7,14,16,18
**large (4)**
18:7;31:1;46:11,
12
**largest (1)**
56:14
**last (1)**
53:15
**lasted (1)**
7:21
**late (2)**
24:16;30:15
**lately (1)**
21:1
**later (1)**
63:23
**Lauren (1)**
7:4
**law (15)**
18:11;21:12;34:1,
7,16;56:13,18;57:1,
6,11,13,15,19,21;

59:23
**lawyers (1)**
20:14
**leading (1)**
49:15
**learned (2)**
37:15;51:14
**learning (2)**
53:24;54:15
**leases (2)**
45:1,3
**least (1)**
64:2
**leave (1)**
21:6
**left (1)**
19:22
**leg (1)**
8:5
**legal (1)**
59:20
**lender (3)**
16:7;17:8;20:21
**lenders (1)**
10:3
**lender's (1)**
21:10
**lengthy (1)**
68:13
**lent (1)**
10:7
**less (1)**
9:14
**liabilities (2)**
42:21;45:15
**liability (5)**
18:11;49:10;
50:13;61:20,21
**liberty (1)**
23:25
**lien (1)**
38:17
**life (1)**
16:3
**light (1)**
64:7
**limited (1)**
41:11
**line (2)**
22:14;41:25
**list (1)**
64:14
**listen (1)**
58:2
**litigation (5)**
30:19,20,21;53:22,
25
**little (7)**
12:7,7;45:19;
46:19;48:25;49:2;
58:11
**LLC (2)**
2:21;4:2

**LLP (2)**
4:11;5:2
**loans (1)**
10:14
**located (4)**
12:20;19:18;
55:15;60:21
**location (5)**
19:1;42:22,23;
43:15;61:4
**locations (1)**
43:21
**lockbox (1)**
10:6
**long (2)**
62:21,21
**longer (4)**
16:19,24;27:8;
29:11
**Look (10)**
32:15;41:12,15;
42:17;46:13,15;
47:23;48:17;59:17;
67:6
**looked (1)**
15:12
**looking (1)**
45:12
**lose (2)**
12:7;40:22
**loss (2)**
12:11,14
**lost (2)**
12:8;68:19
**lot (16)**
12:9;23:21;25:21;
26:11;30:19,21;
32:22;33:18;40:2;
46:17,17,18;48:19;
54:13,19;58:23
**LOVELAND (4)**
4:16;6:18,19;
66:14
**lovely (1)**
23:9

## M

**MA (1)**
4:14
**mainly (1)**
30:2
**maintain (4)**
8:20;31:16;32:22;
56:23
**maintained (1)**
42:19
**majority (2)**
20:19;49:20
**majority-owned (1)**
8:8
**makes (2)**
17:17;18:22

**makeup (1)**
27:24
**making (7)**
10:16;14:18;30:3,
6;55:2;59:22;62:18
**manage (1)**
9:17
**managed (4)**
8:9,16;10:19;13:6
**management (11)**
11:23,24;12:18;
19:20,22;20:20,20;
39:23;63:17,25;66:8
**mandate (2)**
49:9;61:16
**manipulation (1)**
9:15
**manner (1)**
13:7
**many (5)**
20:17;27:12;28:1;
44:6,24
**March (2)**
13:10;31:18
**marginal (1)**
12:5
**Market (1)**
4:4
**Masumoto (7)**
14:25,25;15:2;
67:8,24;68:1,11
**material (3)**
38:10,12,16
**matter (1)**
24:2
**may (16)**
9:3;18:11,25;20:3;
21:18;22:23;23:10;
41:16,19;49:15;
52:11;56:24,24;
61:20;64:6,8
**maybe (2)**
31:24;49:19
**MAZA (7)**
5:14;14:15,16;
23:19,19;24:9;27:1
**mean (6)**
19:24;25:23;27:5;
37:12;47:22;64:19
**meaning (2)**
46:25;48:6
**meantime (1)**
65:24
**meet (1)**
30:18
**mem (1)**
27:12
**members (13)**
8:10;26:23;27:13,
18;28:1,2,3;55:3,4,5,
7,9,11
**mentioned (4)**
29:3;45:19;47:11;

68:8
**mere (1)**
18:6
**merely (2)**
18:13;24:3
**merits (1)**
64:20
**Mesirow (1)**
12:25
**Messina (7)**
27:6,7,7,8;33:16;
47:13;50:16
**metaphors (1)**
15:20
**might (8)**
26:16;46:11;
48:23,24;49:18;
52:9;67:22;68:6
**migrate (1)**
30:9
**Mildly (1)**
47:7
**militate (1)**
24:22
**million (17)**
11:4,11;12:11,12,
14;13:11,15;14:1,2;
17:16;18:3,8;28:13;
30:23;51:4;53:8;
55:7
**million- (1)**
34:17
**million-dollar (2)**
28:25;30:24
**mind (2)**
42:1;66:8
**minimal (1)**
62:19
**minimum (1)**
41:4
**minutes (2)**
7:21;63:11
**miraculous (1)**
28:24
**misleading (1)**
45:20
**missed (2)**
34:5;62:2
**missing (8)**
18:9;29:9;46:13;
51:2,7,9;55:6,10
**misunderstand (1)**
15:24
**misunderstood (1)**
50:19
**mo (1)**
22:1
**moment (1)**
66:23
**money (22)**
10:7,9;17:10;29:3,
4,9;30:18;33:24;
34:12;48:20;51:2,6,

6,9,13,15,19;52:3;
55:10,12,18;65:6
**MONICA (4)**
5:23;14:19,22;
24:12
**monies (1)**
10:11
**monitor (1)**
9:23
**Monte (1)**
33:3
**Monte's (1)**
30:22
**months (6)**
7:24;13:9;21:5;
40:17;45:6;53:15
**moot (1)**
40:2
**more (7)**
13:10,12,25;14:1;
30:11;34:13;49:24
**most (9)**
13:18;19:20;
20:19,22;21:2;
22:10;40:1;56:18;
63:2
**mot (1)**
67:12
**motion (27)**
6:10;7:16,17;
14:13;15:3,15;22:1;
23:17;25:8,9,13;
48:18;49:19;50:5;
52:24;53:5,19;60:4;
62:24;63:1;65:22;
66:2,7;67:5,9,12;
68:7
**motions (2)**
65:21,22;66:10
**mounting (1)**
30:20
**movant (1)**
42:3
**move (2)**
14:12;68:18
**moved (1)**
48:10
**moving (2)**
40:9;41:24
**much (10)**
9:2;10:12;14:24;
15:12;16:11;24:6;
28:12;35:22;38:14;
62:21
**multiple (3)**
12:1;17:2;22:7
**Must (1)**
23:9
**myriad (1)**
24:1
**mysterious (1)**
18:2

**N**

**nail (1)**
25:6
**name (2)**
20:18;66:14
**national (3)**
46:9,9;54:5
**nature (1)**
7:15
**necessarily (1)**
48:16
**need (10)**
15:12;18:14;26:1;
41:1;49:4,22;62:25;
64:2;66:8;67:5
**needed (1)**
16:8
**needs (2)**
8:17;50:15
**negotiate (1)**
39:4
**Neither (2)**
10:15;21:21
**net (1)**
12:11
**New (37)**
2:23;4:22;5:5,12,
21;10:1;16:7;18:16,
17,21,22,25;19:5;
20:10,14,16,17;
21:16;23:20;24:7,19,
23;27:3;33:17,17,22,
23;34:7;45:22;46:3,
9;54:5;55:14;57:4,6,
21;63:4
**next (2)**
48:12;62:6
**nexus (1)**
18:10
**nine (1)**
12:23
**ninety-eight (1)**
50:4
**ninety-four (2)**
18:23,24
**nonbig (1)**
40:8
**noncontroversial (1)**
40:8;65:3
**noncore (1)**
63:19
**None (1)**
18:22
**nonissue (1)**
39:19
**Nope (1)**
58:12
**Nor (1)**
21:15
**North (1)**
4:4

**Northern (1)**
18:21
**note (1)**
48:14
**noted (1)**
36:8
**notice (4)**
51:12,15,18;67:20
**Now's (1)**
6:3
**number (3)**
11:3;46:10,11
**numbers (2)**
46:12,12
**numerosity (1)**
46:14
**NY (5)**
2:23;4:22;5:5,12,
21

**O**

**obfuscate (1)**
10:22
**object (1)**
19:17
**objection (4)**
36:21,23;50:6,7
**objections (1)**
65:21
**obligated (1)**
61:14
**obligation (1)**
40:6
**obligations (2)**
8:19;49:11
**obtained (1)**
34:25
**Obviously (8)**
23:24;24:20;
32:23;40:21;41:7,
18;60:1;64:22
**occasion (1)**
56:1
**occur (2)**
15:10;68:6
**occurred (2)**
15:10;18:15
**Office (18)**
5:18;8:12;10:18;
14:18,23,25;17:6,7;
19:19,24;20:19;
26:14;43:14,23;
45:8;67:8;68:15,21
**Officer (2)**
43:13;51:1
**officers (7)**
11:25;31:9,15;
43:9,11,11;45:14
**offices (12)**
10:1;19:25;23:7;
42:22;43:10,12,21;
44:6,11,13,22,24

**often (1)**
22:7
**old (1)**
40:17
**once (4)**
11:7;51:12;64:1;
67:16
**one (31)**
8:4,9;11:11;12:11;
14:14;15:9;16:14;
17:16;18:3;25:22;
33:23;34:2,10,15;
39:17;40:5,9;41:1;
43:14,15,23;44:25;
45:7;46:10;47:10;
49:22;50:2,5,9;
54:12,22;56:19;
60:8;61:13;63:19;
64:3,23;68:4
**one's (1)**
48:21
**only (18)**
13:3;29:13,13;
32:7,9;38:13,15,21;
43:14;46:1,3,13,13,
15;47:12;50:10,12;
66:22
**onto (4)**
7:16;15:3;48:10,
12
**opened (1)**
62:19
**operate (6)**
8:17,22,22;10:3,
15;16:3
**operated (2)**
12:8;13:9
**operating (4)**
16:15,20,22,25
**operation (2)**
10:18;48:23
**operational (1)**
11:25
**operations (4)**
9:14;16:13;31:21;
52:1
**operations@escribersnet (1)**
2:25
**opinion (4)**
63:8;64:15;68:6,
13
**opportunity (1)**
24:14
**opposed (2)**
33:10;65:14
**opposition (3)**
16:12;21:17;62:24
**options (2)**
34:15,15
**order (27)**
35:5,13,16,24;
36:4,9,18,20;37:5,
20,25;38:1,6,10,14,

15,15;39:1,4,13,15,
16;54:20;56:16;
63:24;64:14,17
**orders (2)**
8:13;65:2
**ordinary (2)**
39:25;40:19
**organization (1)**
7:24
**others (1)**
67:11
**OTTERBOURG (2)**
4:19;6:22
**ought (2)**
65:3,3
**out (12)**
14:6;15:7;26:16;
29:10;39:10,12,14,
18;46:2;67:21;68:3,
14
**outcome (3)**
41:12;56:23;57:7
**outside (4)**
9:20;24:2;52:20;
60:8
**over (25)**
8:20,24;12:1;18:3,
23,24;22:17;24:6;
38:9;40:17;43:21;
44:14;45:17;46:1;
51:3,11,11,19;53:22,
23;54:1,7,8;55:12;
59:14
**overage (1)**
31:4
**overlaps (1)**
23:22
**overpaid (1)**
30:11
**oversee (1)**
64:6
**overseeing (1)**
17:23
**oversight (1)**
28:25
**overwhelmingly (1)**
24:18
**own (6)**
9:17,19,25;16:3,5;
17:15
**owned (2)**
9:18;47:19
**owner (1)**
20:19
**owns (1)**
8:14

**P**

**pad (2)**
66:16,17
**paid (16)**
9:1,1,2;10:6,7,13;

TS EMPLOYMENT, INC.
Case No. 15-10243-mg

August 18, 2015

13:10,14;16:18;
30:10;51:5,11,13,16;
55:12;61:19
**painted (1)**
　26:16
**Palm (2)**
　60:6,20
**paper (1)**
　67:2
**papers (9)**
　16:23;19:3;24:15,
　19;26:4,8;42:13;
　52:15,17
**parent (1)**
　42:19
**Park (1)**
　4:21
**part (4)**
　7:17;28:5;40:1;
　42:12
**parte (1)**
　48:18
**participate (1)**
　32:25
**particular (7)**
　42:9;45:17;50:9;
　54:11,23;57:14;
　64:20
**particularly (1)**
　68:13
**parties (16)**
　31:9;36:8;39:4;
　41:17;46:20;48:15,
　22;49:8;56:20;
　61:12;63:3;65:7,14,
　15,16;68:3
**partners (1)**
　9:20
**parts (1)**
　38:5
**part-time (1)**
　16:9
**party (8)**
　29:9;30:4,12;
　41:24;42:18;56:19;
　61:13,13
**passwords (1)**
　32:13
**pattern (1)**
　50:14
**pay (8)**
　10:12,12;18:13;
　34:14;50:12,14;51:6,
　19
**payroll (6)**
　8:18,21;9:1;13:11,
　12;16:9
**PC (3)**
　4:19;6:22;9:21
**Peacock (2)**
　7:4;19:12
**penalties (1)**
　18:8

**pending (9)**
　20:16;23:24;
　25:11;30:19,19;
　53:22;54:1;60:9,11
**PEO (6)**
　7:24;8:1,15,17,21;
　10:8
**people (4)**
　20:7;26:23;39:25;
　58:14
**percent (8)**
　18:23,24;19:3;
　45:21;46:1,3,13;50:4
**period (1)**
　51:3
**permit (1)**
　58:20
**permitted (1)**
　60:20
**perspective (1)**
　34:19
**petition (2)**
　12:22;16:16
**phantom (1)**
　14:6
**phone (1)**
　33:18
**physically (1)**
　19:18
**picked (1)**
　28:11
**PICKERING (1)**
　4:11
**picture (1)**
　26:16
**pieces (1)**
　30:20
**placate (1)**
　17:5
**place (2)**
　54:8;66:17
**placeholder (1)**
　66:11
**player (1)**
　17:13
**Plaza (1)**
　60:6
**pleading (1)**
　66:5
**pleadings (1)**
　14:1
**please (2)**
　9:5,6
**plenty (1)**
　44:21
**plural (1)**
　54:25
**plus (2)**
　12:5;44:9
**pm (1)**
　68:25
**pocket (1)**
　65:11

**podium (1)**
　25:17
**point (25)**
　29:6,10,12;31:20,
　24;35:2;37:19;
　40:17;41:6;46:8,23;
　47:12,13;48:4,12,14;
　49:12;52:1;53:22;
　54:4;60:3,17;62:4,
　10;66:5
**pointed (2)**
　21:15;68:3
**points (2)**
　61:25;62:12
**policy (1)**
　28:9
**Pope (3)**
　42:17;45:12,13
**position (2)**
　68:1,5
**possession (1)**
　14:3
**possible (1)**
　40:21
**potentially (1)**
　61:21
**precedent (2)**
　21:14,15
**precisely (1)**
　8:18;15:13
**preclude (1)**
　22:8
**pre-existing (1)**
　28:9
**preliminary (1)**
　21:1
**present (2)**
　44:5;58:6
**presentations (1)**
　7:20
**presented (5)**
　23:21;24:3;35:24;
　36:3;37:5
**presenting (1)**
　38:1
**preserving (1)**
　38:21
**pretty (4)**
　30:8;49:15;62:21;
　68:21
**prices (1)**
　16:10
**primary (1)**
　12:4
**principles (1)**
　41:20
**prior (3)**
　8:2;16:11;29:19
**priority (1)**
　39:9
**privately (1)**
　8:14
**pro (1)**

　6:15
**probably (1)**
　49:17
**problem (2)**
　32:10;66:18
**procedures (1)**
　63:20
**proceed (1)**
　40:6
**proceeded (2)**
　33:3;40:8
**proceeding (4)**
　24:5;32:19;40:7;
　44:3
**proceedings (1)**
　68:25
**process (17)**
　8:19;16:8;29:7;
　30:2,8,12,13,16;
　31:6,11,12;34:13;
　40:18,20;44:4;
　48:21;68:18
**professional (2)**
　7:24;31:11
**professionals (3)**
　39:25;40:19;63:18
**program (1)**
　7:17
**prompt (1)**
　67:19
**promptly (2)**
　44:2;64:2
**proof (1)**
　41:23
**proper (3)**
　24:20;32:13;59:6
**properly (1)**
　67:5
**property (4)**
　57:11,17;60:21,25
**proposed (4)**
　6:19;36:3;37:5,10
**proposing (3)**
　40:11,14,14
**prove (2)**
　18:14;61:2
**provide (3)**
　10:17;38:17;61:3
**provided (7)**
　23:22;48:17,19,
　20;49:2;59:18,19
**providing (1)**
　17:14
**public (5)**
　8:11,11;10:16;
　19:20;64:22
**pull (1)**
　58:3
**pulling (1)**
　58:25
**purse (1)**
　8:25
**pursuant (1)**

　15:14
**pursue (1)**
　18:7
**put (9)**
　8:13;25:23;26:4,5;
　30:13;31:11,16;
　33:11;67:19
**puzzle (1)**
　13:4

---

## Q

**questionable (1)**
　12:21
**quickly (1)**
　68:12
**quite (2)**
　29:4;30:12
**quo (2)**
　32:23;67:19

---

## R

**RadioShack (4)**
　21:9,14;55:17,20
**raised (1)**
　50:8
**ran (1)**
　8:10
**rather (1)**
　55:14
**rationale (1)**
　56:10
**read (5)**
　24:15;26:7;47:8;
　52:17;67:2
**real (6)**
　21:18;22:15;60:8,
　11,13,21
**reality (1)**
　15:11
**realized (2)**
　16:17;31:2
**really (19)**
　8:24;24:22;25:7;
　29:15;43:7;46:16;
　47:6,11;50:12,14;
　51:22,25;52:21,23,
　25;54:15;59:12,12;
　62:19
**reason (2)**
　59:14;60:22
**reasons (1)**
　16:14
**receipt (1)**
　10:11
**receivable (1)**
　16:17
**receivables (7)**
　29:11;40:1,12,17,
　20,22;63:21
**received (1)**
　8:20

**recitation (1)**
25:21
**recognize (3)**
38:7;49:22;68:4
**recognized (2)**
41:22;54:13
**reconstruct (1)**
13:1
**record (3)**
8:18;52:14,18
**recorded (1)**
12:10
**records (7)**
13:18,23,25;
19:19;32:11;42:20,
23
**recounted (1)**
17:2
**recover (3)**
30:25;40:19;55:18
**recovering (1)**
31:1
**recovery (1)**
38:17
**rectify (1)**
15:15
**recurring (1)**
17:13
**red (2)**
21:16;49:3
**references (1)**
8:6
**referring (1)**
18:6
**refinance (2)**
29:7,8
**regard (1)**
12:2
**regarding (4)**
21:10;55:6;56:3;
68:2
**reiterate (1)**
62:2
**reject (1)**
9:23
**related (1)**
8:19
**relationship (1)**
31:8
**relevant (3)**
17:20,21;59:12
**reliance (1)**
17:12
**relied (5)**
10:14;16:2,8,11;
18:13
**relief (3)**
34:25;39:20;67:18
**rely (1)**
11:24
**remain (2)**
16:1;64:12
**remainder (2)**

**remained (1)**
55:7
**remember (3)**
37:7,9;44:2
**remembering (1)**
37:6
**removed (1)**
44:5
**reply (1)**
62:25
**report (6)**
7:14,15,18,19;9:9;
14:11
**represented (1)**
16:12
**representing (1)**
34:11
**represents (1)**
54:8
**require (1)**
34:13
**required (2)**
10:9;51:6
**reserve (7)**
13:16;21:10;31:4;
33:2;39:8;56:15,24
**resident (2)**
33:17,17
**resolution (1)**
36:8
**Resource (4)**
2:6;4:3,12;6:20
**respect (13)**
30:7;32:23,24;
33:5;42:4;47:11;
50:7;54:16;55:23;
56:14,16;63:14,15
**respectfully (1)**
23:11
**respond (2)**
66:10;67:5
**responded (1)**
66:6
**response (1)**
66:13
**responsibility (1)**
18:12
**responsible (1)**
61:20
**rest (2)**
6:7;51:19
**rests (2)**
41:23;62:3
**result (3)**
15:16;18:14;56:16
**retain (1)**
20:16
**retainer (1)**
33:24
**retention (3)**
27:10;39:23;63:18
**return (1)**

47:22
**returning (1)**
31:4
**returns (1)**
13:13
**revenue (1)**
12:23
**reverse (1)**
17:21
**review (1)**
41:5
**right (40)**
6:5,6;7:2;11:19;
17:7,8,8;20:11;
21:10,24;25:10;
26:13;28:15;33:20;
34:9,10;35:8;36:1;
37:17;38:13;40:16,
24;45:6,10;48:13;
51:24;53:2,2,6,16;
55:8,10,15;62:25;
65:19;66:2,4,24;
67:1;68:24
**rights (4)**
38:22;39:8;56:24;
57:7
**Riiska (4)**
29:14;30:1,2;31:5
**ripe (4)**
22:12,13,14;49:19
**rise (1)**
66:21
**Robert (5)**
8:9;12:1;20:19;
29:14;47:13
**Ron (1)**
6:14
**RONALD (2)**
4:8;25:3
**ruination (1)**
49:25
**ruled (1)**
21:14
**ruling (3)**
55:17,20;56:3
**rumor (1)**
46:17
**run (8)**
13:6;30:2;31:6,11,
11;34:13,18;48:22
**running (2)**
31:19,20

**S**

**sale (4)**
40:12,16;63:18,19
**sales (2)**
10:16;40:15
**same (23)**
10:2,14,15,18;
11:25;18:2,9,10;
19:15,25;23:6;26:14,

15;27:16;39:10;
41:24;42:22,23;
50:10;56:20;61:4;
63:7;64:6
**Santander (1)**
10:5
**sat (1)**
33:12
**savings (1)**
34:18
**saying (3)**
39:16;49:12;61:3
**SCALI (3)**
4:2;6:15;25:3
**scenario (1)**
57:9
**scenes (1)**
54:19
**scheduled (1)**
63:14
**scheduling (2)**
63:25;66:7
**scheme (1)**
14:10
**scrutiny (1)**
63:6
**searched (1)**
34:15
**SEC (9)**
7:19;14:1,16;
19:14;23:20,24;
31:16;34:10;39:25
**second (7)**
14:14;19:18;
23:21;39:23;60:10,
21;61:10
**second-day (1)**
63:17
**Section (2)**
15:15;46:25
**secure (1)**
16:9
**secured (4)**
16:7;20:21;21:10;
57:10
**SECURITIES (1)**
5:10
**seeing (1)**
65:13
**seeking (4)**
36:10,14;37:4;
39:20
**seem (1)**
65:2
**seems (6)**
9:3;22:15;48:14;
62:22;64:1,16
**SEIDEL (11)**
5:7;6:23,23;66:15,
15,16,17,18,21;67:1,
3
**select (2)**
22:4;25:14

15;27:16;39:10;
**selection (1)**
63:2
**send (1)**
68:14
**sense (4)**
13:4;14:4;17:17;
54:22
**sensing (1)**
58:11
**separate (13)**
24:5;26:17;42:20,
20,21,21,25;45:14,14;
50:14;61:14,15,15;
63:24
**separated (1)**
45:6
**series (1)**
37:9
**serve (2)**
17:18;22:25
**served (1)**
18:15
**service (3)**
8:15;10:17;13:8
**Services (7)**
2:6;4:3,12;6:20;
10:2,8;61:5
**set (7)**
23:23;35:1;36:8;
40:12,17,20;61:16
**setting (1)**
63:20
**settled (1)**
68:5
**seven (1)**
27:18
**several (2)**
56:20;62:10
**shaking (1)**
44:16
**shall (2)**
22:22;41:19
**Shannon (2)**
55:22;56:21
**SHAPIRO (2)**
5:2;6:24
**share (1)**
19:25
**shared (6)**
10:1,1,2,2;19:24;
61:21
**shares (1)**
47:19
**short (2)**
11:11;67:20
**shortfall (2)**
12:22;28:25
**show (1)**
18:15
**showing (1)**
58:15
**shuffle (1)**
68:20

**sic (1)**
9:21
**sides (1)**
50:8
**significant (1)**
56:23
**simple (1)**
58:6
**simply (1)**
63:3
**single (7)**
21:7,19;22:6,9,18;
56:14,17
**sit (4)**
9:5,6;33:14;51:10
**sitting (1)**
58:13
**situation (1)**
22:7
**six (10)**
13:25;14:2;18:20;
21:5;40:17;53:15;
64:2,12,14;68:8
**skip (2)**
42:4,6
**slight (1)**
42:2
**slippery (1)**
49:16
**slope (1)**
49:16
**small (3)**
46:12,12,12
**smallest (1)**
46:10
**software (4)**
8:17,24;9:18,21
**solely (1)**
41:24
**somebody (5)**
8:2;14:6;29:1,7;
44:16
**somebody's (1)**
21:25
**sometimes (2)**
59:6;68:19
**soon (1)**
40:21
**sorry (10)**
8:5;14:21;29:2;
34:5;44:19;47:5,16;
50:21;62:11;66:17
**sort (6)**
31:4,20;43:19;
48:22;49:4;54:3
**sought (7)**
15:7,14;20:23,25;
36:24;49:1,2
**sources (1)**
13:25
**Southern (1)**
61:7
**space (1)**

9:25
**speak (3)**
20:3;23:16;24:10
**SPEAKER (4)**
27:18;44:18;
50:20;65:9
**speaking (1)**
37:12
**Special (3)**
4:12;6:19;39:24
**specific (2)**
15:19;59:14
**speculation (1)**
18:6
**spread (1)**
54:4
**staff (1)**
9:19
**staffing (1)**
8:14
**stage (1)**
23:3
**standard (2)**
41:18;49:7
**stands (1)**
53:21
**start (4)**
7:6,7;26:13;62:18
**started (2)**
30:15;40:18
**State (8)**
4:13;8:14;21:8;
23:3;24:4;57:13,19;
60:11
**stated (1)**
24:19
**States (7)**
2:7;5:10,17,18;
7:20;8:1;15:1
**statistics (2)**
45:18;46:15
**Status (5)**
2:2;7:14;32:22;
57:10;67:19
**stay (6)**
7:8,10;40:6;53:18;
54:2;65:23
**staying (1)**
15:17
**step (1)**
28:20
**still (9)**
16:22,24;19:25;
20:7;23:6;26:21;
44:3;45:14;65:5
**stip (1)**
67:22
**stool (1)**
8:5
**story (1)**
29:18
**straight (1)**
15:19

**stray (1)**
26:22
**Street (9)**
2:22;4:4,13;5:19;
17:4,6,7;32:3;55:14
**strike (1)**
39:7
**strings (1)**
8:25
**strong (1)**
24:20
**strongly (1)**
33:4
**structure (1)**
27:2
**stuff (2)**
39:22;49:1
**subject (2)**
65:13,13
**submit (1)**
67:22
**submitted (1)**
36:22
**subsequently (1)**
44:4
**subsidiary (2)**
42:18,19
**substantial (4)**
30:25;41:21;
54:17;59:22
**substantive (3)**
38:3;65:21;66:13
**substantively (4)**
21:18;64:9;66:6,
10
**subtext (1)**
22:15
**successful (1)**
30:9
**sufficient (1)**
17:24
**suggest (1)**
48:15
**Suite (1)**
2:22
**supervision (1)**
17:10
**support (4)**
16:3;23:17;24:10;
42:8
**supporting (1)**
60:22
**supports (2)**
24:17;47:24
**supposed (3)**
8:22;29:5;51:12
**supposedly (1)**
32:11
**Sure (17)**
6:9;19:9;27:1;
29:20,25;32:20;
34:22;35:4;54:3;
58:18,24;59:2,5,7;

61:6;65:7;67:16
**surprise (1)**
67:6
**surprised (1)**
29:4
**surrounding (1)**
21:3
**susceptible (1)**
9:15
**suspect (1)**
40:4
**sustain (1)**
61:24
**switch (2)**
35:15,21
**system (2)**
8:18;10:4
**systems (2)**
8:25;9:18

**T**

**tactic (3)**
33:7,9;41:10
**tail (1)**
7:7
**talk (6)**
27:20;41:2;49:14;
54:9;63:9,9
**talked (6)**
45:19;48:22;
53:20;54:13;55:16,
17
**talking (4)**
21:1;33:2;35:18;
45:13
**talks (1)**
25:7
**tax (2)**
13:12;61:20
**taxes (6)**
8:21;9:1;13:11;
18:4,14,16;61:19
**taxing (1)**
12:4
**teeth (2)**
58:3,25
**telling (5)**
36:19;38:2;39:13;
55:9;56:19
**ten (1)**
30:23
**tend (2)**
55:25;68:19
**tens (3)**
12:20;14:3,7
**terminated (1)**
13:8
**terms (12)**
24:6;33:24;35:15,
23;36:15,19,21;37:4;
38:3;49:6;56:22;
64:25

**testified (1)**
29:2
**testify (5)**
25:17,19,24;
33:12;52:9
**testimony (5)**
9:4;20:23;33:12;
46:18,19
**that'll (1)**
67:15
**theory (1)**
47:18
**thereafter (1)**
11:3
**there'd (1)**
38:12
**therefore (5)**
24:21;47:21;
49:16;50:13;60:9
**there'll (1)**
21:19
**third (5)**
8:5;18:22;20:17;
30:4,12
**thirty (8)**
18:20,25;19:4;
43:21;44:9,11,13;
45:22
**thirty-something (1)**
30:20
**thorough (1)**
15:9
**though (1)**
15:22
**thought (2)**
43:2,4
**thousands (3)**
14:3,8;16:9
**three (11)**
8:7,8;9:20;13:10,
15;18:21;27:13;
28:2;55:7,11;64:6
**three-member (1)**
30:14
**thwarting (1)**
48:15
**tied (1)**
46:21
**times (3)**
11:3;17:2;62:10
**tiny (1)**
9:20
**today (12)**
13:13,17;19:16;
25:11,15;26:1;
27:15;47:12;52:13;
53:12;68:4,14
**today's (1)**
52:24
**together (2)**
15:13;26:16
**TOGUT (75)**
6:4,5,6,9,11,13;

7:2,3,6,8,9,10,11,13;
9:8,10,11,12,13;
11:1,5,9,13,15,18,21,
23;12:16,18;13:24;
14:14;15:3,23,24;
16:1,21,23;17:2,5,8;
19:6,8,10,12,14,23;
20:1,5,7,10,12,14,25;
21:21,24;22:11,14,
17,23;23:5,8,10,14,
15;42:12;64:16;
65:20;66:2,5,13,22;
67:11,21;68:17,23

**Togut's (1)**
65:10

**told (4)**
29:19;36:2;38:11,
11

**took (5)**
13:2,2;39:10,12,14

**top (4)**
18:20,24;19:4;
45:22

**totality (1)**
24:2

**toward (1)**
58:9

**trace (1)**
11:12

**track (1)**
8:21

**trail (2)**
11:6,9

**transactions (1)**
13:2

**Transcribed (1)**
2:20

**transcript (1)**
55:22

**Transfer (19)**
2:5;15:18;17:24;
18:16,17;19:17;
23:13,17;24:18;
33:7;41:16,24;45:3;
46:6;49:9;53:1;
62:15,24;63:1

**transferred (5)**
10:10;11:4;61:8;
62:20;64:1

**transferring (3)**
24:22;42:8;49:14

**transparent (1)**
9:14

**traveling (1)**
32:11

**Tri- (2)**
8:13;23:2

**trial (2)**
59:10,13

**Tri-State (20)**
8:6,15;9:1;10:1,
12,19;11:15,15,20,
24;12:1,13,19,21;

13:3,19;16:5;32:2;
53:13,14

**Tri-State-controlled (1)**
10:10

**Tri-State's (1)**
13:22

**trouble (1)**
37:6

**true (6)**
17:21;19:16;25:7;
36:4,6;62:5

**trump (1)**
21:12

**trust (1)**
21:23

**trustee (53)**
7:18,20,25;8:1;
12:20,25;13:7,9,12,
22;15:1,14;16:15;
18:14;20:6;21:19;
22:2,3,6,7,9,9,17;
23:21;24:17;25:12,
13,14;33:8;36:23;
37:22;38:12;40:3;
47:17;48:14;53:11,
12,13;61:2;62:3,17;
64:4,6;66:24;67:4,8,
10,13,14,15;68:2,5,
10

**Trustee's (19)**
2:4;7:14,22;9:8,
11;12:24;13:5;
14:10,11;15:5;
17:15;18:5;19:15;
20:24;23:23;25:7;
32:24;38:6;67:9

**try (2)**
33:6;39:3

**trying (9)**
14:4,5;29:7;37:7,
9;58:17,24;59:2;
68:18

**TS (6)**
6:2;11:17;27:3;
28:22,23;44:10

**TSE (76)**
8:5,6,12,15;9:17,
21,23;10:11,17;11:4,
8,12,23;12:5,8,10,
25;13:5;15:21;16:1,
2,3,5,8,8,11,14,15,
19;17:3,9,10,11,23;
18:4;19:25;21:4;
27:6,7,14,25;28:4;
29:3,9;30:10;32:2;
34:2,8,11;38:6;
43:22;44:1,11,12;
47:25;48:14,18;
49:21,23,24;50:7,12,
13,17,18,21;51:1,6;
53:11,12,13;54:18,
21;55:12;61:2,21;
67:8

**TSE's (1)**
49:11

**tune (1)**
18:8

**turn (2)**
6:3,4

**turnover (1)**
57:9

**twenty-four (1)**
10:11

**twins (1)**
46:21

**two (11)**
7:13;15:13;17:18;
22:18;34:3,7;38:4;
41:20;43:9;64:4,17

**Typical (1)**
39:22

---

## U

**ultimately (3)**
30:25;57:13,19

**Um-hum (1)**
35:7

**undelivered (1)**
14:3

**under (7)**
38:21,22;39:17;
57:8,9;61:14;64:11

**undisputed (1)**
22:24

**UNIDENTIFIED (4)**
27:18;44:18;
50:20;65:9

**United (7)**
2:7;5:10,17,18;
7:20;8:1;15:1

**unsecured (4)**
18:23,24;19:4;
45:22

**up (20)**
7:11;17:4,6;22:2,
3;23:10,18;24:11;
28:11;32:3;40:12,
20;41:6;49:14,15,18;
54:21;60:7;63:20;
67:15

**update (1)**
7:22

**upon (4)**
16:2,8,11;22:24

**USC (1)**
15:15

**use (9)**
16:5;17:15;35:5;
36:15,25;37:4;
64:24;65:14,18

**used (2)**
10:22;65:16

**usually (1)**
67:14

**utilities (2)**

39:23;63:18

---

## V

**vacate (1)**
39:1

**vacated (4)**
35:9;36:18,20;
39:12

**value (4)**
38:23,24;39:10;
40:22

**Venue (42)**
2:5;7:17;14:12;
15:3,14,18;19:17;
21:17;22:20;23:17;
25:8,9;33:7,25;
40:23;41:2,7,10,16,
24;42:9;49:9,14;
52:24;53:1,5,19;
60:4,22;61:2,8;62:8,
15,18,24;63:1,2;
65:22;67:5;68:4,4,7

**venue's (2)**
41:8,9

**versus (1)**
60:2

**vice (1)**
6:16

**victims (1)**
12:4

**Victor (6)**
27:11;31:6,8,8,14,
19

**view (3)**
9:11,15;10:23

**Vineyard (3)**
42:17;45:13,13

**virtually (2)**
34:4,8

**virtue (1)**
21:3

**voluntary (1)**
60:2

---

## W

**W-2s (3)**
14:3,5,8

**waiting (2)**
33:4,5

**Walrath (13)**
35:21;36:10,14;
37:3,12;39:1;54:16,
20;63:12,13;64:19;
66:1;68:15

**wants (1)**
23:16

**warrant (1)**
24:5

**watch (1)**
65:10

**wax (3)**

22:18;42:5;46:20

**way (7)**
8:13;13:3;20:15;
22:10;29:13;42:2;
67:19

**ways (1)**
61:4

**week (1)**
31:14

**weekend (1)**
38:9

**weight (1)**
41:21

**well-respected (1)**
31:10

**Wells (28)**
4:20;6:22;10:4,7;
13:6,13;16:7,17;
17:9;29:10,12,18;
30:5,5,10,17;31:3,3;
32:23;33:2;34:1;
37:10;55:18;56:15,
23,25;57:7,22

**Wells' (2)**
29:22,25

**Wells-controlled (1)**
10:6

**West (1)**
2:22

**what's (11)**
13:17;27:15,17;
32:18;34:20;40:25;
45:16;56:25;57:11;
62:6;63:12

**Whereupon (1)**
68:25

**wherever (2)**
13:2;32:2

**whole (2)**
22:14;48:21

**who's (2)**
31:15,20

**whose (2)**
61:2,19

**WILMER (1)**
4:11

**WilmerHale (1)**
6:19

**Wilmington (1)**
4:6

**wind (1)**
16:13

**wind- (1)**
30:1

**wind-down (4)**
29:14;30:7,8;44:4

**wish (1)**
24:10;58:20

**withholding (2)**
18:4;61:19

**within (4)**
10:11;46:25;48:6;
63:10

**without (7)**
10:15;12:2;16:13,
16;36:19;38:2;39:13
**witness (3)**
25:23;26:9;52:9
**witnesses (2)**
20:18;26:1
**wore (1)**
12:1
**work (3)**
14:8;26:14;67:21
**working (3)**
7:23;20:8;30:6
**Workmen's (1)**
12:12
**works (1)**
27:8
**World (1)**
5:11
**wound (1)**
44:5
**written (1)**
63:8
**wrong (3)**
28:14;66:16,17

## Y

**year (2)**
12:7,15
**years (2)**
7:25;41:10
**Yep (5)**
6:4;19:6,10,12,14
**York (27)**
2:23;4:22;5:5,12,
21;10:1;18:16,17,21;
20:16,17;21:16;
23:20;24:7,19,23;
27:3;33:22,23;34:7;
46:4,9;55:14;57:4,6,
21;63:4
**York-based (2)**
16:7;20:14
**Yorkers (3)**
18:25;19:5;45:23
**York-only (1)**
54:6

## Z

**zero (1)**
16:18

## 0

**02109 (1)**
4:14

## 1

**10007 (1)**
5:21

**10019 (1)**
5:5
**10040 (1)**
2:23
**1012b (1)**
46:25
**10169 (1)**
4:22
**10281 (1)**
5:12
**10th (1)**
4:5
**11 (15)**
2:4,5;13:11;15:17;
22:2;25:12,14;27:3;
28:4;33:8;40:3;64:4,
6,13;67:10
**127 (1)**
2:4
**132 (1)**
2:4
**135 (1)**
2:4
**138 (1)**
2:4
**139 (2)**
46:4,4
**13th (1)**
32:1
**1408 (1)**
41:12
**141 (1)**
2:4
**1412 (2)**
15:15;41:15
**15-10243 (1)**
6:2
**160 (7)**
19:19;31:25;32:3,
12;33:14;43:25;45:8
**1633 (1)**
5:4
**192nd (1)**
2:22
**19801 (1)**
4:6
**1983 (1)**
61:7

## 2

**2013 (2)**
12:7,8
**2014 (3)**
12:10,16;31:18
**2015 (1)**
51:17
**20th (3)**
35:2;41:1;63:14
**230 (1)**
4:21
**250 (2)**
44:18,19

**27th (1)**
51:17
**28 (1)**
15:15

## 3

**3 (2)**
5:11;59:9
**3:32 (1)**
68:25
**300 (1)**
18:8
**363 (3)**
40:15,16;57:9
**3rd (1)**
5:20

## 4

**4 (1)**
59:9
**4,498 (1)**
49:21
**400 (1)**
13:12

## 5

**5 (1)**
59:9
**500 (2)**
45:17;46:3
**506 (1)**
57:10
**507b (4)**
38:21,22;39:9,18
**542 (1)**
57:9

## 6

**60 (1)**
4:13

## 7

**7 (2)**
22:22;64:11
**700 (1)**
2:22

## 8

**86 (1)**
5:19

## 9

**913 (1)**
4:4
**94.46 (2)**
19:3;45:21

**973406-2250 (1)**
2:24

EXHIBIT 3

8-K 1 t1500294_8k.htm FORM 8-K

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

_____

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

February 5, 2015
Date of Report
(Date of earliest event reported)

**Corporate Resource Services, Inc.**
(Exact name of registrant as specified in its charter)

| Delaware | 1-36060 | 80-0551965 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

160 Broadway 13th Floor, New York, NY 10038
(Address of principal executive offices and zip code)

(646) 443-2380
(Registrant's telephone number, including area code)

Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Exhibit 3 - 001

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On February 5, 2015, Messrs. Thomas Clarke, Sylvan Holzer and Larry Melby, the members of the Audit Committee of the Board of Directors of Corporate Resource Services, Inc. (the "Company"), each submitted his resignation as a member of the Board of Directors and Audit Committee of the Company effective on such date.

Each of the resignation letters indicated that the former director first learned of the previously reported unpaid federal payroll tax liability of TS Employment, Inc. ("TSE") and related problems on January 29, 2015. The letters indicated that the Audit Committee immediately commenced work to understand the applicable facts and circumstances and to take all appropriate action, including, commencing an independent investigation as to all pertinent matters. The Audit Committee immediately notified management of its intentions and engaged independent counsel to conduct an investigation under the Audit Committee's direction.

The letter reported that on February 5, 2014 Wells Fargo, which has sole control of the Company's financing, notified the Audit Committee that it refuses to provide any funding for the Audit Committee's investigation or to allow any Company funds at all to be used for an investigation. The letter also reported that management of the Company advised the Audit Committee that there is no other funding available for such investigation.

The three members of the Audit Committee indicated that based on their inability to obtain funding to conduct the necessary investigation and other concerns about the situation, including the related party relationships between the Company and TSE, they were resigning from the Board of Directors and its committees.

The Company provided Messrs. Clarke, Holzer and Melby with a copies of the disclosure set forth in this Item 5.02 and has requested that each of them furnish the Company with a letter addressed to the SEC stating whether or not they agree with the statements made herein, each as required by applicable SEC rules.

The resignation letters of Messrs. Clarke, Holzer and Melby are provided as Exhibits to this Current Report on Form 8-K.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS**

(d)    Exhibits

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Resignation letter dated February 5, 2015 received from Thomas J. Clarke, Jr. |
| 99.2 | Resignation letter dated February 5, 2015 received from Sylvan Holzer. |
| 99.3 | Resignation letter dated February 5, 2015 received from Larry Melby. |

Exhibit 3 - 002

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Corporate Resource Services, Inc.**

Date: February 10, 2015

By /s/ John P. Messina, Sr.

Name: John P. Messina, Sr.

Title: Chief Executive Officer

EX-99.1 2 t1500294_ex99-1.htm EXHIBIT 99.1

Exhibit 99.1

**Resignation Letter**

February 5, 2015

Gina L. Russo, Esq.
Secretary
Corporate Resource Services, Inc.
160 Broadway, 13th Floor
New York, New York 10038

Re:    Corporate Resource Services, Inc.

Dear Ms. Russo:

As you know, two days ago the management of Corporate Resource Services publicly disclosed on a Form 8-K that:

- TS Employment, Inc. ("TSE") has a material unpaid federal payroll tax liability.
- On January 28, 2015, Wells Fargo informed the Company that, based on concerns regarding this material payroll tax liability and its potential adverse effects on TSE and the Company as well as the Company's previously reported compliance failures, Wells Fargo would need to reconsider funding the Company's operations through the Account Purchase Agreement.
- The Audit Committee has retained counsel to conduct an independent investigation of certain of the matters described above.

The members of the Audit Committee, including myself, first learned of the unpaid federal payroll tax liability and related problems on January 29, 2015. The Audit Committee collectively and immediately commenced work to understand the applicable facts and circumstances and to take all appropriate action. As noted, that action included commencing an independent investigation as to all pertinent matters. The Audit Committee immediately notified management of its intentions and engaged Hughes Hubbard & Reed LLP as its counsel to conduct that investigation under the Audit Committee's direction.

Notwithstanding the Audit Committee's immediate mobilization, only today we were advised by Wells Fargo, which has sole control of the Company's financing, that it expressly and unequivocally refuses to provide any funding for the Audit Committee's investigation or to allow any Company funds at all to be used for an investigation. Further, management has advised the Audit Committee that there is no other funding whatsoever available for such investigation. This leaves the Audit Committee paralyzed from taking action, in direct contravention of the well establish legal and policy imperatives applicable to it, including under The Dodd Frank Act, its fiduciary duties to stockholders, and other standards that demand audit committees be assured access to proper advisors and financing to execute their responsibilities.

Exhibit 3 - 004

The foregoing concerns are exacerbated not only by the apparent malfeasance that requires immediate remediation for the benefit of our stockholders, but also by the obvious related party relationships between TSE and the Company. We believe the circumstances clearly call for complete independence in immediate investigations. We are additionally concerned that the Company's inexplicable delay in issuing and enforcing a document hold may jeopardize any investigation and invoke the possibility of criminal liability if relevant documents are destroyed.

Nonetheless, all of the members of the Audit Committee have been effectively obstructed by the positions of the Company and Wells Fargo. Accordingly and regrettably, I hereby resign my position as a member of the Board of Directors and all committees thereof of Corporate Resource Services effective immediately. I note that this action is only taken after the members of the Audit Committee have exhausted our efforts to overcome the obstacles to conducting an independent investigation and executing our duties to the Company's stockholders.

*[Signature page follows]*

2

Signature page to Resignation Letter dated February 5, 2015.

/s/ Thomas J. Clarke, Jr
Thomas J. Clarke, Jr

3

Exhibit 3 - 006

EXHIBIT 4

## 2015 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F06000002502

**Entity Name:** CARUSSO STAFFING CORP.

**Current Principal Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**FEI Number: 20-0347493**

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

**FILED**
**Jan 26, 2015**
**Secretary of State**
**CC3743781553**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

|                                          |      |
|------------------------------------------|------|
| Electronic Signature of Registered Agent | Date |

**Officer/Director Detail :**

| Title | P |  | Title | V |
|-------|---|--|-------|---|
| Name | CASSERA, ROBERT | | Name | MESSINA, JOHN P |
| Address | 160 BROADWAY | | Address | 160 BROADWAY |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

| Title | S |
|-------|---|
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY |
| City-State-Zip: | NEW YORK NY 10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

| SIGNATURE: ROBERT CASSERA | PRESIDENT | 01/26/2015 |
|---------------------------|-----------|------------|
| Electronic Signature of Signing Officer/Director Detail | | Date |

Exhibit 4-001

Exhibit 4-002

## 2009 FOR PROFIT CORPORATION ANNUAL REPORT

### DOCUMENT# F06000003270

**Entity Name:** TRI-STATE ENTERTAINMENT PRODUCTION PEO, INC.

**FILED**
**Jun 29, 2009**
**Secretary of State**

**Current Principal Place of Business:**

160 BROADWAY
NEW YORK, NY 10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY
NEW YORK, NY 10038

**New Mailing Address:**

**FEI Number: 20-4659322**     **FEI Number Applied For ( )**     **FEI Number Not Applicable ( )**     **Certificate of Status Desired ( )**

**Name and Address of Current Registered Agent:**

TRI-STATE EMPLOYMENT SERVICES, INC.
300 WEST ADAMS STREET
SUITE 450
JACKSONVILLE, FL 32202 US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                          Date

**In accordance with s. 607.193(2)(b), F.S., the corporation did not receive the prior notice.**
**Election Campaign Financing Trust Fund Contribution ( ).**

**OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title: | PD          ( ) Delete |
| Name: | CASSERA, ROBERT |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY 10038 |

| | |
|---|---|
| Title: | SGM        ( ) Delete |
| Name: | TRIPPEDDI, YOLANDA |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY 10038 |

| | |
|---|---|
| Title: | MD          ( ) Delete |
| Name: | FOLEY, JAMES |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY 10038 |

| | |
|---|---|
| Title: | MD          ( ) Delete |
| Name: | MESSINA, JOHN |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY 10038 |

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title: | ( ) Change ( ) Addition |
| Name: | |
| Address: | |
| City-St-Zip: | |

| | |
|---|---|
| Title: | ( ) Change ( ) Addition |
| Name: | |
| Address: | |
| City-St-Zip: | |

| | |
|---|---|
| Title: | ( ) Change ( ) Addition |
| Name: | |
| Address: | |
| City-St-Zip: | |

| | |
|---|---|
| Title: | ( ) Change ( ) Addition |
| Name: | |
| Address: | |
| City-St-Zip: | |

I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  ROBERT CASSERA                          PRE                06/29/2009

Electronic Signature of Signing Officer or Director                          Date

Exhibit 4-003

Exhibit 4-004

## 2015 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F06000004973

**Entity Name:** TSE-PEO, INC.

**FILED**
**Jan 27, 2015**
**Secretary of State**
**CC4591112331**

**Current Principal  Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK,  NY  10038

**Current Mailing Address:**

160 BROADWAY
15TH FLOOR
NEW YORK,  NY  10038

**FEI Number: 74-3071640**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL  33324  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____    Date
Electronic Signature of Registered Agent

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | EVP |
| Name | CASSERA, ROBERT | | Name | JOHN, MESSINA |
| Address | 160 BROADWAY 15TH FLOOR | | Address | 160 BROADWAY 15TH FLOOR |
| City-State-Zip: | NEW YORK  NY  10038 | | City-State-Zip: | NEW YORK  NY  10038 |

| | |
|---|---|
| Title | S |
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY,  15TH FL |
| City-State-Zip: | NEW YORK  NY  10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                    PRESIDENT            01/27/2015
Electronic Signature of Signing Officer/Director Detail                          Date

Exhibit 4-005

Exhibit 4-006

OCT. 6. 006C 3:38PM ne  C C



NO. 608   P. 4 1

## Florida Department of State
### Division of Corporations
### Public Access System

### Electronic Filing Cover Sheet

Note: Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.

(((H06000246402 3)))

H06000246402SABCY

Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.

```
To:
    Division of Corporations
    Fax Number     : (850)205-0381

From:
    Account Name   : CORPORATION SERVICE COMPANY
    Account Number : I20000000195
    Phone          : (850)521-1000
    Fax Number     : (850)558-1575
```

## FOREIGN PROFIT/NONPROFIT CORPORATION

### JUSTIN & BROOKS, INC.

| Certificate of Status | 0 |
|---|---|
| Certified Copy | 0 |
| Page Count | 04 |
| Estimated Charge | $70.00 |

FILED 06 OCT -6 PM 12: 10

Electronic Filing Menu   :   Corporate Filing Menu                Help

https://efile.sunbiz.org/scripts/efilcovr.exe                    10/6/2006

Exhibit 4-007

OCT. 6. 2006  3:39PM    C S C                                    NO. 608    P. 2/4

R060002664n2

## APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA.*

1. Justin & Brooks, Inc.
   _____
   (Enter name of corporation; must include "INCORPORATED," "COMPANY," "CORPORATION," "Inc.," "Co.," "Corp," "Inc.," "Co." or "Corp.")


   _____
   (If name unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

2. NEW YORK                                    3. 13-3976162
   _____              _____
   (State or country under the law of which it is incorporated)      (FEI number, if applicable)

4. 11/18/97                                    5. Perpetual
   _____              _____
   (Date of incorporation)                  (Duration: Year corp. will cease to exist or "perpetual")

6. 1/1/2006
   _____
   (Date first transacted business in Florida, if prior to registration)
   (SEE SECTIONS 607.1501 & 607.1502, F.S., to determine penalty liability)

7. 160 Broadway  New York, NY 10038
   _____
   (Principal office address)

   160 Broadway  New York, NY 10038
   _____
   (Current mailing address)

8. Tracking Company
   _____
   (Purpose(s) of corporation authorized in home state or country to be carried out in state of Florida)

9. Name and street address of Florida registered agent: (P.O. Box NOT acceptable)

   Name:      Corporation Service Company

   Office Address:   1201 Hays Street

   Tallahassee                    , Florida  32301
   _____        _____
   (City)                    (Zip code)

10. Registered agent's acceptance:
*Having been named as registered agent and to accept service of process for the above stated corporation at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

   Corporation Service Company                    **Denise Mick**
   By:  _Denise Mick_                              **as its agent**
   _____
   (Registered agent's signature)

11. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the law of which it is incorporated.

12. Names and business addresses of officers and/or directors:

                                        R06000246402

Exhibit 4-008

OCT. 6. 2006 3:39PM    C S C                                    NO. 608    P. 3/4

**A. DIRECTORS**                                    06000246402 3

Chairman: _____

Address: _____

_____

Vice Chairman: _____

Address: _____

_____

Director: _____

Address: _____

_____

Director: _____

Address: _____

_____

**B. OFFICERS**

President: Robert Cassera

Address: 160 Broadway

New York, NY 10038

Vice President: _____

Address: _____

_____

Secretary: _____

Address: _____

Treasurer: _____

Address: _____

NOTE: If necessary, you may attach an addendum to the application listing additional officers and/or directors.

13. _____ ✗ _____
    (Signature of Director or Officer listed in number 12 of the application)

14. Robert Cassera    President
    (Typed or printed name and capacity of person signing application)

06000246402 3

Exhibit 4-009

OCT. 6 2006 3:39PM    C S C                                    NO. 608    P. 4/4

№06000246402 3

## State of New York
## Department of State } ss:

I hereby certify, that the Certificate of Incorporation of JUSTIN &
BROOKS, INC. was filed on 11/18/1997, with perpetual duration, and that a
diligent examination has been made of the Corporate index for documents
filed with this Department for a certificate, order, or record of a
dissolution, and upon such examination, no such certificate, order or
record has been found, and that so far as indicated by the records of
this Department, such corporation is an existing corporation.
***

*WITNESS my hand and the official seal
of the Department of State at the City of
Albany, this 05th day of October two
thousand and six.*

*Special Deputy Secretary of State*

*200610060326 63*

FILED
06 OCT -6 PM 12:11

№06000246402 3

Exhibit 4-010

## 2014 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F07000002202

**Entity Name:** TRI-STATE CRM, INC.

**Current Principal Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**FEI Number:** 20-4002911

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

**FILED
Jan 10, 2014
Secretary of State
CC1758723611**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____    Date
Electronic Signature of Registered Agent

### Officer/Director Detail :

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | VP |
| Name | CASSERA, ROBERT | | Name | JOHN, MESSINA |
| Address | 160 BROADWAY, 15TH FLOOR | | Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

| | |
|---|---|
| Title | S |
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA             PRESIDENT             01/10/2014

Electronic Signature of Signing Officer/Director Detail             Date

Exhibit 4-011

Exhibit 4-012

# 2008 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED
Feb 14, 2008
Secretary of State**

DOCUMENT# F07000004027

**Entity Name:** TRI-STATE STAFFING, INC.

**Current Principal Place of Business:**

160 BROADWAY
NEW YORK, NY  10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY
NEW YORK, NY  10038

**New Mailing Address:**

**FEI Number:** 20-2206843    FEI Number Applied For ( )    FEI Number Not Applicable ( )    Certificate of Status Desired (X)

**Name and Address of Current Registered Agent:**

CORPORATION SERVICE COMPANY
1201 HAYS STREET
TALLAHASSEE, FL  32301    US

**Name and Address of New Registered Agent:**

TRI-STATE EMPLOYMENT SERVICES INC
300 WEST ADAMS STREET
SUITE 450
JACKSONVILLE, FL  32202  US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:  ROBERT CASSERA                                02/14/2008

      Electronic Signature of Registered Agent                    Date

**Election Campaign Financing Trust Fund Contribution ( ).**

**OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title: | CP         ( ) Delete |
| Name: | CASSERA, ROBERT |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY  10038 |

| | |
|---|---|
| Title: | VP         (X) Delete |
| Name: | MESSINA, JOHN |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY  10038 |

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title: | PRES       (X) Change ( ) Addition |
| Name: | CASSERA, ROBERT |
| Address: | 160 BROADWAY |
| City-St-Zip: | NEW YORK, NY  10038 |

| | |
|---|---|
| Title: | ( ) Change ( ) Addition |
| Name: | |
| Address: | |
| City-St-Zip: | |

I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Chapter 119, Florida Statutes.  I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  ROBERT CASSERA                    PRES          02/14/2008

      Electronic Signature of Signing Officer or Director          Date

Exhibit 4-013

Exhibit 4-014

## 2015  FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F08000004213

**Entity Name:** TRI-STATE SOLUTIONS, INC.

**Current Principal  Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK,  NY  10038

**Current Mailing Address:**

160 BROADWAY
15TH FLOOR
NEW YORK,  NY  10038

**FEI Number:** 75-3033600

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL  33324  US

**FILED**
**Jan 27, 2015**
**Secretary of State**
**CC5739518011**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____    Date

Electronic Signature of Registered Agent

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | V |
| Name | CASSERA, ROBERT | | Name | MESSINA, JOHN P |
| Address | 160 BROADWAY, 15TH FLOOR | | Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK  NY  10038 | | City-State-Zip: | NEW YORK  NY  10038 |

| | |
|---|---|
| Title | S |
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK  NY  10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                          PRESIDENT                    01/27/2015

Electronic Signature of Signing Officer/Director Detail                          Date

Exhibit 4-015

Exhibit 4-016



_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

[ ] PICK-UP      [ ] WAIT      [ ] MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only

300143658913

02/16/09--01021--012   **70.00



FILED
2009 FEB 16  A 11: 52
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

2-17-09
WC

Exhibit 4-017

# COVER LETTER

**TO:**  New Filing Section
Division of Corporations

**SUBJECT:**  TODAYS PEO INC.

(Name of corporation - must include suffix)

Dear Sir or Madam:

The enclosed "Application by Foreign Corporation for Authorization to Transact Business in Florida," "Certificate of Existence," and check are submitted to register the above referenced foreign corporation to transact business in Florida.

Please return all correspondence concerning this matter to the following:

Janice Null on behalf of Incorp Services, Inc.

(Name of Person)

Incorp Services, Inc.

(Firm/Company)

375 N. Stephanie St. Suite 1411

(Address)

Henderson, NV 89014-8909

(City/State and Zip code)

For further information concerning this matter, please call:

Janice Null/ Incorp Services, Inc.    at ( 702 ) 866-2500 ext. 2027

(Name of Person)           (Area Code & Daytime Telephone Number)

**STREET/COURIER ADDRESS:**
New Filing Section
Division of Corporations
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

**MAILING ADDRESS:**
New Filing Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

Enclosed is a check for the following amount:

☑ $70.00 Filing Fee  ☐ $78.75 Filing Fee & Certificate of Status  ☐ $78.75 Filing Fee & Certified Copy  ☐ $87.50 Filing Fee, Certificate of Status & Certified Copy

Exhibit 4-018

## APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT
## BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO
REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA.*

1. **TODAYS PEO INC.**

(Enter name of corporation; must include "INCORPORATED," "COMPANY," "CORPORATION,"
"Inc.," "Co.," "Corp," "Inc," "Co," or "Corp.")

(If name unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

2. **Nevada**    3. _20-203 1092_

(State or country under the law of which it is incorporated)    (FEI number, if applicable)

4. **12/16/2004**    5. **Perpetual**

(Date of incorporation)    (Duration: Year corp. will cease to exist or "perpetual")

6. **Upon filing by the Secretary of State**

(Date first transacted business in Florida, if prior to registration)
(SEE SECTIONS 607.1501 & 607.1502, F.S., to determine penalty liability)

7. **160 Broadway, 15th Floor, New York, NY 10038**

(Principal office address)

**160 Broadway, 15th Floor, New York, NY 10038**

(Current mailing address)

8. **Any legal purpose**

(Purpose(s) of corporation authorized in home state or country to be carried out in state of Florida)

9. Name and street address of Florida registered agent: (P.O. Box **NOT** acceptable)

Name:    **Incorp Services, Inc.**

Office Address:    **17888 67th Court North**

**Loxahatchee** , Florida **33470**

(City)    (Zip code)

10. **Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated corporation at the place
designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I
further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties,
and I am familiar with and accept the obligations of my position as registered agent.*

Janice Null on behalf of Incorp Services, Inc.

(Registered agent's signature)

11. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to
the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction
under the law of which it is incorporated.

Exhibit 4-019

FILED

2004 FEB 16  A 11: 52

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

12. Names and business addresses of officers and/or directors:

## A. DIRECTORS

Chairman: _____

Address: _____

_____

Vice Chairman: _____

Address: _____

_____

Director: _____

Address: _____

_____

Director: _____

Address: _____

_____

## B. OFFICERS

President: Robert Cassera _____

Address: 160 Broadway, 15th Floor _____

New York, NY 10038 _____

Vice President: _____

Address: _____

Secretary: Yolanda Trippiedi _____

Address: 160 Broadway, 15th Floor, New York, NY 10038 _____

Treasurer: _____

Address: _____

NOTE: If necessary, you may attach an addendum to the application listing additional officers and/or directors.

13. _____
(Signature of Director or Officer listed in number 12 of the application)

14. Robert Cassera, President
(Typed or printed name and capacity of person signing application)

Exhibit 4-020







# CERTIFICATE OF EXISTENCE
## WITH STATUS IN GOOD STANDING

I, ROSS MILLER, the duly elected and qualified Nevada Secretary of State, do hereby certify that I am, by the laws of said State, the custodian of the records relating to filings by corporations, non-profit corporations, corporation soles, limited-liability companies, limited partnerships, limited-liability partnerships and business trusts pursuant to Title 7 of the Nevada Revised Statutes which are either presently in a status of good standing or were in good standing for a time period subsequent of 1976 and am the proper officer to execute this certificate.

I further certify that the records of the Nevada Secretary of State, at the date of this certificate, evidence, **TODAYS PEO INC.**, as a corporation duly organized under the laws of Nevada and existing under and by virtue of the laws of the State of Nevada since December 16, 2004, and is in good standing in this state.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on February 10, 2009.

ROSS MILLER
Secretary of State

Electronic Certificate
Certificate Number: C20090210-2002
You may verify this electronic certificate
online at http://www.nvsos.gov/

Exhibit 4-021

Exhibit 4-022

# 2012 FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F09000002270

**Entity Name:** TSEFL, INC.

**FILED**
**Feb 07, 2012**
**Secretary of State**

**Current Principal Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY  10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY  10038

**New Mailing Address:**

**FEI Number:** 03-0444912       FEI Number Applied For ( )       FEI Number Not Applicable ( )       Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
515 E. PARK AVENUE
TALLAHASSEE, FL  32301      US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

        Electronic Signature of Registered Agent                         Date

## OFFICERS AND DIRECTORS:

| | |
|---|---|
| Title: | PRES |
| Name: | CASSERA, ROBERT |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY  10038 US |

| | |
|---|---|
| Title: | VP |
| Name: | MESSINA, JOHN P |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY  10038 US |

| | |
|---|---|
| Title: | SEC |
| Name: | TRIPPIEDI, YOLANDA |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY  10038 US |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:  ROBERT CASSERA                  PRES         02/07/2012
        Electronic Signature of Signing Officer or Director                   Date

Exhibit 4-023

Exhibit 4-024

# 2010 FOR PROFIT CORPORATION ANNUAL REPORT

FILED
Feb 17, 2010
Secretary of State

## DOCUMENT# F09000003057

**Entity Name:** TRI-OVERLOAD STAFFING INC.

**Current Principal Place of Business:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY  10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY  10038

**New Mailing Address:**

**FEI Number: 27-0581430**    FEI Number Applied For ( )    FEI Number Not Applicable ( )    **Certificate of Status Desired (X)**

**Name and Address of Current Registered Agent:**

INCORP SERVICES, INC.
17888 67TH COURT NORTH
LOXAHATCHEE, FL  33470    US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent    Date

**Election Campaign Financing Trust Fund Contribution ( ).**

## OFFICERS AND DIRECTORS:

| | |
|---|---|
| Title: | CP |
| Name: | CASSERA, ROBERT |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY  10038 |

| | |
|---|---|
| Title: | S |
| Name: | TRIPPIEDI, YOLANDA |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY  10038 |

| | |
|---|---|
| Title: | T |
| Name: | URSINO, MARIA |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY  10038 |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE: ROBERT CASSERA    PRES    02/17/2010

Electronic Signature of Signing Officer or Director    Date

Exhibit 4-025

Exhibit 4-026

## 2013 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F11000000172

**Entity Name:** D & D STAFFING OF NEW YORK, CORP.

**Current Principal Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**FEI Number: 20-0440250**

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
515 E. PARK AVENUE
TALLAHASSEE, FL 32301 US

**FILED**
**Jan 16, 2013**
**Secretary of State**
**CC6154758925**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                                        Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | V |
| Name | CASSERA, ROBERT | | Name | MESSINA, JOHN P |
| Address | 160 BROADWAY, 15TH FLOOR | | Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

| | |
|---|---|
| Title | S |
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE: ROBERT CASSERA                        PRESIDENT                        01/16/2013

Electronic Signature of Signing Officer/Director Detail                                              Date

Exhibit 4-027

Exhibit 4-028

## 2015  FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F11000000484

**Entity Name:** TRI-ODYSSEY PEO INC.

**Current Principal  Place of Business:**

160 BROADWAY 15TH FLOOR
NEW YORK,  NY  10038

**Current Mailing Address:**

160 BROADWAY 15TH FLOOR
NEW YORK,  NY  10038

**FEI Number: 26-4539988**

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL  33324  US

**FILED
Jan 08, 2015
Secretary of State
CC8825205013**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____

Electronic Signature of Registered Agent                                                                                      Date

### Officer/Director Detail :

| Title | PRESIDENT, DIRECTOR | | Title | SECRETARY |
|---|---|---|---|---|
| Name | CASSERA, ROBERT | | Name | TRIPPLEDI, YOLANDA |
| Address | 160 BROADWAY 15TH FLOOR | | Address | 160 BROADWAY 15TH FLOOR |
| City-State-Zip: | NEW YORK  NY  10038 | | City-State-Zip: | NEW YORK  NY  10038 |

| Title | TREASURER |
|---|---|
| Name | URSINO, MARIA |
| Address | 160 BROADWAY 15TH FLOOR |
| City-State-Zip: | NEW YORK  NY  10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                          PRESIDENT                    01/08/2015

Electronic Signature of Signing Officer/Director Detail                                                    Date

Exhibit 4-029

Exhibit 4-030

## 2015 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F11000004704

**Entity Name:** TS STAFFING SERVICES, INC.

**Current Principal Place of Business:**

160 BROADWAY
13TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY
13TH FLOOR
NEW YORK, NY 10038 US

**FEI Number: 45-3668647**

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

**FILED**
**Jan 08, 2015**
**Secretary of State**
**CC3926879588**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____        Date
          Electronic Signature of Registered Agent

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | SR. EXECUTIVE VICE PRESIDENT | | Title | DIRECTOR |
| Name | CASSERA, ROBERT | | Name | MESSINA, JOHN P |
| Address | 160 BROADWAY 13TH FLOOR | | Address | 160 BROADWAY 13TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |
| Title | SECRETARY | | Title | VP |
| Name | TRIPPIEDI, YOLANDA | | Name | CASSERA, JOE |
| Address | 160 BROADWAY, 11TH FLOOR | | Address | 160 BROADWAY 13TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |
| Title | TREASURER, CFO | | Title | PRESIDENT |
| Name | GOLDE, MIKE | | Name | LEVINE, MARK |
| Address | 160 BROADWAY 13TH FLOOR | | Address | 160 BROADWAY 13TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |
| Title | ASST. SECRETARY | | Title | CEO |
| Name | RUSSO, GINA L | | Name | MESSINA, JOHN P SR. |
| Address | 160 BROADWAY 13TH FLOOR | | Address | 160 BROADWAY 13TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: MARK LEVINE                                  PRESIDENT              01/08/2015

          Electronic Signature of Signing Officer/Director Detail                              Date

Exhibit 4-031

Exhibit 4-032

## 2015 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F13000001175

**Entity Name:** SOLUTIONS H2 CORP.

**FILED**
**Jan 08, 2015**
**Secretary of State**
**CC4651593729**

**Current Principal Place of Business:**

160 BROADWAY, 15TH FL
NEW YORK, NY  10038

**Current Mailing Address:**

160 BROADWAY, 15TH FL
NEW YORK, NY  10038

**FEI Number: 46-2214384**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL  33324  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
Electronic Signature of Registered Agent                                      Date

**Officer/Director Detail :**

| | |
|---|---|
| Title | PRESIDENT, DIRECTOR |
| Name | CASSERA, ROBERT |
| Address | 160 BROADWAY, 15TH FL |
| City-State-Zip: | NEW YORK NY  10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                          PRESIDENT                      01/08/2015
_____
Electronic Signature of Signing Officer/Director Detail                            Date

Exhibit 4-033

Exhibit 4-034

## 2015 FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F95000004020

**Entity Name:** TRI-STATE EMPLOYMENT SERVICE INC.

**Current Principal Place of Business:**

160 BROADWAY
15TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038 US

**FEI Number: 13-3703106**

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

**FILED**
**Jan 27, 2015**
**Secretary of State**
**CC9259421762**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____

Electronic Signature of Registered Agent                                          Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | PRES | | Title | VP |
| Name | CASSERA, ROBERT | | Name | MESSINA, JOHN P |
| Address | 160 BROADWAY, 15TH FLOOR | | Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

| | |
|---|---|
| Title | SEC |
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 12210 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                    PRESIDENT                    01/27/2015

Electronic Signature of Signing Officer/Director Detail                                          Date

Exhibit 4-035

Exhibit 4-036

# 2011 FOR PROFIT CORPORATION ANNUAL REPORT

**DOCUMENT# P08000001359**

**FILED**
**Feb 10, 2011**
**Secretary of State**

**Entity Name:** TS STAFFING CORP.

**Current Principal Place of Business:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038

**New Mailing Address:**

**FEI Number:** 26-1689291      FEI Number Applied For ( )      FEI Number Not Applicable ( )      Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
2731 EXECUTIVE PARK DR  STE 4
WESTON, FL  33331      US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:

_____
Electronic Signature of Registered Agent                                    Date

**OFFICERS AND DIRECTORS:**

| | |
|---|---|
| Title: | P |
| Name: | CASSERA, ROBERT |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY 10038 |

| | |
|---|---|
| Title: | VP |
| Name: | MESSINA, JOHN P |
| Address: | 160 BROADWAY, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY 10038 |

| | |
|---|---|
| Title: | S |
| Name: | TRIPPIEDI, YOLANDA |
| Address: | 160 BROAD, 15TH FLOOR |
| City-St-Zip: | NEW YORK, NY 10038 |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:   ROBERT CASSERA                                    PRES              02/10/2011
_____
Electronic Signature of Signing Officer or Director                                    Date

Exhibit 4-037

Exhibit 4-038

# 2012 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Feb 09, 2012**
**Secretary of State**

## DOCUMENT# P08000026800

**Entity Name:** TRI-STATE PERSONET CORP.

**Current Principal Place of Business:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038

**New Mailing Address:**

**FEI Number:** 26-2171352    FEI Number Applied For ( )    FEI Number Not Applicable ( )    Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
515 E. PARK AVENUE
TALLAHASSEE, FL 32301    US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:

_____

Electronic Signature of Registered Agent                                                    Date

## OFFICERS AND DIRECTORS:

Title:        P
Name:        CASSERA, ROBERT
Address:     160 BROADWAY, 15TH FL
City-St-Zip: NEW YORK, NY 10038

Title:        VP
Name:        MESSINA, JOHN P
Address:     160 BROADWAY, 15TH FL
City-St-Zip: NEW YORK, NY 10038

Title:        S
Name:        TRIPPIEDI, YOLANDA
Address:     160 BROADWAY, 15TH FL
City-St-Zip: NEW YORK, NY 10038

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:  ROBERT CASSERA                                    PRES            02/09/2012
            Electronic Signature of Signing Officer or Director                        Date

Exhibit 4-039

Exhibit 4-040

# 2009 FOR PROFIT CORPORATION ANNUAL REPORT

## DOCUMENT# P08000107559

**Entity Name:** TRI-DIAMOND STAFFING INC.

**FILED**
**May 12, 2009**
**Secretary of State**

**Current Principal Place of Business:**

160 BROADWAY 15TH FLOOR
NEW YORK, NY 10038

**New Principal Place of Business:**

**Current Mailing Address:**

160 BROADWAY 15TH FLOOR
NEW YORK, NY 10038

**New Mailing Address:**

FEI Number: 26-3853428    FEI Number Applied For ( )    FEI Number Not Applicable ( )    Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

TRI-STATE EMPLOYMENT SERVICES INC.
150 SE 2ND AVE SUITE 801
MIAMI, FL 33131   US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                        Date

In accordance with s. 607.193(2)(b), F.S., the corporation did not receive the prior notice.
Election Campaign Financing Trust Fund Contribution ( ).

**OFFICERS AND DIRECTORS:**

Title:          PD          ( ) Delete
Name:          CASSERA, ROBERT
Address:       160 BROADWAY 15TH FLOOR
City-St-Zip:   NEW YORK, NY 10038

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

Title:                    ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  ROBERT CASSERA                              PD              05/12/2009

Electronic Signature of Signing Officer or Director                              Date

Exhibit 4-041

Exhibit 4-042

12/22/2009  4:52:27 PM  -0000  POWERED BY ORCAFAX                    PAGE 1  OF  4

Division of Corporations                                            Page 1 of 2

# Florida Department of State
## Division of Corporations
## Electronic Filing Cover Sheet

Note: Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.

### (((H09000263238 3)))

H09000263238ABCD

Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.

```
To:
      Division of Corporations
      Fax Number    : (850)617-6381            RECEIVED DEC 2 2 2009

From:
      Account Name   : NUBCO
      Account Number : 104662003600           RECEIVED DEC 2 2 2009
      Phone          : (516)935-3960
      Fax Number     : (516)935-3088
```

**Enter the email address for this business entity to be used for future annual report mailings. Enter only one email address please.**

Email Address:  cpakusco88@aol.com

### FLORIDA PROFIT/NON PROFIT CORPORATION
### A Temporary Staffing Inc.

| | |
|---|---|
| Certificate of Status | 1 |
| Certified Copy | 0 |
| Page Count | 03 |
| Estimated Charge | $78.75 |

SECRETARY OF STATE
TALLAHASSEE, FLORIDA
2009 DEC 22  P 2: 23

FILED

DEC 23 2009
D. A. WHITE
12/22/2009

https://efile.sunbiz.org/scripts/efilcovr.exe

Exhibit 4-043

12/22/2009 4:52:27 PM −0500 POWERED BY ORCAFAX          PAGE 2    OF 4

FILED H09000263236

## ARTICLES OF INCORPORATION

2009 DEC 22  P 2: 23

SECRETARY OF STATE
TALLAHASSEE. FLORIDA

*The undersigned incorporator(s), for the purpose of forming a corporation under the Florida Business Corporation Act, hereby adopt(s) the following Articles of Incorporation.*

### ARTICLE I  NAME

The name of the corporation shall be:

## A Temporary Staffing Inc.

### ARTICLE II  PRINCIPAL OFFICE

The principal place of business and mailing address of this corporation shall be:

## A Temporary Staffing Inc.
160 Broadway, 15th Floor
New York, NY 10038

### ARTICLE III  SHARES

The number of shares of stock that this corporation is authorized to have outstanding at any one time is:

1,900 Shares at No Par Value

### ARTICLE IV  INITIAL REGISTERED AGENT AND STREET ADDRESS

The name and address of the initial registered agent is:

Robert Cassera
3351 E. Oakland Park Boulevard
Fort Lauderdale, FL 33308

*Prepared By:*
Bruce E. Hubbard
77 East John St.
Hicksville, New York 11801
1-516-835-3840

H09000263236

Exhibit 4-044

H09000263238

## ARTICLES V    INITIAL OFFICER(S)/DIRECTOR(S)

The name(s) and street address(es) and title(s) to these Articles of Incorporation is(are):

Robert Cassera - President/Director
160 Broadway, 15th Floor
New York, NY 10038

## ARTICLES VI    INCORPORATOR(S)

The name(s) and street address(es) of the incorporator(s) to these Articles of Incorporation is(are):

Robert Cassera
160 Broadway, 15th Floor
New York, NY 10038

The undersigned incorporator(s) has(have) executed these Articles of Incorporation this

____21st____ day of __December__    2009

Robert Cassera - Signature

H09000263238

Exhibit 4-045

PAGE 4    OF 4

H09000263238

## CERTIFICATE OF DESIGNATION OF
## REGISTERED AGENT/REGISTERED OFFICE

PURSUANT TO THE PROVISIONS OF SECTION 607.0501, FLORIDA STATUTES, THE
UNDERSIGNED CORPORATION, ORGANIZED UNDER THE LAWS OF THE STATE OF
FLORIDA, SUBMITS THE FOLLOWING STATEMENT IN THE DESIGNATING THE
REGISTERED OFFICE/AGENT, IN THE STATE OF FLORIDA.

1. The name of the corporation is: **A Temporary Staffing Inc.**

2. The name and address of the registered agent and office is:

Robert Cassera

Name

3351 E. Oakland Park Boulevard

(P.O. Box or Mail Drop Box NOT Acceptable)

Fort Lauderdale, FL 33308

(City / State / Zip)

*Having been named as registered agent and to accept service of process for the above stated
corporation at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity. I further agree to comply with the provisions of all the statutes
relating to the proper and complete performance of my duties, and am familiar with and accept the
obligations of my position as registered agent.*

Robert Cassera
SIGNATURE

December 21, 2009

(Date)

FILED
2009 DEC 22 P 2: 29
SECRETARY OF STATE
TALLAHASSEE. FLORIDA

H09000263238

Exhibit 4-046

## 2015 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P95000000237

**Entity Name:** STS GROUP, INC.

**Current Principal Place of Business:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY, 15TH FLOOR
NEW YORK, NY 10038

**FEI Number: 65-0557834**

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

**FILED**
**Jan 27, 2015**
**Secretary of State**
**CC0086995956**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
Electronic Signature of Registered Agent                                          Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | PRES | | Title | VP |
| Name | CASSERA, ROBERT | | Name | MESSINA, JOHN P |
| Address | 160 BROADWAY 15TH FLOOR | | Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

| | |
|---|---|
| Title | SEC |
| Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY, 15TH FLOOR |
| City-State-Zip: | NEW YORK NY 10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                           PRESIDENT              01/27/2015
_____
Electronic Signature of Signing Officer/Director Detail                            Date

Exhibit 4-047

EXHIBIT 5

## 2015 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P10000064493

**Entity Name:** TS EMPLOYMENT, INC.

**FILED**
**Jan 09, 2015**
**Secretary of State**
**CC0635588764**

**Current Principal Place of Business:**

160 BROADWAY 15TH FLOOR
NEW YORK, NY 10038

**Current Mailing Address:**

160 BROADWAY 15TH FLOOR
NEW YORK, NY 10038

**FEI Number:** 27-3009930

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

NRAI SERVICES, INC.
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
Electronic Signature of Registered Agent                                               Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | PRESIDENT, DIRECTOR | | Title | S. SECRETARY |
| Name | CASSERA, ROBERT | | Name | TRIPPIEDI, YOLANDA |
| Address | 160 BROADWAY 15TH FLOOR | | Address | 160 BROADWAY, 15TH FL |
| City-State-Zip: | NEW YORK NY 10038 | | City-State-Zip: | NEW YORK NY 10038 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT CASSERA                          PRESIDENT                          01/09/2015
_____
Electronic Signature of Signing Officer/Director Detail                                               Date